

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY
BRANCH 05

---

STATE OF WISCONSIN,

             Plaintiff,     JURY TRIAL

    -vs-             Case No. 04CF000609

DANNY L. WILBER,

             Defendant.

COPY

---

CHARGE:  First Degree Intentional Homicide While
Armed with a Dangerous Weapon

---

February 17, 2005
Milwaukee, Wisconsin
Safety Building-Room 316


BEFORE:

      THE HONORABLE MARY M. KUHNMUENCH
      CIRCUIT JUDGE


APPEARANCES:

JAMES GRIFFIN, Assistant District Attorney,
    Appeared on behalf of the State of Wisconsin.

MICHAEL CHERNIN, Attorney-at-Law,
    Appeared on behalf of the defendant.

    Defendant appeared in person.


Lori J. Cunico
Official Court Reporter

# I N D E X

WITNESS                                                    PAGE

DONALD JENNINGS

Continued Direct Examination by                            4
    Attorney Griffin
Cross Examination by Attorney Chernin                      25
Redirect Examination by Attorney Griffin                   41
Recross Examination by Attorney Chernin                    45


JEFFREY JENTZEN

Direct Examination by Attorney Griffin                     49
Cross Examination by Attorney Chernin                      68

MARK SIMONSON

Direct Examination by Attorney Griffin                     82
Cross Examination by Attorney Chernin                      98

EXHIBITS                                         ID'd     REC'd

38 - Diagram                                      14        23
39 - Diagram                                      19
32 - Autopsy Protocol                             53
23 - Lead Fragments                               63
 2 - Bullet Jacket                                84
 3 - Lead Fragments                               95
 4 - Lead Fragments                               95
 5 - Lead Fragments                               95

2

1
2         THE COURT:  State of Wisconsin v.
3  Danny Wilber, 04CF000609, first degree
4  intentional homicide while armed with a
5  dangerous weapon.  Appearances please.
6         ATTORNEY GRIFFIN:  Assistant DA
7  Jim Griffin for the State along with Detective
8  Tom Casper with the Milwaukee Police
9  Department.
10        ATTORNEY CHERNIN:  And Michael
11  Chernin appearing on behalf of Danny Wilber,
12  who appears in person.
13        THE COURT:  Good morning.
14  Mr. Jennings, I'm going to remind you that you
15  remain under oath.  When the jury comes in you
16  must stand with the rest of the people in the
17  court.  Bring the jury in.
18        (Jury in box.)
19        THE COURT:  Please be seated.
20  Welcome back, ladies and gentlemen.  I
21  probably lost all credibility with you since
22  we're now an hour and five minutes after, but
23  I'm still the judge.  All right.  We are going
24  to continue -- you may be seated
25  Mr. Jennings -- with the direct examination of

3

```
 1          this witness.  Mr. Griffin.

 2                          CONTINUED DIRECT EXAMINATION OF

 3          DONALD JENNINGS:

 4   BY ATTORNEY GRIFFIN:

 5   Q.    Mr. Jennings, on March 14th, I don't know if

 6          you remember the specific day, but the day

 7          that the police talked to you about all of

 8          this, you remember being downtown here with

 9          the police?

10   A.    Yes, I do.

11   Q.    How was it that you came to be in the police

12          station talking to them over there at the

13          Detective Bureau?

14   A.    'Cuz --

15                          ATTORNEY CHERNIN:  I'm going to

16          object.

17                          THE COURT:  Basis?  Side bar with

18          the lawyers.

19                          ATTORNEY CHERNIN:  Yeah.

20                          (Side bar.)

21                          THE COURT:  Back on the record.

22          You may ask the question.

23   BY ATTORNEY GRIFFIN:

24   Q.    How was it that you came down to the police

25          station on -- when they talked to you about
```

4

```
 1      this?

 2  A.  'Cuz I was -- I was at a -- a weekend

 3      nightclub, and when I was walking through the

 4      hallways I guess, one of the officers had my

 5      picture in his wallet, I guess, he searching

 6      around like -- like I did it.

 7  Q.  Did you know that your cousin Danny Wilber had

 8      been arrested on February 20th?

 9  A.  Yeah, to my knowledge.

10  Q.  Right?

11  A.  Correct.

12  Q.  And you knew even before that, after Antonia

13      West had been talked to by the police and

14      that, that the police thought Danny Wilber was

15      the guy that shot and killed Mr. Diaz there in

16      that after hours; right?

17              ATTORNEY CHERNIN:  Objection.

18      Leading, and 906.02, lack of personal

19      knowledge.

20              THE COURT:  Sustained.

21      Rephrase.

22  BY ATTORNEY GRIFFIN:

23  Q.  When did you find out that the police thought

24      Danny Wilber killed Mr. Diaz?

25  A.  I didn't find out till he was in custody.
```

5

```
 1   Q.   On the 20th?

 2   A.   Yes.

 3   Q.   Did you talk to Antonia West any time

 4        between -- that you can recall between the

 5        time of the shooting and the time Mr. Wilber

 6        was arrested?

 7   A.   Yeah, I talked to her, but it was -- it wasn't

 8        specific about who did it or who didn't do

 9        it.  It was, did you see that, did you

10        understand that, that's what was the whole

11        question, about the whole situation was.

12   Q.   Did she tell you that she'd been questioned by

13        the police about this?

14                  ATTORNEY CHERNIN:  Objection.

15   A.   Yes, she did.

16                  ATTORNEY CHERNIN:  Hearsay.

17                  THE COURT:  Overruled.  I'll

18        allow it.

19   A.   Yes, she did.

20                  THE COURT:  It's not asking what

21        the conversation was about, just what was

22        asked.  I'll allow the question.

23                  What is your response?

24                  THE WITNESS:  Yes, she did.

25                  THE COURT:  You may continue.
```

6

1    BY ATTORNEY GRIFFIN:

2    Q.   And did she tell you that the police kept

3         telling her that they wanted her to say Danny

4         did it, Danny did it?

5                        ATTORNEY CHERNIN:  Objection.

6         Hearsay.

7                        THE COURT:  Overruled.  I'll

8         allow it.

9    A.   No, she didn't at first.

10   BY ATTORNEY GRIFFIN:

11   Q.   At first?

12   A.   Correct.

13   Q.   When did you find out that the police were

14        telling her something like that?

15   A.   She --

16                       ATTORNEY CHERNIN:  Objection.

17        This calls for hearsay again.

18   A.   She said police --

19                       THE COURT:  One moment.  I'll

20        note your running objection.  You may

21        continue.

22   A.   Well, she -- she brung it to my attention but

23        she didn't tell me what was going on, how it

24        was going to happen.  She just told me that

25        they was trying to badger the witness to get

7

```
 1      her to try to testify against her own brother.
 2  BY ATTORNEY GRIFFIN:
 3  Q.  So it was before Mr. Wilber was arrested that
 4      in your mind you knew that the police, because
 5      they're the police, had decided that they were
 6      looking at Danny as the guy?
 7  A.  Yes.
 8  Q.  And was it that the point, sir, that you
 9      called the police and told them, you got the
10      wrong guy?  You guys are look at Danny Wilber,
11      I was there, I saw as soon as that shot went
12      off his hands went up in the air, he had no
13      gun?
14  A.  Correct.
15  Q.  You went right to the police station?
16  A.  When they arrested me I -- I -- I stated
17      that --
18  Q.  No, no --
19  A.  -- the whole time.
20  Q.  -- the day before they arrested you or the day
21      before that or the day before that or the day
22      before that?
23  A.  I didn't even see no one.
24  Q.  You didn't even see no one?
25  A.  No, I didn't, but Antonia, 'cuz that's my
```

8

```
 1     family.

 2  Q. Well, did you tell the police, sir, at one

 3     point when you talked to them, you were going

 4     to do what you can to protect your family and

 5     defend your cousin?

 6  A. Correct.

 7  Q. So what were you waiting for?

 8  A. What you mean, what I was waiting for?

 9  Q. When Mr. Wilber got arrested on the 20th did

10     you call the police or go to the police

11     station and say, you have the wrong man?

12              ATTORNEY CHERNIN:  Objection.  It

13     assumes a fact not in evidence.

14              THE COURT:  Overruled.  I'll

15     allow it.

16  A. Ask that again.

17  BY ATTORNEY GRIFFIN:

18  Q. When they -- the police arrested your cousin

19     Danny did you go to the police or call the

20     police and say, you've got the wrong man, I

21     saw him, I saw his hands go up in the air

22     immediately after the shot?

23  A. No, I didn't.

24  Q. How about the day after that?

25  A. No, I didn't.
```

9

```
1    Q.   The day after that?

2    A.   'Cuz I had a warrant for my arrest at the time

3         for driving, and I didn't want to be sitting

4         in no jail cell just to testify.  And I

5         didn't -- I didn't want to do that.

6    Q.   So when were you planning on protecting your

7         family and defending your cousin with that

8         outstanding warrant?  A little bit later,

9         maybe in the summertime you'd turn yourself in

10        or what?

11   A.   Well, I waited, I waited at home, or whenever

12        they caught me that's when they caught me.

13   Q.   They didn't catch you at home?

14   A.   No, they caught me at the club.

15   Q.   So my question is, sir, do you know, according

16        to you, your cousin is wrongly accused of

17        this, you were there when that shot went off

18        and you looked, his hands immediately went up

19        in the air, who better than you to tell the

20        world that Danny Wilber didn't shoot and kill

21        that guy than you?  Who better?

22   A.   'Cuz I heard what was going on and at the

23        time, after the shot, it was a reaction of you

24        gonna -- you gonna automatically look towards

25        wherever the shot came from, and that's when
```

10

```
 1      you looked and you see the man just fall, and
 2      everybody just run out the house.
 3   Q. When were you going to tell the police all
 4      that, that your cousin Danny didn't kill --
 5   A. I was scared and I was petrified and I didn't
 6      want nobody to get blamed for nothing, so I
 7      just kept my mouth shut till they caught me.
 8      And that's when I gave them my statement, what
 9      you got in front of you.
10   Q. Right.  But for 24 days at least you know that
11      Mr. Wilber's been arrested for this?
12   A. Correct.
13   Q. So why didn't you go clear it up with the
14      police?  Driving warrant versus homicide, and
15      you thought your driving warrant was more
16      important?  You're tight with your cousin?
17   A. Of course.  I know he didn't do it, so it
18      wasn't even no -- no -- I ain't never have to
19      prove it, I was going to wait till court.
20   Q. You were going to wait till court?
21   A. I was going to wait till the court.  Now I'm
22      here.
23   Q. And then turn yourself in on the warrant?
24   A. No, they caught me, I said I was going to wait
25      till they catch me, and they caught me at the
```

11

```
 1        nightclub and now I'm here.

 2   Q.   So let me get this straight.  If, for example,

 3        on March 1st of last year, God forbid you'd

 4        been in an auto accident and died, your story

 5        about Danny Wilber being innocent, about Danny

 6        Wilber throwing his hands up, about no way

 7        Danny Wilber could have shot that guy, that

 8        would have gone to you with your grave and no

 9        one would have known?

10   A.   Not correct.

11   Q.   Who would have known?

12   A.   The court.

13   Q.   How?

14   A.   'Cuz I -- they arrested me to testify.

15   Q.   No, I'm saying if a week before they arrested

16        you.

17   A.   A week before I was trying to stay away so I

18        ain't gotta testify, 'cuz I didn't want to be

19        standing up here on that stand and testify --

20   Q.   Why?

21   A.   -- which I'm doing now.

22   Q.   Why wouldn't you want to do that?

23   A.   Because I'm okay with it now, because it's

24        coming out more clear to me that I know he

25        didn't do it.
```

12

1   Q.   It's coming more clear right now?

2   A.   Yes, it is.

3   Q.   And what about on March 1st, two weeks before

4        the police arrested you, last year March 1st,

5        do you remember that time before the police

6        arrested you after the killing, before the

7        police arrest you, Danny Wilber gets arrested;

8        right?

9   A.   Correct.

10  Q.   Okay.  If God forbid you'd had a heart attack

11       and died the day after he was arrested, how

12       would the world have known that you saw him

13       throw his hands up and that he had no gun and

14       all of those things?  How would anyone have

15       known?

16  A.   Because I wasn't the only witness in the

17       kitchen.

18  Q.   Right.  Your cousin Antonia was there; right?

19  A.   Like the sixth witness that was in the

20       kitchen.

21  Q.   What about Antonia, is she one of them?

22  A.   Yeah, she's a witness.

23  Q.   The one who you told to shut the fuck up when

24       she was talking about what she'd seen?

25  A.   Correct.

13

```
 1    Q.   I'm going to show you what's been marked as
 2         Exhibit 38.  Do you recognize that?
 3    A.   Somewhat.  It's kind of big though, but --
 4    Q.   It's kind of big?
 5    A.   Yeah, the way it spreaded out.
 6    Q.   Pick it up and look at it.
 7    A.   I'm looking at it.
 8    Q.   It's a diagram, not to scale, but kind of a
 9         loose sketch of that place where the shooting
10         took place; right?
11    A.   Correct.
12    Q.   And there's initials on there, like AW for
13         Antonia West, and DW for Danny Wilber, and an
14         X for unknown Hispanic male, what is all that?
15    A.   Them was all the witnesses that was in the
16         kitchen.
17    Q.   Is this you telling the police where everyone
18         was, as best you recalled?
19    A.   When they arrested me they already had this
20         sketch.
21    Q.   Right, but I'm talking about where the
22         initials are put in, like right by the sink,
23         do you see where it says sink here, just to
24         the left of that there's the initials DJ?
25    A.   Correct.
```

14

```
 1   Q.   Is that where you were?

 2   A.   Yes, I was.

 3   Q.   And then just next to that is -- a little bit

 4        up to the left are the initials RT.  That's

 5        for Richard Torres; correct?

 6   A.   Correct.

 7   Q.   And then right by the corner of the table here

 8        are the initials ON for Oscar Niles; right?

 9   A.   That wasn't his spot though, but that's

10        correct, the initials.

11   Q.   And then over to the right here are AW and DW

12        in black?

13   A.   Correct.

14   Q.   Now, I want to go right over by where it says

15        side porch over here; right?  See this area

16        here?

17   A.   Yep.

18   Q.   Now, there's three sets of initials there, but

19        two of them are in red; correct?

20   A.   Yep.

21   Q.   Which two are in red?

22   A.   DW and DD.

23   Q.   DW and DD is; that right?

24   A.   Correct.

25   Q.   And that stands -- the DW stands for Danny
```

15

```
 1         Wilber the defendant, and DD stands for David
 2         Diaz, the guy that got shot; correct?
 3    A.   Nope.
 4    Q.   What does it stand for?
 5    A.   I know what it stands for, I'm just saying the
 6         penmanship where the spots are, that's
 7         incorrect.
 8    Q.   I want to talk about what you were telling the
 9         police when you talked to them.  You see here
10         where it says DD in red, David Diaz after
11         shooting, and you have the DD right there?
12    A.   Yep.
13    Q.   Okay.  And right above that is DW, also in
14         red, which you marked as Danny Wilber during
15         shooting; correct?  That's what you were
16         telling the police?
17    A.   Let me get this correct.
18    Q.   Sure.
19    A.   These are all in the wrong spot.  First of
20         all, these are all in the wrong spot.  He
21         wasn't standing right there, he was standing
22         in front of Antonia, which is not over here by
23         the door yet until he grabbed and try to grab
24         and he hit his hand, that's when all the
25         conversation started.  That's when everybody
```

16

```
 1        rushed into the kitchen.

 2   Q.   Let me ask you this.  What -- when you were

 3        with the police, what were you telling them

 4        that had them put these initials DW and DD

 5        right next to each other there in red?

 6                  ATTORNEY CHERNIN:  Well --

 7   A.   I don't understand that --

 8                  ATTORNEY CHERNIN:   -- on the

 9        basis.

10   A.   -- 'cuz they weren't red.

11                  THE COURT:  One moment.

12                  ATTORNEY CHERNIN:  Objection on

13        the basis foundation.  How would he know

14        what's in the police's mind?

15                  THE COURT:  That's not what is

16        being asked.  I'm going to overrule the

17        objection.  Reask the question.  And,

18        Mr. Jennings, I'm going to direct you to

19        respond to the question that's put to you.

20                  Mr. Griffin, you may ask the

21        question again.

22   BY ATTORNEY GRIFFIN:

23   Q.   What does this mean?  Why is the DW here in

24        black and the DW over here in red?

25   A.   I don't know.
```

17

```
 1   Q.   You don't know?  You don't remember?

 2   A.   I remember, but I don't know why you got black

 3        DW over here, then you've got a red DW over

 4        here.

 5   Q.   Did this diagram --

 6   A.   Why it ain't got no red DJ right there.

 7   Q.   This particular diagram was done with you and

 8        the two detectives, Detective Corbett and

 9        Detective Caballero, on March 14th of 2004;

10        correct?

11   A.   Everything that's in black was what I was

12        shown in the detective room, all this new red

13        stuff just appeared.

14   Q.   Oh, the new red stuff got added in later?

15   A.   No, it just got it, yes, it did.  On my paper

16        it ain't got no red dots.

17   Q.   Like this one that's a photo that doesn't

18        color anything?

19   A.   It's black.  That's what I'm saying.  I'm

20        trying to correct you that it wasn't red until

21        now that I'm on the stand.  It was black,

22        that's what I'm telling you.

23   Q.   Okay.  So in other words, the copy that you

24        saw was all black?

25   A.   Yeah.  And you asked me what was the red and
```

18

```
1         the red DW and the red DD.  I don't know.
2                         ATTORNEY GRIFFIN:  Let me mark
3         this one, sir.
4                         (Exhibit Number 39 was marked for
5         identification.)
6     BY ATTORNEY GRIFFIN:
7     Q.  This is Exhibit 39, is it, except for the
8         coloring?
9     A.  Okay.  You should have said that the first
10        time.
11                        THE COURT:  Mr. Jennings, stop.
12                        THE WITNESS:  I'm just trying --
13                        THE COURT:  Answer the question
14        that's being put to you, sir.
15    BY ATTORNEY GRIFFIN:
16    Q.  Except for the coloring, are they the same?
17    A.  Yeah, they're the same.
18    Q.  When you were with the police on March 14th
19        did they use a red pen to distinguish when you
20        were saying where Danny was before and where
21        he was during the shooting?
22    A.  No, they didn't.
23    Q.  Is it your testimony to this jury that this
24        red ink on this page, Exhibit 38, with the
25        initials DW in red and DD in red, that DW is
```

19

1       Danny Wilber during shooting and the DD is
2       David Diaz after shooting, were added after
3       you were done with the police, that they just
4       added that in on their own?  That's what must
5       have happened?
6   A.  No, you just throwing me off with the redness,
7       that's all.  You asked me the same question in
8       a different way, I'm trying to explain it
9       then.  I got them telling me to tell the
10      truth.  I'm telling the truth and you're
11      trying to twist me.  I don't understand what
12      you're trying to get at.
13  Q.  Let's back up.  March 14th of 2004 you're in
14      the room with the police; correct?  The two
15      detectives?
16  A.  Yeah, I told you correct.
17  Q.  Okay.  The detectives at some point pull out a
18      diagram like this, which is Exhibit 38, but it
19      doesn't have any of these initials on it;
20      right?
21  A.  They didn't put this one out on me, they had
22      that one out on me because it was already in
23      my file when they had my name ready to write.
24  Q.  They had this one?
25  A.  Yeah, they had copies of everybody's

20

1      statements and stuff and they were just

2      showing me everybody's statements.

3  Q.  My question is, did you tell them that you

4      were right there and so they wrote in DJ to

5      tell -- to indicate that that's what you were

6      saying about where you were?

7  A.  Well, before I got arrested, so everybody can

8      understand this --

9               THE COURT:  Mr. Jennings, answer

10     the question.

11             THE WITNESS:  I am.

12             THE COURT:  No, no, no.

13    Mr. Jennings, stop.

14             Mr. Griffin, ask the question

15    again.

16  BY ATTORNEY GRIFFIN:

17  Q.  Did the police write the initials DJ in there

18      because that's where you were telling them you

19      were standing when all of this happened?

20  A.  Correct.

21  Q.  Did you -- did the police write in these

22      initials DW, and I'm pointing to the ones that

23      are on this page in black because that's where

24      you said Danny Wilber was standing?

25  A.  Yes.

```
 1   Q.   Did they then write at some point in the
 2        interview while you were there and with your
 3        knowledge and indication, this red DW to show
 4        where Danny Wilber was during the shooting?
 5   A.   Like I said again, it wasn't red, it was like
 6        that already before I got in to -- to get
 7        investigated for what happened, it was already
 8        sketched out, marked, everybody was already in
 9        their spots already.
10   Q.   So all of --
11   A.   I just had agreed to where I was standing at
12        and was Danny standing there, and that's how
13        the whole situation was.
14   Q.   So it's your testimony to this jury that when
15        the police first showed you Exhibit 38, the
16        initials DW and AW, for example, right here
17        next to each other already on the paper?
18   A.   All these was already on the paper.  Somebody
19        already was grabbed already, so wherever how
20        they sketched everybody to be where they was
21        supposed to been at, that's -- they already
22        had this before I even got arrested and got
23        subpoenaed for this.
24   Q.   So --
25   A.   All this was sketched out already.
```

22

```
 1   Q.   I want to make clear that you're telling the
 2        jury that all of the initials, ON, RT, DJ, AW,
 3        DW and JD, along with the red DW and DD, when
 4        you saw them they were in black, were already
 5        on that page when the police first showed you
 6        that sketch?
 7   A.   Correct.
 8                     ATTORNEY GRIFFIN:  I'm going to
 9        move Exhibit 38 into evidence and Exhibit --
10        well, just 38 for now and ask that it be
11        published.
12                     THE COURT:  Any objection?
13                     ATTORNEY CHERNIN:  To Exhibit --
14        no.
15                     THE COURT:  Court will receive
16        Exhibit 38 into the record, and it will be
17        published to the jury.
18                     (Exhibit Number 38 was received
19        into evidence and published to the jury.)
20                     THE COURT:  It has been
21        published to the jury.  You may continue.
22   BY ATTORNEY GRIFFIN:
23   Q.   Now that the jury has seen this, Mr. Jennings
24        I'm going to ask, for example, this part where
25        it says 'others' with arrows pointing towards
```

23

```
 1        the victim and where those -- where those
 2        initials are in red, was that also just on the
 3        page when they showed it to you or did you
 4        tell them that?
 5    A.  It was already on the page when they showed
 6        me, and then I had to verify was I standing
 7        right here, 'cuz another witness, which the
 8        detective explained to me all these was marked
 9        already before you got here, I just want to
10        verify it was you standing in this spot right
11        here.  And that's the question I was asked of
12        me the whole time we was in there.  And then
13        they started asking, where was he laying, and
14        all the other stuff they was asking.
15    Q.  Was the word 'others' with those two arrows
16        already on the page the first time the
17        detectives showed it to you, yes or no?
18    A.  Yes.
19    Q.  And in fact that area of the living room where
20        it says 'others,' you couldn't have seen that;
21        right?
22    A.  Couldn't have seen what?  Can you ask that
23        again?
24    Q.  Well, the area of the living room sort of down
25        in here where the word 'others' is, back sort
```

24

1    of toward the living room, you couldn't have

2    seen that because your view was blocked off by

3    those cabinets; correct?

4  A.  Correct.

5  Q.  And in fact, you were looking to your left

6    sort of toward Oscar, not to your right where

7    the shooting happened?

8  A.  Correct.

9  Q.  Okay.  Do you know which witness it was that

10    had given the police all of that information

11    so that they could put all those initials on

12    that page?  Did they tell you it was Antonia?

13  A.  Well, at the time they told me everybody that

14    was there already gave a statement already

15    before I gave a statement.  That's why I

16    stayed away.  I didn't want to turn myself in

17    or get any stories, because I wanted to wait

18    till the police caught me, so then I can tell

19    them the real true story.

20                    ATTORNEY GRIFFIN:   Nothing

21    further.

22                    THE COURT:  Cross.

23                    ATTORNEY CHERNIN:   Thank you.

24                    CROSS EXAMINATION:

25  BY ATTORNEY CHERNIN:

25

```
 1   Q.   Mr. Jennings, do you still have Exhibit 38 in
 2        front of you?
 3   A.   No, I don't.
 4   Q.   With the red diagram.  With the red drawing.
 5        Isn't it true that you told the police that at
 6        the time of the shooting that Danny was
 7        engaged in a fight or in an entanglement with
 8        Jeranek Diaz, who you might know as Rock?
 9   A.   Correct.
10   Q.   And on Exhibit 38, doesn't it show that the
11        proximity of Danny during the shooting was
12        that he was engaged with the initials JD, who
13        is Jeranek -- you know to be Jeranek Diaz was
14        Rock; correct?
15   A.   Correct.
16   Q.   So at the time of the shooting, according to
17        what you were trying to portray, Danny was in
18        front of David Diaz; is that correct?
19   A.   Correct.
20   Q.   And he was engaged in a -- I think you used
21        the term tussle?
22   A.   Tussle.
23   Q.   With Jeranek Diaz; isn't that correct?
24   A.   Yes.
25   Q.   And the diagram, Exhibit 38, does it include
```

26

```
 1        -- it says 'side porch.'  Do you see where it
 2        says 'side porch?'
 3   A.   Correct.
 4   Q.   Did that refer to the door -- sorry -- that
 5        you see on Exhibit 14 where the diagram --
 6        where the -- the diagram that's not drawn to
 7        scale, shows the side porch, does that refer
 8        to that door?
 9   A.   No, it don't.
10   Q.   The side porch is outside?
11   A.   Yes, it is.
12   Q.   Is that the door leading to the side porch?
13   A.   I think so.
14   Q.   Okay.  Now, so that when you see the
15        perspective of Exhibit 14, on Exhibit 14 at
16        the time of the shooting, can you point to
17        where Rock and Danny Wilber were standing?
18   A.   They were standing right here, like diagonal
19        on angles.
20                 ATTORNEY GRIFFIN:  Hang on one
21        second, Mr. Chernin.  Have him point to that
22        again.
23                 ATTORNEY CHERNIN:  Yes.
24   A.   It was diagonal right here from the corner of
25        the table and Diaz was right here.
```

27

```
 1   BY ATTORNEY CHERNIN:

 2   Q.   Which Diaz?  Let's be clear.

 3   A.   Okay.  Rock.

 4   Q.   Rock was near that door?

 5   A.   Yes, he was.

 6   Q.   And Danny was facing him?

 7   A.   Yes, he was.

 8   Q.   So his back was to you?

 9   A.   Like his -- like he was on an angle, but I

10        could see half of the front of him and like

11        the back of him.

12   Q.   And from where you were standing, again,

13        let's -- I think you pointed to the outer edge

14        of the diagram?

15                   THE COURT:  Mr. Chernin, why

16        don't you have him hold the picture.

17                   ATTORNEY CHERNIN:  I'm sorry.

18   BY ATTORNEY CHERNIN:

19   Q.   When Mr. Griffin asked you where you were

20        standing, you had pointed to the outer edge of

21        that photograph?  I'm sorry, Mr. Griffin.

22                   When you pointed to the -- you

23        pointed to the edge of that diagram, correct,

24        or that photograph, where -- as to where you

25        were standing?  Where is the kitchen sink?
```

28

```
 1   A.   I was standing right here next to the kitchen
 2        sink leaning.
 3   Q.   Okay.  And you were able to see to your right,
 4        and to your right and to what would be the
 5        north of the -- of the cabinet is where you
 6        saw your cousin Danny and Rock engaged in what
 7        you call the tussle; correct?
 8   A.   Correct.
 9   Q.   Now, on the diagram, Exhibit 38, you'll see
10        that there is a -- a legend written to the
11        right; is that correct?  To the right on the
12        diagram.  Exhibit 38 -- you can put Exhibit 14
13        down, I'll take that.  On the right side of
14        the piece of paper there's a bunch of names
15        written; right?
16   A.   Correct.
17   Q.   And those names are ON; correct?
18   A.   Say that again.
19   Q.   The top one says ON for Oscar Niles?
20   A.   Correct.
21   Q.   And then RT, Richard Torres; correct?
22   A.   Correct.
23   Q.   And DJ, Donald Jennings; correct?
24   A.   Correct.
25   Q.   And AW, Antonia West; correct?
```

29

1    A.    Correct.

2    Q.    And DW, Danny Wilber; correct?

3    A.    Correct.

4    Q.    And JD, Jeranek Diaz; correct?

5    A.    Correct.

6    Q.    And then there's an X for, and it says unknown

7          Hispanic male?

8    A.    Correct.

9    Q.    Did you tell them that there was an unknown

10         Hispanic male standing there or was that

11         something -- how -- where did that come from?

12   A.    Well, before I was arrested this sketch was

13         already mastered out, and they already had the

14         place of everybody placed already, all I had

15         to do was verify that there was a Mexican man

16         sitting at the table.

17   Q.    And did you tell them that, that there was --

18   A.    Yes, I did.  They asked me did I know his

19         name.  I didn't know his name, I never even

20         seen him before.

21   Q.    Okay.  And so when you -- at the time that

22         Danny was engaged in the tussle with Rock, did

23         you see David Diaz at that point in time or

24         were you -- what were you -- did you see David

25         Diaz to your right?

30

```
1   A.    Yeah, I know I just -- I heard him.  I know --
2         I know they was over there arguing, so I
3         glanced at Niles and I said, like, man, then
4         pow, and I looked and everybody was reacting.
5         Everybody paused.  And that's when everybody
6         vacated out of the kitchen.
7   Q.    Okay.  Now, did David Diaz fall away from or
8         toward where Danny and Rock were fighting?
9   A.    Well, he -- well, the way he fell, they was
10        right here by the door and the table.
11  Q.    Well, let's use -- let's just -- I'm sorry to
12        interrupt you, but maybe it will be helpful if
13        you have Exhibits 14 and 15 with you, and
14        maybe you can show the jury what you're
15        talking about as you're doing it.  That's 14,
16        this is 15, and I'm sorry, I know this is
17        rather awkward, you know, maybe it would be
18        helpful if I asked you to come down off the
19        stand, we'll put that up on the board and
20        maybe you can point on the board and show this
21        to the jury.  But you're going to have to
22        speak up loudly, Mr. Jennings.
23              Now, is it -- looking at Exhibit
24        38, which is that piece of paper, is
25        everything that you're saying now consistent
```

31

1       with that diagram that Danny was in front of

2       David Diaz at the time the shot was fired?

3       Could you answer that question?

4   A.  Yes, he was.

5   Q.  Okay.  Now, using, Exhibits 14 and 15, could

6       you show this jury where Rock -- Jeranek Diaz

7       and Danny were tussling at the time you

8       observed David Diaz?

9                   THE COURT:  Mr. Jennings --

10                  ATTORNEY CHERNIN:  Speak up.

11                  THE COURT:  -- we're going to

12      need you to speak up real loud and clear.

13  BY ATTORNEY CHERNIN:

14  Q.  Donald, we're going to move you a little

15      closer to the reporter, and hopefully -- I'm

16      going to ask you -- can the members of the

17      jury see the diagram -- or the photograph.

18      And you're saying you can show better from,

19      Exhibit 14 where everything was happening?

20  A.  Yeah, 'cuz it shows the sink.

21  Q.  Okay.  Could you use Exhibit 14, the

22      photograph, and tell this jury what you saw?

23  A.  Well, I -- I see Danny Wilber standing in

24      front of Diaz, he's leaning against the door

25      already.

32

```
 1    Q.   Okay.  There's two Diazes though, okay.  Let's
 2         talk about the one that --
 3    A.   Rock.
 4    Q.   -- against the door, call him Rock please.
 5    A.   Rock.  Rock was standing at the door, Danny
 6         was right here, and Antonia West was standing
 7         next to him drinking her beer, which is right
 8         here.  This beer right here is hers.  That was
 9         Niles, he was on this side, and he rolled a
10         blunt, where we broke the blunt down, and I'm
11         sitting right here, Niles is by the pantry,
12         and it's like, I said it's a pantry on this
13         side.  So that's where Niles is placed.
14                   I was placed like towards the
15         'frigerator, like towards the bathroom, where
16         Arterio or whatever his name was, RT, was
17         standing right in front of the bathroom, like
18         he just came out the bathroom.  And then
19         that's when he crossed me and they got to
20         arguing.  I guess he came to try to calm all
21         of them down.  So it was -- it was his house,
22         he kept saying, this is my house, why don't
23         you all calm down.  That's when the tussle
24         began, and then two seconds later, that's when
25         the shot was rang.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 33 of 122   Document 61-22

```
 1   Q.   Let me ask you another question.  At some
 2        point during this tussle when RT goes up, does
 3        Danny pop him in the face a couple times with
 4        a punch?
 5   A.   I don't know.  He just -- he just pointed at
 6        him and that's when the smack came to smack
 7        his hand away, and that's when they got to
 8        tussling, and that's when the shot was fired.
 9   Q.   Okay.  So as far as you're concerned, there's
10        nothing inconsistent between what this diagram
11        represents, Exhibit 38, and what you're
12        showing to the jury now; is that fair to say?
13   A.   Yeah.  It's just spread it, so the placements
14        on the paper is some time incorrect, because
15        that's not where everybody was standing at,
16        they were more squished together, because the
17        kitchen, you can see it's not big like how the
18        paper is.
19   Q.   So the diagram -- or this Exhibit 38 doesn't
20        give a good perspective of these, these
21        pictures are better?
22   A.   Correct.
23   Q.   Now -- you can resume the stand.
24                  Now, you do want to protect
25        Danny; don't you?
```

34

```
1    A.    Yes, I do.

2    Q.    And how is it best that you can protect

3          Danny?  By doing what?

4    A.    Tell 'em the whole truth, nothing but the

5          truth.

6    Q.    Now, this unknown Hispanic male, have you ever

7          been able to identify who that was?

8    A.    I just know he had -- he was a Mexican, he had

9          like a shade over and like -- like a hoody

10         sweater, that's all he had on.  And like the

11         hoody came to like right here, like where it

12         was over half of his -- his -- the back of his

13         head.  And you can barely see any -- he was at

14         the table all drunk with his head down and he

15         ain't talk to nobody.

16   Q.    Okay.  I don't know if Mr. Griffin -- I think

17         he did go through some of these photos with

18         you.  This is Javier Diaz Denoyos, Exhibit

19         19.  Does that man look familiar to you?

20   A.    Yeah, he look familiar, 'cuz I know him.

21   Q.    So if you know him, he wasn't the unknown guy;

22         right?

23   A.    He wasn't the unknown guy.

24   Q.    Was he in the kitchen at the time of the

25         shooting?
```

35

```
 1   A.   No, he -- I don't recognize him being there.
 2   Q.   Tony Valdez, Exhibit Number 18, is that the
 3        unknown Hispanic male or is that somebody you
 4        know?
 5   A.   That's somebody I know.
 6   Q.   Is that your friend?
 7   A.   Associate.
 8   Q.   Okay.  Isaiah Arroyo, Exhibit 20, is he known
 9        to you or is he an unknown Hispanic male?
10   A.   He's an associate too.
11   Q.   So you know him; right?
12   A.   Correct.
13   Q.   And you knew him on -- you knew all this --
14        those three guys that we talked about so far,
15        you knew all of them on January 31st of 2004;
16        correct?
17   A.   Correct.
18   Q.   Now, Jeranek Diaz, Exhibit Number 21, he's not
19        the unknown Hispanic male; is he?
20   A.   No, he isn't.
21   Q.   Did you know him as Rock or is that something
22        that was introduced to you by Mr. Griffin or
23        the police?
24   A.   Rock.
25   Q.   You knew him as Rock?
```

36

```
 1                    THE COURT:  Is that a yes?
 2                    THE WITNESS:  Yes.
 3   BY ATTORNEY CHERNIN:
 4   Q.   And you knew him as Rock on January 31st of
 5        2004; is that correct?
 6   A.   Correct.
 7   Q.   Now Exhibit Number 8, Richard Torres, Vato,
 8        did you know him on January 31st of 2004?
 9   A.   I didn't know him, but he got a familiar face
10        like he'd been around with people that I
11        associate with.  So that puts him in the
12        associate category.
13   Q.   Okay.  So when you say know, you knew who
14        he -- who he was, but you didn't associate
15        with him as friends; right?
16   A.   Correct.
17   Q.   Now, none of those guys are the unknown
18        Hispanic male; are they?
19   A.   No, they're not.
20   Q.   Now, when you met with the police on March
21        14th of 2004, they took down a statement from
22        you; isn't that correct?
23   A.   Correct.
24   Q.   And ultimately you refused to sign that
25        statement because what reason?
```

37

```
 1   A.    'Cuz the last -- the paragraph they got in
 2         there asking me some crazy question, and then
 3         they just put it in their own perspective on
 4         how the case was going.  So they just wrote
 5         that down there to try to -- try to can him,
 6         basically.
 7   Q.    Okay.  And what you were -- is it fair to say
 8         that you were offended by the police
 9         incorporating that paragraph?
10   A.    Correct.
11   Q.    And that paragraph had to do with the last
12         time -- at least what's written is that it's
13         the last time that you saw Danny Wilber with a
14         gun; right?
15   A.    Correct.
16   Q.    And you told him ten years ago; is that
17         correct?
18   A.    Correct.
19   Q.    And you just thought that that whole paragraph
20         is just sort of nonsensical; correct?
21   A.    Very correct.
22   Q.    Now, the police you wanted -- is it fair to
23         say that you wanted to tell the police the
24         truth about what happened?
25   A.    I did tell the truth.
```

38

```
 1   Q.   And the decision to write down the -- your
 2        statement, who made that decision?  Was that
 3        your decision or was that the police?
 4   A.   It's always the police's decision.
 5   Q.   And did they give you an opportunity to put
 6        this statement of yours on audio tape, like
 7        record it?
 8   A.   No, they didn't.
 9   Q.   Did they give you the opportunity to make a
10        video tape of what you wanted to tell them?
11   A.   No, they didn't.
12   Q.   Who chose the words, the specific words that
13        were put on that piece of paper?  Was that
14        their choice or yours?
15   A.   That was their choice.
16   Q.   And is it fair to say that you were -- you
17        yourself were in custody at the time of that
18        interrogation?
19   A.   That was?
20   Q.   On March 14th.
21   A.   They arrest -- they tried to say they arrested
22        me for the warrant, what had me there, but
23        they was chasing me around to try to get me in
24        custody for this.
25   Q.   And they were in control of the situation, not
```

39

1    you?

2    A.    Correct.

3    Q.    Is that correct?

4                  Now, did they ever give you the

5          opportunity to make your own diagram?

6    A.    No, they didn't.

7    Q.    And when the gunshot went off you didn't see

8          Mr. Diaz fall; did you?

9    A.    I just like seen his body just fall, then we

10         just seen blood spreading and we just ran.

11   Q.    And Mr. Diaz was falling from -- first of all,

12         did you see or observe anybody moving

13         Mr. Diaz's body before you left that house?

14   A.    No, I did not.

15   Q.    You're looking at Exhibit Number 15.  Is that

16         the position that you recall Mr. Diaz being in

17         as you ran out of that kitchen?

18   A.    Yes, I did.

19   Q.    And at the time Mr. Diaz's feet were located

20         in this position with his knees roughly

21         parallel to the edge of the counter top; isn't

22         that correct?

23   A.    Correct.

24   Q.    And at any time did you see Danny Wilber

25         either reach behind the counter, or was he

40

1  standing at any time behind the counter with a

2  gun pointed to the head of the young man who

3  died, David Diaz?

4 A. No, I did not see that.

5     ATTORNEY CHERNIN:  I have no

6  additional questions of Mr. Jennings at this

7  time.

8     THE COURT:  Redirect.

9     REDIRECT EXAMINATION:

10 BY ATTORNEY GRIFFIN:

11 Q. Mr. Jennings, just for a minute if you can

12  sort of imagine that this is the counter, and

13  you have -- the sink's right here, you're kind

14  of standing in that kitchen, over to your

15  right is where your cousin and Rock are

16  struggling; right?

17 A. They were like --

18 Q. Right to your right?

19 A. Just a little bit in front of the computer

20  right here where she at.  I'm -- I'm at where

21  you at.

22 Q. Right.  I'm you?

23 A. Yeah.

24 Q. And Oscar Niles is kind of right here?

25 A. No, he's like where Danny is sitting.

41

```
1    Q.   Okay.  Over here?

2    A.   By the pantry.

3    Q.   And Richard Torres walks in front of you

4         heading over towards the struggle; right?

5    A.   Yeah, when the tussle -- yes.

6    Q.   So as you look over here, if you had looked

7         over there, you would have seen Richard

8         Torres's back?

9    A.   Who is Richard Torres?  The RT?

10   Q.   Yeah.

11   A.   He just glanced past me just a second.

12   Q.   He went past you, and he's now part of the

13        struggle, and if you turned and looked you

14        would have seen his back?

15   A.   Danny is six eight and he's standing, and the

16        Mexican dude was nothing but like five

17        eight -- five nine.  And when he did like

18        this, you can just see him, he's standing

19        that's.  Like if I stand up right now, I would

20        be higher than all of you all 'cuz I'm six

21        eight.  And that's what I seen him do.  He

22        paused, and he went like this, and his eyes

23        got big like he was scared himself, so that's

24        how I knew that he was not the shooter.

25   Q.   You done?
```

42

1    A.    Yeah, I'm done.

2    Q.    Okay.  So as you were standing at the sink

3          here and Mr. Torres, RT, walked past you, if

4          you had looked to your right what you would

5          have seen is Mr. Torres's back, yes or no?

6    A.    Incorrect.

7    Q.    What would you have seen?

8    A.    I just -- like I said, the table was more away

9          from me, it was a little -- just that little

10         gap, as long as he walked past me, like he was

11         basically almost like the same angle I'm

12         standing, but he was to the right of me more.

13         So when he walked that way, that's when you

14         heard the shot.  As soon as he walked past me

15         you heard the shot.  Everybody stopped, paused

16         and ran.  And there wasn't nothing else to be

17         added.

18   Q.    So of all the people in that room in the

19         seconds after the shot, who had that natural

20         human reaction after a shooting to go like

21         this?

22   A.    That would be anyone.

23   Q.    No, in that room at that time who did that?

24         Is that what you did, you heard the shot and

25         went like this, throwing your hands up, expose

43

```
 1      your innards?

 2   A.  No, I jumped to see what --

 3   Q.  Kind of like this?

 4   A.  -- what was the loud noise at that time 'cuz

 5       that was just an obvious noise that it's a

 6       party, everybody kicking it, then you hear a

 7       tussle, then five seconds later you hear a

 8       gunshot that was real loud, that echoed the

 9       whole house, and everybody reaction was to

10       just crunch down.

11   Q.  Except for Danny, whose reaction was to throw

12       his hands up in the air; is that right?

13   A.  Well, like I said before, he didn't like just

14       throw his hands up, he like weaved back, like

15       if the bullet came, like it went past him or

16       something, and he went like this, like if

17       somebody was shooting at him or something.

18   Q.  You said the police were chasing you around?

19   A.  I was just being sarcastic at that -- that

20       word.

21   Q.  In other words, you knew for a while the

22       police were looking for you and wanting to

23       talk to you about this case?

24   A.  Yes, I did.

25   Q.  And Mr. I want to tell the truth, I want to
```

44

```
1        get the truth out Donald Jennings, went right
2        to the police and told 'em the truth?
3   A.   Correct.
4                   ATTORNEY GRIFFIN:  Nothing
5        further.
6                   THE COURT:  Recross.
7                   RECROSS EXAMINATION:
8   BY ATTORNEY CHERNIN:
9   Q.   Now, again, Mr. Torres, according to your
10       testimony in direct for Mr. Griffin, you
11       testified was pulling on Danny, the back of
12       Danny's coat; correct?
13  A.   He -- he went to grab his coat, but as he
14       already went to grab him, Danny already went
15       like this, and he was scared, like, oh.
16  Q.   And the two closest people to Mr. Diaz as he
17       was falling forward shot, the people closest
18       and in front of him were Rock and your cousin
19       Danny; correct?
20  A.   Correct.
21  Q.   And this reaction that Mr. Griffin would have
22       -- had you have of putting his arms up, was
23       that a reaction of -- of -- in your
24       observation was that a reaction of backing
25       away on Danny's part or was he being pulled
```

45

```
 1        away at that moment by Torres?  What was
 2        happening?  I mean, what was causing Danny to
 3        go backwards or put his hands up?
 4    A.  Well, he a big guy, ain't nobody -- ain't no
 5        little dude just going to grab him, he ain't
 6        going to budge that way.  He did that
 7        intentionally on himself to move back and like
 8        move out the sound of the -- the sound of the
 9        shot.  Everybody move like if they was getting
10        shot at.  Everybody moved, didn't nobody know
11        where the gunshot came from.
12    Q.  And you could not see or observe who did that
13        shot; is that correct?
14    A.  Yeah, I couldn't see past the counters.  The
15        counters is blocking me at the top.  If I'm
16        leaning against it the counters are leaning
17        right here, I can't see nothing past the
18        counter.  If I look straight all I see is the
19        door of the outside.
20    Q.  And the counters you're talking to are the
21        upper counters that are depicted in Exhibit
22        14; is that correct?
23    A.  Correct.  So that cut off -- that did -- that
24        cut off my eyesight of seeing a shot that was
25        taken by somebody, but it wasn't Danny.
```

46

```
1   Q.   Mr. Jennings, did -- did you know or not know
2        whether there was anybody coming from the
3        upstairs at the time of the fight?
4   A.   I couldn't -- I couldn't -- I wouldn't even
5        recognize that.
6   Q.   You didn't hear anything or see anything?
7   A.   'Cuz once you heard the tussle everybody
8        attention just drawed on the tussle.  They
9        wasn't no trying to hear this, hear this, hear
10       that, it was just I heard a tussle, it was
11       loud, then right after that, two -- five
12       seconds later you heard a shot, there wasn't
13       no time to look and do all what -- what
14       everybody is trying to say you could have did
15       at the time of the shot, but it was everybody
16       scared anyway once they hear a shot come out
17       of nowhere.
18                I ain't seen no gun the whole
19       day, then I hear a gunshot, that will scare me
20       too.  I think somebody shooting in the house
21       or something, that would just be my reaction.
22  Q.   And David Diaz, had he been there long, to
23       your recollection?  I mean, how long was David
24       Diaz standing there before the shot occurred?
25  A.   Diaz as in Rock?
```

47

```
 1   Q.   I'm sorry, not Rock, 'cuz you said he's in
 2        this tussle with Danny.  I'm talking about
 3        Mr. Diaz, the dead man, how long was he there
 4        before -- do you recall him being there?
 5   A.   I don't even recall him even in the kitchen or
 6        none of that.  Like I said, they showed he was
 7        coming from the hallway, I guess he was coming
 8        to the tussle too, I guess.  And then that's
 9        when you heard the shot and everybody paused
10        and vacated the house.
11   Q.   Now, Danny -- you didn't see or observe --
12        Danny's involved in a fight basically with two
13        guys; right?
14   A.   Correct.
15   Q.   Jeranek, Rock and Vato, you don't see him
16        drawing a gun out on either Vato or Rock; do
17        you?
18   A.   No, I don't.
19                 ATTORNEY CHERNIN:  I have nothing
20        further at this time.
21                 THE COURT:  Redirect.
22                 ATTORNEY GRIFFIN:  Nothing.
23                 THE COURT:  You may step down.
24                 THE WITNESS:  Okay.
25                 (Witness excused.)
```

48

```
 1                    ATTORNEY GRIFFIN:  Doctor
 2        Jentzen.
 3                    (Side bar.)
 4                    THE COURT:  I'm going to have you
 5        raise your right hand and my clerk will swear
 6        you in.
 7                    JEFFREY JENTZEN, called as a
 8        witness herein, having been first duly sworn,
 9        was examined and testified as follows.
10                    THE CLERK:  Please be seated.
11                    THE COURT:  Doctor, what I'm
12        going to ask you to do is to begin by stating
13        your full name for the record, spelling your
14        first and last name.
15                    THE WITNESS:  Doctor Jeffrey
16        Jentzen.  J-E-F-F-R-E-Y, J-E-N-T-Z-E-N.
17                    THE COURT:  You may begin.
18                    DIRECT EXAMINATION:
19   BY ATTORNEY GRIFFIN:
20   Q.   Sir, what do you do for a living?
21   A.   I'm a medical examiner for Milwaukee County.
22   Q.   How long have you been doing that?
23   A.   Since January of 1987.
24   Q.   As the medical examiner for Milwaukee County,
25        what are your -- forgetting your
```

49

```
1        administrative duties, as a general rule what
2        is it you do for a living?
3   A.   I'm a forensic pathologist, I perform
4        autopsies and I supervise other forensic
5        pathologists within the office.  I also
6        oversee a forensic drug testing laboratory and
7        testify in courts of law.
8   Q.   How long have you been doing that?
9   A.   For approximately 20 years.
10  Q.   And if you had to estimate about how many
11       autopsies you've done, your number would be?
12  A.   I probably do about 250 autopsies personally
13       myself each year and I supervise probably two
14       to three times that number.
15  Q.   Is it fair to say that in your particular
16       profession as well, one doctor may do an
17       autopsy, another will review the work and
18       verify findings, things like that?
19  A.   Yes.
20  Q.   When you talk about an autopsy, why would your
21       office -- obviously not every death in
22       Milwaukee County ends up in an autopsy -- when
23       are you doing an autopsy?
24  A.   Our office is statutorily or legally required
25       to investigate sudden and unexpected deaths,
```

50

1     and that includes deaths due to accidents or

2     suicide, for example, or homicide cases or

3     cases in which a person would die suddenly and

4     unexpectedly without a known medical history.

5  Q.  Are you and your -- the people that work for

6     you that do autopsies, to start with, are you

7     all doctors?

8  A.  Yes.

9  Q.  What is it -- what kind of study and practice

10    do you become?  What you are now?

11  A.  Well, we do four years of medical school and

12    then we do a specialized training in

13    pathology, which would be anatomic clinical

14    pathology.  And after that we do a year of

15    special training in forensic pathology.

16  Q.  When we talk about an autopsy, what are the --

17    again, very basically, what are the steps

18    involved?

19  A.  Well, typically it is the examination of a

20    dead person, and we look at the outside of the

21    body, when the body's clothed or how he would

22    receive it, we would photograph the body, we

23    would make any -- we would collect any

24    evidence or anything we saw in the body.  And

25    then we undress the body, wash the body off,

51

1     and then we rephotograph and reexamine the
2     body, looking for any evidence or trauma.
3              And then following that we would
4     do an internal examination where we open the
5     body with a surgical incision, we look at the
6     body's organs for the purposes of detecting of
7     any natural disease or looking for trauma.  We
8     would also recover any evidence that might be
9     in the body, and we would recover blood and
10    body fluids and even portions of organs to do
11    drug testing on it at a future date within the
12    laboratory.
13             ATTORNEY GRIFFIN:  Judge, I
14    believe there's a stipulation between the
15    parties with regard to Doctor Jentzen's
16    qualifications to testify as an expert.
17             THE COURT:  Is that correct?
18             ATTORNEY CHERNIN:  That is
19    correct.
20             THE COURT:  So stipulated.
21             ATTORNEY GRIFFIN:  And this is in
22    the field of forensic pathology.
23             THE COURT:  So stipulated.
24   BY ATTORNEY GRIFFIN:
25   Q.  Doctor, I'm going to show you what's been

52

```
 1          marked as Exhibit 32.  Do you recognize it?
 2   A.     Yes.  Exhibit 32 is an autopsy performed on an
 3          individual by the name of David Diaz.  And it
 4          is -- has an identification number given in
 5          our office as 04485.  And that's the number.
 6          And it consists of an autopsy protocol of nine
 7          pages, and then there is an inherent
 8          laboratory test on the back of the -- of this
 9          report.
10   Q.     This autopsy was performed by whom?
11   A.     Doctor Mary Mainland.
12   Q.     And --
13                  ATTORNEY CHERNIN:  Excuse me just
14          a moment.
15                  (Discussion off the record.)
16   BY ATTORNEY GRIFFIN:
17   Q.     You have reviewed all of the work done on this
18          case though and are ready to testify about
19          cause of death and things like that and give
20          findings to a reasonable degree of medical
21          certainty?
22   A.     Yes, I am.
23   Q.     Let's start at the end of it, if you will.
24          What killed David Diaz, to a reasonable degree
25          of medical certainty?
```

53

```
 1  A.   He died as a result of a gunshot wound to the
 2       head.
 3  Q.   What was it about that gunshot wound to the
 4       head, in other words, more specifically, what
 5       happened to his body that -- that made it that
 6       gunshot wound kill him?
 7  A.   The bullet basically traversed his brain and
 8       severed his spinal cord at the junction of the
 9       brain.  And basically that is where the body
10       gets signals to breathe and for heart rate,
11       and that area was completely destroyed by the
12       wound.
13  Q.   Do you remember where the wound went in?
14  A.   Yes.
15  Q.   Where?
16  A.   It entered in the upper portion of the left
17       scalp, and if I can show.
18  Q.   If you would.
19  A.   There was a -- it was one and a half inches
20       below the top of the head, and about one --
21       two and a half inches from the mid line.  So
22       it was in the left back portion of the scalp
23       area.
24  Q.   And did there -- that's the entrance wound?
25  A.   Correct.
```

54

1    Q.   How are you able to distinguish between an
2         entrance wound and an exit wound with
3         gunshots?
4    A.   Well, by looking at the wounds there an
5         entrance wound have a particular appearance.
6         It has an abrasion area around it where the
7         bullet enters the skin.  In this case there
8         was also some soot and powder deposition that
9         was surrounding the entrance wound.  Also, we
10        look at the skull underneath the entrance
11        wound, and it has a characteristic fracture or
12        a bevely pattern that we look at on the bone.
13        So by looking at the bone under the -- under
14        the scalpel we can confirm that that's an
15        entrance or an exit wound.
16   Q.   Now you've talked about soot and powder.  What
17        does that mean to you when you're doing an
18        autopsy and you see an entrance gunshot wound?
19   A.   Well, when a weapon is fired, a rifle or a --
20        a handgun is fired, the bullet exits the end
21        of the barrel, but also powder from the
22        cartridge exits with the bullet.  And as
23        powder is both burnt powder which comes out in
24        the form of a smoke pattern, what we call
25        soot, and it's also unburnt powder granules,

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 55 of 122   Document 61-22

1      which come out in a spray that I would -- I
2      would say is very similar to the size of
3      grains of salt, which is the powder.  And that
4      comes out in a very high velocity, it strikes
5      the skin and it leaves a mark.
6  Q.   When you look at -- do those names have a --
7      those marks, excuse me, have a name?
8  A.   Yeah, we call it stippling, or an older term
9      might be powder tattooing.
10 Q.   Does that indicate to you to some degree how
11     close the barrel of the gun is to that
12     entrance gunshot wound area on the victim's
13     head?
14 A.   Yes.
15 Q.   And what does it tell you?
16 A.   Well, as the soot and powder comes out of the
17     end of the weapon, the farther away then
18     there's no -- it's too far away for the soot
19     to deposit onto the target, so you just get
20     the stippling.  And a little farther away
21     you'll go out to a point where there's no
22     stippling at all to the scalp, and so we call
23     that a distant gunshot wound.
24 Q.   In this particular case do you, to a
25     reasonable degree of medical certainty, have

                           56

```
 1       some estimate as to how far away the gun

 2       barrel was, based on the powder and soot that

 3       you found?

 4   A.  I do.

 5   Q.  What is that?

 6   A.  Two to three inches.

 7   Q.  The gun itself was two to three inches from

 8       the scalp of the victim at the time that gun

 9       was fired?

10   A.  Yes.

11   Q.  Did you recover -- strike that.

12                   Once you identify and observe

13       the -- sort of the exterior, the stippling,

14       the entrance gunshot wound, what do you do in

15       terms of the bullet path through the victim's

16       head?

17   A.  Well, we -- as part of the examination we do a

18       complete examination, so we would -- we would

19       reflect the scalp area back, we would look at,

20       as I mentioned, the skull, we'd examine the

21       skull perforation.  In this case there was

22       marked shattering of the skull, so the skull

23       was fragmented in a number of different

24       pieces.  We then open the skull cap up and we

25       follow the wound track through the brain
```

57

1     tissue itself.

2                    And in this case the wound had

3     gone through not only brain tissue, but it

4     severed the spinal cord or the brain stem at

5     the junction of the brain and it had continued

6     in a left to right direction, and had exited

7     through the front, what we call the maxillary

8     sinus, which is right in the cheek area is a

9     sinus.  So it came out of the right maxillary

10    sinus, and there was an exit wound, and I'm

11    pointing to the area just to the right of

12    my -- the nasal bridge or to the nose --

13    bridge of my nose is where the exit wound came

14    out.

15 Q.  I'm going to ask you, Doctor, again, I know

16    you pointed to both, I'm going to ask you to

17    use both hands and point with one hand to the

18    entrance wound and with one hand to the exit

19    wound at the same time so the jury can kind of

20    get a feel for the path of that bullet through

21    Mr. Diaz's head.

22 A.  The wound entered from the left superior or

23    upper scalp, one and half inches down from the

24    top of the head and two and a half inches from

25    the midline, so it was basically in the back

58

```
 1        corner.  And it exited through the right
 2        lateral nasal bridge, just to the right of the
 3        nasal bridge.  So it was going from a left to
 4        right and top to bottom direction and back to
 5        front.
 6   Q.   When we talk about top to bottom, for example,
 7        you talked about an inch and a half down from
 8        what would be the very top of his scalp, when
 9        it came out over about by his nose there how
10        far down was it?  In other words, how many
11        inches downward had that bullet traveled?
12   A.   Could I refer to my records?
13   Q.   Please do.
14                    ATTORNEY CHERNIN:  Doctor, if I
15        might interrupt, what portion --
16                    THE COURT:  One moment.  One
17        moment.  This is on direct examination, if you
18        have a question just ask counsel to clarify it
19        for you.
20   A.   It was five and a half inches below the top of
21        the head.
22   BY ATTORNEY GRIFFIN:
23   Q.   So from the one and a half inch to five and a
24        of inches as the bullet enters and it's going
25        down it has a drop, if you will, of four
```

59

1    inches in height?

2    A.   Correct.

3    Q.   I want to talk for a minute about what you

4         refer to as the anatomic position and how that

5         affects the way you look at things and how

6         when you say -- when I ask you questions about

7         where the victim may have been, those kinds of

8         things, we can answer always in reference to

9         the anatomic position.  Explain what that is

10        to the jury, to you.

11                   THE WITNESS:  Can I stand, Your

12        Honor?

13                   THE COURT:  You may.

14   A.   The anatomic position is a position that we

15        use to describe wounds, and if I could just

16        demonstrate off of a sketch that is -- that we

17        would use in our regular course of business,

18        is a general sketch.  And we use this sketch

19        to describe positions.  And so this is the

20        anatomic position that I described.  Eyes

21        looking front with a person standing straight

22        and the hands turned.  So this is how we

23        describe wounds.

24                   We have the person laying on an

25        autopsy table, which assists us in making

60

```
 1        those determinations, but we have to have some
 2        reference point to describe the position.  So
 3        we'll go top to bottom, right to left, front
 4        to back, using the reference to the anatomic
 5        position.
 6  BY ATTORNEY GRIFFIN:
 7  Q.   This particular bullet, when it went through
 8        Mr. Diaz's head, stayed on pretty much a
 9        straight line?
10  A.   Yes.
11  Q.   And if we took the -- took the entrance
12        gunshot wound as one point on the line and the
13        entrance and the exit as the other point, you
14        have a line; correct?
15  A.   Correct.
16  Q.   And then a third point on that line of course
17        would be the barrel of the gun, in other
18        words, you said I think two to three inches
19        away?
20  A.   Correct.
21  Q.   That would be a third point on that line;
22        correct?  Could be?
23  A.   It would be on the line, yes.
24  Q.   Right.  Once, for example, we fixed that line,
25        essentially we have the exit gunshot wound,
```

61

```
1        the entrance gunshot wound, and then the

2        barrel of the gun.  The barrel of the gun to

3        maintain that line, depending on how the

4        victim moves out of the anatomic position, the

5        gun barrel is always going to have to sort of

6        move with it; correct?

7    A.  Yes.

8    Q.  In other words --

9    A.  Assuming the position of the wound track, then

10       you have to assume the position of the weapon.

11   Q.  Right.  In other words, may I use Detective

12       Casper here, if you'd stand up for a minute,

13       approximating for a minute with -- this is a

14       toy gun for the record, Judge, it's just

15       plastic, I had the bailiff look at it -- once

16       we have sort of an approximation of the line

17       of -- and we hold the gun here, you don't know

18       because you weren't there, exactly how the

19       victim was standing at the time that that

20       bullet went into his head; correct?

21   A.  Or if the individual was standing at all,

22       right.

23   Q.  He could have been sitting?

24   A.  Correct.

25   Q.  My point is, as we turn the victim's head, say
```

62

1    one way or the other, even though we have to

2    kind of move the gun to keep that line, if you

3    will, between exit, entrance and barrel or --

4    or the -- where the bullet comes out?

5 A.  That's a correct assumption, yes.

6 Q.  Okay.  And so when we talk about anatomic

7    position for your purposes everything's

8    straight?

9 A.  Correct.

10 Q.  Okay.

11 A.  The body is straight.

12 Q.  Throughout this wound path did you recover any

13    physical evidence, not counting body parts or

14    materials of Mr. Diaz, but more specifically,

15    bullet pieces?

16 A.  Yes.  Doctor Mainland was able to recover

17    fragments of the bullet as it went through the

18    brain tissue and the right maxillary sinus.

19 Q.  So were there lead fragments in one particular

20    spot or different spots along the wound path?

21 A.  Different spot along the wound path.

22 Q.  I'm going to show you what's been marked as

23    Exhibit 23.  What are those?

24 A.  This is a bullet envelope that is used in our

25    office.  It's closed with this evidence tape,

63

1    and it is signed by Doctor Mainland's

2    signature that I recognize.  And this plastic

3    container contains probably four small lead

4    colored metal fragments.

5    Q.   Those particular fragments, if you could

6         describe the best you can, not which one's

7         which, how close was the first one, say to the

8         entrance wound, how close was the last one to

9         the exit wound?

10   A.   Well, my -- I reviewed the x-ray before coming

11        to court and the -- the bullet starts to

12        fragment as it strikes a portion of the bone

13        typically.  So there's a small amount of

14        fragmentation or very microscopic around the

15        entrance wound, but most of the larger

16        fragments are in the right maxillary sinus,

17        and as the bullet is exiting the skull but

18        entering the facial bones.

19   Q.   So when you talk about the maxillary sinus, in

20        other words, there are some pieces right near

21        the exit wound?

22   A.   Correct.

23   Q.   When a person is shot standing up, for

24        example, and then they fall to the floor, can

25        pieces come out of that wound?  That exit

64

```
 1      wound?  Other pieces?

 2  A.  It's possible.

 3  Q.  Is it possible that when he falls there

 4      further back and as he hits the ground, they

 5      move toward the exit wound?

 6  A.  I think that would be very unlikely.

 7  Q.  When you say it's unlikely, why do you say

 8      that?

 9  A.  Because the material is -- is stuck within

10      brain tissue far back, and there is a -- there

11      is a temporary cavity when -- when the tissues

12      and the bones expand, but then when the cavity

13      collapses upon itself, that cavity is fairly

14      narrow.  There can be bullet fragments, et

15      cetera, especially over the maxillary sinus

16      that may be expressed, but I think it would be

17      very unlikely that there would be material

18      higher up within the brain tissue that would

19      come out.

20  Q.  Do you remember how tall Mr. Diaz was?

21  A.  He was five feet eight.

22  Q.  And as far as you know, was he -- he was

23      wearing Shoes?  I mean you saw the pictures

24      from the scene; correct?

25  A.  Correct.
```

65

1   Q.   And the bullet was an inch and a half down, so

2        the bullet went in, again, assuming he wasn't

3        wearing any shoes, at a height off the ground

4        of five foot six and a half?

5   A.   Roughly, yes.

6   Q.   Roughly.  Okay.  And it went down about four

7        inches, so it came out then about five two and

8        half, again, assuming no shoes and rough?

9   A.   Correct.

10   Q.   Okay.  How long does Mr. Diaz live?

11       Approximately.  As best you can tell.

12   A.   I have an opinion.

13   Q.   Your opinion, that's what I mean.

14   A.   I think he died immediately.

15   Q.   Would he have been able, for example, to run,

16        walk, step, dance, anything like that at all?

17   A.   No.

18   Q.   Are you able to tell, based on what you'd

19        seen, whether he was in fact moving at the

20        time he was shot?

21   A.   I don't have an opinion, no.

22   Q.   Do you remember how much he weighed?

23   A.   I believe he is -- if I could refer to my

24        records.

25   Q.   Please.

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 66 of 122   Document 61-22

```
1   A.   I believe he was 250 pounds.  Yes, he was 258
2        pounds.
3   Q.   Is he, by your -- by medical standards,
4        someone you would call heavyset?
5   A.   Yes.
6   Q.   Even obese, as you refer to it in your report?
7   A.   It was Doctor Mainland's term, yes.
8   Q.   Doctor Mainland's term.  Was -- were there any
9        other signs, notable signs, important signs to
10       you guys in terms of any injury on Mr. Diaz?
11  A.   I believe there was some old bruises,
12       insignificant, on his leg, but other than that
13       there was no significant trauma.
14  Q.   For example, was there anything that showed
15       that as he fell to the floor, he hit and
16       bruised his head or face or anything like
17       that?
18  A.   I didn't recall any of that, no.
19  Q.   The bullet pieces or fragments that were found
20       inside of Mr. Diaz, were you guys able to
21       weigh those and give an approximate weight of
22       those pieces?
23  A.   If I could refer to the --
24                THE COURT:  You're looking at
25       Exhibit 23?
```

67

```
 1                    THE WITNESS:  I'm looking at
 2        Exhibit 23, Your Honor, and I see no -- if I
 3        could refer to my records.  I don't see any
 4        weight on that.
 5   BY ATTORNEY GRIFFIN:
 6   Q.   Referring to page 5, the second paragraph
 7        under evidence of injury, the last sentence in
 8        that paragraph.
 9   A.   Yes.  Okay.  Doctor Mainland mentions in that
10        second paragraph that fragments of the bullet
11        totaling 0.7 grams were recovered from the
12        cranial cavity and the right maxillary sinus
13        and orbital region, which orbital region is
14        the eye socket, basically.
15   Q.   All of the opinions that you've given here
16        today are to a reasonable degree of medical
17        certainty?
18   A.   Yes.
19                    ATTORNEY GRIFFIN:  Nothing
20        further.
21                    THE COURT:  Cross.
22                    CROSS EXAMINATION:
23   BY ATTORNEY CHERNIN:
24   Q.   Bullet fragments that are found outside of the
25        body, would those have been fragments that
```

68

```
1        passed through the body?

2   A.   Yes.  It -- it very well could have been, yes.

3   Q.   When you told Mr. Griffin that it was

4        extremely unlikely that a bullet fragment

5        would have been found some distance away from

6        the body, it could not have been the result of

7        the body falling and hitting the floor and

8        fragments shooting out, is that what you meant

9        by it was unlikely?

10  A.   Yes.

11  Q.   And when -- is there any way for you to tell,

12       based upon the autopsy, the direction of the

13       barrel as it's placed at the head?  Was it

14       definitely this is -- are you certain to a

15       reasonable degree of medical certainty that

16       this was a shot from the back?

17  A.   Yes.  I -- if I could, the -- the weapon was

18       held to the back of his head.  Now, if his

19       head was turned to the -- if I could

20       demonstrate -- if his head was turned to the

21       right, then -- then the wound would have come

22       in from the left side.  And I think as far as

23       you're referring to as the back, I think

24       you're referring to the back of torso,

25       anterior to posterior direction, not in the
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 69 of 122   Document 61-22

```
 1         right to left direction.

 2    Q.   So the back left side of the head?

 3    A.   Right.  It's the back of the head, but as --

 4         as mentioned before, the head moves.

 5    Q.   And if there is a shot, the head -- I mean

 6         whatever direction the head is shooting -- or

 7         is turned, is going to be the path that the

 8         bullet will follow when it comes -- when the

 9         shot goes down four and a half inches, roughly

10         four inches, into the sinus cavity; is that

11         correct?

12    A.   Correct.

13    Q.   And if the head were turned in a direction,

14         would one expect that any fragments that

15         passed through the head would be found in the

16         direction that the bullet was taking through

17         the head?

18    A.   No, I wouldn't expect that.

19    Q.   What would you expect?

20    A.   I would expect that when the bullet came out,

21         that portion of the bullet that came out would

22         exit in a straight direction but would bounce

23         and ricochet throughout the scene.  It would

24         hit the floor, it may go to either direction,

25         and it wouldn't come out -- it wouldn't be
```

```
1          found in -- I wouldn't expect it to be found
2          in an exact straight line position from where
3          the weapon was fired and where it exited from
4          the front part of his face.
5    Q.    So if it were a little off center from that
6          straight line, that wouldn't surprise you?
7    A.    No, it would not.
8    Q.    But you definitely expect it to follow in a
9          line unless it did hit something; correct?  I
10         mean --
11   A.    Well, it --
12   Q.    It would follow a straight line unless
13         something knocked it out of that straight
14         line?
15   A.    Well, it would end up striking something,
16         whether it was on the floor or the wall, or it
17         would eventually strike something that would
18         change its direction.
19   Q.    And if it -- like, for example, if -- if the
20         bullet path had gone through the head, toward
21         what's portrayed in this diagram, Exhibit 1,
22         as a wall, one would expect to see the
23         fragment marks on that wall; correct?
24   A.    I would expect that the -- that the exiting
25         bullet would have ricocheted off the wall and
```

71

```
 1       been in some other place in the room.
 2   Q.  If the direction had been toward that wall;
 3       correct?
 4   A.  Well, if the exit -- if the bullet exited in
 5       the position that it would strike the wall I
 6       would expect it to strike the wall.
 7   Q.  And bounce anywhere?
 8   A.  And bounce anywhere.
 9   Q.  And when -- when a bullet passes through the
10       brain, one would expect organic matter,
11       whether it be blood or gray matter, to follow
12       the path in the trajectory of the shot; is
13       that correct?
14   A.  There would be a certain amount of biological
15       spray that would occur with the exit wound,
16       correct.
17   Q.  So if, for example, one were shot next to this
18       wall, one would expect some biological
19       material if -- if -- if that was a direction,
20       that one would expect biological material to
21       be found on that wall?
22   A.  It would depend on how far away the individual
23       was from the wall.
24   Q.  Fair enough.  Oh, Doctor Jentzen, do you use
25       the term intermediate wound?
```

72

1    A.    Intermediate wound?  Yes.

2    Q.    What does an intermediate wound mean to you?

3          And -- and let me ask you this, is that a term

4          of art in the forensic pathology profession

5          such that you and Doctor Mainland would both

6          use that term?

7    A.    Yes.  The -- the term intermediate range,

8          there's -- there's two terms, one's an

9          intermediate target and the other is an

10         intermediate range.  Intermediate range would

11         mean that the -- that the target was far

12         enough away so you get powder stippling onto

13         the target.  And intermediate target would

14         imply that there is a -- something in between

15         the end of the weapon and the eventual -- in

16         this case the head, that would -- that the

17         bullet had to pass through in order to strike

18         the target.  So in this case it uses

19         intermediate range.

20   Q.    Well, if -- if you were to hear that Doctor

21         Mainland states that the wound path was from

22         back to front, you'd agree with that; correct?

23   A.    Correct.

24   Q.    And would you also agree with, Doctor Mainland

25         also states there was soot and stippling

73

```
 1          around the entrance wound, indicating there

 2          was an intermediate wound?

 3    A.    Yeah, I think she's using that as an

 4          intermediate range wound.  Correct.

 5    Q.    What does an intermediate range wound mean?

 6    A.    It would mean that there was powder stippling

 7          on to the wound.  And I would -- I would use

 8          that term to describe just powder stippling,

 9          but she uses it in this case to include also

10          some of the powder, meaning that it could

11          be -- it's probably at a range between a close

12          range gunshot wound and an intermediate range

13          gunshot wound.  It's probably right at that

14          cusp.

15    Q.    And -- and a contact wound would obviously

16          be -- a close range would be a contact wound

17          immediately pressed up against the flesh;

18          correct?

19    A.    And if I could expound.

20    Q.    Yes.

21    A.    You would not see powder stippling on a

22          contact wound, the powder would all be

23          injected into the target.

24    Q.    And you expressed an opinion that it's two to

25          three inches.  Is that consistent with an
```

74

```
 1        intermediate wound?

 2   A.   I think it's closer.  I think that's more

 3        consistent with a close range.  My terminology

 4        would have been close range wound.

 5   Q.   So when you say two to three inches, you

 6        just -- you're -- you would say it's closer

 7        rather than intermediate?  Intermediate means

 8        what to you?

 9   A.   Intermediate means probably in a -- depending

10        upon -- these are all different handguns and

11        it's just an estimation, but my estimation

12        would be probably between six inches and

13        probably two to three feet would be an

14        intermediate range.  But in this case we have

15        a corona of soot and powder deposition around

16        the wound that gives us a fairly accurate

17        range of fire.

18   Q.   And is that taken from Doctor Mainland's

19        report?

20   A.   Correct.

21   Q.   Where do you see that, Doctor Jentzen?

22   A.   In her description about the -- the -- the

23        deposition of the powder stippling around the

24        wound being one and a half inches in one

25        direction and one and -- and a half inch in
```

75

```
1        one direction, et cetera.

2   Q.   Thank you.

3   A.   And also in my examination of photographs

4        before testimony.

5   Q.   Okay.  So, Doctor, just so I'm not trying to

6        be confusing, you used the term corona.

7        That's a term that you would have used based

8        upon the measurements from --

9   A.   Correct.

10  Q.   -- from Doctor Mainland, but Doctor Mainland

11       didn't use the word corona?

12  A.   That's my own terminology.

13  Q.   In your profession you would use that term to

14       express the measurements that she used, the

15       stippling being found one and a quarter inch

16       superior, one and a quarter inch posteriorly,

17       one half inch inferiorly, and one and a

18       quarter inch anteriorly?

19  A.   Correct.

20  Q.   Those would indicate the corona, and so in

21       other words, I'm motioning with my hand

22       creating a circle, and roughly that would

23       indicate the -- from the midpoint of the

24       circle that would indicate the distances that

25       you saw the powder burns?
```

76

```
1   A.    Yes, that's correct.

2   Q.    Okay.  Thank you.  I didn't mean to be

3         confused, but she had not used that term, but

4         I can understand where you are.

5                    ATTORNEY CHERNIN:  I have no

6         additional questions of Doctor Jentzen.

7                    THE COURT:  Mr. Griffin.

8                    ATTORNEY GRIFFIN:  I have

9         nothing.

10                   THE COURT:  Doctor, you may step

11        down.  Thank you, Your Honor.  I'll take my

12        copy.

13                   (Witness excused.)

14                   THE COURT:  Ladies and gentlemen,

15        we'll take a ten-minute break, we'll be back

16        on the record at 11:15.

17                   DEPUTY:  All rise for the jury

18        please.

19                   (Jury out of box.)

20                   THE COURT:  You may be seated.

21        Court notes that we had a side bar during --

22        the court's had a side bar with the lawyers

23        during Mr. Jennings' testimony, Donald

24        Jennings' testimony, that involved the

25        defense's objection to the question that I
```

77

1     believe Mr. Griffin had postured or was about
     2     to posture with respect to Mr. Jennings' first
     3     encounter with the police as it relates to
     4     their -- the police's investigation into this
     5     matter.  And it was concern about the fact
     6     that there was the possibility that
     7     Mr. Jennings' answer may reflect that he was a
     8     warrant, and that they had -- he had been
     9     picked up on a warrant.
    10               Mr. Griffin indicated that this
    11     was his witness and he was free to explore
    12     that, particularly the -- along the track of
    13     what subsequently followed and what the court
    14     permitted, which was the witness's willingness
    15     to indicate to the police at his first
    16     opportunity his belief that his cousin, the
    17     defendant, was not the shooter in this
    18     matter.  After that was explained to the court
    19     and the defense -- the defense withdrew its
    20     objection and the court allowed the
    21     questioning to continue.
    22               ATTORNEY CHERNIN:  That is a
    23     correct statement, Your Honor.  My concern at
    24     the time was that there would be an answer
    25     which would improperly violate the rules under

                              78

```
1       906.09.  And based on Mr. Griffin's response
2       to me I was satisfied that he had no intention
3       of even trying to invoke that sort of a
4       response, so therefore, I withdrew the
5       objection based upon what Mr. Griffin said.
6                    THE COURT:  There was a second
7       smaller side bar right at the beginning of
8       Doctor Jentzen's testimony that had to do with
9       the defense needing a comfort break.  During
10      that break the State indicated that the court
11      should advise counsel, defense counsel, not to
12      infringe on the jury box, and to limit his
13      leaning on the jury box during the examination
14      and cross examination of witnesses.
15      Mr. Chernin acknowledged same and indicated
16      that he would refrain from doing so.
17                    Finally --
18                    ATTORNEY CHERNIN:  Judge, there
19      was also -- if I might, there was an
20      additional portion of that, was that we
21      discussed the -- my stipulation to the
22      credentials of Doctor Jentzen --
23                    THE COURT:  That's correct.
24                    ATTORNEY CHERNIN:  And --
25                    THE COURT.  As an expert --
```

79

```
 1                  ATTORNEY CHERNIN:  As an expert.

 2                  THE COURT:  -- in the field of

 3      forensic pathology.

 4                  ATTORNEY CHERNIN:  And I did so.

 5                  THE COURT:  The court understands

 6      that we need to at some point -- and this is

 7      probably as good an opportunity as any -- to

 8      talk a little bit about the State's use of

 9      demonstrative evidence, and having the defense

10      put its objection on the record, and then

11      having the court rule on it prior to the State

12      introducing that evidence.  I was not sure,

13      Mr. Griffin, when it was that you were

14      planning on doing that, so the timing of my

15      ruling is -- is tied to that.

16                  ATTORNEY GRIFFIN:  I'm going to

17      ask, if I may, Judge, only because it's 11:15

18      and I've had Mr. Simonson here since 10:00,

19      could we just -- could we deal with that right

20      at the lunch break as opposed to now?

21                  THE COURT:  Again, that's --

22      that's acceptable to the court.  I just want

23      to make sure, as I've advised the parties all

24      along, that I know that's an issue and it

25      needs to be put on the record.  We've had a
```

80

```
 1    discussion in chambers about it, which I've

 2    summarized earlier, but we need to put that on

 3    the record more fully, and we need to do that

 4    prior to any such demonstration occurring.  So

 5    if that's not going to happen with

 6    Mr. Simonson's testimony, then I see no reason

 7    not to hold off on my ruling and the arguments

 8    on it until after his testimony.

 9                    All right.  Guys, we're going to

10    take a ten-minute break, we want to be back in

11    our seats at 20 after the hour.

12                    (Break taken.)

13                    DEPUTY:  All rise for the jury.

14                    (Jury in box.)

15                    THE COURT:  Welcome back, ladies

16    and gentlemen.  Please be seated.

17                    Mr. Simonson, I'm going to have

18    you raise your right hand and my clerk will

19    swear you in.

20                    MARK SIMONSON, called as a

21    witness herein, having been first duly sworn,

22    was examined and testified as follows.

23                    THE CLERK:  Please be seated.

24                    THE COURT:  What I'm going to ask

25    you to do, sir, is to begin by stating your
```

81

```
 1      full name for the record, spelling your first

 2      and last name.

 3                      THE WITNESS:  My name is Mark

 4      Simonson.  M-A-R-K, S-I-M-O-N-S-O-N.

 5                      THE COURT:  You may begin.

 6                      DIRECT EXAMINATION:

 7  BY ATTORNEY GRIFFIN:

 8  Q.  Mr. Simonson, what do you do for a living?

 9  A.  I'm a firearm, tool mark examiner at the State

10      Crime Laboratory here in Milwaukee.

11  Q.  What does a firearm and tool mark examiner, in

12      this case you, do every -- not every day, but

13      almost every day?

14  A.  We receive, receipt and report on firearms and

15      firearm-related evidence, that being guns,

16      bullets, cartridge cases, shotgun shells.

17      Tool mark would be like trying to identify a

18      bolt cutter, cutting a lock.  We also do

19      serial number restorations and perform

20      distance determinations when asked.

21  Q.  How long have you been doing that?

22  A.  I'll have five years in the end of next month.

23  Q.  And where have you worked as a firearm and

24      tool mark examiner or some kind of similar

25      position in your life?
```

82

```
1   A.   Just here at the Milwaukee lab.

2   Q.   Who is your boss?

3   A.   Reg Templin.

4   Q.   How long has Mr. Templin been doing that kind

5        of a thing?

6   A.   Over 30 years.

7   Q.   How many times have you testified in courts

8        here in Wisconsin as an expert witness in the

9        field of firearm and tool mark examination?

10  A.   Between ten to twenty.

11  Q.   And when we talk about firearm and tool mark

12       examination, how do you get into that line of

13       work?  What was your course of study, what was

14       your training, that kind of thing?

15  A.   Well, I have a bachelor of science with a

16       minor in environmental law enforcement.  And I

17       also was very interested in guns all my life

18       so I have a broad general experience before I

19       came to the lab.  But my lab is -- an examiner

20       is kind of like an apprenticeship, I'll follow

21       the head examiner around, work with him, see

22       everything he sees and look at what he looks

23       at.  I've also attended an FBI gunshot residue

24       course, and also a serial number restoration

25       course put on by ATF.
```

83

```
 1   Q.   Have you ever testified in a courtroom where
 2        you weren't -- your opinions weren't accepted
 3        as expert opinions?
 4   A.   No.
 5   Q.   We'll start with an exhibit from this case,
 6        Exhibit Number 2.
 7                    ATTORNEY CHERNIN:   Judge, I
 8        expect to be asking questions as well
 9        requiring opinions, and I'm stipulating to
10        Mr. Simonson's credentials as an expert.
11                    THE COURT:   So stipulated.
12   BY ATTORNEY GRIFFIN:
13   Q.   What is Exhibit Number 2?
14   A.   It's a fired 38 378 caliber bullet jacket.
15   Q.   You've looked at that before?
16   A.   Yes.
17   Q.   And just using that as an example, what steps
18        did you take to be -- when you got that thing
19        from the police -- the Milwaukee police;
20        right?
21   A.   That's correct.
22   Q.   What steps did you take with that to identify
23        it, to figure out what it was, to draw
24        whatever conclusions you draw?
25   A.   Well, what I'll first do, look at it, is look
```

84

```
1          at the shape and diameter of the bullet
2          jacket.  And I'll look at -- also when a gun
3          is -- the bullet's fired it passes through the
4          barrel of the firearm and that has what we
5          call lands and grooves in it, in the rifling.
6          You can think of it as like the inside of a
7          nut and a bolt.  The bullet's a little bit
8          over sized and as it passes through the barrel
9          it squeezes down a little bit and it's spun,
10         and that's what makes it accurate.
11                   Those impressions are also left
12         behind on the bullet, that's how I'm able to
13         make an identification as to whether this -- I
14         could match a particular firearm as firing
15         this particular bullet jacket.  In this case,
16         the bullet jacket has five lands and grooves
17         impressed in it with a right-hand twist.
18    Q.   Five lands and -- lands, L-A-N-D-S; right?
19    A.   That's correct.
20    Q.   And grooves with a right-hand twist.  Now, if
21         you had to explain that to a person who
22         didn't -- who doesn't do what you do, like me,
23         how would you explain what that is exactly?
24    A.   Well, that is the, you know, like I was
25         explaining with the barrel having high and low
```

85

| | | |
|---|---|---|
| 1 | | spots in it, so it will -- when the bullet |
| 2 | | hits the barrel it's squeezed and spun, and |
| 3 | | those impressions are left behind on the |
| 4 | | bullet. |
| 5 | Q. | In other words, as a bullet -- say you go and |
| 6 | | buy a bullet at Wal-Mart and put it in a |
| 7 | | particular gun, a particular 38 or 357, and I |
| 8 | | fire that bullet, and I had another 38 357 |
| 9 | | with another bullet, when you look at those |
| 10 | | bullets can you tell the difference between |
| 11 | | gun number one and gun number two? |
| 12 | A. | Yes. |
| 13 | Q. | Does every gun, as a bullet goes down, leave a |
| 14 | | unique marking, so to speak, on that bullet? |
| 15 | A. | Yes. |
| 16 | Q. | So like snowflakes, every gun's different? |
| 17 | A. | That's correct. |
| 18 | Q. | When you talk about lands and grooves, are we |
| 19 | | talking about something you can't see or you |
| 20 | | only see with a microscope? |
| 21 | A. | Lands and grooves, it's what we call a class |
| 22 | | characteristic. That's like a general |
| 23 | | characteristic to a particular gun. Like in |
| 24 | | this case five lands and grooves in a right- |
| 25 | | hand twist is characteristics of revolvers |

86

```
 1        manufactured by Smith & Wesson, Taurus and
 2        Ruger.  That's a general.  What we look for is
 3        individual, when we identify it to a
 4        particular gun, we're going from just
 5        observing the bullet down to the microscopic
 6        level.
 7   Q.   In other words, if you have a gun that's
 8        suspected in a particular shooting and a
 9        bullet that's suspected to have come from that
10        gun, can you do something to be able to tell
11        us to a reasonable degree of scientific
12        certainty whether this bullet recovered by the
13        police and this gun recovered by the police
14        were used together?
15   A.   That's correct.
16   Q.   In this case no gun was ever recovered, no gun
17        was ever submitted to you for any kind of
18        testing?
19   A.   That's correct.
20   Q.   But that particular Exhibit Number 2 does tell
21        you the kind of -- the caliber of weapon used
22        in this case?
23   A.   That's correct.
24   Q.   Which is what you refer to as a 38, 357?
25   A.   Yes.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 87 of 122   Document 61-22

1   Q.   What's the difference between a 38 and a 357
2        and why can't you tell us which one it is?
3   A.   Well, what that refers to is the caliber of
4        the gun.  A revolver you can have it in 38
5        special or 357 magnum.  357 magnum is slightly
6        longer than a 38 special, so you could fire
7        the 38 special in the 357 magnum, but not vice
8        versa.
9                   Also, the bullets are
10       constructed, they're the same shape, size,
11       weight, so it fires the same bullet, just a
12       different casing on the back of it, so one is
13       more powerful than the other.
14  Q.   When you talk about a 38, 357 it's clear that
15       this can only be a revolver?
16  A.   That's correct.
17  Q.   As opposed to say a semiautomatic handgun?
18  A.   That's correct.
19  Q.   We'll get to that in a little bit.  This
20       particular gun, for example, did it have
21       anything unusual or strange about it?  That
22       particular exhibit I mean, and the gun that
23       fired it?
24  A.   No.
25  Q.   When I go -- say that particular bullet, I buy

88

```
 1        it at the gun store, what are the pieces of
 2        it?  In other words, before it's fired and you
 3        end up with Exhibit Number 2 and some other
 4        pieces we'll talk about, what comprises that
 5        bullet?
 6   A.   Okay.  That bullet in -- a jacketed bullet in
 7        this case is usually a -- in this case is a
 8        copper jacket with a lead bullet core in the
 9        center of it.  So it's actually two pieces to
10        the bullet.
11   Q.   In other words, the part that takes off down
12        the barrel of the gun towards the target has
13        two pieces?
14   A.   That's correct.
15   Q.   The inside is lead, the outer part is copper?
16   A.   That's correct.
17   Q.   Why?  Why isn't it all lead or copper?
18   A.   That's the way that bullet is constructed.
19   Q.   In this particular case the -- that jacket
20        that was submitted to you had none of its core
21        left to it, essentially; correct?
22   A.   That's correct.
23   Q.   What does that tell you?
24   A.   Just that the core did separate from the
25        jacket at one time.
```

89

```
1    Q.   When a bullet, again, that I buy from the
2         store before it's fired, in addition to the
3         jacket and the inside of that, the lead, is
4         there more to it, in other words, casing,
5         powder, primer, things like that?
6    A.   That's correct.  The entire unfired cartridge
7         would have -- the bullet would sit on top and
8         then will be the cartridge case, usually
9         brass.  Inside that brass casing contains the
10        gun powder.  And then there's a primer on the
11        very back of the cartridge case, that's what
12        the firing pin strikes to ignite the gun
13        powder inside the shell casing.
14   Q.   So again, as I pull the trigger, the firing
15        thing hits that thing hard, that creates a
16        small explosion in there; right?
17   A.   That's correct.
18   Q.   The powder and all that burn, and that's what
19        forces that bullet down the barrel towards its
20        target?
21   A.   That's correct.
22   Q.   Okay.  What's left behind in the gun in a
23        revolver is what you would refer to as a
24        casing?
25   A.   That's correct.
```

90

```
 1   Q.   I keep using the word bullet, would you agree
 2        with me a bullet to you means just the part
 3        that takes off down the barrel?
 4   A.   That's correct.
 5   Q.   What you call the whole thing that I buy from
 6        the store is what you call an unfired
 7        cartridge?
 8   A.   That's correct.
 9   Q.   Okay.  And of that cartridge, the bullet takes
10        off down the barrel, in a revolver what
11        happens to the casing where -- where it was
12        all -- the powder and all that was housed
13        before it was fired?
14   A.   When a revolver is fired, the -- the unfired
15        cartridges are contained in what we call the
16        cylinder on it.  Then as you fire the gun,
17        those cartridge cases stay behind in the
18        cylinder until they're manually retrieved from
19        the gun.
20   Q.   I always -- back -- the western movies which
21        you always see John Wayne and those guys
22        firing those guns, then they have to stop at
23        one point, kind of knock that little wheel
24        out, get those things that they knock on the
25        ground, those are casings; right?
```

91

1   A.   That's correct.

2   Q.   Then they have to take a bullet and load in

3        each individual one back in that wheel, pop it

4        back into place and then they can start

5        shooting again?

6   A.   That's correct.

7   Q.   Are there any difference between those

8        revolvers we see in the movies and the modern

9        ones, other than maybe they're a little

10       sleeker or something?

11  A.   The function is the same.

12  Q.   Now, contrast that if you would to what

13       happens in a bullet when I half-fire it in a

14       semiautomatic handgun?

15  A.   Okay.  In a semiautomatic handgun the unfired

16       cartridge are contained in the magazine, which

17       is usually in the grip of the gun.  As the gun

18       is fired, the unfired cartridges go into the

19       barrel, the gun is fired, the slide comes back

20       on the top and the fired cartridge case is

21       thrown out of the gun, usually up to the right

22       and to the rear.  The slide then goes forward,

23       chambering the next unfired cartridge ready to

24       be fired.

25  Q.   So however many bullets you have in that

1      magazine when you pop into, what you say is

2      usually the handle of the gun, you can pull

3      that trigger 17 times, 20 times, however many

4      bullets and it will just keep firing?

5   A.  It will fire as long as there is ammunition in

6      the magazine.

7   Q.  But it's one trigger pull for each bullet?

8   A.  That's correct.

9   Q.  In this particular case we're not talking

10     about semiautomatic handguns; right?

11  A.  That's correct.

12  Q.  We're talking about the kind that would have a

13     little wheel on it that would turn, in other

14     words, with each pull of the trigger on this

15     particular gun, the bullet takes off, the

16     wheel turns, you pull it again, the bullet

17     goes, the wheel turns, et cetera, et cetera?

18  A.  That's correct.

19  Q.  Okay.  When we talk about a 38, 357, for

20     example, again, going back to those old

21     westerns, you see when John Wayne points it,

22     you see just that little kind of barrel going

23     off it?

24  A.  That's correct.

25  Q.  And with semiautomatics a lot of times the

93

```
 1          barrel actually looks a little bit thicker,
 2          sort of, I'm holding my hands maybe an inch,
 3          inch and a half apart?
 4    A.    Correct.
 5    Q.    Are there any revolvers now that have that
 6          inch, inch and half part sticking out from it?
 7    A.    Yeah, there's some revolvers are manufactured
 8          of what we call an under lug.  It's basically
 9          a counterweight underneath the barrel to make
10          the pistol heavier.
11    Q.    But again, it would still have that little
12          wheel?
13    A.    That's correct.
14    Q.    But as you look at the barrel part it looks
15          more like a semiautomatic than say the old
16          kind of what I call the revolvers from the
17          westerns?
18    A.    It could.
19    Q.    It could?
20    A.    Right.
21    Q.    Okay.  I'm going to show you some more
22          exhibits here which have been marked as 3, 4
23          and 5, which are those.  I'd like you to take
24          a look at them.  And 23.
25                    You ready?
```

94

1   A.   Yep.

2   Q.   Okay.  What are 3, 4 and 5, and what are --

3        what is 23?

4   A.   They're all lead fragments.

5   Q.   And when you get those lead fragments, 3, 4

6        and 5, you know now, I believe, or knew at the

7        time those were recovered from the scene of

8        this homicide; right?

9   A.   That's correct.

10  Q.   And 23 are lead pieces taken from the victim

11       during autopsy; right?

12  A.   That's correct.

13  Q.   What can you tell the jury about those

14       fragments?

15  A.   The lead fragments are consistent with bullet

16       core material, that being the center portion

17       of the bullet.

18  Q.   Are those lead fragments that you have in your

19       hands, 3, 4, 5 and 23, did they come from a

20       38, 357?

21  A.   That I can't say for sure.

22  Q.   Could they have come from something else?

23       Some other gun I mean.

24  A.   They're consistent with being lead bullet

25       fragments.

95

```
 1    Q.    Well, just -- and I know we're not talking

 2          about a nine millimeter in terms of that

 3          jacket, but if I fired say a nine millimeter

 4          bullet out of a handgun, would it have that

 5          same lead core material that's there in 3, 4,

 6          5 and 23?

 7    A.    That's correct.

 8    Q.    Okay.  But in this particular case if -- and

 9          I'm not saying a nine millimeter, but assuming

10          for a minute that a nine millimeter had been

11          fired in this case, and the casing was picked

12          up and the gun was taken away and all you had

13          was those lead fragments, you couldn't say

14          whether it was a nine millimeter or a 45 or a

15          38, 357 you just say, I got some lead

16          fragments?

17    A.    That's correct.

18    Q.    Now, you -- what you do, firearm and tool mark

19          examiners, a lot of time in movies and on TV

20          they talk about ballistics?

21    A.    That's correct.

22    Q.    How do you distinguish ballistics from what

23          you do?

24    A.    Ballistics is the study of firearms and

25          ammunition, what we call internal ballistics
```

96

```
1        would be the behavior as the gun is fired,
2        external ballistics, which would be the study
3        of the bullet as it's in flight between the
4        barrel and the target, and terminal ballistics
5        being the effects of the bullet on a target.
6    Q.  Do you have anything to do with ballistics?
7    A.  We dabble in it, but what I do is a
8        comparative science.
9    Q.  When you say dabble in it, in other words, you
10       fire a lot of guns for test patterns of
11       casings and you're noting what happens as the
12       bullet travels through the air and those
13       things, but you're not an expert in it?
14   A.  That's correct.
15   Q.  Are all of the opinions that you've given here
16       today to a reasonable degree of scientific
17       certainty?
18   A.  Yes.
19   Q.  Is there anything else about Exhibit 2, 3, 4,
20       5 or 23 that you can tell this jury about the
21       weapon used in this case?
22   A.  The bullet fragments, no.
23   Q.  What about -- other than knowing it's a 38 or
24       a 357, is there anything else that that
25       jacketing tells you?
```

97

1    A.    Just that it was probably fired out of a

2          revolver manufactured by Smith & Wesson,

3          Taurus or Sturm Ruger.

4    Q.    And do you know, for example, were you able to

5          tell when that jacket had been fired?

6    A.    No.

7    Q.    Could have been fired ten years ago?

8    A.    Yes.

9                    ATTORNEY GRIFFIN:   Nothing

10         further.

11                   THE COURT:   Cross.

12                   CROSS EXAMINATION:

13   BY ATTORNEY CHERNIN:

14   Q.    To your knowledge, was that exhibit -- the

15         jacket, I'm sorry, what number is that one?

16   A.    Exhibit 2.

17   Q.    2.   Was that submitted for any sort of organic

18         testing to see if there were any DNA or any

19         sort of biological materials on that?

20   A.    No.

21   Q.    It was not?

22   A.    That's correct.

23   Q.    And so we don't know if that gun passed

24         through the dead person in this case; is that

25         correct?

                          98

1   A.   That's correct.

2   Q.   And that was -- and to your knowledge that

3        jacket has never been outside of the presence

4        of law enforcement involved in this case;

5        isn't that correct?

6   A.   That's correct.

7                ATTORNEY GRIFFIN:  Are we talking

8        about since January 31st of '04?

9                ATTORNEY CHERNIN:  Yes.

10  BY ATTORNEY CHERNIN:

11  Q.   Since January 31st of '04 that's always

12        consistently been in the possession of law

13        enforcement involved with this case; correct?

14  A.   That's correct.

15  Q.   And you know that because of then inventory

16        number on it and the markings; is that

17        correct?

18  A.   That's correct.

19  Q.   And that those inventory numbers and markings

20        would be found on Exhibit 2 and they're

21        consistent with -- there's a -- an inventory

22        number indicating that Detective Tom Casper

23        got that -- picked up that jacket and then got

24        it to you at the crime lab; correct?

25  A.   That's correct.

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 99 of 122   Document 61-22

```
 1   Q.   And other than the time that that left your
 2        possession at the crime lab, was returned to
 3        Detective Casper or somebody else with
 4        Milwaukee Police Department?
 5   A.   That's correct.
 6   Q.   Now, you talked about an under lug on a
 7        barrel?
 8   A.   Yes.
 9   Q.   Is that manufactured by the manufacturer or is
10        that under lug an after market piece?
11   A.   It's usually a factory item.
12   Q.   And to your knowledge, does Sturm Ruger make
13        such a weapon with an under lug?
14   A.   Yes.
15   Q.   And also Taurus?
16   A.   Yes.
17   Q.   And also Smith & Wesson?
18   A.   Yes.
19   Q.   But there is no question that a revolver is
20        still going to have that cylinder protruding
21        from it; correct?
22   A.   That's correct.
23   Q.   And does Smith & Wesson make a silver gun with
24        black grips in the revolver?
25   A.   Yes.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 100 of 122   Document 61-22

```
1    Q.   And similarly, for Taurus and Sturm Ruger?

2    A.   That's correct.

3    Q.   Now, you do not know whether this was fired

4         out of a 38 or a 357, the -- the casing,

5         Exhibit Number 2 -- or jacket rather, Number

6         2, you don't know whether that was fired from

7         a 38 or a 357?

8    A.   It could have been either.

9    Q.   And a 38 refers to the length of the barrel;

10        is that correct?

11   A.   Well, 38 is just a name, but you're talking

12        about the length of the cartridge case, would

13        be the name for that.

14   Q.   Okay.  Now, how long is the barrel on a 38?

15   A.   Whatever barrel length the factory produced it

16        in.

17   Q.   What does -- what lengths does Sturm Ruger?

18   A.   Anywhere from two inches to seven and a half.

19   Q.   And would that also be the case with Taurus?

20   A.   Yes.

21   Q.   And with Smith & Wesson?

22   A.   Yes.

23   Q.   And you can't say what length of barrel was

24        used to shoot casing number -- or jacket

25        Number 2; can you?
```

101

```
 1   A.   That's correct.

 2   Q.   Your initial test of the lead fragments or

 3        some of the lead fragments was from February

 4        of 2004; correct?

 5   A.   That's correct.

 6   Q.   Exhibit 33, that testing was done in February

 7        of 2004; correct?

 8   A.   That's correct.

 9   Q.   And then Exhibit 34, the bullet fragments from

10        the autopsy report -- or from the body, that

11        testing you did February 15th of 2005?  Two

12        days ago?

13   A.   That's correct.

14   Q.   Why did it take you a year to test those --

15        the fragments from the autopsy?

16   A.   I never received this item until this week.

17   Q.   And do you know when you did receive that?

18   A.   Well, I worked it on the 9th, which would have

19        been Tuesday.

20   Q.   Tuesday?

21   A.   Excuse me, the 15th.

22   Q.   So you received it the 15th and you worked on

23        it on the 15th?

24   A.   That's correct.

25   Q.   And if you had had additional time to work on
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 102 of 122   Document 61-22

1        that, would there have been any other tests

2        that you could have performed to determine

3        whether the bullet fragments -- yeah, the

4        bullet fragments came from the same gun as the

5        jacket?

6   A.   No.

7   Q.   Lead is just lead; is that correct?

8   A.   Lead is lead, that's correct.

9                (Defense counsel confers with

10       defendant.)

11  BY ATTORNEY CHERNIN:

12  Q.   Did you receive the jacket, the copper jacket,

13       did you receive the copper jacket on -- in

14       Exhibit Number 2, did you -- do you get an

15       inventory report from the Milwaukee Police

16       Department accompanying that?

17  A.   No.

18                ATTORNEY CHERNIN:  I have no

19       additional questions of this witness.

20                THE COURT:  Redirect.

21                ATTORNEY GRIFFIN:  Could I see

22       you on the side for just a second, Judge.

23                (Side bar.)

24                THE COURT:  Nothing further of

25       this witness from either side; is that

                             103

```
1          correct, gentlemen?

2                        ATTORNEY GRIFFIN:  Correct.

3                        ATTORNEY CHERNIN:  That is

4          correct, Your Honor.

5                        THE COURT:  Mr. Simonson, you may

6          step down.

7                        (Witness excused.)

8                        THE COURT:  All right.  Ladies

9          and gentlemen of the jury, we're going to end

10         our morning session at this time and we're

11         going to pick back up at 1:15 this afternoon.

12         That will give you a good hour and 15

13         minutes.  And one of the things I'm going to

14         advise you of is a ruling that I have made

15         earlier this morning with both counsel, and

16         they are aware of it, and that is going

17         forward you will be kept together, sequestered

18         together, both coming and leaving the

19         courtroom.  You will also be kept together and

20         will eat together for lunch, and that has been

21         brought up and will be served in the jury

22         room.

23                        All your bathroom breaks will be

24         taken in the jury room.  And I understand that

25         there are a couple of smokers.  We have
```

104

1    decided to crack the window a bit. Is there

2    anyone who's going to object to that?

3    Otherwise we can -- and don't feel, you know,

4    embarrassed about it, I don't smoke so, you

5    know, if you -- if you'd rather have those

6    people who are -- who are my smokers in the

7    group? How many do I have that actually --

8    okay, we got three. Three of you. I thought

9    it was more than that. There's three. All

10    right.

11    What we will do, if that becomes

12    a problem for anybody else who's in the jury

13    room, what we will do is one of my deputies

14    will stay back with those three, take them out

15    at the time that they need to have a cigarette

16    break, it's usually before the lunch is

17    served. We can do it afterwards if you want

18    to wait. You can coordinate that through my

19    deputy. But the rest of you will remain back

20    together in the jury room, you will not be

21    allowed to wander out, sort of individually,

22    for lunch from now on or coming or going.

23    At the end of the day today I'm

24    going to make some announcements about where

25    you will congregate in the morning and the

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 105 of 122   Document 61-22

deputies coming to get you and how you will
leave in the morning and how my deputies will
escort you out. Those are the kinds of things
I have made a decision about. It's nothing
for you to be concerned about in the sense of,
you know, anybody done anything wrong, it's
just that as I indicated to you earlier, I
want to avoid even the appearance of somebody
suggesting that the jury was somehow tainted,
talking or overhearing conversations in the
hallway, talking to people. And so even to
just avoid that possibility, this is the best
way to address that situation. So I'm going
to ask you to cooperate. If you have any
questions about that, what you're allowed to
do or not do in that regard, please direct it
to my deputies and they'll communicate
anybody's concerns directly to me.

So at this point you're going to
be discharged into the back into the jury
room, and in addition, if anyone wants to go
out and stretch their legs, the deputies will
take you, again, together, you know, not
individually, together, for those of you who
want to go out and stretch your legs, get some

106

```
 1      fresh air.  In the summertime we routinely do
 2      that, not so much in the wintertime.  If
 3      that's something you want to do as well.
 4      Again, it has to be done collectively and with
 5      my deputies.  Thank you.
 6                  DEPUTY:  All rise for the jury
 7      please.
 8                  (Jury out of box.)
 9                  THE COURT:  Please be seated.
10      The court wants to make a brief record of
11      the -- a brief record of the basis for the
12      court making the ruling that I have made with
13      respect to the jury and the sequestration
14      order requiring them to remain together for
15      lunches, when they come and when they depart
16      in the evening.  And it's based on the
17      following factors.  This court has the primary
18      duty of not only insuring the defendant has a
19      fair trial, but I have an equal duty to make
20      sure that the fair trial is done in a safe
21      fashion.  And in that regard, specific issues
22      have arisen over the course, primarily of the
23      last day, for certain over the last 48 hours,
24      with respect to additional security measures
25      being taken.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 107 of 122   Document 61-22

1          I was advised, and I then with my

2    deputies advised the lawyers, that there were

3    several things that came to my attention

4    yesterday, some directly to my attention and

5    some indirectly.  The things that came to my

6    attention directly I think I've already spoken

7    about in an earlier session yesterday with the

8    defendant, and that is the defendant's

9    behavior, which was primarily directed at the

10   court, that is me, at the end of the morning

11   session yesterday, Wednesday, February 16th.

12   And it had to do with the court's ruling on a

13   particular matter.

14          The defendant wanted to --

15   outside the presence of the jury, admonish the

16   court for not ruling in any way since the

17   beginning of the trial in the defense's

18   favor.  In addition, the defendant, in what I

19   took to be an aggressive posture towards the

20   court, indicated that I don't, that is the

21   court, does not intimidate him.  And finally,

22   that the defendant is not going down for this,

23   I believe these are fairly accurate quotes.

24   And then finally, what are you going to do

25   about it, hold me in contempt.

```
 1              My response at the time was I
 2    think fairly measured.  It is clear to the
 3    court and I think clear to anyone who observed
 4    that outburst yesterday, that it was a clear
 5    basis for this court to in fact find the
 6    defendant in contempt.  The court decided that
 7    that was an extreme measure that in my
 8    judgment wasn't necessary, at least from my
 9    perspective, in terms of the way he had
10    addressed the court, and that I would at least
11    admonish him and as well talk to his lawyer
12    about making sure that he understood what the
13    restraints were, the constraints I should say,
14    about his behavior in the court, both in front
15    of the jury and outside the presence of the
16    jury.
17              That took care of the issue with
18    respect to the defendant's behavior towards --
19    directly towards the court.  But I have, as I
20    said earlier, an obligation to make sure that
21    any proceeding in here is done in a safe
22    fashion.  So in that regard, mindful of my
23    obligation to the jury, to my staff and to any
24    individuals who are in the gallery during this
25    trial, in conjunction with the advice and
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 109 of 122   Document 61-22

1	direction of my deputies, we decided to take
2	the following steps.
3	First, it was decided that we
4	would add additional security to the
5	courtroom.  That was accomplished yesterday
6	afternoon with two additional deputies inside
7	the courtroom and at least one outside the
8	courtroom in the gallery for the better part
9	of the afternoon session.  That would continue
10	as I had worked it out with my deputies for
11	the duration of the trial.
12	Secondly, the court indicated
13	that the -- I consented to the deputy's
14	directive that they should use the stun belt
15	for the defendant, who I was advised after he
16	departed my court was continued to be highly
17	agitated, not only at them but at anyone back
18	in the bullpen area, as well as his own lawyer
19	for the better part of the lunch hour
20	yesterday.  In addition, my deputies advised
21	me as to the reasons for the stun belt, that
22	the defendant had made certain statements to
23	them back there during the lunch hour, as well
24	as earlier in the day, he was not going down
25	for this, you might as well use your gun and

110

1      kill me now.

2                Finally, there was some
3      statements made by the defendant as it relates
4      to his coming and going from the courtroom.
5      That is, when he had been brought up yesterday
6      by my deputy from the jail to the court, he
7      was asking questions directly related to the
8      path that he would be taking every day in the
9      morning, what floor he'd be coming and leaving
10     from, what time he does that, whether there
11     are any other individuals who are allowed, is
12     it a public entrance, a private entrance, are
13     people allowed to have access -- other people
14     allowed to have access to this same pathway.

15               Those are the types of questions
16     that good law enforcement take heed of and
17     analyze to determine whether or not the
18     defendant or anyone in custody is considering
19     abusing his in-custody status.  That's
20     longhand for saying whether or not he's
21     interested in fleeing or having an attempt to
22     flee or have others assist him in fleeing.
23     Based upon those comments, the court, in
24     addition to my own observation of the
25     defendant, agreed with the Sheriff's

111

1    Department that they should take the

2    additional step of securing the defendant with

3    a stun belt for the duration of the trial.

4    That has also been accomplished.

5              The third thing that I indicated

6    to the Sheriff's Department was that I wanted

7    the defendant to continue to have the use of

8    his hands, but he must be fully restrained,

9    continue to be fully restrained at his ankle

10   to the eye bolt directly under the floor.  As

11   indicated in my ruling earlier, both tables,

12   defense and the State, have skirted tables,

13   thus blocking the jury's direct line of vision

14   to the defendant, and the security measures

15   that are ostensibly out of their view, that is

16   around his ankle and under the table, secured

17   to an eye bolt.

18              Finally, I indicated to the

19   deputies that if it should become necessary,

20   should the defendant engage in any further

21   disturbances, either out of my presence or

22   directly in my presence, we may in fact be

23   forced to take the following two measures.

24   Number one, we will secure his hands, but

25   direct him to keep his hands below the table

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 112 of 122   Document 61-22

1  for the duration of the trial. If that was

2  unsuccessful, then the court would take the

3  most drastic step, which would be to secure

4  the defendant outside the presence of the jury

5  for the remainder of the trial. He would

6  still have access either through a video

7  conferencing directly from the jail, or in

8  Judge John Franke's courtroom, which has a

9  glassed-in area that is for that specific

10  purpose, to have defendants who have become

11  disruptive or unruly in front of a jury, to

12  separate them from the defense table and to

13  actually have them in a separate area of the

14  courtroom.

15            Fortunately, after the lunch hour

16  yesterday when I explained certain things to

17  the defendant, he indicated to the court that

18  he was all right, that he was going to be

19  compliant with all further directives, even

20  though he may not agree with them, and that it

21  would not be a necessity to take those

22  additional steps. Today, Thursday we have had

23  no problems with the defendant at all. So

24  again, since noon yesterday we have not found

25  it necessary to engage in any additional

113

1    security measures.

2              However, at least in terms of the

3    defendant directly, it also came to my

4    attention however that there were individuals,

5    as I mentioned in a -- a brief comment

6    yesterday towards the end of the day, and

7    whether they are one and the same we do not

8    know, but there are three male individuals,

9    they appear to be African-American, who had

10   approached my clerk, a member of my staff, and

11   made some comments to her outside this court,

12   which again is inappropriate.  The specifics

13   of the comments had to do with whether or not

14   she was going to be getting her fingers

15   ready.  Fingers ready for what we could only

16   speculate and so we don't know what that

17   means.  The court looks at it, as I think a

18   prudent court does, as an ill-advised comment

19   at best, and -- and a possible threat at

20   worse.

21              In addition, the three

22   individuals, again of African-American

23   heritage, young males, entered the courtroom

24   yesterday afternoon, I had not seen them prior

25   to that time.  They had been in the gallery.

114

```
 1      I had asked both counsel whether or not they
 2      recognized them or whether they were
 3      witnesses.  Neither one indicated that they
 4      were familiar with them.  I asked my deputy to
 5      make sure that he watched them throughout the
 6      rest the trial.  One of the things -- actually
 7      two things became clear to the court.  Certain
 8      individuals were found at the end of this
 9      hallway down in the direction, I believe, of
10      Judge Conen's court, although I could be
11      mistaken on that.
12                  In any event, they were out in
13      the hallway at the same time witnesses in this
14      trial were under a sequestration order from
15      the court.  Those individuals had come in and
16      out of the court on at least one or two
17      opportunities yesterday afternoon, and I was
18      advised, again by one of my deputies, that on
19      one occasion a few of them were in the direct
20      vicinity, if not immediately next to,
21      witnesses that had been scheduled or were
22      scheduled to testify in this case.
23                  When I combined all of those
24      types of observations and comments, in light
25      of the defendant's behavior in my court, it
```

115

```
 1      became clear to me that additional steps
 2      needed to be taken to protect the sanctity of
 3      the jury and of witnesses.  And indeed I
 4      advised my -- both lawyers and my deputy that
 5      we needed to remind Antonia West, a witness
 6      who had already testified in this case but had
 7      not been releases from her subpoena, that she
 8      was to remain outside the courtroom and not
 9      discuss her testimony with anyone until
10      directed to do so by this court.  And yet, we
11      found her in the back row of the gallery
12      during the initial stages of Mr. Jennings'
13      testimony yesterday afternoon.

14                   With that as a backdrop, the
15      court believed that the most prudent steps to
16      be taken to secure, as I said, the sanctity of
17      the jury from any direct or indirect contact
18      or interaction with potential witnesses or
19      other people connected to this case, that the
20      State's request that I sequester them for the
21      duration of the trial be granted.  My
22      ruling -- I believe the defense had asked that
23      I not make such a broad statement.

24                   I don't think that the State
25      wanted me to initially announce the
```

116

1     sequestration order in court, and the defense

2     had asked that I somehow communicate my

3     desires or my directives through my deputies.

4     I advised both of them that I was denying

5     those requests. Everything we do in here has

6     to be on the record. That's for appellate

7     purposes, and so that is why I advised -- why

8     I'm making the record the way I am right now,

9     and I advised the parties that I would be

10     addressing the jurors myself.

11            Finally, Mr. Chernin's request

12     that I allow the deputy to sort of communicate

13     that to them, to the jurors about coming and

14     going and taking smoking breaks and so forth,

15     that that come from my deputy, and again, I

16     denied that request. It is not a sheriff's

17     directive, it's a court order, and it must

18     come from the court.

19            The directive is as follows. As

20     I have indicated to the jurors today before

21     they broke, that they will, for the duration

22     of the trial, be kept together. When they're

23     coming in the morning they'll report down to

24     Jury Management to a particular area. We will

25     work the logistics of that out. Then they

117

```
 1     will be escorted up here together as a group
 2     with my deputies to the jury room.  At the end
 3     of the day the procedure will be followed
 4     again.
 5                  With respect to lunch, they will
 6     be kept together as if they were in
 7     deliberations.  They will be kept together for
 8     lunch.  Lunch will be served up in the jury
 9     room and there will be a deputy back there at
10     all times.  I believe that those -- we will
11     release them for the evening.  The
12     sequestration order does not require that it
13     carry into the evening in their homes.  They
14     will return to their homes in the evening.
15                  I believe that those are the
16     appropriate steps that needed to be taken in
17     this court's belief that it would protect the
18     sanctity of the jury's purview and of their --
19     their ultimate deliberations.
20                  Mr. Griffin, is that a fairly
21     accurate summary of the discussions we had
22     about this subject earlier this morning?
23                  ATTORNEY GRIFFIN:  Yes.
24                  THE COURT:  Mr. Chernin?
25                  ATTORNEY CHERNIN:  Yes, Your
```

118

1  Honor.  Your Honor, something occurred to me

2  as you were speaking.  One of the things that

3  the court might want to add is back in prior

4  times when they did used to sequester juries

5  there was an additional instruction that

6  despite the fact that they were together that

7  they should not commence to discuss the case

8  or commence deliberations.  And since you've

9  already instructed them that, but now because

10  of their being together all the time, at least

11  while they're together, if you could give them

12  some form of instruction in that regard that

13  they're not to discuss the case or commence

14  deliberations, I would appreciate that.

15              THE COURT:  I will agree to do

16  that.

17              ATTORNEY CHERNIN:  Thank you.

18              Beyond that, there is one other

19  matter with respect to Exhibit 32, the autopsy

20  protocol.  There was a toxicology report that

21  was attached as a last page on the portion

22  that was presented to Doctor Jentzen.  I

23  believe that Mr. Griffin did that

24  inadvertently and Doctor Jentzen did not

25  testify as to matters contained within the

```
 1   toxicology report.  And Mr. Griffin and I
 2   agree that the toxicology report is not a
 3   proper item of -- for that exhibit and we're
 4   asking that that be removed.
 5                THE COURT:  Mr. Griffin?
 6                ATTORNEY GRIFFIN:  I think I
 7   already did, but I'll double check.  In any
 8   event, 32 will not include, when it goes into
 9   the record -- and we can talk about exhibits
10   in a minute -- yes, I already removed it.
11                ATTORNEY CHERNIN:  Lastly, Your
12   Honor, Mr. Wilber, I asked him about those
13   three individuals, he doesn't have any idea
14   who they are and he says that they're not
15   people that he knows to his recollection and
16   he did not know who they are.  And so not that
17   I'm arguing with the court, we're just letting
18   the court know that so that the court can do
19   what it wants to do.
20                THE COURT:  We still have the
21   issue to deal with of the demonstrative
22   evidence.  I'm going to take that up between
23   1:15 and 1:30.  That gives you folks an hour
24   for your lunch hour and it gives my staff a
25   break as well.  They've been at this since
```

120

1          7:30 this morning.

2                         That's it, gentlemen.

3                         (Lunch break taken.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF WISCONSIN )

2

3    MILWAUKEE COUNTY    )

4

5              I, Lori J. Cunico, do hereby certify

6         that I am a Registered Professional Reporter,

7         that as such I recorded the foregoing

8         proceedings, later transcribed by me, and that

9         it is true and correct to the best of my

10        abilities.

11

12        Dated this ___ day of October, 2005, at

13        Milwaukee, Wisconsin.

14

15

16        _____

17        Lori J. Cunico - Court Reporter

18

19

20

21

22

23

24

25
```

122