1   STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY

2                             Branch 05

3

STATE OF WISCONSIN,

4
                       Plaintiff,

5

6            -vs-               File No. 04-CF-000609

7   DANNY L. WILBER,

8                   Defendant.

9

10              JURY TRIAL (DAY 4 - P.M.)

11

12

13          Proceeding held on February 17, 2005

14

15      BEFORE THE HONORABLE MARY KUHNMUENCH
               CIRCUIT COURT JUDGE

16

17

18           A P P E A R A N C E S

19       JAMES GRIFFIN, Assistant District Attorney,
   appeared on behalf of the State of Wisconsin.

20
       MICHAEL CHERNIN, Attorney at Law, appeared

21   on behalf of the defendant.

22       The defendant appeared in person.

23

24

25              Cynthia A. Dobbs
          Certified Shorthand Reporter

Case 1:10-cv-00179-WCG  Filed 08/29/19  Page 1 of 182  Document 61-23

```
 1              W I T N E S S    I N D E X

 2

   OSCAR NILES
 3 Direct Examination by Mr. Griffin      .................    23
   Continued Direct Examination by Mr. Griffin    ..........    74
 4 Cross Examination by Mr. Chernin       .................    93
   Redirect Examination by Mr. Griffin    ................   109
 5 Recross Examination by Mr. Chernin     ..............   116

 6 LEA FRANCESCHETTI
   Direct Examination by Mr. Griffin      ................   118
 7 Cross Examination by Mr. Chernin       ................   130

 8 JAIMIE WILLIAMS
   Direct Examination by Mr. Griffin      ................   133
 9 Cross Examination by Mr. Chernin       ................   146

10

11

12              E X H I B I T    I N D E X

13                 (No exhibits received.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (The following proceedings were held

 2         outside the presence of the jury.)

 3                    THE COURT:  All right.  Let's go on the

 4         record.  The State of Wisconsin versus Darryl -- I mean --

 5         Danny Wilber, 04-CF-000609, first degree intentional

 6         homicide while armed with a dangerous weapon.

 7                    MR. GRIFFIN:  Assistant D.A. Jim Griffin

 8         for the State with Detective Tom Casper of the Milwaukee

 9         Police Department.

10                    MR. CHERNIN:  Michael Chernin appearing on

11         behalf of Danny Wilber.  Danny Wilber is down the hall

12         coming in a custodial --

13                    MR. GRIFFIN:  Setting.

14                    MR. CHERNIN:  -- setting.  Thank you.  My

15         client is now present in the courtroom.

16                    THE COURT:  All right.  The State of

17         Wisconsin versus Danny Wilber.  The Court has previously

18         called the case for the afternoon session, the lawyers

19         have made their appearances on the record, and the

20         defendant is now present in court.

21                    The issue of the demonstrative evidence

22         that the State has wished to introduce into the record has

23         come up on at least three occasions and the Court has --

24         during the course of this trial the Court has talked to

25         the lawyers about what I believe are the relevant cases,
```

1        what the Fifth Amendment privilege allows or does not

 2        allow with respect to demonstrative evidence, and that

 3        there is a relevant Court of Appeals case on point, as

 4        well as the Supreme -- the Supreme Court of the United

 5        States case in Pennsylvania v. Muniz, M-U-N-I-Z, 496 U.S.

 6        582, 1990 wherein the Supreme Court of the United States

 7        indicated that the -- or held that the privilege does not

 8        protect a suspect from compulsion to produce real or

 9        physical evidence.

10                    With that as a backdrop, there is also a

11        State of Wisconsin case, that's State v. Hubanks,

12        H-U-B-A-N-K-S, which was a case actually out of Milwaukee

13        County before then Circuit Court Judge Rudolph Randa, I

14        believe the prosecutor was then John DiMotto, it's 173

15        Wisconsin 2d at Page 1.  That case specifically referenced

16        a voice identification issue and the court's allowance of

17        the state's request in front of the jury of having the

18        defendant submit a voice identification in front of the

19        jury, even though he had made the determination not to

20        testify during the trial to exercise his Fifth Amendment

21        rights.  The Court ultimately ruled that it was

22        demonstrative evidence and it was admissible and

23        ultimately indicated that he would give an instruction to

24        the jury should the defendant refuse to comply with such a

25        directive, and in that case since the defendant in fact

1    refused to give the direct -- to produce that type of

2    evidence -- demonstrative evidence consistent with what

3    the State was asking for, Judge Randa apparently gave an

4    instruction to the jury that they were able to give -- the

5    jury could give that declination the weight they think

6    that it deserves.  The defendant in that case,

7    Mr. Hubanks, appealed both issues, that is, that it was a

8    violation -- the demonstration itself was in violation of

9    his Fifth Amendment rights and then secondly that the

10   instruction that the court ultimately gave to the jury was

11   improper.  The Court of Appeals affirmed the trial court

12   on both points.

13           With that as the backdrop, Mr. Chernin -- I

14   mean -- Mr. Griffin, I'm going to have you since it's your

15   request, your motion *in limine* to ask the Court permission

16   at this time for the introduction of demonstrative

17   evidence involving the defendant, I'm going to have you

18   put that on -- your request on the record at this time and

19   just summarize for the Court the procedure that you intend

20   to use.

21           MR. GRIFFIN:  Judge, I have -- I'm going to

22   go ahead and mark this board as Exhibit 40.  This board

23   was made in the arts and crafts shop of the D.A.'s Office

24   by Ms. Maggiore and company.  It is essentially several

25   different pieces of foam type board put together to

measure -- I don't even know how tall, I would say over 7

feet, and obviously it's about maybe a yard wide or so,

and I simply am going to -- the defendant obviously is not

going to be allowed to move from his chair.  I'm simply

going to ask the defendant to stand and point to this

board.  I'm going to ask him to -- do you want me to do it

now so you can --

THE COURT:  Yes.

MR. GRIFFIN:  Is the defendant willing to

do it?

THE COURT:  Well, Mr. Chernin, we've never

even made it to that point so I don't know what --

MR. CHERNIN:  For purposes of this

demonstration and to deal with the issue of the argument,

I'm going to ask Mr. Wilber to do it here, and although

the Court has not made a ruling on it -- I'm going to ask

you to do it here because I want the Court to see what

Mr. Griffin is asking you to do in front of the jury and

I -- and I do have a response, but -- and please do this

part with them.

MR. GRIFFIN:  Well, if I may, if he does

this and Detective Casper sees it, Detective Casper or

anyone else in the courtroom could testify about what

happened when he did it, so even if he does it to show

what it is we are going to do, I mean, I can use Detective

```
 1        Casper as if he were the defendant, have him point, but if

 2        the defendant's points here, there's -- Detective Casper

 3        is going to watch him do it.

 4               MR. CHERNIN:  Okay.  Well, if that's what

 5        you are going to ask -- if that's the way you want to do

 6        it, let's -- why don't you explain what you want done.

 7               MR. GRIFFIN:  Sure.  Detective Casper --

 8        I'm going to use Detective Casper, Judge, as if he were

 9        the defendant just to show you what I would like him to

10        do.

11               THE COURT:  Go ahead.

12               MR. GRIFFIN:  I would put the board in a

13        place where the defendant could reach it with the tip of

14        his finger and I would ask him first --

15               THE COURT:  I want you to -- Mr. Griffin,

16        you are standing directly in front of the jury box with

17        that board and obviously the defendant -- if Mr. Casper is

18        going to -- Detective Casper is going to be the defendant

19        for purposes of this exercise, I'm going to tell you to

20        have him step directly into the spot that you are

21        requesting this Court to have the defendant stand, so in

22        front of the jury box is not going to -- that's not going

23        to be allowed.  The defendant as I indicated to both

24        parties yesterday will remain seated -- or will remain at

25        his counsel table at all times and however this exercise
```

1    is carried out, with or without his cooperation, it needs

2    to be conducted from that immediate area so as to protect

3    again his -- the jury from seeing any of the security

4    restraints that we've used, particularly on his ankle, in

5    front of the jury.  So the detective should stand there

6    where ostensively he is right now which is about a half a

7    foot if that, you know, a few inches away from the

8    defendant who is now seated.  Detective Casper is now

9    standing next to the seated defendant at counsel table.

10   You are standing directly to the right of that counsel

11   table within about it appears to the Court to be a foot

12   and a half from -- or I would say probably 3 feet actually

13   from the defendant -- the seated defendant.

14              MR. GRIFFIN:  The board would be at

15   approximately this spot.  I would try to get it so it's

16   approximately at arm's length away from the defendant.  I

17   don't know exactly how, but I would ask the defendant to

18   simply hold his arm out with his either palm down I guess

19   and his fingers extended or just have his right finger

20   touch the board so that his arm essentially is straight at

21   shoulder level.

22              THE COURT:  How are you going to ask him to

23   do that?

24              MR. GRIFFIN:  I would -- I would simply --

25   well, actually I think the Court ought to ask him to do

```
1          it, not me, but --

2                    THE COURT:  No, this is your request.

3                    MR. GRIFFIN:  I would say, Mr. Wilber,

4          would you please point directly at the board with your arm

5          at shoulder length -- at shoulder height, excuse me, level

6          with your shoulder, he would point to a particular spot on

7          the board with either -- which either I or Detective

8          Casper would then mark, I would then ask him to point to

9          the line that I have placed here, there's a black line on

10         the board, I would ask him to then touch that line.

11                   THE COURT:  And for what purpose are you

12         asking or seeking to have the introduction of this

13         demonstrative evidence into the record?

14                   MR. GRIFFIN:  The -- as I've said before,

15         Judge, and I think there's evidence on the record that the

16         defendant is as tall as 6'9", on his booking photos I

17         think it's 6'7", I think Mr. Jennings may have said 6'8",

18         and I believe that when the defendant points to this line

19         here which is at 5'8", his arm would be in a slightly

20         downward angle which would not happen for someone say who

21         is 6 feet such as myself; even to get to 5'8", my arm is

22         coming up and I'm just about 6 feet and I have shoes on.

23                   There was testimony from Dr. Jentzen that

24         the victim's injury was actually an inch and a half below

25         the top of his head, 5'6 and a half if you will, but as we
```

1    know from the photos, the defendant (sic) had some sort of
2    shoes or boots on.  So sort of not knowing exactly how
3    high those shoes --
4                    THE COURT:  The defendant or the victim?
5                    MR. GRIFFIN:  Strike that, the victim.
6    They look like sort of average rubber soled boots.  So
7    again I put the line at 5'8", and this is not a specific
8    demonstration, but I think it's an approximation where it
9    would have been if the defendant -- where the entrance
10   gunshot wound would have been given the fact that Mr. Diaz
11   had some kind of shoe on.  And the Court can review the
12   photos to see if an inch and a half is some -- I mean, he
13   didn't have platform heels on or anything like that.  So
14   that's the purpose of my demonstration.  I believe that
15   ultimately Mr. Wilber will have to drop his arm, in other
16   words, that his arm --
17                    THE COURT:  What does it go to?
18                    MR. GRIFFIN:  It goes to the angle of the
19   wound, in other words, the trajectory of the bullet
20   through Mr. Diaz's head is at a downward angle and we are
21   talking about an entrance gunshot wound that assuming
22   Mr. Diaz had no shoes on was 5 feet 6 and a half inches
23   approximately from the ground.  The bullet traveled
24   through his head and came out approximately 4 inches lower
25   than that.  Again in the anatomic position.

1           THE COURT:  And again the purpose of having
2      the defendant go through this exercise in front of the
3      jury is for what?
4           MR. GRIFFIN:  Is to show that the defendant
5      at his height unlike someone who was 5'8" for example
6      would -- again as he put the gun out towards Mr. Diaz's
7      head and he aimed it at his head would have a slightly
8      downward angel to his arm, as I said before, contrasted
9      with someone who isn't that tall.
10          THE COURT:  And you believe that this is
11     consistent with other types of demonstrative evidence how?
12          MR. GRIFFIN:  Well, I didn't -- I believe
13     that the defendant's arm out similar to a voice pattern or
14     the other things talked about in the case law is nothing
15     that's normally hidden from view, it's not testimonial in
16     any way.  The defendant holding his arm out or holding his
17     arm out a few inches lower is something that the
18     defendant's probably done a countless number of times in
19     his life that a countless number of individuals would have
20     seen.  Certainly there's even been testimony from his
21     family members that night that he held his arms up, that
22     kind of a gesture if you will.  There's nothing
23     communicative about it in the sense of testimony, it's not
24     the -- it's no different than him speaking words or
25     pointing or walking with a particular gate, that's his

```
 1      normal gate that people would have always seen him walk

 2      with, and so for those purposes and I think that for those

 3      reasons it's not testimonial, it's not the kind of

 4      testimony that the Fifth Amendment protects against, and I

 5      gave some of the cites that I thought were consistent with

 6      that principle earlier.  It's no different than a

 7      fingerprint, a voice print, a particular gesture, walking.

 8                  THE COURT:  In the Hubanks case for

 9      instance the defendant argued that the particular words

10      that he was asked or directed to speak were inherently

11      testimonial because they were non neutral, content laden,

12      and prejudicial and thus was a clear -- they went to his

13      mindset or depicted that and thus was a violation of his

14      Fifth Amendment right.  How would you respond to that?

15                  MR. GRIFFIN:  Well, I think the -- in a

16      subjective sense I guess if you want to assume for a

17      minute that the defendant is guilty and did say those

18      things guiltily, he is repeating the same words that he,

19      himself, said at the time of the crime, but that's

20      obviously the whole question, I mean, you are sort of

21      bootstrapping the answer in a sense that if the defendant

22      is guilty and if he pointed the gun at Mr. Diaz, clearly

23      his arm would have been at a downward angle and in a sense

24      what the jury is seeing is some similar type of

25      reenactment to the actual crime, but that's not the
```

1    question here, in other words, the fact that the guy had

2    to utter specific words in Hubanks for example, the words

3    which were alleged that he said the night of the crime, is

4    no different because he's not guilty, and there's nothing

5    being said to the jury, hey, he's going to repeat the same

6    words he said that night, everybody, get ready.  No,

7    that's sort of the -- the allegation if you will from the

8    State, that's the State's theory, but the defendant if you

9    will, there's nothing in the defendant uttering those

10   words that is an admission in and of itself that he did in

11   fact utter those words.  There's nothing with the

12   defendant pointing at this board here today that in any

13   way says or indicates -- in other words, the defendant is

14   not in any way indicating to the jury that he in fact did

15   that, that he in fact pointed his arm at Mr. Diaz's head

16   and fired, this is nothing that the defendant is saying to

17   the jury himself, he's not being compelled to say I am

18   guilty in any way or to incriminate himself.  He is being

19   forced to do what he would do every single day anyways --

20   you figure fingerprints, walking -- I don't remember the

21   exact quotes, but I can get them if the Court will give me

22   a second.

23                    MR. CHERNIN:  Exact quotes from what,

24   Hubanks?

25                    MR. GRIFFIN:  No.  What I think is sort of

the relevant Fifth Amendment testimony -- issues here.
That the privilege against self-incrimination is a bar
against compelling, quote, communications or testimony,
but that compulsion which makes a suspect or accused the
source of real or physical evidence does not violate it.
And this is just real or physical evidence, the angle of
his arm if you will at the time of the shooting.

In terms of some of the voice kinds of
comparisons, I think the case law said the like -- like
facial characteristics, as voices repeatedly proves for
others to hear and things like that and that's why it's
not any kind of mistery, and that the Fourth -- strike
that -- the -- where's the quote that I was -- well, I
thought I had it here, Judge, but maybe I'm wrong.  I
don't know what I did with that stuff.

So that again is no different than if the
defendant walked for the jury, stood up for the jury, held
his hands out for the jury, showed a tattoo or a mole to
the jury, showed that he was missing a finger or a toe to
the jury, to show that the particular identifications for
example by a witness are in fact accurate.  The defendant
is not testifying in this particular instance.  He's not
saying to the jury that it's true or not true or anything
like that.  The jury is allowed to observe physical
characteristics and movements, and in this particular

1    case, arm angles of the defendant which are not
2    testimonial in any way.
3                        THE COURT:  Anything else?
4                        MR. GRIFFIN:  Nope.
5                        THE COURT:  Mr. Chernin.
6                        MR. CHERNIN:  Okay.  Here's the big
7    distinction between what Mr. Griffin is talking about and
8    those cases are talking about.  In Hubanks in particular
9    there had been testimony that the perpetrator of the crime
10   uttered specific words and based upon the testimony of
11   that witness it was asked that those words be repeated so
12   that an *in court* identification could be made of -- of the
13   person who perpetrated the crime.  Ostensively if the
14   person on the stand heard the words and -- and -- and the
15   speaker had, you know, a Slovak accent, it wasn't going to
16   be that person, I mean, that was the notion of what was
17   going on when Judge DiMotto asked -- then A.D.A. DiMotto
18   asked Judge Randa for that ruling.  So there is a
19   difference here in that there is no testimony in the
20   record and there will be -- unless -- unless some of these
21   witnesses change their version of events, there will be no
22   testimony in the record indicating that someone saw or
23   observed Danny Wilber holding a gun in a particular angle
24   and now having that witness be able to identify Wilber
25   from that conduct.  The sole purpose -- oh, and let me

1  back up. That really is the distinction, okay, that --
2  and the other thing is there's no -- I don't know which
3  hand Mr. Griffin intends to have Mr. Wilber raise to
4  engage in this because there's no testimony in this record
5  showing that Mr. Wilber held a gun in his left or right
6  hand and there's nobody saying that he's right handed or
7  left handed, so we now have some further testimonial
8  issues coming into play where if Mr. Wilber were to -- I
9  mean, I don't know which hand he would raise and I don't
10 know which hand they are asserting that he had a gun in,
11 but that would be testimonial in nature and would -- if --
12 for example if he were to raise his right hand because
13 that would be in a position that would allow him to shoot
14 across at a particular angle, that is testimonial in
15 nature, but he also could be left handed, I don't know,
16 and that's why this is testimonial in nature and it's
17 asking the defendant to reveal something that would not
18 otherwise be revealed.
19            MR. GRIFFIN: Well, he's now changing the
20 entire argument, the entire offer. This is not used nor
21 could it ever be argued that he because he pointed to this
22 board, auh-hah, he had a particular angle, that's not the
23 point that we are talking about here.
24            MR. CHERNIN: Well, that's exactly it.
25            MR. GRIFFIN: No, it isn't.

```
 1                    MR. CHERNIN:  Yes, it is.  You are saying
 2          that you want him to demonstrate that he's going to --
 3          that the gun from his arm would be pointed at a particular
 4          angle.  You have no measurements to confirm what those --
 5          what those angles are and you are asking him to create
 6          evidence for you in the courtroom.  Now if it were -- if
 7          it were a question as I said earlier of identification
 8          based upon a witness' perception of events that you are
 9          trying to demonstrate, that's one thing, but all you are
10          doing is trying to inflame this jury by having Wilber
11          appear in -- Mr. Wilber appear in a menacing fashion, and
12          aside from the fact that it's testimonial, the next -- and
13          if the Court says it's not testimonial, then the question
14          is, is it prejudicial, and that's what Footnote 7 of the
15          Hubanks case addresses, is it prejudicial in nature, and
16          the only thing that you hope to do is to have a jury see
17          Mr. Wilber engaged in a particular form of conduct.
18          Anybody who is -- has any ability to think at all could
19          see that preliminary a person 6'7" could point down, but
20          that doesn't mean that a person standing on the steps
21          couldn't have reached over and done that.  No one has
22          testified as to that.  That would be like having me ask
23          for a demonstration of having somebody stand on the steps
24          and do it and -- and it could have been a shorter person
25          with their arm out trying to reach over something.  We
```

```
 1    don't know what the situation is.  There is no testimonial
 2    evidence.
 3              THE COURT:  You are arguing about all
 4    those -- the most recent comments you've made,
 5    Mr. Chernin, go to the weight the jury would give it, not
 6    it's admissibility, I mean, your argument on the
 7    testimonial nature goes to admissibility.
 8              MR. CHERNIN:  Correct.
 9              THE COURT:  Everything else you are talking
10    about goes to the weight the jury would give it, what
11    evidentiary value does it have, how is it relevant, and I
12    would like the State to respond to it.
13              Demonstrative evidence has value because it
14    ostensively assists the jury, the trier of fact, it
15    clarifies evidence, clarifies a particular point or an
16    element that has been raised or an issue that's been
17    raised during the trial.  So I guess the question that I
18    have for the State at this point is just in response to
19    the first part.  I will deal with the prejudicial issue
20    later.
21              MR. CHERNIN:  Yes.
22              THE COURT:  How is this -- you know, it's
23    clearly demonstrative evidence.  If it's not testimonial
24    in nature, it's admissible.  The arguments he is raising
25    go to its weight and unfair prejudice, but, you know, why
```

```
1        is this demonstration relevant demonstrative evidence and
2        how will it assist the jury?
3                        MR. GRIFFIN:  Judge --
4                        MR. CHERNIN:  If I might --
5                        THE COURT:  One moment.  You raised a point
6        and I want him to respond.
7                        MR. GRIFFIN:  Judge, if I may before I
8        answer, I got a note from Ms. Maggiore that Oscar Niles is
9        talking about leaving and that he doesn't care whether you
10       body attach him or not, he's been here for three days,
11       etc., and I will be able to get through the rest of the
12       afternoon without doing this demonstrative evidence.  I
13       also have another witness, Lea Franceschetti, who gave
14       birth on Sunday and is in a lot of pain.  So I'm going to
15       ask the Court's indulgence, can we go ahead and finish
16       these witnesses and then deal with this at the end of the
17       day?
18                       THE COURT:  Are you going to need a body
19       attachment?
20                       MR. GRIFFIN:  If he sticks around this
21       afternoon, no.  If I don't get to him this afternoon, I
22       may.
23                       THE COURT:  Who are you putting on the
24       witness stand next?
25                       MR. GRIFFIN:  Lea Franceschetti and Jaimie
```

```
1      Williams.  Lea's in a lot of pain.

2                  THE COURT:  What are you going to do with

3      Oscar Niles?

4                  MR. GRIFFIN:  Right after.  They won't take

5      that long.  They will take maybe a half an hour each.

6                  MR. CHERNIN:  Here's the problem,

7      Mr. Griffin, I know you are trying to put something on,

8      you asked him to be here, you told him you were going to

9      put him on this morning, based upon that he made

10     arrangements to -- he's got to take care of his daughter.

11                 THE COURT:  Mr. Chernin, you are not his

12     advocate.

13                 MR. CHERNIN:  No, I'm just.

14                 THE COURT:  Mr. Chernin, you are not

15     Mr. Niles' advocate in this court, you are Mr. Wilber's.

16                 MR. CHERNIN:  I have --

17                 THE COURT:  And you keep stepping over the

18     line, including getting too comfortable with the jury box.

19     Now step away from the jury box now.

20                 MR. CHERNIN:  There's no jury in the

21     courtroom.

22                 THE COURT:  I don't care if they are in

23     there or not, it's a habit that you are developing and

24     continuing even outside the presence of the jury and you

25     are taking liberties that I'm not going to allow or
```

```
 1    continue to permit.  I said to you earlier that if you did
 2    these things -- you also interrupted counsel in the middle
 3    of his testimony where you were going to start asking, and
 4    just because you think it is an inane point that you can
 5    just blab out what the word is, you mean Vato, that's not
 6    your role.  When you want clarification or want to get
 7    clarification, you do it on cross.  Now I've given you a
 8    lot of leeway on both of those areas.  If I have to do it
 9    again, I'm going to instruct you in front of the jury.
10    Please don't make me do that.
11             Now with respect to the issue of the body
12    attachment.  It seems to me that out of fairness to Mr.
13    Wild -- or Niles -- Oscar Niles, is that his name?
14             MR. GRIFFIN:  Yes.
15             THE COURT:  That you are -- and if you are
16    worried about whether he is going to leave or not, he
17    ought to be the witness that you put on the witness stand
18    first this afternoon or to alleviate any additional
19    concerns that the Court would have with him leaving and
20    you coming to me at the end of the day today asking for a
21    body attachment ask for it now so that the deputies can
22    secure him or law enforcement can secure him, one or the
23    other, but I don't want to have to deal with this issue at
24    6 o'clock.
25             MR. GRIFFIN:  Understood.  I will call
```

1    Mr. Niles right now if the Court is willing to go ahead

2    and let's -- we can deal with him.

3                    THE COURT:  I'll put the legal issue on the

4    back burner.  We will deal with it at the end of the day.

5                    MR. GRIFFIN:  Thank you.

6                    THE COURT:  Let's bring the jury out.

7                    (The following proceedings were held in the

8    presence of the jury.)

9                    THE COURT:  Mr. Niles, I'm going to have

10   you raise your right hand.  My clerk will swear you in.

11                   OSCAR NILES, being first duly sworn on oath

12   to tell the truth, the whole truth, and nothing but the

13   truth, testified as follows:

14                   THE COURT:  What I'm going to ask you to

15   do, Mr. Niles, is pull your chair directly into that bench

16   in front of you.  Use the mike.  Speak up loud and clear

17   so that we can get all of your responses on the record.

18   I'm going to have you begin by stating your full name for

19   the record, spelling your first and last name.  Go ahead.

20                   THE WITNESS:  Oscar Niles, O-S-C-A-R

21   N-I-L-E-S.

22                   THE COURT:  You may begin.

23                   MR. GRIFFIN:  Could we see you on the side

24   for a second, Judge, before we start.

25                   (Whereupon, an off the record discussion

```
 1    was had.)
 2                    THE COURT:  Mr. Niles, the lawyers are
 3         going to approach you with some material to refresh your
 4         memory on something.
 5                    (Whereupon, an off the record discussion
 6         was had.)
 7                    THE COURT:  Back on the record.  You may
 8         continue.
 9    DIRECT EXAMINATION BY MR. GRIFFIN:
10    Q    Sir, how old are you?
11    A    Twenty one years old.
12    Q    And what do you do for a living?
13    A    Work at Coakley Brothers.
14    Q    Is that a mover?
15    A    Yes, it is.
16    Q    And what part of town do you live in, what street, the
17         closest big intersection, that kind of thing?
18    A    27th Street.
19    Q    And -- 27th and what?
20    A    Lincoln.
21    Q    Do you know Danny Wilber?
22    A    Yes, I do.
23    Q    Do you know him as Slim?
24    A    Yes.
25    Q    Do you see him in court today?
```

```
1    A    Yes, I do.

2    Q    Can you point him out by where he's sitting and what he's

3         wearing.

4    A    He's wearing a light blue shirt and he is sitting to the

5         front of you.

6    Q    Does the shirt he have on have any stripes on it?

7    A    Yes, it does.

8                        MR. GRIFFIN:  May the record reflect the

9         witness has identified the defendant?

10                       THE COURT:  It does.

11   Q    How do you know Mr. Wilber?

12   A    I know him through friends and that's a family member of

13        some of my friends.

14   Q    How long have you known him?  In other words, have you

15        known him at all -- what -- how long you've been good

16        friends or bad friends, how long have you known Danny

17        Wilber?  Since you were 2?

18   A    No, maybe about a year.

19   Q    A year from now or a year back from when the shooting

20        happened?

21   A    I would say probably like a year since the shooting

22        happened.

23   Q    So in other words, when the shooting happened, at that

24        time you'd known him for about a year?

25   A    Yes.  I knew him a few months prior before that.
```

```
 1    Q    Okay.  And you had met him through family members of yours
 2         as well as friends of yours?

 3    A    No, friends of mine are family members of his.

 4    Q    Like who?

 5    A    Donald Jennings, Antonia West.

 6    Q    How long have you known Donald?

 7    A    I know Donald for about 3 years.

 8    Q    And Antonia?

 9    A    Roughly around the same time.

10    Q    But you didn't meet Danny Wilber until a couple months
11         before the shooting?

12    A    Correct.

13    Q    What about Wanda Tatum?

14    A    I knew her around the same period as the other ones.

15    Q    3 years?

16    A    Yeah.

17    Q    Where did Wanda live?  Where did the Wilber family --
18         where was their primary residence for the Wilbers, and the
19         Tatums, and the Wests?

20    A    26th and Forest Home.

21    Q    2548?

22    A    I'm not sure what the address is correctly, but 26th and
23         Forest Home.

24    Q    Okay.  How many times in your life would you say you've
25         been there?  Too many to count?
```

| | | |
|---|---|---|
| 1 | A | Too many to count.  Over five. |
| 2 | Q | Over five times? |
| 3 | A | Yes. |
| 4 | Q | And was -- was your first sort of connection into the -- |
| 5 | | Mr. Wilber and his family through Donald Jennings? |
| 6 | A | Can you repeat that. |
| 7 | Q | Sure.  Was the first person of the -- Danny Wilber's |
| 8 | | family, including his cousins, and his sisters, and all |
| 9 | | that stuff -- was the first person of that group that you |
| 10 | | ever knew or were friends with, was it Donald Jennings? |
| 11 | A | Yes. |
| 12 | Q | And how did you and Mr. Jennings meet?  School or just the |
| 13 | | street? |
| 14 | A | The playground.  We used to play basketball together. |
| 15 | Q | The night of the shooting, in other words, the evening |
| 16 | | before that, did you go to Bicardi's? |
| 17 | A | Yes, I did. |
| 18 | Q | What is Bicardi's? |
| 19 | A | A local tavern. |
| 20 | Q | How many times before the night of the shooting would you |
| 21 | | say -- when you were there how many times in your life |
| 22 | | before that had you been there? |
| 23 | A | A few. |
| 24 | Q | Was it a regular hangout? |
| 25 | A | I wouldn't say a regular hangout, but I've been there many |

| | | |
|---|---|---|
| 1 | | times. |
| 2 | Q | On that particular night why was it that you ended up at |
| 3 | | Bicardi's? |
| 4 | A | I couldn't tell you that one. |
| 5 | Q | Were you planning on meeting someone?  Did you have a |
| 6 | | date?  Is that just a place that you go sometimes? |
| 7 | A | Just a place where I go to have a few drinks. |
| 8 | Q | Did you have a few drinks? |
| 9 | A | Yes, I did. |
| 10 | Q | And for you when you say a few drinks, what is it you are |
| 11 | | drinking?  What were you drinking? |
| 12 | A | Mixed drink.  Mixed drinks. |
| 13 | Q | Which ones? |
| 14 | A | Hennessey and Coke. |
| 15 | Q | Anything else? |
| 16 | A | No, that's it. |
| 17 | Q | So your sort of preferred drink is Hennessey and Coke? |
| 18 | A | Yes. |
| 19 | Q | And for those who may not know on the jury, what is |
| 20 | | Hennessey? |
| 21 | A | A cognac. |
| 22 | Q | Before you left Bicardi's that night and went to the |
| 23 | | after -- you went to that after-set.  Correct? |
| 24 | A | Right. |
| 25 | Q | The after-hours party? |

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | The time you were at Bicardi's, how many drinks |
| 3 | | approximately would you say you had? |
| 4 | A | Probably three -- two or three. |
| 5 | Q | How long were you there? |
| 6 | A | I can't recall that. |
| 7 | Q | What would be a more normal time?  Would you go there |
| 8 | | right after dinner like 7 o'clock? |
| 9 | A | No. |
| 10 | Q | Later like 10, 11'ish? |
| 11 | A | 10, 11'ish. |
| 12 | Q | I know you weren't looking at your watch, but would it be |
| 13 | | later in the evening or night time? |
| 14 | A | Night time. |
| 15 | Q | And how long did you stay, until they closed? |
| 16 | A | Until they closed. |
| 17 | Q | What time did they close that Saturday morning? |
| 18 | A | I can't tell you the exact time, but I think they start |
| 19 | | shutting down around 2. |
| 20 | Q | So some time after 2 would have been the time you moved |
| 21 | | from Bicardi's to the after-set? |
| 22 | A | Correct. |
| 23 | Q | How did you find out about that party -- the after bar |
| 24 | | party? |
| 25 | A | I just heard it throughout.  No one personally told me, |

```
 1           it's just everyone was given the word.

 2    Q      Well, didn't they get on the microphone and say party at

 3           1128 West Mineral, everyone go there?

 4    A      Not that I recall.

 5    Q      But word was that if you were at Bicardi's and whatever,

 6           there was this party at 1128 West Mineral.  Is that right?

 7    A      Yes.

 8    Q      Did you go there?

 9    A      Yes, I did.

10    Q      Do you remember how you got from Bicardi's to that party?

11    A      Yes.

12    Q      How?

13    A      A friend named Endalia.

14    Q      That's E-N-D-A-L-I-A?

15    A      Correct.

16    Q      What is her relationship to you?

17    A      Just a friend.

18    Q      A romantic friend or a neighborhood friend?

19    A      Just a friend.

20    Q      It's a woman?

21    A      A woman friend, yep.

22    Q      Had you gone with her to Bicardi's or you just met her --

23           saw her there?

24    A      I saw her there.  No plans to meet her there or anything.

25           I seen her there.
```

| | | |
|---|---|---|
| 1 | Q | And sort of she said she was going to the after-set, you |
| 2 | | said, hey, give me a ride, you ended up going with her? |
| 3 | A | No, she didn't say she was going, I just kind of invited |
| 4 | | her. |
| 5 | Q | Did anyone else go in the car with you two? |
| 6 | A | No, they didn't. |
| 7 | Q | Did you guys go get something to eat or anything like that |
| 8 | | before the after-set or you went straight from Bicardi's |
| 9 | | there? |
| 10 | A | Straight from Bicardi's there. |
| 11 | Q | How far of a ride was that approximately? |
| 12 | A | 5 minute ride. |
| 13 | Q | And did you guys pretty much get there, park, and go in? |
| 14 | A | Yes. |
| 15 | Q | And what happened when you were in there? What was going |
| 16 | | on? |
| 17 | A | People drinking, playing cards I think, lifting weights. |
| 18 | Q | What were you doing? |
| 19 | A | What was I doing? I was sitting in the kitchen talking to |
| 20 | | a few people. |
| 21 | Q | Were you playing cards or lifting weights? |
| 22 | A | Neither one of those. |
| 23 | Q | Drinking? |
| 24 | A | I think I had a beer. |
| 25 | Q | Did you have time before the stuff started getting |

```
 1              crazy -- I mean, did you have time to finish that beer or

 2              not even?

 3      A       Not even to be honest.

 4      Q       Where were you in the house?  When you first got there,

 5              did you go straight to the kitchen and stay there, the

 6              weight room, the front room, upstairs, what?

 7      A       Straight to the kitchen.

 8      Q       And did you -- do you recall from the time you first got

 9              to that kitchen to the time the shooting happened, do you

10              recall leaving that kitchen?

11      A       I don't think I left the kitchen.

12      Q       How long would you say you were in that party there on

13              Mineral before things started getting out of the ordinary?

14      A       Not even 20 minutes maybe.

15      Q       So pretty quick things started getting unusual?

16                        THE COURT:  Is that yes or no?

17                        THE WITNESS:  Yes.

18      Q       Was there something going on in the weight room where guys

19              were lifting weights and dropping them on the floor or

20              something like that?

21      A       I did hear that, but like I said, I was in the kitchen, I

22              don't know what was going on in the living room.

23      Q       Was there any kind of argument or anything like that?

24      A       Not to my knowledge.

25      Q       So as you are in the kitchen there, at some point did you
```

| | | |
|---|---|---|
| 1 | | have words or something like that with Mr. Wilber didn't |
| 2 | | you say? Was that a no? |
| 3 | A | We got into an argument, but what do you mean by words? |
| 4 | Q | Well, didn't you say something to upset him? |
| 5 | A | No. |
| 6 | Q | You didn't say anything? |
| 7 | | THE COURT: Is that a yes or no? |
| 8 | A | Not to my knowledge, no. |
| 9 | Q | The problem, sir, the reason we keep asking you to speak |
| 10 | | is that moving your head -- I see you obviously going up |
| 11 | | and down and back and forth, but the woman in front of you |
| 12 | | has to type everything you say. |
| 13 | A | I understand that. |
| 14 | Q | Okay. |
| 15 | | THE COURT: Make sure that you use verbal |
| 16 | | responses. |
| 17 | | THE WITNESS: Yes, Judge. |
| 18 | | THE COURT: Thank you. |
| 19 | Q | So what happened as you were there in the kitchen with |
| 20 | | Mr. Wilber? What happened between you two? |
| 21 | A | We had a little confrontation about why I was pumping my |
| 22 | | chest out to him or something to that effect. |
| 23 | Q | Why you were pumping your chest out to him? |
| 24 | A | Right. |
| 25 | Q | And were you doing that? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | What does that mean to pump your chest out at somebody? |
| 3 | A | I don't know what the definition would be for that. |
| 4 | Q | Well, how would you perceive it as best you recall? When |
| 5 | | Danny Wilber told you that, when he said -- what did he |
| 6 | | say to you, why are you pumping your chest out at me? |
| 7 | A | Right. |
| 8 | Q | What did you think he meant by that? |
| 9 | A | I couldn't tell you to be honest. |
| 10 | Q | Well, did he say it in a way that made you nervous, |
| 11 | | scared, happy, sad, elated, thrilled, depressed? What was |
| 12 | | your reaction to it? |
| 13 | A | Mind my own business, continue doing what I was doing. I |
| 14 | | was talking to Donald and a friend of mine. |
| 15 | Q | You were talking to Donald? |
| 16 | A | Yes -- |
| 17 | Q | And that would -- |
| 18 | A | -- and Endalia. |
| 19 | | THE COURT: Are you saying Donald and |
| 20 | | Endalia? |
| 21 | | THE WITNESS: Yes. |
| 22 | | THE COURT: Thank you. |
| 23 | Q | And at that point since you were just minding your own |
| 24 | | business, did Mr. Wilber just leave it alone? |
| 25 | A | Something happened where the tension was off me now. |

```
 1    Q    Well, before the attention was off you though, when he
 2         first said to you why are you poking your chest out at me
 3         or words to that effect that was between you two, it was
 4         just words?
 5    A    No, I said I am not pumping my chest out towards you.
 6    Q    And what did he say?
 7    A    I don't even remember.
 8    Q    Well, did anything else happen between you two?  Let me be
 9         more specific.  Did Mr. Wilber ever touch you?
10    A    He grabbed my shirt.
11    Q    Now, as you do -- as you say that, you are taking both of
12         your hands kind of right around your chest area and taking
13         your shirt into your fists.  Right?
14    A    Right.
15    Q    And why did he do that?
16    A    I couldn't tell you.
17    Q    What happened when he grabbed your shirt?  What happened
18         when he grabbed your shirt?
19    A    My chain came off.
20    Q    Do you remember telling the police that Slim approached
21         you and pulled the chain off breaking it?
22    A    I remember telling them that, but I didn't tell them in
23         those words.
24    Q    How did you say it?
25    A    I said he grabbed my shirt and at that time my chain came
```

```
1        off.

2    Q   So the whole chain coming off was just sort of a -- an

3        accident, a byproduct or whatever of him grabbing your

4        shirt?

5    A   Right.

6    Q   And what did he do when your necklace came off?

7    A   He just had it.  He threw it back at me.

8    Q   So it didn't just -- it broke off or came off and it was

9        in his hand?

10   A   Right.

11   Q   And he threw it back at you?

12   A   Right.

13   Q   Had you and Mr. Wilber had some kind of dispute?

14   A   No, we didn't.

15   Q   I mean, was there some bad blood between you two before

16       all this happened?

17   A   No, there wasn't.

18   Q   Had he tried to buy that chain from you?

19   A   Not that I recall.

20   Q   What kind of chain was it?

21   A   As in -- what do you mean what kind of chain?  It was a

22       gold chain.

23   Q   Where was it on your body, I mean, was it like one of

24       those kind of a big old, you know, hang down to your navel

25       kind of chain or what?
```

```
1   A   Probably.

2   Q   Probably?

3   A   It was, yes.

4   Q   After he pulled it off your neck, was it so broken you had

5       to throw it away or what?

6   A   No.

7   Q   And what was it that ended the confrontation between you

8       and Mr. Wilber?

9   A   Some gentlemen came in from out the -- out the living room

10      into the kitchen and told everyone in there to take it

11      easy.

12  Q   And of the -- when you say everyone in there, are you

13      talking about everyone in the kitchen?

14  A   No.  I shouldn't say everyone, but a few gentlemen that

15      came from the living room tried to come in there and calm

16      everything down.

17  Q   And in -- you are talking about calm everything down in

18      the kitchen?

19  A   Right, as in the dispute with me and Mr. Wilber.

20  Q   And did you need calming down?

21  A   I didn't need calming down.

22  Q   So who needed calming down?

23  A   Danny.

24  Q   At that point like a second or two before those guys show

25      up in the kitchen and tell him to calm down or whatever,
```

| 1 | | describe him. |
|---|---|---|
| 2 | A | I can't describe him. I -- how would you want me to |
| 3 | | describe him? What do you mean by describe him? |
| 4 | Q | Was he geeked up? |
| 5 | A | A little bit. Adrenaline was probably rushing. |
| 6 | Q | Was he aggressive? |
| 7 | A | I don't know what you would call it. |
| 8 | Q | Was he pumped up? |
| 9 | A | I don't know. |
| 10 | Q | You don't know? |
| 11 | A | No, I don't. |
| 12 | Q | How drunk was he? |
| 13 | A | I don't know how drunk he was. I wasn't watching what he |
| 14 | | was drinking. |
| 15 | Q | Well, but you had been around drunk people before. Right? |
| 16 | A | He wasn't sloppy drunk. He wasn't throwing up or falling |
| 17 | | over. |
| 18 | Q | Were you surprised at what was going on between him and |
| 19 | | you? |
| 20 | A | A little bit. |
| 21 | Q | Scared? |
| 22 | A | No. |
| 23 | Q | Do you remember the guys that came into the kitchen to try |
| 24 | | and calm him down? |
| 25 | A | Yes, I do. |

| 1 | Q | What were their names or nicknames? |
|---|---|---|
| 2 | A | Rock and Vato. |
| 3 | Q | Rock and Vato? |
| 4 | A | Yep. |
| 5 | Q | I'm going to show you a couple of photographs, one is a |
| 6 |   | Polaroid marked No. 8.  Do you recognize the guy in that |
| 7 |   | picture? |
| 8 | A | Yes, I do. |
| 9 | Q | Who is that? |
| 10 | A | That's Vato. |
| 11 | Q | That's one of the guys that tried to calm the defendant |
| 12 |   | down? |
| 13 | A | Yes, it is. |
| 14 | Q | And Exhibit No. 21, do you recognize that guy? |
| 15 | A | Yes. |
| 16 | Q | Who is that? |
| 17 | A | Rock. |
| 18 | Q | Rock.  Did you know -- back when all this was going on and |
| 19 |   | you were there on Mineral, did you know their names other |
| 20 |   | than Rock and Vato? |
| 21 | A | Yes. |
| 22 | Q | Okay.  And what was Vato's name? |
| 23 | A | Richard Torres. |
| 24 | Q | How did you know him? |
| 25 | A | Just from around. |

| | | |
|---|---|---|
| 1 | Q | I mean, how did you know his name? |
| 2 | A | I think we were in the House of Corrections together |
| 3 | | before. |
| 4 | Q | And what about Rock? |
| 5 | A | Rock, just a friend from around the neighborhood. |
| 6 | Q | Good guys, bad guys, okay guys? |
| 7 | A | Good guys. Average guys. |
| 8 | Q | Okay. Either one of them ever snatch a chain off your |
| 9 | | neck -- |
| 10 | A | No, they haven't. |
| 11 | Q | -- or do anything like that? Did either of those guys -- |
| 12 | | THE COURT: Hang on just a minute, |
| 13 | | Mr. Griffin. Is that -- |
| 14 | | THE WITNESS: No. I'm sorry, Judge. |
| 15 | Q | Did either Rock or Vato that night ever do anything to |
| 16 | | provoke Mr. Wilber? Other than respond to things he may |
| 17 | | have done, but did they ever do anything other than try to |
| 18 | | get him to calm down? |
| 19 | A | No. |
| 20 | Q | In that house that night the time you were there who is |
| 21 | | the only guy that could be described as out of control? |
| 22 | A | I don't know. |
| 23 | Q | You are not sure? |
| 24 | A | I'm not sure. |
| 25 | Q | Who else besides Danny Wilber fought with you? |

| | | |
|---|---|---|
| 1 | A | No one. |
| 2 | Q | Who else did other people have to tell to chill out or |
| 3 | | calm down? |
| 4 | A | No one. |
| 5 | Q | Only him? |
| 6 | A | Only him. |
| 7 | Q | Was there anyone else there that made you nervous or |
| 8 | | scared or anything like that at all? |
| 9 | A | No one, not even him. |
| 10 | Q | Did you ever see Mr. Wilber throw a chair? |
| 11 | A | No, I didn't. |
| 12 | Q | Did you tell the police he did? |
| 13 | A | No, that was never in none of my statements. |
| 14 | Q | Did you ever tell the police that Rock told Slim to chill |
| 15 | | out.  Slim then threw the chair at Oscar and walked over |
| 16 | | towards Rock? |
| 17 | A | No. |
| 18 | Q | Never told them that? |
| 19 | A | No. |
| 20 | Q | I'm going to show you, Mr. Niles, what's been marked as |
| 21 | | Exhibit 36. |
| 22 | | MR. CHERNIN:  Can I see which one you are |
| 23 | | referring to. |
| 24 | Q | Take a look at it.  The sticker is on the very back page |
| 25 | | on the back.  When you turn that over, does it say 36? |

```
 1    A    Yes, it does.

 2    Q    What is that?

 3    A    What is what?

 4    Q    What is Exhibit 36?

 5    A    My statement.

 6    Q    One of your statements?

 7    A    Yes.

 8    Q    Okay.  I'm going to ask you to -- did you ever sign that

 9         statement?

10    A    Yes, I did.

11    Q    Okay.

12    A    Now, is this -- am I going to see in here that I seen him

13         throw a chair or am I going to see --

14                   THE COURT:  Mr. Niles, you have to wait

15         until he asks you a question.  We don't know what he's

16         going to ask you.

17                   THE WITNESS:  I'm sorry.

18    Q    On the very bottom of the first page Slim then threw the

19         chair.  Do you see that?

20    A    No, I don't.  I see Slim then threw the chain.

21    Q    The chain?

22    A    Yes, the chain.

23    Q    At?

24    A    Me, the table -- the kitchen table.

25    Q    Did he ever knock over or throw a chair?
```

| 1 | A | No. |
|---|---|-----|
| 2 | Q | And what did he do then after he threw the chain back at |
| 3 | | you? |
| 4 | A | He got into a confrontation with Rock and Vato. |
| 5 | Q | What happened?  Where? |
| 6 | A | In the kitchen. |
| 7 | Q | Where in the kitchen? |
| 8 | A | In the kitchen -- what do you mean where in the kitchen? |
| 9 | Q | By the stove, by the refrigerator, near the bathroom? |
| 10 | A | I think by the stove. |
| 11 | Q | Do you remember that kitchen very well? |
| 12 | A | Somewhat. |
| 13 | Q | To your right there's a diagram.  You can step off the |
| 14 | | witness stand and take a look at it for a minute because |
| 15 | | then I'm going to ask you some questions.  Okay. |
| 16 | | THE COURT:  Are you going to be asking him |
| 17 | | to point at things?  There's a pointer right on the |
| 18 | | witness stand. |
| 19 | Q | You want to hold that.  There we go.  Do you recognize |
| 20 | | this as sort of a diagram of that particular residence |
| 21 | | there on Mineral? |
| 22 | A | Right, it looks familiar. |
| 23 | Q | It's not to scale, okay, just so you know, but in the -- |
| 24 | | is this -- as you come into the front door of that |
| 25 | | residence, you are in sort of a living room area? |

```
 1    A    Yes.

 2    Q    When you came in, did you head straight back into the

 3         kitchen?

 4    A    Yes.

 5    Q    And the kitchen is sort of at the top of this diagram or

 6         in that house it was in the back.

 7    A    Yes.

 8    Q    Where were you in the kitchen when the defendant grabbed

 9         your chain as best you recall?  So for the record you are

10         pointing to the -- the table, the square in the kitchen

11         area with the No. 2 in the circle?

12    A    At the bottom.

13    Q    Sort of the bottom left-hand corner a little bit off of

14         that?

15    A    Right.

16    Q    That's where you were standing when the defendant grabbed

17         your chain?

18    A    Yes.

19    Q    Which way were you facing, in other words, were you facing

20         eastbound or were you facing westbound or north or south?

21    A    I was probably facing this way.

22    Q    The confrontation between you and the defendant takes

23         place approximately in the area that you pointed to before

24         then.  Right?

25    A    Correct.
```

| | | |
|---|---|---|
| 1 | Q | And where do Rock and Vato come from? |
| 2 | A | The living room. |
| 3 | Q | Did you see them come walking into the kitchen? |
| 4 | A | Yes, I did. |
| 5 | Q | Did they come right up to the defendant over in the area |
| 6 | | where you and Mr. Wilber were? |
| 7 | A | No, somehow they moved over here. |
| 8 | Q | Right now you are pointing to the area which again if we |
| 9 | | look at the square with No. 2 in it would be just to the |
| 10 | | right of that square on this diagram. Right? |
| 11 | A | Yes. |
| 12 | Q | Just above the -- the head of the guy that -- that's -- |
| 13 | | the victim in this area? |
| 14 | A | Yes. |
| 15 | Q | And what happened over there? |
| 16 | A | A little tussle between the three of them. |
| 17 | Q | Between the three of them? |
| 18 | A | Yes. |
| 19 | Q | When you say a little tussle, what was it that you saw? |
| 20 | A | Three guys wrestling. |
| 21 | Q | Wrestling? |
| 22 | A | Yes. |
| 23 | Q | Did you see specifically what Mr. Wilber was doing? |
| 24 | A | No, I didn't. |
| 25 | Q | Did you ever see him punch or choke anyone? |

| | | |
|---|---|---|
| 1 | A | I didn't see -- it was like a tussle. I didn't -- there |
| 2 | | was too much going on. I don't recall what he was doing |
| 3 | | or what they did, every move they made, I couldn't tell |
| 4 | | you. |
| 5 | Q | Did they stay according to your recollection pretty much |
| 6 | | in this area here that you've talked about before to the |
| 7 | | right of the kitchen table? |
| 8 | A | Yes. |
| 9 | Q | Where did you go? |
| 10 | A | I stayed right here the whole time. |
| 11 | Q | Where was Antonia West? |
| 12 | A | I think she was right here. |
| 13 | Q | Okay. And when you say right here, you are pointing to |
| 14 | | what's now marked in the area of the kitchen where there's |
| 15 | | a measurement where it's written 12 feet 8 inches? |
| 16 | A | Right. |
| 17 | Q | You recall her right there? |
| 18 | A | Yes. |
| 19 | Q | How close was she to the guys that were tussling? |
| 20 | A | I can't remember. |
| 21 | Q | A few feet? |
| 22 | A | I can't remember. |
| 23 | Q | What was she doing? |
| 24 | A | Just standing there. |
| 25 | Q | Was she looking at you? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | What was she doing? |
| 3 | A | She was just standing there.  I don't know what she was |
| 4 | | doing. |
| 5 | Q | And what about Donald Jennings, where was he? |
| 6 | A | He might have been somewhere around here.  He was by me. |
| 7 | Q | And you are pointing to this line here that sort of |
| 8 | | represents a line of cabinets sort of near the sink that's |
| 9 | | drawn in here? |
| 10 | A | Correct. |
| 11 | Q | Again on this particular diagram -- |
| 12 | | MR. GRIFFIN:  I don't know how else to |
| 13 | | describe it, Judge, other than -- do you want me to |
| 14 | | describe it further for the record? |
| 15 | | THE COURT:  That's fine. |
| 16 | Q | What was Donald Jennings doing? |
| 17 | A | Just standing there. |
| 18 | Q | Which way was he looking? |
| 19 | A | I think he was looking this way towards me. |
| 20 | Q | Up in this area are Vato, and Rock, and Danny Wilber. |
| 21 | | Anybody else go up in that area? |
| 22 | A | I don't think so. |
| 23 | Q | At what point if any did you become aware of David Diaz in |
| 24 | | that area? |
| 25 | A | I don't think I became aware of when he came in. |

```
 1    Q    At all?

 2    A    At all.

 3    Q    Did you ever see --

 4    A    But I kind of did see him standing right up here.  I'm not

 5         aware of when he came into the kitchen.

 6    Q    At some point you became aware that David Diaz was in the

 7         kitchen?

 8    A    Right.

 9    Q    And from your angle right here -- again pointing over to

10         what would be just off the bottom left corner of the

11         table -- you could see him in the kitchen?

12    A    Right.

13    Q    How close was he to the door?

14    A    Not too far from the door.  It might have been right next

15         to the door.

16    Q    I'm going to show you what's been marked as Exhibit 15.

17         Do you recognize that?

18    A    Yes, I do.

19    Q    Okay.  What is it?

20    A    The kitchen.

21    Q    The kitchen where this all took place?

22    A    Right.

23    Q    And this edge of the table here is sort of right in the

24         middle, the one in the -- off to the left side.  You were

25         sort of standing over near that edge of the table or
```

| | | |
|---|---|---|
| 1 | | closest to that edge of the table? |
| 2 | A | Correct, over this way somewhere right around here. |
| 3 | Q | Sort of where that bottle is on the floor? |
| 4 | A | Like where I told you on the diagram, yep. |
| 5 | Q | Okay. And Mr. Diaz you said you thought he was standing |
| 6 | | right by -- when you say the door, are you referring to |
| 7 | | the white door that we see in Exhibit 15? |
| 8 | A | I'm referring to the doorframe from the living room to the |
| 9 | | kitchen. |
| 10 | Q | Okay. Do you see that on here? |
| 11 | A | No, I don't. |
| 12 | Q | I'm going to show you what's been marked as Exhibit 25. |
| 13 | | Do you see the doorframe you are talking about here? |
| 14 | A | Right. |
| 15 | Q | Can you point to it for the jury. Okay. There's sort of |
| 16 | | one doorframe a little closer to what would be the living |
| 17 | | room, right, and one that's a little closer to the |
| 18 | | kitchen? |
| 19 | A | Right. |
| 20 | Q | And there's stairs that go upstairs this way? |
| 21 | A | I don't -- I don't remember stairs. |
| 22 | Q | How -- where was Mr. Diaz? |
| 23 | A | He was in the doorframe. |
| 24 | Q | This -- which one, the one closer to the living room or |
| 25 | | the one closer to the kitchen? |

| | | |
|---|---|---|
| 1 | A | The one closest to the kitchen. |
| 2 | Q | How far into the kitchen did he get? |
| 3 | A | Not too far. |
| 4 | Q | How long does this -- do you recognize this as a stove or |
| 5 | | you don't remember if that's a stove up there? |
| 6 | A | I can't remember. |
| 7 | Q | Okay.  I'm going to refer to this -- I know you don't |
| 8 | | know, but I'm going to call this thing a stove, okay, |
| 9 | | because it's on the diagram up in the top right-hand |
| 10 | | corner.  As opposed to keep saying the box up in the upper |
| 11 | | right-hand corner, I'm just going to say the stove.  How |
| 12 | | close to the stove were Vato, and Rock, and Mr. Wilber |
| 13 | | when they were struggling as best you recall?  In other |
| 14 | | words, if the table is about right here and this what I |
| 15 | | call a stove is up in this corner, where were they? |
| 16 | A | Probably around here like I said earlier. |
| 17 | Q | And you are circling an area again off what would be the |
| 18 | | top right-hand corner of the table? |
| 19 | A | Right. |
| 20 | Q | At any point did this particular group of guys here move |
| 21 | | down toward where Mr. Diaz was? |
| 22 | A | Not that I can recall. |
| 23 | Q | Were you watching them the whole time? |
| 24 | A | Sort of. |
| 25 | Q | At some point when this struggle is going on is there a |

| | | |
|---|---|---|
| 1 | | gunshot? |
| 2 | A | Yes, there was. |
| 3 | Q | When the gunshot went off, what were you looking at? |
| 4 | A | I don't remember. |
| 5 | Q | What did you do? |
| 6 | A | What did I do?  I ran out the house. |
| 7 | Q | No, after the gunshot.  When the gunshot goes off, boom -- |
| 8 | A | Okay. |
| 9 | Q | -- what did you do? |
| 10 | A | Run out the house. |
| 11 | Q | Did you duck down or look around to see where it was |
| 12 | | coming from? |
| 13 | A | I looked around, I mean, yeah, that's common sense. |
| 14 | Q | What's common sense? |
| 15 | A | To look around before I make a movement out of the |
| 16 | | kitchen. |
| 17 | Q | Didn't you throw your hands up in the air like you are |
| 18 | | scared or something like that? |
| 19 | A | I don't think so. |
| 20 | Q | Isn't that sort of what you should do when you hear a |
| 21 | | gunshot? |
| 22 | A | No, you should look around. |
| 23 | Q | What about ducking? |
| 24 | A | Yeah. |
| 25 | Q | When you ran out from here, did you take the most direct |

```
 1            route, in other words, across the kitchen, down the

 2            hallway and out the front door?

 3    A       Yes, I did.

 4    Q       And how did you get out?  In other words, how did you get

 5            out of that area -- bus, taxi, ride?

 6    A       Jaimie.

 7    Q       Jaimie who?

 8    A       I don't -- Jaimie.

 9    Q       Is she a white woman --

10    A       Yes.

11    Q       -- Jaimie Williams do you know?

12    A       Jaimie and Lea.

13    Q       Jaimie and Lea, you got in their car?

14    A       Yep.

15    Q       Did you see the victim fall -- did you see Mr. Diaz fall

16            down?

17    A       Yes, I had to get past him in order to get out the house.

18            I did see him laying on the ground.

19    Q       Why did you run out?

20    A       Why wouldn't I run out.  Everyone ran out.

21    Q       Well, did you think about helping him?

22    A       No.  I don't want no part in it.

23    Q       When did you call the police?

24    A       I didn't call the police.

25    Q       So the police found you?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And when the police talked to you the first time, did you |
| 3 | | tell them everything? |
| 4 | A | No, I didn't. |
| 5 | Q | Why not? |
| 6 | A | 'Cause I was scared and I didn't want to have no part in |
| 7 | | it. |
| 8 | Q | What were you scared of? |
| 9 | A | Them bothering me, keep coming to my mom's house. |
| 10 | Q | How long did it take the police to find you? |
| 11 | A | Two days. |
| 12 | Q | And during those two days how many times did they stop by? |
| 13 | A | More than twice. |
| 14 | Q | You know what they wanted.  Right? |
| 15 | A | They wanted to talk to me about what happened at this |
| 16 | | party. |
| 17 | Q | And what was -- what was it that had happened in the party |
| 18 | | that you were so afraid to talk to the police about? |
| 19 | A | About everything.  I didn't want no part in it pointblank. |
| 20 | Q | Do you remember telling the police the second time they |
| 21 | | talked to you that you had not told the first set of |
| 22 | | detectives the truth because you were afraid for your |
| 23 | | family? |
| 24 | A | Yes. |
| 25 | Q | Why? |

| | | |
|---|---|---|
| 1 | A | Because the detectives keep being a nuisance to my mom's |
| 2 | | house. |
| 3 | Q | But why would that make you afraid for your family? |
| 4 | A | Just everything in general.  It's a murder. |
| 5 | Q | Right, but you didn't see who did it? |
| 6 | A | It's a homicide. |
| 7 | Q | Did you see who did it? |
| 8 | A | No, I didn't. |
| 9 | Q | So why would you be afraid?  You couldn't point the finger |
| 10 | | at anybody. |
| 11 | A | Because I didn't want to talk to them. |
| 12 | Q | Right, I understand you don't want to talk to them, that |
| 13 | | part I got, but why did you tell them that you were afraid |
| 14 | | for your family? |
| 15 | A | I couldn't tell you.  That's what I told them at the time. |
| 16 | Q | Do you remember telling the police that when you saw a |
| 17 | | ball of guys tussling, the victim, David Diaz, was |
| 18 | | standing next to the group but not fighting? |
| 19 | A | Yes. |
| 20 | Q | Was he standing next to the group or in that doorway that |
| 21 | | you had him in when we talked about that picture before? |
| 22 | A | He was standing in the doorway that was not too far from |
| 23 | | where the tussle was going on.  The map here is very big, |
| 24 | | but the kitchen itself is small. |
| 25 | Q | Well, when we talk about the group that's fighting or |

```
 1              tussling that includes Mr. Wilber -- and we're looking at

 2              Exhibit 14 right now -- which side of the table are they

 3              on?

 4     A        This side of the table.

 5     Q        So you are pointing at the floor area that would be

 6              between the stove and the table?

 7     A        Right.

 8     Q        And I'm assuming then that Mr. Diaz was way back here

 9              behind those cabinets and the doorframe?

10     A        Mr. Diaz was right here.  That's where the doorframe is.

11     Q        Can you see -- could you see the doorframe --

12     A        I'm not going by every inch -- I'm not telling you every

13              inch and centimeter, I'm telling you where it is.  He was

14              right here.  The tussle was right here.

15     Q        In other words, Mr. Diaz was far enough into the kitchen

16              area that you standing over by this end of the table could

17              see him?

18     A        Somewhat.

19     Q        And -- somewhat?

20     A        Somewhat, yep.

21     Q        And he was in far enough that he wasn't actually in the

22              doorframe that you talked about before, in other words,

23              you don't remember him standing directly under that

24              doorframe.  Do you?

25     A        No.
```

| | | |
|---|---|---|
| 1 | Q | In Exhibit 25 you said he was right by this -- this |
| 2 | | doorframe, this -- the one closer to -- |
| 3 | A | He wasn't under the doorframe, he was by the doorframe. |
| 4 | Q | In the kitchen? |
| 5 | A | You see the difference? |
| 6 | Q | Right.  And if you had to guess -- closest estimate -- not |
| 7 | | guess, estimate -- the group of guys tussling are how many |
| 8 | | feet away from Mr. Diaz -- Mr. Diaz, the guy that got |
| 9 | | shot? |
| 10 | A | I don't think I could estimate that correctly. |
| 11 | Q | Well, everything is pretty small in there.  Right? |
| 12 | A | Yeah.  I don't think I could estimate that correctly. |
| 13 | Q | When the shot went off, were you looking at the guys |
| 14 | | tussling, were you looking at Mr. Diaz, were you looking |
| 15 | | at Endalia, were you looking at Donald Jennings, were you |
| 16 | | looking at your shoes? |
| 17 | A | I was looking at my chain. |
| 18 | Q | At your chain? |
| 19 | A | Yes, I had it in my hand.  I was trying to fix it. |
| 20 | Q | And all of a sudden boom? |
| 21 | A | Yep. |
| 22 | Q | How were you trying to fix your chain?  What was wrong |
| 23 | | with it? |
| 24 | A | One of the clamps was out like it's been spread open when |
| 25 | | it should have been welded together like this. |

```
1    Q    So that it didn't form a chain, it was like a -- just a
2         loop -- or I mean a long string now.  Right?
3    A    Yes.
4    Q    Okay.  And how did you determine that, you were looking at
5         it in the party?
6    A    Yes.
7    Q    So while the tussling goes on, at one point you decide to
8         look down and start fixing your chain and then boom, the
9         shot goes on?
10   A    No, I been doing this from the get-go after this happened.
11   Q    So after Mr. Wilber snatches your chain, Vato and Rock
12        come up and tell him to chill out?
13   A    Correct.
14   Q    And that gets Mr. Wilber to fighting with them.  Correct?
15   A    Correct.
16   Q    He doesn't just chill out?
17   A    No.
18   Q    Who started the tussling?
19   A    I didn't see who started the tussling.
20   Q    The tussle is going on over there while you are trying to
21        fix your chain?
22   A    At the same time I -- I'm not just saying I was fixing my
23        chain -- just fixing my chain, because if there's
24        commotion in the whole kitchen, I'm not gonna be just
25        worrying about my chain --
```

| | | |
|---|---|---|
| 1 | Q | So you are doing both? |
| 2 | A | -- you understand.  Yes. |
| 3 | Q | Were you trying to roll a blunt for Donald Jennings? |
| 4 | A | Yes, I was, but I think that might have took place before |
| 5 | | this. |
| 6 | Q | Did you ever get that thing rolled up? |
| 7 | A | I don't remember. |
| 8 | Q | Did you ever smoke it? |
| 9 | A | I don't remember. |
| 10 | Q | You don't remember if you smoked a blunt there that night |
| 11 | | or that morning? |
| 12 | A | There's too much going on.  That was about last year some |
| 13 | | time. |
| 14 | Q | So as you are fixing your chain and watching the tussle |
| 15 | | and seeing Mr. Diaz in the doorway, boom, a shot goes off? |
| 16 | A | Correct. |
| 17 | Q | Did you ever see Danny Wilber punch Vato? |
| 18 | A | No, I didn't. |
| 19 | Q | Did you ever see him choke Rock? |
| 20 | A | No, I didn't. |
| 21 | Q | Did you ever see Vato grab Mr. Wilber from behind? |
| 22 | A | No, I didn't.  I told you, I didn't see what moves they |
| 23 | | were making.  I just know it was (unintelligible |
| 24 | | response.)  Everyone was getting into it pointblank.  Out |
| 25 | | of those three I don't remember who did what, who choked |

```
 1        who.

 2    Q   And after a shot went off, what did you look at?

 3    A   I told you, I looked everywhere, I looked around.

 4    Q   And what was Mr. Wilber doing?

 5    A   Trying to get out.  He checked himself.

 6    Q   He checked himself?

 7    A   Yeah.

 8    Q   And you remember that?

 9    A   Yes.

10    Q   And did you check yourself?

11    A   No, I didn't.

12    Q   So the only guy --

13    A   I wasn't one of the guys fighting.  Now if I would have

14        been fighting, I would have checked myself, maybe I would

15        have got shot.

16    Q   So you are saying one of the guys fighting is the kind of

17        guy that is in the mindset that he might pull out a gun

18        and shoot somebody?

19    A   Repeat that.

20    Q   That you -- if you had been fighting, you would have

21        checked yourself?

22    A   To see if I got shot whoever opposing -- whoever the

23        opposing person was.

24    Q   Because the kind of guys in that tussle might pull out a

25        gun and shoot?
```

```
1    A    I don't know.

2    Q    That would be your mindset if you had been in a tussle?

3    A    If I was fighting, yes, why wouldn't they.

4    Q    Why wouldn't you?

5    A    If I was fighting someone and I heard a gunshot, I would

6         check myself 'cause maybe I could have got shot by someone

7         I was fighting with.

8    Q    Do you remember telling the police that:  I said before,

9         the victim, David Diaz, was standing next to the group,

10        but not fighting.  Oscar states he was moving towards the

11        door to leave, then he heard a shot, he and Endalia ran

12        out of the house?

13   A    I probably did.  Now is that before I gave them my last

14        statement?

15                  THE COURT:  Again, they are going to ask

16        you that.

17                  THE WITNESS:  Oh, okay.

18   Q    This is -- you agree that in your first statement you

19        basically lied to the police and said you left before the

20        shooting?

21   A    Right.

22   Q    Okay.  So that one you agree wasn't true?

23   A    Wasn't true.

24   Q    And in what I will call the second statement is the one

25        where you told them that you hadn't told them the truth in
```

| | | |
|---|---|---|
| 1 | | the first statement because you were afraid for your |
| 2 | | family? |
| 3 | A | Right. |
| 4 | Q | And that's the one that you have in front of you right now |
| 5 | | that is marked I think Exhibit 36 on the back? |
| 6 | A | Yes. |
| 7 | Q | And I'm looking at Page 2 about half way down, you see |
| 8 | | where Endalia is underlined there? |
| 9 | A | Yes. |
| 10 | Q | Okay. That's the part I just read. You want to take a |
| 11 | | minute and read it. |
| 12 | | THE COURT: Did you read it? |
| 13 | | THE WITNESS: Yes, I did. |
| 14 | | THE COURT: He's read it. |
| 15 | Q | So this is right about -- you are talking to the police. |
| 16 | | This is the part where the actual shooting happened, |
| 17 | | right -- this is the part of your statement where you are |
| 18 | | talking about that? |
| 19 | A | Right. |
| 20 | Q | Oscar states he didn't see Slim with a gun. He didn't see |
| 21 | | who shot David. He knew David got shot, but didn't |
| 22 | | actually see the shooting. Is that right? |
| 23 | A | Oscar states he didn't see Slim with the gun. He didn't |
| 24 | | see who shot David, correct. |
| 25 | Q | Anything in there about seeing Mr. Wilber patting himself |

```
 1         down?

 2    A.   Is that on this Page 2?

 3    Q    Yeah, in that part.  You see it?  If you want to take a

 4         minute and read the whole thing and you can just tell me

 5         where the part is about him patting himself down.

 6                        THE COURT:  I don't see where it says Slim

 7         patted himself down.

 8                        MR. GRIFFIN:  Where -- I'm sorry, where

 9         what?

10                        THE WITNESS:  What did you say, where Slim

11         was patting himself down?

12                        MR. GRIFFIN:  Yeah.

13    A    I don't see that.

14    Q    Is it in any of your statements, sir, to the police -- the

15         ones that you signed I mean?

16    A    Probably.  Did you see it?  I don't know.

17    Q    On that particular one, your second one -- which by the

18         way was on February 5th of 2004, correct, just a few days

19         after the shooting?

20    A    Yes.

21    Q    It said you then ran out of the house and ran to Lea's

22         car.  Correct?

23    A    Correct.

24    Q    What happened in Lea's car?

25    A    She got a call from Tony and he wanted to speak with me.
```

| | | |
|---|---|---|
| 1 | Q | Who is Tony? |
| 2 | A | Tony Valdez. |
| 3 | Q | I'm going to show you a photograph marked Exhibit 18.  I'm |
| 4 | | going to see if this is the Tony Valdez you are talking |
| 5 | | about. |
| 6 | A | Yes, it is. |
| 7 | Q | It is? |
| 8 | A | Yes. |
| 9 | Q | What did he want to talk to you about? |
| 10 | A | He asked me what happened at the party. |
| 11 | Q | How had he hear about it? |
| 12 | A | I think Lea might have told him.  I'm not sure how he |
| 13 | | found out about it, I just know what he told me on the |
| 14 | | phone. |
| 15 | Q | Do you remember Antonia West saying anything there in the |
| 16 | | car? |
| 17 | A | No, I don't. |
| 18 | Q | Do you remember Donald Jennings saying shut the fuck up? |
| 19 | A | No, I don't.  I think some people were making a few |
| 20 | | comments like that's fucked up, but I don't remember |
| 21 | | anything else. |
| 22 | Q | I'm going to show you a photograph marked Exhibit 19.  Do |
| 23 | | you recognize that guy? |
| 24 | A | Yes, I do. |
| 25 | Q | Who is he? |

| 1 | A | That's Javi. |
|---|---|---|
| 2 | Q | Who is he with respect to Danny Wilber? |
| 3 | A | A friend. What do you mean with respect to Danny Wilber? |
| 4 | Q | A friend, enemy, a business associate? |
| 5 | A | Associate probably. |
| 6 | Q | Associate? |
| 7 | A | Yeah. |
| 8 | Q | What's the difference -- well, never mind. In the moments |
| 9 | | before the shooting there, did you see Javi, the guy in |
| 10 | | that picture, come into the kitchen as well? |
| 11 | A | Probably. Like I said in my statement, I couldn't recall |
| 12 | | if it was Javi, but someone else came in there to try to |
| 13 | | calm everything down too. |
| 14 | Q | Now, at the very back of that statement, the very last |
| 15 | | page is sort of a -- a sketch or a --or a map -- really a |
| 16 | | sketch I guess of that house, right -- a hand drawn |
| 17 | | sketch. Correct? |
| 18 | A | Correct. |
| 19 | Q | And you've seen that before? |
| 20 | A | Correct. |
| 21 | Q | Did the police ask you to point out to them where everyone |
| 22 | | was as best you could recall, things like that? |
| 23 | A | Yes, they did. |
| 24 | Q | Okay. And in this particular one, the one that you did, |
| 25 | | this -- this is actually the second one you did. Right? |

```
 1          The first one you did you didn't mention to the police
 2          anything about any tussle or anything like that.  You want
 3          me to show it to you?
 4   A      Yes.
 5   Q      Sure.  In -- when the police talked to you for the first
 6          time --
 7   A      Yeah, I didn't tell them any of that because I didn't want
 8          to have no part in it, that's what I told you earlier.
 9   Q      But my point is you did this particular sketch with them.
10          Correct?
11                      MR. CHERNIN:  May I please, which exhibit
12          is that?
13                      MR. GRIFFIN:  35, his first statement.
14                      THE WITNESS:  Yeah, what are you trying to
15          say?
16                      MR. GRIFFIN:  Hang on.
17                      MR. CHERNIN:  I'm sorry, I want to see
18          which one is which.
19   Q      Do you agree that this is a copy of that first statement
20          that you gave the police?
21   A      Yes.
22   Q      And the first time they brought the sketch in, all you
23          showed them was you, and Slim, and Endalia over there by
24          the table.  Correct?
25   A      Correct.
```

| | | |
|---|---|---|
| 1 | Q | You didn't mention anything about anything else at that |
| 2 | | party because you told them you had left before the |
| 3 | | shooting the first time you talked to the police? |
| 4 | A | I don't think I told them too much. |
| 5 | Q | Right? |
| 6 | A | I didn't tell them too much. |
| 7 | Q | And when you did this diagram, you weren't talking about |
| 8 | | where anyone was when the shooting or any tussle or |
| 9 | | anything like that happened.  Right? |
| 10 | A | No. |
| 11 | Q | So this one has got just Endalia, Oscar meaning you, and |
| 12 | | Slim.  Correct? |
| 13 | A | Correct. |
| 14 | Q | Right over here by the table? |
| 15 | A | Correct. |
| 16 | Q | Okay.  And then when you talked to them the second time, |
| 17 | | they pull out a copy of this.  Right?  When you talk to |
| 18 | | them then the second time, they make a copy of that thing |
| 19 | | and you add things to it.  Right? |
| 20 | A | Right. |
| 21 | Q | You add information? |
| 22 | A | Yeah, once they show me everyone's statement. |
| 23 | Q | Okay. |
| 24 | A | They told me that these people are telling them what |
| 25 | | happened, why do I keep lying to them. |

| | | |
|---|---|---|
| 1 | Q | And you were lying to them? |
| 2 | A | That's when I told them the truth. |
| 3 | Q | Okay. |
| 4 | A | When they showed me these five statements saying this is |
| 5 | | what happened, look here. |
| 6 | Q | And then you realized I don't need to be afraid for my |
| 7 | | family anymore because I'm not the only one? |
| 8 | A | No, then I realized it's time to get down to business and |
| 9 | | tell them what happened. |
| 10 | Q | Okay. |
| 11 | A | They already know pointblank. |
| 12 | Q | And in this particular drawing you add in a few things. |
| 13 | | Correct? |
| 14 | A | Correct. I added in what they wanted in, what they needed |
| 15 | | to know, what they wanted to hear. |
| 16 | Q | Okay. So you just told them what they wanted to hear. Is |
| 17 | | that what you are saying? |
| 18 | A | Not necessarily. |
| 19 | Q | Okay. Did you tell them the truth ever? Did you ever get |
| 20 | | to the point where you said I'm just going to tell them |
| 21 | | the truth? |
| 22 | A | Yeah. |
| 23 | Q | And the truth -- |
| 24 | A | You seen my statement. Right? |
| 25 | Q | I'm confused because I thought you just said you told them |

```
 1              what they needed to hear or wanted to hear.

 2      A       What they needed to hear.

 3      Q       Okay.  And what did they need to hear?

 4      A       The truth.

 5      Q       The truth, okay.  So you agree that at some point you told

 6              them the truth?

 7      A       Yes.

 8      Q       Okay.  In this particular document, the last page of

 9              Exhibit 36, up by the stove there's a little circle with

10              some names next it to.  Right?

11      A       Right.

12      Q       What names?

13      A       Rock, Vato, Slim, and David.

14      Q       Rock, Vato, Slim, and David.  Right?

15      A       Yes.

16      Q       The three guys who are friends and Mr. Wilber?

17      A       Right.

18      Q       And then you have a couple other guys in there, a

19              couple -- what does it say -- a couple of Hispanic males?

20      A       Unknown.

21      Q       Unknown.  Do you remember who they were or what race they

22              were or anything?

23      A       That's why it's unknown, I don't remember.

24      Q       Who is the tallest guy in that group?

25      A       Mr. Wilber.
```

```
 1    Q    By how far?  At least a foot over everybody?

 2    A    I'm not sure.

 3    Q    Was there anybody there that was even close to his height?

 4    A    I don't think so.

 5    Q    How tall is he?

 6    A    I don't remember.

 7    Q    Best estimate?

 8    A    I don't know.

 9    Q    Best estimate.

10    A    6 -- 6' -- 6'1", 6'2", 6'3".

11    Q    You think he's 6'2" or 6'3"?

12    A    I don't know.

13    Q    So in your second drawing here, other than the two or

14         three unknown guys, the four guys are Rock, Vato, Slim,

15         and David.  Is that right?

16    A    Correct.

17    Q    And this would have been at the moment of the tussle and

18         the moment the gunshot went off the way you were telling

19         it to the police on February 5th, just four or five days

20         after it happened?

21    A    What about it?  Could you repeat yourself, please.

22    Q    You've got Rock, Vato, Slim and David all right in that

23         little circle on this diagram.  Correct?

24    A    Correct, but I don't think I was -- that David was in the

25         circle, I never said that.  I'm saying who was all on this
```

| | | |
|---|---|---|
| 1 | | side, who was lined up on the other side of me. |
| 2 | Q | Right. What you said was the victim, David Diaz, was |
| 3 | | standing next to the group but not fighting? |
| 4 | A | Right. And I didn't say necessarily next to the group. |
| 5 | Q | So you didn't say necessarily next to the group and you |
| 6 | | didn't necessarily say -- |
| 7 | A | He was there on the side of the wall where it was going |
| 8 | | on. |
| 9 | Q | And then the police talked to you again -- |
| 10 | | THE COURT: One moment. Sidebar with the |
| 11 | | lawyers. |
| 12 | | (Whereupon, an off the record discussion |
| 13 | | was had.) |
| 14 | | THE COURT: All right. |
| 15 | | (The following proceedings were held |
| 16 | | outside the presence of the jury.) |
| 17 | | THE COURT: Mr. Niles, I've allowed it to |
| 18 | | go for a little bit and I didn't want to embarrass you in |
| 19 | | front of the jury, that's why I've sent them out, but you |
| 20 | | are to respond to the questions that are put to you by |
| 21 | | counsel. |
| 22 | | THE WITNESS: All right. |
| 23 | | THE COURT: It is unimportant for purposes |
| 24 | | of these proceedings whether you like the question, don't |
| 25 | | like the question, like the person asking it, don't like |

1    the person asking it.  You are to respond to the question.

2                    THE WITNESS:  All right, Judge.

3                    THE COURT:  In addition, no more facial

4    gestures or acknowledgement of any kind.  You know what

5    I'm talking about 'cause I saw you do it, and you

6    immediately knew I saw you do it so you looked at me.

7                    THE WITNESS:  Yeah.

8                    THE COURT:  Don't do that again.  You do

9    that again, I'm going to admonish you in front of the

10   jury.  You understand what I'm saying?

11                   THE WITNESS:  Yes, I do, Judge.

12                   THE COURT:  The witness was getting a

13   little agitated up here in response to comments --

14                   THE WITNESS:  He keeps asking --I'm sorry.

15                   THE COURT:  The witness was getting a

16   little agitated in response to questions by counsel and at

17   one point after he had in his opinion -- or my surmising

18   what he's thinking is he showed Mr. Griffin.  He winked or

19   acknowledged Mr. Wilber in the witness stand as if he was

20   holding his own up here on the witness stand.  He knows he

21   did it, I know he did it, he looked right immediately at

22   me 'cause he knew I caught him doing it.  I don't want

23   that to go on at all again.  That's it.  Mr. Wilber, I

24   don't think this is funny.  Do you?

25                   THE DEFENDANT:  I just don't understand --

```
 1                    THE COURT:  I don't think this is funny.
 2         Do you?
 3                    THE DEFENDANT:  I just don't understand
 4         where all this stuff is coming from.
 5                    THE COURT:  You don't.  Do you?  You are an
 6         innocent in this whole thing.
 7                    THE DEFENDANT:  I'm an innocent in this
 8         whole thing.  I'm innocent of all charges.
 9                    THE COURT:  And you have not instigated
10         anything in this courtroom, you have not acted
11         inappropriately to the Court or anyone in this courtroom
12         during the duration of the trial.  Is that what you are
13         telling me?
14                    THE DEFENDANT:  I'm innocent of all
15         charges.
16                    THE COURT:  I'm not talking about your
17         innocence to these charges.  I'm talking about your
18         behavior in this courtroom.
19                    THE DEFENDANT:  And what you are referring
20         to right now as far as what Mr. Niles did, I have no
21         knowledge of what he is doing.
22                    THE COURT:  Then all you need to do is say
23         that to your lawyer.  You don't need to --
24                    THE DEFENDANT:  That's what I did.  You
25         started speaking to me, Your Honor.
```

```
 1                    THE COURT:  And I said we don't need to
 2          smile or laugh about these things because that's exactly
 3          what you were just doing.  Mr. Chernin, you can call it
 4          anything you want, but the Court is not stupid.
 5                    MR. CHERNIN:  Your Honor, I --
 6                    THE COURT:  The Court has eyes.
 7                    MR. CHERNIN:  Your Honor, I don't know what
 8          you are talking about.
 9                    THE COURT:  And I observed him just
10          laughing again at what was going on.  I think it's
11          perfectly acceptable for the Court to find out if there is
12          something about what I'm saying that's funny and I would
13          like to know about it.
14                    MR. CHERNIN:  Judge, I don't think there's
15          anything funny about what you are saying, but I have no
16          idea what you are talking about now when you are
17          addressing me about it.  I'm sorry.  I missed what --
18          who -- I don't even know who this -- was I smiling or was
19          Mr. Wilber smiling?
20                    THE COURT:  Mr. Wilber.
21                    MR. CHERNIN:  Okay.  I didn't see that,
22          so -- and if -- and was he smiling to Mr. Niles before?
23                    THE COURT:  To you.
24                    MR. CHERNIN:  To me when?
25                    THE COURT:  Just now, Mr. Chernin.
```

```
 1                    MR. CHERNIN:  Okay.  If he -- if that's
 2       what the Court thinks, I --
 3                    THE COURT:  No, I don't think that, I know
 4       it and I know it because I observed it.  Now it's going to
 5       stop because I'm quite honestly at the end of my rope and
 6       I'm a little tired of having to be restrained here.  I'm
 7       not going to be restrained again.  I have been exemplary
 8       in my restraint.  Do not please in any way, shape or form
 9       mistake my kindness for weakness.  Are we communicating,
10       gentlemen?  Are we communicating, gentlemen?
11                    MR. GRIFFIN:  Yes.
12                    MR. CHERNIN:  Are you -- you -- I don't
13       know who you are addressing.  I'm sorry, if you are
14       addressing me, I --
15                    THE COURT:  I'm looking right at the four
16       of you gentlemen sitting at these tables.
17                    MR. CHERNIN:  Okay.  I understand what you
18       are saying.
19                    THE COURT:  Thank you.  Communicate it to
20       your client.  Don't mistake my kindness for weakness.  Big
21       mistake.  Big mistake.  Let's bring the jury back out.
22                    THE WITNESS:  Your Honor --
23                    THE COURT:  That's it.
24                    (The following proceedings were held in the
25       presence of the jury.)
```

1                       THE COURT:  Mr. Griffin, you may continue.

2  CONTINUED DIRECT EXAMINATION BY MR. GRIFFIN:

3  Q  Mr. Niles, as you are standing there by the kitchen table,

4     where did the shot come from?

5  A  I don't know.

6  Q  As best you remember.

7  A  I don't know.

8  Q  Did it come from the living room?

9  A  I don't know.

10  Q  How loud was it?

11  A  As in a bang -- just a bang.  I don't know how loud it

12     was.

13  Q  Was there much of an echo to it?

14  A  Not that I can recall.

15  Q  Do you recall telling the police that you heard a gunshot

16     come from the area where the tussle was?

17  A  I'm not sure.

18  Q  Do you recall telling them that you did not see who shot

19     due to the number of people.  The kitchen was well lit.

20     Niles stated everybody started to run out of the kitchen

21     towards the living room.  Niles noticed everybody running

22     away from Slim who is now standing by himself.

23  A  Is that in this exhibit?

24  Q  No, I'm asking if you remember ever telling that to the

25     police?

| | | |
|---|---|---|
| 1 | A | Not that I can recall.  I remember telling them everybody |
| 2 | | was running out of the kitchen, yes, after the gunshot. |
| 3 | Q | I'm going to show you what's been marked as Exhibit 37. |
| 4 | | You recognize it? |
| 5 | A | Yes, I do. |
| 6 | Q | Did you read it yesterday? |
| 7 | A | Yes, I did, I skimmed through it. |
| 8 | Q | I'm sorry? |
| 9 | A | Yes. |
| 10 | Q | You skimmed through it? |
| 11 | A | I read it, yes. |
| 12 | Q | Okay.  Is that your signature on the -- about the fifth |
| 13 | | line down after the part about them reading you your |
| 14 | | rights? |
| 15 | A | Yes. |
| 16 | Q | And is -- are those your initials at the bottom of that |
| 17 | | first page, O.N.? |
| 18 | A | Correct. |
| 19 | Q | And is that your signature at the end of the document |
| 20 | | after the words is true and correct? |
| 21 | A | Yes. |
| 22 | Q | Why did you sign it? |
| 23 | A | 'Cause this is what I told them somewhat and I wanted to |
| 24 | | get out of the interrogation room. |
| 25 | Q | You wanted to get out of the interrogation room? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So you -- |
| 3 | A | In order to do that you got to comply with what they are |
| 4 | | asking you and what they are telling you. |
| 5 | Q | You couldn't possibly not sign it. Is that what you are |
| 6 | | saying? |
| 7 | A | I probably could have not signed it, but it would have |
| 8 | | been more to that. |
| 9 | Q | In what way? |
| 10 | A | By the detectives harassing me. |
| 11 | Q | Harassing you? |
| 12 | A | Yes. |
| 13 | Q | In what way? |
| 14 | A | I had one detective tell me that he'll mess with me for |
| 15 | | the rest of my life. |
| 16 | Q | If what, if you didn't tell him the truth? |
| 17 | A | Something to that effect. If I keep playing games or |
| 18 | | something like that. |
| 19 | Q | In this particular statement in that first paragraph on |
| 20 | | Page 1 of 2 there you talk about it a little bit |
| 21 | | differently. Correct? |
| 22 | A | Page 1 of 2? |
| 23 | Q | You state that after Slim took your necklace from around |
| 24 | | your neck and threw it back on the kitchen table, Slim |
| 25 | | walked across the kitchen to confront Rock. And again |

```
 1          this statement was given on February 5th starting around
 2          9:15 p.m.  Correct?
 3     A    Correct.
 4     Q    So Slim actually goes to confront Rock and really not the
 5          other way around at least as you told it to the police
 6          then?
 7     A    No, after they told him to calm down.
 8     Q    After they told him to calm down, Slim walked across the
 9          kitchen to confront Rock?
10     A    Something to that.  I didn't -- I don't really get what
11          you are trying to say.
12     Q    Well, you -- in other words, you and Slim are over here.
13          On Exhibit No. 1 you and Slim are over on the what would
14          be the left side of this kitchen table.  Right?
15     A    Right.
16     Q    Rock and Vato come in.  Where do they go?  They just stay
17          here at the entrance way sort of between the living room
18          and the kitchen or do they come over by Mr. Wilber and
19          you?
20     A    I don't remember, but at some point they told him to calm
21          down.
22     Q    And that's --
23     A    That's like me telling you to calm down from way over
24          there.  If I'm right here telling you to calm down from
25          over there, I don't think that goes.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  And you -- what do you mean you don't think it |
| 2 | | goes? |
| 3 | A | I would probably have to approach you and tell you to calm |
| 4 | | down. |
| 5 | Q | And if not, then you are going to go come by me? |
| 6 | A | I probably would have did that from the get-go. |
| 7 | Q | Slim walked across the kitchen to confront Rock who had |
| 8 | | told Slim to chill out.  Niles stated when Slim took his |
| 9 | | necklace, he meaning Niles was sitting at the kitchen |
| 10 | | table by the bathroom and refrigerator and Slim walked |
| 11 | | across the kitchen by the stove.  Is that right? |
| 12 | A | Yes. |
| 13 | Q | Is that what happened? |
| 14 | A | That they came in to confront him. |
| 15 | Q | Were you sitting at the kitchen table by the bathroom? |
| 16 | A | Who, me? |
| 17 | Q | Yeah. |
| 18 | A | I might have been standing by the kitchen table by the |
| 19 | | bathroom. |
| 20 | Q | Did Slim then walk across the kitchen by the stove? |
| 21 | A | I don't remember.  I don't know how they met up like that. |
| 22 | Q | What I mean is Rock is standing there telling him to chill |
| 23 | | out? |
| 24 | A | Right. |
| 25 | Q | And his response is that he goes over by him, he's not |

| | | |
|---|---|---|
| 1 | | going to take that -- as you said, you are not going to |
| 2 | | take it.  Right? |
| 3 | A | I didn't -- |
| 4 | Q | Mr. Wilber didn't like being told to chill out.  Did he? |
| 5 | A | I don't know. |
| 6 | Q | He did something about it though.  Right? |
| 7 | A | I don't know.  He didn't do anything about it.  They all |
| 8 | | did something about it. |
| 9 | Q | Did you tell the police that when the tussle started, two |
| 10 | | to three people from the living room, maybe more, came |
| 11 | | into the kitchen and tried to separate everybody and calm |
| 12 | | everybody down? |
| 13 | A | Right. |
| 14 | Q | Niles stated he does not know who the people were that |
| 15 | | came into the kitchen from the living room other than they |
| 16 | | were males.  There were two females in the kitchen, |
| 17 | | Endalia who you were talking to and Slim's sister, |
| 18 | | Antonia? |
| 19 | A | Correct. |
| 20 | Q | Niles stated he then heard a gunshot come from the area |
| 21 | | where the tussle was.  Is that what you told the police, |
| 22 | | sir? |
| 23 | A | It says right here.  At the time I think I did. |
| 24 | Q | But now a year later you think you remember it a little |
| 25 | | differently? |

```
 1   A   No, I just wanted to get out the interrogation room.

 2   Q   So you A, lied to them or B, told them the truth to get

 3       out of the interrogation room.  Which was it?

 4   A   I told them what they wanted to hear.  That's what they

 5       wanted to hear.  They kept telling me that I heard the

 6       gunshot from that area.

 7   Q   You told them what they wanted to hear?

 8   A   I told them what they wanted to hear and they wrote it

 9       down how they wanted to write it down.

10   Q   Whether it was true or not, you were going to say whatever

11       you thought was in your best interests?

12   A   Correct, I was gonna be here regardless.

13   Q   And but my point is that you are the kind of guy who if

14       it's in your best interests, you will say whatever it is

15       you've got to say if you think it's in your best

16       interests, you don't care if somebody is dead, you don't

17       care if somebody is charged with a homicide, you don't

18       care --

19   A   Incorrect.

20   Q   Okay.

21   A   Incorrect.

22   Q   So you are in this room with the police, you saw a guy get

23       shot, you saw him fall to the ground, right, you ran over

24       his body to get out of the house.

25   A   I didn't see him get shot.
```

| | | |
|---|---|---|
| 1 | Q | Well, you were in the house when he got shot? |
| 2 | A | Correct. |
| 3 | Q | You know that the police are thinking Danny Wilber did it? |
| 4 | A | I don't know who they were thinking. |
| 5 | Q | They didn't tell you that? |
| 6 | A | They were telling me we know you seen who did it, that's |
| 7 | | what the detectives were telling me. |
| 8 | Q | And so what the police wanted you to tell them was what? |
| 9 | A | The police wanted me to tell them that I seen this man do |
| 10 | | something. |
| 11 | Q | Danny Wilber? |
| 12 | A | Yes. |
| 13 | Q | So you knew the police wanted you to say Danny Wilber was |
| 14 | | the guy? |
| 15 | A | To some extent. |
| 16 | Q | So why didn't you tell them that? You were going to tell |
| 17 | | them whatever they wanted to hear. Whatever it was they |
| 18 | | wanted to hear, you were going to tell them so you could |
| 19 | | get out that room. |
| 20 | A | That's putting someone elses life in jeopardy that don't |
| 21 | | got nothing to do with it, that's what I'm saying, it's a |
| 22 | | difference. |
| 23 | Q | So you wouldn't tell the police that you heard a gunshot |
| 24 | | come from the area where the tussle was unless it was |
| 25 | | true. Is that right? |

| | | |
|---|---|---|
| 1 | A | No, 'cause I just told you I didn't tell them what was |
| 2 | | true. |
| 3 | Q | Do you even know the difference between the truth and a |
| 4 | | lie? |
| 5 | A | Yes, I do. |
| 6 | Q | Okay.  What's the truth? |
| 7 | A | The truth is telling the truth, what I seen and what I |
| 8 | | didn't see. |
| 9 | Q | Okay.  And when you told the police can it be also the |
| 10 | | truth what you heard? |
| 11 | A | If I heard something and I told them and I really did hear |
| 12 | | it, then, yeah, that would be called telling the truth. |
| 13 | Q | Did you hear a gunshot come from the area where the tussle |
| 14 | | was? |
| 15 | A | I don't know where the gunshot came from. |
| 16 | Q | Did you tell the police on February 5th, 2004, |
| 17 | | approximately five days after the shooting, that you had |
| 18 | | heard a gunshot come from the area where the tussle was? |
| 19 | A | No, I didn't. |
| 20 | Q | The police made this up? |
| 21 | A | No, they didn't.  They put it in their own words. |
| 22 | Q | Okay.  What words did you say? |
| 23 | A | I said I think I heard the gunshot come from there. |
| 24 | Q | Okay.  So you think you heard the gunshot -- |
| 25 | A | I don't know where the gunshot came from. |

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 82 of 182   Document 61-23

```
 1    Q    Right, I understand now that you don't know where the
 2         gunshot came from.  On February 5th --
 3    A    I didn't know where the gunshot came from.
 4    Q    But you thought it came from the area where the tussle
 5         was?
 6    A    It came from somewhere in the kitchen or somewhere around
 7         the perimeter, that's where the guy got killed.
 8    Q    But you did not see who shot due to the number of people?
 9    A    No, I didn't.
10    Q    Is that what you told the police?
11    A    Correct.
12    Q    And you couldn't see who shot because of the number of
13         people where?
14    A    In the kitchen.
15    Q    In the tussle?
16    A    I said I did not see who had a gun or did not see anyone
17         shoot in the kitchen.
18    Q    The kitchen was well lit though.  Right?
19    A    Correct.
20    Q    Did you tell the police that or they just wanted to hear
21         that from you so you told them it was?
22    A    I told them that the kitchen was well lit.  They would ask
23         me was the kitchen well lit?  Yes.
24    Q    Did they ask you did you hear the gunshot come from the
25         tussle and you said yes?
```

```
 1   A    I can't recall that.  I don't remember exact words what
 2        they asked me.  Even from reading this, I couldn't tell
 3        you the exact words what they asked me.
 4   Q    Did you tell the police that everybody started to run out
 5        of the kitchen towards the living room?
 6   A    Yes, I did.
 7   Q    Did you tell them that you noticed everybody running away
 8        from Slim?
 9   A    Everyone running out of the kitchen.
10   Q    Away from Slim?
11   A    No, he wasn't chasing no one.
12   Q    Who was now standing by himself.  Did you tell them that,
13        sir?
14   A    Tell them what?
15   Q    That Slim was now standing by himself as everybody ran out
16        of the kitchen?
17   A    Probably.
18   Q    So in other words, everybody ran out of the kitchen
19        because there's been a gunshot and it's time to get out of
20        there 'cause you might get shot?
21   A    Right.
22   Q    The one guy that didn't do that right away as you recall
23        was Mr. Wilber?
24   A    He checked himself.
25   Q    He checked himself?
```

```
1    A    Correct.

2    Q    That's not in there though.  You didn't tell the police

3         that that night -- did you -- that's new?

4    A    No, I didn't think they asked me that.  They were asking

5         me questions and wanted me to answer them how they wanted

6         me to answer them.

7    Q    Well, Mr. Niles, you are not a dumb guy.  You just said 5

8         minutes ago the police wanted you to say Danny Wilber did

9         this.  Did you tell them, no way Danny Wilber did it, he's

10        patting himself down, he's thinking he got shot, I see his

11        hands as he pats himself down, he had no gun, you guys are

12        crazy.  You didn't tell them that.  You said everybody ran

13        away from him as he stood there by himself.

14   A    I did tell them that.  I did tell them that.  They didn't

15        write it down.  I'm not saying I didn't tell them that.

16        They didn't write down everything we discussed in that

17        little room.

18   Q    Did you run away?

19   A    Yes, I did.

20   Q    Why?

21   A    'Cause I didn't want to be in here.  I didn't want to be

22        no where around there.

23   Q    Were you afraid you were going to get shot?

24   A    No, I just didn't want nothing to do with it.

25   Q    Niles also noticed somebody laying on the kitchen floor
```

| | | |
|---|---|---|
| 1 | | about 7 feet away from Slim. |
| 2 | A | If that's how many feet that they wrote down. |
| 3 | Q | Is that what you told them?  You think they just picked |
| 4 | | that number out of a hat? |
| 5 | A | No, they probably said what was it, 5, 6, 7 feet. |
| 6 | Q | And you as a truth teller said? |
| 7 | A | 7 feet probably. |
| 8 | Q | In order to tell them the truth or to lie to them? |
| 9 | A | In order to give them a statement so I could get out of |
| 10 | | the interrogation room. |
| 11 | Q | Did you tell the police that you did not know who was |
| 12 | | lying on the kitchen floor and did not see this person |
| 13 | | bleeding? |
| 14 | A | I can't remember.  I have -- I would have to read this |
| 15 | | over. |
| 16 | Q | Go ahead, take your time.  Did you tell the police that? |
| 17 | A | Right here in my statement it says standing by himself |
| 18 | | Niles also noticed someone laying on the kitchen floor |
| 19 | | about 7 feet away from Slim.  Niles did not know who was |
| 20 | | laying on the kitchen floor and did not see this person |
| 21 | | bleeding.  Niles did not see Slim with a gun. |
| 22 | Q | Right.  I'm only at the part -- or stop at the bleeding. |
| 23 | | The next sentence will be did you tell them you didn't see |
| 24 | | Slim with a gun? |
| 25 | A | Yes, I did tell them that. |

```
1    Q    Okay.  So that part you did tell them?

2    A    Correct.

3    Q    Okay.  So you managed --

4    A    And I'm not voluntarily telling these people this.  They

5         are asking me questions and I'm pretty sure you are quite

6         familiar with that.

7    Q    So why didn't you --

8                        THE COURT:  Stop.  Mr. Niles, do you recall

9         my conversation with you earlier?

10                       THE WITNESS:  Yes, I do, Your Honor.

11                       THE COURT:  Adhere to it, please.  You may

12        continue.

13   Q    Why didn't you want to tell them?

14   A    Why didn't I want to tell them what?

15   Q    That Slim didn't do this, you hadn't seen Slim with a gun,

16        here's the deal, guys, here's what happened, boom, boom,

17        boom, boom, boom?

18   A    I did tell them I didn't see Slim with the gun.

19   Q    See, Mr. Niles, what I don't understand is you seem to

20        want to say you told the police these things, and that the

21        police had things they wanted to hear, and that they are

22        just asking questions and you are answering them or they

23        are giving you multiple choices and you are picking one.

24        So what happened in there with the police?  Were you

25        giving them information or were they giving you the
```

| | | |
|---|---|---|
| 1 | | information? |
| 2 | A | 50/50. |
| 3 | Q | 50/50.  What information did the police give you? |
| 4 | A | They are asking me questions -- |
| 5 | Q | Like what? |
| 6 | A | -- and they are giving me choices of the answers, what -- |
| 7 | | what would probably best fit that question. |
| 8 | Q | So they would ask you a question like:  Mr. Niles, did you |
| 9 | | see the person bleeding?  (a) yes, (b) no, and you would |
| 10 | | say, auh, (b) no? |
| 11 | A | They didn't say it like that. |
| 12 | Q | Oh, how did they say it? |
| 13 | A | I don't know how I could put it to you. |
| 14 | Q | Put it to me the way they put it to you. |
| 15 | A | So did you -- did you see this man do this, did you -- did |
| 16 | | you see him do this, did you run out, you know. |
| 17 | Q | Well, what was it that the police said to you that got you |
| 18 | | to say to them I noticed everybody running away from Slim |
| 19 | | who was now at that point standing by himself?  What was |
| 20 | | it they said to you that got you to say that? |
| 21 | A | I can't remember.  It was about a year ago.  I don't |
| 22 | | remember the exact same words.  This is the only thing I |
| 23 | | remember what's on this paper. |
| 24 | Q | And you signed it -- strike that.  Did the police go back |
| 25 | | through it with you at the end?  Did they read it to you? |

| | | |
|---|---|---|
| 1 | A | Not that I can remember. |
| 2 | Q | But it's possible? |
| 3 | A | It's possible. |
| 4 | Q | And at the very bottom where it says this statement was |
| 5 | | read back to Niles by Detective Caballero in the presence |
| 6 | | of Detective Corbett and is true and correct and then |
| 7 | | there's an X and your signature. You see where I'm |
| 8 | | talking about at the very bottom? |
| 9 | A | Yes, I do. |
| 10 | Q | You signed that because it was true and correct? |
| 11 | A | No, because it was midnight and I was tired. I been in |
| 12 | | this interrogation room for a few days now. |
| 13 | Q | So when you signed your name after the words is true and |
| 14 | | correct, did you -- did you know why you were signing it? |
| 15 | A | Yes. |
| 16 | Q | Why? |
| 17 | A | To get out of there. |
| 18 | Q | Well, I mean when you see a person's signature on a line |
| 19 | | after it reads the statement is true and correct, what do |
| 20 | | you think that means? |
| 21 | A | That everything I said here is true and correct. |
| 22 | Q | But it wasn't? |
| 23 | A | No, it wasn't. |
| 24 | Q | Did they give you the bathroom break from 12:26 to |
| 25 | | 12:37 -- or 12:31? |

```
1    A    It was declined.

2    Q    No, the bathroom break.

3    A    It was declined.

4    Q    What about coffee, water and soda but declined, did they

5         offer you coffee, water or soda?

6    A    But I declined it.

7    Q    And what about the bathroom break from 12:26 to 12:31 or

8         was that their bathroom break?

9    A    I don't think I took a bathroom break.

10   Q    Did they or -- I mean they might have?

11   A    They might have.  They took a lot of breaks.

12   Q    Okay.  So which part of this last document is not true?

13   A    There's little pieces and fragments that I see that aren't

14        true.

15   Q    Like pick one just so I have an example of what it is you

16        are talking about.

17   A    All right.  Niles noticed everyone running away from Slim

18        who was now standing by himself, and when I said that, I

19        meant everybody as in the people he was fighting with,

20        along with everybody, Rock, Vato --

21   Q    And ran the hell out of there?

22   A    Yeah, everyone, even -- even -- and this is their buddy

23        that just got killed.  Everyone ran.

24   Q    And this is their buddy that just got killed?

25   A    Right.  Everyone ran.
```

| | | |
|---|---|---|
| 1 | Q | God, they must be running from the gunman.  Huh? |
| 2 | A | Everyone ran. |
| 3 | Q | Except Mr. Pat Down, Danny Wilber.  Right? |
| 4 | A | No, he ran after he checked himself. |
| 5 | Q | After he checked himself.  And you stuck around to see |
| 6 | | that? |
| 7 | A | No, I didn't.  It just happened right away. |
| 8 | Q | So the first thing that happened was everybody is running |
| 9 | | out including you except Danny Wilber who is taking the |
| 10 | | time to pat himself down.  Is that it?  That's the way it |
| 11 | | really happened? |
| 12 | A | When the gunshot went off, yes. |
| 13 | Q | I'm going to show you one more photo, Mr. Niles, Exhibit |
| 14 | | No. 20.  Do you recognize that guy? |
| 15 | A | Yes, I do. |
| 16 | Q | Who is that? |
| 17 | A | Isaiah. |
| 18 | Q | And was he there? |
| 19 | A | Yes, he was. |
| 20 | Q | Was he in the kitchen? |
| 21 | A | No, I didn't see him in the kitchen. |
| 22 | Q | Ever? |
| 23 | A | Ever. |
| 24 | Q | At the after-set? |
| 25 | A | I didn't see him in the kitchen. |

1    Q    Okay.  Can you hand me your statements at well.

2                      MR. GRIFFIN:  Judge, I'm going to ask -- I

3         don't know if you want me to mark it separately from the

4         statement, but that the jury be allowed to see the last

5         page here of Exhibit 36.  I could separate it and mark it

6         36-A, but I'm going to move 36 into evidence.  And at this

7         time I don't think the jurors need to read the whole

8         statement, but --

9                      THE COURT:  Let's have it marked as 36-A.

10        That's the last page of Exhibit 36 and it is a -- it

11        purports to be a diagram.

12                     MR. GRIFFIN:  Yes.

13                     MR. CHERNIN:  Is that the diagram that

14        is --

15                     THE COURT:  Show that to defense counsel.

16                     MR. CHERNIN:  Thank you.

17                     THE COURT:  Are you asking the Court to

18        receive Exhibit 36-A into the record at this time?

19                     MR. GRIFFIN:  Yes, and I will remark the

20        remaining three pages as Exhibit 36.

21                     THE COURT:  Does the defense have any

22        objection to the Court receiving 36-A into the record?

23                     MR. CHERNIN:  No, Your Honor.

24                     THE COURT:  The Court will receive 36-A at

25        this time.

```
 1                      MR. GRIFFIN:  And I ask that it be
 2         published.
 3                      THE COURT:  Publish it to the jury.
 4                      MR. GRIFFIN:  And I have nothing further --
 5         oh, strike that, I have one more question.
 6                      THE COURT:  Wait until the jury has
 7         reviewed the document.  It has been published.  You
 8         indicated you had another question, Mr. Griffin?
 9    Q    Mr. Niles, have you ever been adjudicated delinquent of a
10         crime as a juvenile?
11    A    Yes.
12    Q    How many times?
13    A    Four.
14    Q    Have you ever been convicted of a crime as an adult?
15    A    Yes.
16    Q    How many times?
17    A    Three.
18                      MR. GRIFFIN:  Nothing further.
19                      THE COURT:  Cross.
20    CROSS EXAMINATION BY MR. CHERNIN:
21    Q    There came a point in time after the shooting when you
22         were taken into custody.  Is that a fair statement?
23    A    Correct.
24    Q    When I say taken into custody, what does that mean to you?
25    A    Taken, getting arrested.
```

| | | |
|---|---|---|
| 1 | Q | And that happened to you several days after the |
| 2 | | shooting -- |
| 3 | A | Correct. |
| 4 | Q | -- on January 31st. Correct? |
| 5 | A | Yes. |
| 6 | Q | Who took you into custody? |
| 7 | A | Well, the first time they came to my house and left me a |
| 8 | | card. When I got home, I returned their phone call, went |
| 9 | | down voluntarily to go talk to them, and then they let me |
| 10 | | go, and after that they kept coming to my house and -- and |
| 11 | | then I don't know the arresting officer though. |
| 12 | Q | Were you actually booked into the jail as part of this |
| 13 | | investigation? |
| 14 | A | I don't think so. |
| 15 | Q | Okay. Did you understand that you were free to leave when |
| 16 | | those police officers were talking to you even the first |
| 17 | | time? |
| 18 | A | No, I didn't. I wasn't aware of that. |
| 19 | Q | At that time did you know whether you were merely a |
| 20 | | witness in this matter or if you were the person who they |
| 21 | | may be interested as being a participant in a homicide? |
| 22 | A | I didn't know. |
| 23 | Q | Was that -- no one made that clear to you? |
| 24 | A | No one made that clear to me. |
| 25 | Q | And isn't it true that on the 5th day of February -- I'm |

1        sorry -- the 4th day of February, 2004, you were taken

2        into an interview room at approximately 7 o'clock --

3        precisely at 7:07 p.m.  Do you have any reason to dispute

4        that it was 7:07 p.m.?

5                    MR. GRIFFIN:  I will stipulate.

6    Q   And that you left that interview room at 11:48 p.m.  Would

7        you agree that that sounds about right, that sounds

8        correct?  You said it was about midnight.

9    A   Yeah.

10   Q   So about quarter to -- well, 11:48 p.m. is about midnight.

11       Right?

12   A   Yes.

13   Q   So you were interviewed for a total of 4 hours and 41

14       minutes.  Correct?

15   A   Correct.

16   Q   And then the next day at -- isn't it true that on February

17       5th of 2004 you were again in the same interview room with

18       different detectives.  Isn't that correct?

19   A   Yes.

20   Q   And this is in the afternoon.  Now did you come in

21       voluntarily that time or did the police come get you?  How

22       did you end up in the same interview room at the Criminal

23       Investigation Bureau on February 5th of 2004?

24   A   They never let me leave.

25   Q   So you remained in custody from February -- or you were --

```
 1          from February 4th of 2004 from 7 o'clock until 11:48 they
 2          took you to a room and offered you a bathroom break at
 3          10:06 p.m.  So for 3 and a half -- or 3 hours was the
 4          first time they offered you a break.  Right?
 5     A    Correct.
 6                    MR. GRIFFIN:  Well, I'm going to object.
 7          Mr. Chernin is pretty much testifying and then trying to
 8          throw in a question at the end.  He was not in custody,
 9          that's inaccurate.
10                    THE COURT:  Are you objecting to the form
11          of the question?
12                    MR. GRIFFIN:  I'm objecting.
13                    THE COURT:  Sustained.  Rephrase.
14     Q    Well, did you perceive yourself as being free to leave?
15     A    No.
16     Q    Did the police tell you you were free to leave?
17     A    No.
18     Q    And you remained -- where -- if you weren't -- if you
19          never left, where did you stay?
20     A    In a little holding cell.
21     Q    So even -- was -- was this little holding cell that you
22          were in, were there bars there?
23     A    Yes.
24     Q    Did you have a key to those -- that door so that you could
25          leave?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Were you offered a shower? |
| 3 | A | No. |
| 4 | Q | Were you offered some food or only -- were you offered |
| 5 | | food while you were in that little holding area? |
| 6 | A | Coffee, soda and cigarettes and I declined. |
| 7 | Q | What about -- what about food? |
| 8 | A | No. |
| 9 | Q | Were you offered a bologna sandwich? |
| 10 | A | No. |
| 11 | Q | So you were held -- if it's not in custody, you were |
| 12 | | held -- if Mr. Griffin doesn't agree that's custody -- you |
| 13 | | were held and then you came -- and then somebody came to |
| 14 | | see you -- it's midnight -- roughly midnight and you are |
| 15 | | placed into this holding cell.  Right? |
| 16 | A | Yes. |
| 17 | Q | Is that correct?  And then the next day in the afternoon |
| 18 | | about 2:30 in the afternoon some other detectives come in |
| 19 | | to see you.  Is that correct? |
| 20 | A | Yes. |
| 21 | Q | And do they bring you food? |
| 22 | A | No. |
| 23 | Q | Do they bring you water? |
| 24 | A | No. |
| 25 | Q | Do they offer you a shower? |

```
1   A    No.

2   Q    And they talk to you for -- from 2:30 until approximately

3        4:11 p.m.   Correct?

4   A    Correct.  Not exactly all that time.  They would walk out

5        for like 15 minutes, send another group of detectives in,

6        walk out for about 15 minutes, when they were done, send

7        another group in.

8   Q    Well, when these guys were coming in and out, were they

9        offering you food?

10  A    No.

11  Q    Water?

12  A    Soda, coffee.  No water I don't think -- well, that has to

13       do with soda or coffee, but I declined that.

14  Q    Then you talked to them for an hour and 41 minutes and

15       then later that night -- well, first of all, after that

16       4:11 p.m., where did you go then?  Were you -- did you

17       perceive yourself as being in custody?

18  A    I thought I was.

19  Q    And were you placed -- where did they take you?  Did they

20       take you to the jail, did they take you to Mr. Griffin's

21       house, where did they take you?

22  A    No, they keep taking me to a room with bars and then I --

23       from there I would go to a little investigation room with

24       just four solid walls.  When they were done there, they

25       said, okay, you are not telling us what we need to hear,
```

```
 1              put him back in his cell.  So they take me back to the
 2              cell, put me back in the cell.
 3     Q        And so about 5 -- roughly about 5 hours later because
 4              their interview, Exhibit 37 -- I'm sorry, Exhibit 37,
 5              which is one of the documents that Mr. Griffin showed you,
 6              shows you -- shows you were taken in again at they say
 7              9:13 p.m., correct, and then it shows that you were in an
 8              interrogation room until 1:35 in the morning.  Is that
 9              correct?
10     A        Correct.
11     Q        Now what happened to you -- oh, by the way, did anyone
12              allow you a telephone call?
13     A        No telephone call.
14     Q        Did anyone in the world know where you were?
15     A        Probably my mother and that was because the first day I
16              went down there voluntarily.
17     Q        So did you regard this as like a friendly confrontation
18              with the police?
19     A        No, because my mom said she had been calling and no one
20              knew where I was.
21     Q        Now during that time you were held without communication
22              to the outside world.  Is that a fair statement?
23     A        Yes.
24     Q        During that time you then are brought back for a third
25              interview at 9:13 on February 5th.  Is that correct?  Now
```

```
 1          between --

 2     A    Correct.

 3     Q    And between that second and third interview were you

 4          offered a shower?

 5     A    No.

 6     Q    Were you offered food?

 7     A    No.

 8     Q    But you were offered cigarettes?

 9     A    Yes, and I don't smoke.

10     Q    And you were offered soda.  And do you drink soda?

11     A    Not that much.  Try not to.  Juice and water.

12     Q    Now during that period of time for another 4 hours they

13          write down two pages of stuff.  Is that correct?

14     A    Correct.

15     Q    And did you perceive them as being friendly, were they

16          trying to break your spirit, what were they trying to do?

17          Did you think that these were people that you could rely

18          on to tell your message to the outside world?

19     A    No.

20     Q    Who was in control of these interviews, was it you or was

21          it the police officers?  Who was it?  Who was in control?

22     A    The detectives.

23     Q    And who is writing on those -- other than where you may

24          have put your initials or your name in a couple places on

25          those three exhibits, who was writing down the words that
```

```
 1            were there?

 2    A       Detectives.

 3    Q       Have you ever heard of an audio tape or -- and a tape

 4            recorder?

 5    A       Yes.

 6    Q       Or a videotape --

 7    A       Yes.

 8    Q       -- and a video recorder?  Were any of those things brought

 9            into the interview room with you?

10    A       No.

11    Q       Now, Mr. -- now all you knew was that there was a dead

12            man.  Right?

13    A       Yes.

14    Q       And Mr. Griffin asked you a whole bunch of questions about

15            when you lied and when you were telling the truth.  Right?

16    A       Correct.

17    Q       Now at the time you were talking to these detectives, did

18            the detective tell you, hey -- and first of all, do the

19            people call you Oscar or Mr. Niles or Jay?  What were

20            these police officers calling you?

21    A       Jay.

22    Q       And why were they calling you Jay?

23    A       Because that's a nickname.

24    Q       For junior?

25    A       Yeah.
```

```
 1   Q   Okay.  Now, Mr. Niles, one of the last things that you
 2       told Mr. Griffin was that the last person that you saw as
 3       you left the kitchen was the person you call Slim.  Right?
 4   A   Correct.
 5   Q   And Slim is Danny Wilber?
 6   A   Correct.
 7   Q   And Danny Wilber is the man that's been sitting next to me
 8       at counsel table --
 9   A   Right.
10   Q   -- this time?  Now, during that period of time -- was
11       this a long period of time before you ran out after you
12       heard the shot or was it a very short period of time?
13   A   Very short period, right away, everybody.
14   Q   And the person who was closest to the shot, other than the
15       person who dropped over, you perceived to be Mr. Wilber.
16       Correct?
17   A   Wilber, correct.
18   Q   Now was there ever a period of time that Danny Wilber was
19       behind David Diaz --
20   A   No.
21   Q   -- the person whose dead?  Did you know this man to be
22       named David Diaz by the way?  You didn't know his name?
23   A   No.
24   Q   There's -- in Exhibit 15 and Exhibit 14 there is some --
25       there's a body lying on the floor.  Does that appear to be
```

| | | |
|---|---|---|
| 1 | | what you -- other than the pool of blood, does that appear |
| 2 | | to be what you saw in the kitchen at 1128 West Mineral |
| 3 | | Street on January 31st of 2004? |
| 4 | A | Yes, but without all the blood. |
| 5 | Q | Okay. And so somebody was at least lying there on the |
| 6 | | floor. Correct? |
| 7 | A | Correct. |
| 8 | Q | And what appears to be in this diagram, would you agree |
| 9 | | that this is -- there's a table there? |
| 10 | A | Auh-hum. |
| 11 | Q | And does this appear to be -- and I'm pointing and I'm |
| 12 | | going to ask you to hold this and I'm going to point to |
| 13 | | something with the pointer when I find it, but I will use |
| 14 | | a pen. This -- pull it back so you can see it as well. |
| 15 | | This item back here with the knobs and the dials, does |
| 16 | | that appear to be the stove? |
| 17 | A | Yes. |
| 18 | Q | So when you talk about the stove area and you -- and you |
| 19 | | drew a diagram, Exhibit 38-A -- |
| 20 | | THE COURT: Do you mean 36-A? |
| 21 | | MR. CHERNIN: 36-A. Thank you, Judge. |
| 22 | Q | 36-A, when you talk about the stove area that you see in |
| 23 | | Exhibit 15, the tussle was going on in this area between |
| 24 | | this part of the doorframe and the stove. Is that a fair |
| 25 | | statement? |

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And while the tussle was going on, there was not a body |
| 3 | | lying on the floor.  Was there? |
| 4 | A | No. |
| 5 | Q | And so when you say 7 feet away, that's an estimate or was |
| 6 | | that what the police used as an estimate? |
| 7 | A | They used about 5, 6, 7. |
| 8 | Q | Feet? |
| 9 | A | Right, which I -- |
| 10 | Q | And when -- when the police were interviewing you, you |
| 11 | | didn't have the opportunity to have a picture like Exhibit |
| 12 | | 15.  Did you? |
| 13 | A | No. |
| 14 | Q | And you didn't even have -- you had this rough diagram, |
| 15 | | exhibit -- what was your 36-A.  Right? |
| 16 | A | Right. |
| 17 | Q | And that's what you had available to you.  Right? |
| 18 | A | Right. |
| 19 | Q | Now, you continue to hold Exhibit 15 and that's okay.  Now |
| 20 | | Mr. Diaz, when you say he was near this group that was |
| 21 | | struggling, was this -- were these guys just standing |
| 22 | | still and pushing one another or were they moving around? |
| 23 | A | They were moving around. |
| 24 | Q | They were moving around? |
| 25 | A | Correct. |

| | | |
|---|---|---|
| 1 | Q | And was Rock closer to the wall or closer to the table? |
| 2 | A | Closer to the table like more or less right here. |
| 3 | Q | And where was Danny? |
| 4 | A | Over here. |
| 5 | Q | And where was Richard Torres, Vato? |
| 6 | A | Kind of right here too. |
| 7 | Q | Okay. Now the table seems to be moved -- or appears to be |
| 8 | | close to that wall. Is that -- is that just a perception |
| 9 | | of depth on that diagram or was it moved in some way? How |
| 10 | | did -- or is that how it looked to you? |
| 11 | A | From this picture here it looks to be pushed back a little |
| 12 | | bit more. |
| 13 | Q | More than it was on that night? |
| 14 | A | Right, and it was more this way like centered in the |
| 15 | | middle, you know. |
| 16 | Q | Would Exhibit 14 more accurately depict where you recall |
| 17 | | the table being? |
| 18 | A | Right. |
| 19 | Q | Was Danny Wilber -- you see some cabinets in that |
| 20 | | photograph? |
| 21 | A | Yes, I do. |
| 22 | Q | And by that photograph, I'm talking about Exhibit 14, the |
| 23 | | one that's in front right now -- which one -- I'm sorry, |
| 24 | | either 14 or 15? |
| 25 | A | Exhibit 14. |

```
 1    Q    Which one shows it better from your perspective?  We will

 2         talk from which one you choose.

 3    A    14.

 4    Q    14.  You are looking at Exhibit 14.  And you see some

 5         cabinets -- kitchen cabinets?

 6    A    Correct.

 7    Q    Now was Danny Wilber standing next to those cabinets when

 8         you saw the gun or -- I'm sorry -- when you heard the

 9         gunshot go off, where did you see Wilber?

10    A    Somewhere over here.

11    Q    When you looked up over there?

12    A    Right.

13    Q    So it would have been to the west -- I'm sorry -- to the

14         north -- it would have been -- well, let's use -- use that

15         diagram.  More towards those curtains.  Right?

16    A    Right.

17    Q    So he would have been towards the curtains, not behind

18         Diaz.  Correct?

19    A    Not behind Diaz.

20    Q    Diaz was away from the curtains and closer to the

21         cabinets?

22    A    Right.

23    Q    And you are pointing to an area on Exhibit 14 near it

24         might be a slow pressure cooker or a bread maker or

25         something.  It's a -- some -- some sort of kitchen utensil
```

```
 1              or cooking device is on that counter.  Right?

 2    A         Correct.

 3    Q         And so he was closer to that.  And so when you see -- on

 4              Exhibit 15, the next one, when you see from that

 5              perspective where Mr. Diaz is lying, does that adequately

 6              depict the view that you had when you first saw Mr. Diaz

 7              hit the floor?

 8    A         Yes.

 9    Q         So that his feet would have been behind the cabinet area?

10    A         Correct.

11    Q         And he fell forward?

12    A         Forward.

13    Q         So he would have fallen toward Danny Wilber.  Is that

14              correct?

15    A         Correct.

16    Q         I'm sorry, you don't have to hold those any longer.  I can

17              put those down for you.

18    A         My arm was getting tiered.

19    Q         I know, I can see that.  I appreciate it.  Now during the

20              time that the police were questioning you, did you say to

21              them, hey, look, let me just write down everything that

22              happened or did they give you the opportunity even to

23              write it down?

24    A         No.

25    Q         Mr. Griffin asked you if you know the difference between a
```

| | | |
|---|---|---|
| 1 | | truth and a lie.  Did the police have the entire truth in |
| 2 | | what they wrote down? |
| 3 | A | No. |
| 4 | Q | And did you want to come -- did you think you would ever |
| 5 | | have an opportunity to come and tell the truth to someone? |
| 6 | A | Yes. |
| 7 | Q | Who did you think you would have an opportunity to tell |
| 8 | | the truth to? |
| 9 | A | Everyone in this courtroom.  Why I gave the statement that |
| 10 | | time was to get out of there then and there.  I knew it |
| 11 | | wasn't going to be over. |
| 12 | Q | Now, what happened -- after 11 -- at 1:35 p.m. after this |
| 13 | | last statement, Exhibit 37, did the police let you go |
| 14 | | then? |
| 15 | A | Yes. |
| 16 | Q | Did they drive you home? |
| 17 | A | No. |
| 18 | Q | So you had been according to your -- your thinking, even |
| 19 | | if Mr. Griffin says you weren't in custody, you had been |
| 20 | | in constant police contact contained in a -- in a room |
| 21 | | with cell -- with cell bars from the day before when you |
| 22 | | had voluntarily appeared at about 7 o'clock at night until |
| 23 | | 3 hours later.  Is that fair to say? |
| 24 | A | Yes. |
| 25 | | MR. CHERNIN:  Thank you. |

```
 1                    THE COURT:  Are you going to have redirect?

 2                    MR. GRIFFIN:  Yes.

 3                    THE COURT:  We are going to take our

 4      afternoon break, ladies and gentlemen.  We will be back on

 5      the record at 10 minutes after the hour of 4.

 6                    (The following proceedings were held

 7      outside the presence of the jury.)

 8                    THE COURT:  Mr. Niles, you may step down.

 9      I remind you, you remain under oath and you will return to

10      the witness stand at 10 minutes after the hour of 4.

11                    THE WITNESS:  Thanks.

12                    (Whereupon, a recess was had at 3:59 PM.)

13                    (The following proceedings were held in the

14      presence of the jury.)

15                    (Witness Oscar Niles resumes the stand.)

16                    THE COURT:  You may begin your redirect.

17                    MR. CHERNIN:  Do we have a ruling on that?

18                    THE COURT:  I will have a sidebar with the

19      lawyers.

20                    (Whereupon, an off the record discussion

21      was had.)

22                    THE COURT:  You may begin your redirect.

23      REDIRECT EXAMINATION BY MR. GRIFFIN:

24      Q    Mr. Niles, this is Exhibit 41.  That's another statement

25           that the police took from you -- not about this homicide,
```

| | | |
|---|---|---|
| 1 | | the one that Danny Wilber is charged with, but about |
| 2 | | another one, right, that they talked to you about when you |
| 3 | | were down here back in February of last year? |
| 4 | A | Correct. |
| 5 | Q | The one you -- okay. And how many pages is that? |
| 6 | A | Three. |
| 7 | Q | Did you sign it? |
| 8 | A | Yes, I did. |
| 9 | Q | Is that one also full of stuff that's left out and stuff |
| 10 | | the police didn't put in right and all that kind of stuff? |
| 11 | A | No, because this one was took after all these were took. |
| 12 | Q | So that one -- the one not about Danny Wilber, the guy on |
| 13 | | trial, where you told them you didn't know anything about |
| 14 | | that other homicide, that's all correct? |
| 15 | A | Correct. This is the one I gave first, this is the last |
| 16 | | one, that's probably why they waited last to talk to me |
| 17 | | about this one. |
| 18 | Q | So that they could get it all right finally? |
| 19 | A | I don't know why. I couldn't tell you that. |
| 20 | Q | This is the homicide where the victim's name was Eugene |
| 21 | | Pettis. Right? |
| 22 | A | Correct. |
| 23 | Q | It had nothing do with Danny Wilber or anything like that. |
| 24 | | Part of the reason the police took longer with you was |
| 25 | | because they were also talking to you and interviewing you |

| 1 | | about this other homicide in case you had information |
| --- | --- | --- |
| 2 | | about that? |
| 3 | A | What were the time frames on that one? Could you tell me |
| 4 | | please. |
| 5 | Q | 9:13 p.m. to 1:35 a.m. |
| 6 | A | And what was the times on this, 9:13 to 1:35 a.m.? |
| 7 | Q | Right. This is occurring at the same time. They just |
| 8 | | document it separately because the homicides are separate. |
| 9 | A | Right or did they just leave out the room a few times and |
| 10 | | then come back in. |
| 11 | Q | Well, in any event, from 9:15 to 1:35 you are talking to |
| 12 | | them about two different homicides. Right? |
| 13 | A | No, that one -- I think that one might have been short, |
| 14 | | they just put that time frame down because they were |
| 15 | | talking to me about this one. |
| 16 | Q | The whole interview talking about both of them lasts -- |
| 17 | | you go into that interview room at 9:35, 9 -- excuse me -- |
| 18 | | 9:13 p.m., you get out at 1:35 a.m., and during that time |
| 19 | | they are talking to you about this homicide, meaning |
| 20 | | Mr. Wilber, the homicide he's accused of, and this one |
| 21 | | involving Eugene Pettis? |
| 22 | A | I would say they talked to me about that one at about -- |
| 23 | | not to be exact, but I would say around 1:15 a.m. |
| 24 | Q | So in 20 minutes you covered all this? |
| 25 | A | Probably. |

| | | |
|---|---|---|
| 1 | Q | Including the -- |
| 2 | A | That was real brief. I didn't know anything about it. |
| 3 | Q | Did they show you a photograph of Roberto Gonzalez and |
| 4 | | Doug Kirsh and all that stuff? |
| 5 | A | Yes, they did. |
| 6 | Q | And you gave them all this information in 20 minutes? |
| 7 | A | Yes, I did. I'm not saying it was exactly 20 minutes. |
| 8 | Q | When you were -- when you first agreed to come down to the |
| 9 | | police, you agree they came to your house and you agreed |
| 10 | | to go down and talk to them? |
| 11 | A | Correct. |
| 12 | Q | And because you figured, well, they finally got me, I |
| 13 | | might as well go down and tell them what I know. Right? |
| 14 | A | This is the first time? |
| 15 | Q | Yeah, when you first went down with the police on February |
| 16 | | 5th. |
| 17 | A | No, I just went down there so they could stop coming to my |
| 18 | | mom's house. |
| 19 | Q | What did you think you were going down for? |
| 20 | A | I knew what it was for. |
| 21 | Q | What was it about? |
| 22 | A | What had happened the night of the after-set. They wanted |
| 23 | | to know some answers. |
| 24 | Q | And so you figured I will go down there with them, I will |
| 25 | | answer their questions, and that way they will stop |

| 1 | | bugging me? |
| 2 | A | Yes. |
| 3 | Q | And so you sat down with those detectives and sure enough |
| 4 | | you spent a number of hours lying to them? |
| 5 | A | I wouldn't say not necessarily lying. |
| 6 | Q | Well, you told them that you -- |
| 7 | A | There were some twists in there. |
| 8 | Q | Some twists? |
| 9 | A | Yes. |
| 10 | Q | Okay. So as best you can, what's the difference between a |
| 11 | | twist and a lie to Oscar Niles? |
| 12 | A | What's the difference? |
| 13 | Q | Yeah, what's the difference. |
| 14 | A | Is that I didn't lie, I just rearranged some sentences. |
| 15 | Q | Okay. So for example when you said I wasn't there when |
| 16 | | the shooting happened, what you meant -- what you twisted |
| 17 | | was I was there when the shooting happened? |
| 18 | A | And I didn't want anything to do with the shooting. |
| 19 | Q | Okay. And therefore you were willing to lie? |
| 20 | A | I wouldn't say necessarily lie, like I said before. |
| 21 | Q | Okay. You were willing to twist the truth to whatever you |
| 22 | | wanted to get out of it? |
| 23 | A | Yes. |
| 24 | Q | Okay. And you know that lying to the police is a crime, |
| 25 | | obstructing an officer. You ever heard that? |

```
 1    A    Yes, I did.

 2    Q    Okay.  And so in your mind at least you knew, huh, maybe

 3         they are keeping me here because they know I just lied to

 4         them and they know I committed a crime?

 5    A    No.

 6    Q    When you were in that jail which is with the bars on it,

 7         didn't they serve you food up there?  Isn't there a meal

 8         schedule up there of breakfast, lunch and dinner?

 9    A    No.

10    Q    No McDonald's at all?

11    A    I didn't have any McDonald's.

12    Q    Did they offer it to you?

13    A    I'm not sure.  I don't think so.

14    Q    It's possible?

15    A    I was probably asleep.  They don't come in there and wake

16         you up, say excuse me, you want your food.

17    Q    And at what point did you say I want some food?

18    A    At no point.

19    Q    Well, what point did you tell them, hey, can I get a

20         shower?

21    A    At no point.

22    Q    At what point did you say could I get some juice or water?

23    A    At no point.

24    Q    In fact, they were offering those things and you were

25         saying I don't want them?
```

```
 1    A    Correct.  No, they were offering the water, yes, not the
 2         shower and the food, but that's irrelevant right now.
 3    Q    You said that you preferred juice and water to soda?
 4    A    Pardon me?  Yes.
 5    Q    But your favorite --
 6    A    I'm saying not there -- I'm not saying in the jail what
 7         they are offering me, I'm just saying in general.
 8    Q    In general.  But your favorite mixed drink is Hennessey
 9         and Coke?
10    A    Yes.
11    Q    So you will drink the soda if it's mixed with the
12         Hennessey?
13    A    Correct.
14    Q    You knew when the police first came to get you that you
15         were just a possible witness to all of this.  Correct?
16    A    Correct.
17    Q    Okay.  So why the attitude?
18    A    I didn't want to be a witness.  I didn't want nothing to
19         do with it.  It was terrifying.
20    Q    Right, but at that point you are down in the police
21         station, you've agreed to go with them, I mean, why not
22         tell them what you know and get it over with?
23    A    At that time I had so many things running through my mind.
24    Q    What you told the police was that you didn't go in and
25         tell them right away what happened 'cause you were scared
```

```
1           for your family.

2    A      Too many things running through my mind.

3    Q      Too many things running through your mind?

4    A      Too many thoughts running through my mind.

5    Q      Like, man, am I gonna be the one that puts Danny down for

6           this?

7    A      Not necessarily, no.

8                      MR. GRIFFIN:  Nothing further.

9                      THE COURT:  Recross?

10   RECROSS EXAMINATION BY MR. CHERNIN:

11   Q      Mr. Niles, again you acknowledge that you didn't always

12          tell the truth to the police.  Correct?

13   A      Yes, I do.

14   Q      And despite those untruths that you told, was there ever a

15          period in time when you saw Mr. Wilber behind Mr. Diaz

16          prior to or after you heard the gunshot in the kitchen at

17          1128 West Mineral Street on January 31st of 2004?

18   A      No.

19                     MR. CHERNIN:  Thank you.

20                     THE COURT:  Anything further, Mr. Griffin?

21                     MR. GRIFFIN:  No.

22                     THE COURT:  You may step down.

23                     (The witness leaves the stand.)

24                     MR. GRIFFIN:  I call Ms. Franceschetti.

25                     THE WITNESS:  Am I done?
```

```
 1                    THE COURT:  Is either side expecting to
 2          call -- or recall Mr. Niles to the witness stand?
 3                    MR. CHERNIN:  I don't anticipate doing so.
 4                    THE COURT:  Mr. Griffin?
 5                    MR. GRIFFIN:  No, I'm not.
 6                    THE COURT:  The defendant is released from
 7          his subpoena.
 8                    MR. GRIFFIN:  The witness?
 9                    THE COURT:  I mean the witness is released
10          from his subpoena.
11                    I'm going to have you come on up to the
12          witness stand.  I'm going to have you remain standing.
13          I'm going to have you raise your right hand and my clerk
14          will swear you in.
15                    LEA FRANCESCHETTI, being first duly sworn
16          on oath to tell the truth, the whole truth, and nothing
17          but the truth, testified as follows:
18                    THE CLERK:  Please be seated.
19                    THE COURT:  I'm going to have you pull that
20          chair directly into the bench in front of you.  I'm going
21          to ask you to use the microphone, speak up real loud and
22          clear, and I want you to begin by stating your full name
23          for the record, spelling your first and last name.
24                    THE WITNESS:  Lea Marie Franceschetti,
25          L-E-A  F-R-A-N-C-E-S-C-H-E-T-T-I.
```

|       | THE COURT:  You may begin.                                |
|-------|-----------------------------------------------------------|

1                        THE COURT:  You may begin.

2    DIRECT EXAMINATION BY MR. GRIFFIN:

3    Q    Ma'am, you pronounce your last name Franceschetti?

4    A    Franceschetti.

5    Q    Franceschetti?

6    A    Auh-huh.

7    Q    Okay.

8                        THE COURT:  Is that a yes?

9                        THE WITNESS:  Yes.

10                       THE COURT:  One of the things we need you

11        to do is the court reporter who is seated in front of you

12        is taking every single thing down in the courtroom and she

13        needs to take down actual word responses as opposed to

14        verbal responses.

15                       THE WITNESS:  Okay.

16                       THE COURT:  So I need you to use yes or no

17        or a natural word response.  Thank you.  You may begin.

18   Q    You are in some pain.  Correct?

19   A    Yes.

20   Q    If you need anything, please let the Judge know, okay.

21   A    Yes.

22                       THE COURT:  Do you want water to begin

23        with?

24                       THE WITNESS:  No, I'm fine.

25                       THE COURT:  Go ahead.

| 1 | Q | How old are you? |
| 2 | A | 23. |
| 3 | Q | How many kids do you have? |
| 4 | A | I just had one. |
| 5 | Q | About five days ago? |
| 6 | A | Five days earlier. |
| 7 | Q | And that's why you are hurting.  Right? |
| 8 | A | Yes. |
| 9 | Q | Okay.  But you are down here today because you got a |
| 10 | | subpoena.  Right? |
| 11 | A | Yes. |
| 12 | Q | And you know you are down here to talk about what happened |
| 13 | | a little over a year ago on West Mineral.  Correct? |
| 14 | A | Yes. |
| 15 | Q | Had you been at Bicardi's? |
| 16 | A | Since? |
| 17 | Q | No, before you went to that after-hours party. |
| 18 | A | Yes. |
| 19 | Q | Okay.  Where is Bacardi's? |
| 20 | A | 27th and Lincoln. |
| 21 | Q | Before that day how many times had you been to Bicardi's |
| 22 | | in your life if you remember? |
| 23 | A | Like ten. |
| 24 | Q | So you are familiar with that place? |
| 25 | A | Yes. |

```
 1    Q    When you were there, did you see a guy by the name of
 2         Danny Wilber?
 3    A    I didn't really pay attention.
 4    Q    Did you -- did you see a guy there with the nickname Slim?
 5    A    No, I mean --
 6    Q    At Bicardi's I mean.
 7    A    Oh, well, not that I noticed, no.
 8    Q    Okay.  How was it that you went from Bicardi's to that
 9         after-hours party over on West Mineral?
10    A    People were talking about a party and they asked us to go
11         with so we went.
12    Q    Didn't the D.J. get on the microphone and say everybody at
13         Bicardi's, after-set at 1128 West Mineral or something
14         like that?
15    A    Not that I remember.
16    Q    Okay.  Just word of mouth kind of thing?
17    A    Yeah.
18    Q    Okay.  How much had you had to drink there at Bicardi's?
19    A    Enough.
20    Q    What's enough, I mean --
21    A    I was -- I was intoxicated.
22    Q    And what were you drinking if you recall?
23    A    Well, probably Miller Lite and Jaeger Bombs.
24    Q    And Jaeger bombs are Jaegermeister and Red Bull?
25    A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Do you remember, was -- did you go before the bar closed |
| 2 | | over to that party or when the bar closed? |
| 3 | A | When the bar closed. |
| 4 | Q | So everybody that's -- |
| 5 | A | Yeah. |
| 6 | Q | Okay. How did you get from Bicardi's over to the |
| 7 | | after-set or the after-hours party? |
| 8 | A | With my friend Jaimie. |
| 9 | Q | Jaimie, what's her last name? |
| 10 | A | Williams. |
| 11 | Q | She's out in the hallway right now? |
| 12 | A | Yes. |
| 13 | Q | When you walked into that party or that house, what |
| 14 | | happened? |
| 15 | A | We were -- I was talking to people, we went -- I was in |
| 16 | | the front room mostly the whole time with Tim, and Jaimie, |
| 17 | | and Tony. I didn't really leave that room much so. |
| 18 | Q | While you were there, did you have -- did you have to |
| 19 | | begin with while you are in the house an unpleasant |
| 20 | | experience with someone to put it -- |
| 21 | A | Yeah. |
| 22 | Q | Who was that? |
| 23 | A | Slim. |
| 24 | Q | And do you see this guy -- that guy in court today? |
| 25 | A | He looks different. |

```
 1    Q    Right.  But do you see him?

 2    A    I guess, yeah.

 3    Q    Okay.  This guy that you knew as Slim, what happened --

 4                   THE COURT:  One moment, Mr. Chernin -- I

 5         mean, Mr. Griffin.  You said I guess, yeah, and then you

 6         said --

 7                   THE WITNESS:  He looks -- I've only seen

 8         him like twice in my whole life, so I don't really

 9         remember what he looks like.  I remember tall and black.

10                   THE COURT:  And you were pointing in what

11         direction just now?

12                   THE WITNESS:  The front.

13                   THE COURT:  And who were you pointing at?

14                   THE WITNESS:  Him.

15                   THE COURT:  Would you describe him by where

16         he's seated what he's wearing.

17                   THE WITNESS:  The striped shirt, blue,

18         brown.

19                   THE COURT:  Is that who you were indicating

20         to Mr. Griffin when he asked you that question?

21                   THE WITNESS:  Yes.

22                   THE COURT:  You may continue.

23    Q    When you talked to the police shortly after this happened,

24         did they show you a photo of Mr. Wilber?

25    A    Yes.
```

```
 1    Q    And you said this is the guy that I'm talking about that I
 2         had this little confrontation -- altercation with him?
 3    A    Yes.
 4    Q    Okay.  And how did that go?  What happened exactly?
 5    A    He just said, bitch, I'll slap you and that was it.
 6    Q    To you?
 7    A    Yeah.
 8    Q    Bitch, I will slap you?
 9    A    Yeah.
10    Q    Well, what had you said to him to get him to say that?
11    A    I didn't say anything.
12    Q    Well, did you give him a look?
13    A    No, I was talking to some other guy, I had my back towards
14         him and he came up.
15    Q    He came up to where you were.  What were you doing at that
16         moment?
17    A    Talking to some other person.  I don't know --
18    Q    Did you --
19    A    -- exactly.  He was a person at the party.
20                   THE COURT:  Okay.  Mr. Griffin, I'm just
21         going to ask you to remember to let her finish her
22         response and then you can ask her the next question.
23    Q    Did you give him the finger or anything?
24    A    No, I kept my mouth shut.
25    Q    Did you give him a look like buzz off before he said that?
```

```
1    A    No.  I looked at who I was talking to just like whatever.
2         I didn't understand where it was coming from.
3    Q    Before or after Mr. Wilber said:  Bitch, I will slap you,
4         did you do anything that you can think of now that might
5         have set him off?
6    A    Not that I can think of, no.
7    Q    How long were you there in the after-hours -- at the
8         after-set?
9    A    Not -- maybe not even an hour.  It wasn't too long.
10   Q    What -- what made you leave?
11   A    Some guy came up to us and told us to leave.
12   Q    Do you remember who that guy was?
13   A    I guess his name is Isaiah.
14   Q    I'm going to show you a photograph marked Exhibit 20.  Do
15        you recognize that guy?
16   A    Yeah.
17   Q    Who is that?
18   A    That's the one that told us to leave, Isaiah.
19             MR. GRIFFIN:  Isaiah Arroyo, A-R-R-O-Y-O,
20        for the record.
21   Q    And do you know why he told -- when you say told us to
22        leave, you mean you and Jaimie?
23   A    Yeah.
24   Q    Do you know why he said that?
25   A    No, I don't.
```

```
 1    Q    Do you recall him using the word drama?

 2    A    No.

 3    Q    Did you do that, did you leave?

 4    A    Yeah, we left right away.

 5    Q    And where did you go?

 6    A    To the car.

 7    Q    With Jaimie?

 8    A    With Jaimie.

 9    Q    And what happened next?

10    A    We warmed up the vehicle, and we were sitting in there

11         warming up 'cause it was really cold out and all of a

12         sudden about a couple minutes later all these people got

13         in the car in the back seat.

14    Q    Did you know who they were?

15    A    Yes.

16    Q    Who?

17    A    It was Donald, Jay, and Antonia, and Donald's girl friend.

18    Q    Did you know Antonia?

19    A    I have -- I've -- yeah.  Not too good.  It was just like

20         on a -- how do you say that -- I have seen her around.  I

21         don't talk to her on the phone or anything, I just see her

22         when we go out.

23    Q    I'm going to show you a picture marked Exhibit 12.  Do you

24         know who that is?

25    A    That's Antonia.
```

```
1    Q   The Antonia that got in the car that you were in shortly
2        after you left the after-set?
3    A   Yes.
4    Q   When you say Donald, do you know who that is in
5        relationship to Antonia?
6    A   I think it's her cousin.  I'm not really sure.
7    Q   And Jay, did you see him here today?
8    A   Yeah.
9    Q   Do you know his real name?
10   A   No.  I think Jay.
11   Q   I'm going to show you a picture marked Exhibit 22.  Do you
12       recognize that guy?
13   A   Auh-hum, that's Jay.
14                   THE COURT:  Is that a yes?
15                   THE WITNESS:  Yes.  Sorry.  Jay.
16   Q   Who -- that's Jay.  And then another woman in addition to
17       Antonia also got in the car?
18   A   Yes.
19   Q   So four people got in the car?
20   A   Yes.
21   Q   Had they gone there with you?
22   A   Not in the same car, no.
23   Q   Right.  I mean had they traveled in the same car with you
24       and Jaimie from Bicardi's to the after-set?
25   A   No.
```

| | | |
|---|---|---|
| 1 | Q | Do you know how it is they picked that car to get into? |
| 2 | A | I have no clue. |
| 3 | Q | And what happened when they got in the car? |
| 4 | A | They -- every -- they were all yelling saying get out of |
| 5 | | here, just drive, just drive. |
| 6 | Q | Do you recall Antonia saying anything else besides, you |
| 7 | | know, just drive, just drive? |
| 8 | A | Yeah, she was screaming in the back I can't believe he did |
| 9 | | that, I can't believe he did that. |
| 10 | Q | I can't believe he did that, I can't believe he did that? |
| 11 | A | Yeah -- yes. |
| 12 | Q | And do you recall anybody saying anything when she said |
| 13 | | that? |
| 14 | A | No. |
| 15 | Q | What was her emotional state? |
| 16 | A | She was crying. |
| 17 | Q | What about the other woman? |
| 18 | A | I don't think anything. I didn't really notice. I was on |
| 19 | | my phone a lot though so I wasn't really paying attention. |
| 20 | Q | Was she crying? |
| 21 | A | The other female? |
| 22 | Q | Yeah. |
| 23 | A | I don't know. I don't think so, but I'm not sure. |
| 24 | Q | Did you tell the police that by the way Antonia was crying |
| 25 | | and speaking, that you thought someone had been shot in |

| | | |
|---|---|---|
| 1 | | the house? |
| 2 | A | I would assume, I mean -- |
| 3 | Q | Well, at that time when it was happening, is that what you |
| 4 | | thought? |
| 5 | A | That's what I was thinking, yeah. |
| 6 | Q | And did you tell the police that someone had been shot -- |
| 7 | | but you thought that someone had been shot back at the |
| 8 | | house and that Antonia knew who shot person? |
| 9 | A | I didn't know if she knew, but I -- it seemed like she |
| 10 | | did. |
| 11 | Q | It seemed to you like she knew? |
| 12 | A | Yeah, but she never said that she knew. |
| 13 | Q | But she never said the name the person -- |
| 14 | A | No. |
| 15 | Q | -- or anything like that? |
| 16 | A | No. |
| 17 | Q | What was it that Antonia did in the car or was doing in |
| 18 | | the car there that lead you to believe I think she knows |
| 19 | | who did this? |
| 20 | A | Yes. |
| 21 | Q | What was it?  What did she do? |
| 22 | A | Just the way every -- the way she was yelling and the way |
| 23 | | she was crying.  Just her reactions. |
| 24 | Q | Lead you to believe that Antonia knew who did the |
| 25 | | shooting? |

```
1    A    Yes.

2    Q    Do you recall Donald Jennings -- Donald -- the guy Donald

3         telling her to shut the fuck up?  Do you recall that?

4    A    Yeah -- yes.

5    Q    You think so?

6    A    Yes.

7    Q    Okay.  But when you talked -- do you remember when you

8         talked to the police you said you weren't sure that that

9         happened, but that if Jaimie Williams said it happened, it

10        probably did?

11   A    I think so.  I remember him yelling, but I'm not

12        exactly -- I wasn't like -- again, I wasn't really paying

13        attention.  I was on the phone most of the time.

14   Q    With who?

15   A    With -- I was talking to Tony.

16   Q    Is that Tony Valdez?

17   A    Yes.

18   Q    And the people in the car never talked about -- other than

19        the things you said here today, they never talked about

20        what had happened in there or anything like that?

21   A    No.

22   Q    Do you remember a conversation by those people including

23        Jay -- not about specifics -- but, man, that was so fucked

24        up, what happened?

25   A    No.
```

```
1    Q    Nothing like that?

2    A    No.

3                      MR. GRIFFIN:  Nothing further.

4                      THE COURT:  Cross.

5    CROSS EXAMINATION BY MR. CHERNIN:

6    Q    Ms. Franceschetti -- is it shettie?

7    A    It's Franceschetti.

8    Q    Okay.  Ms. Franceschetti, Mr. Griffin just asked you some

9         questions about if Antonia knew something and what Antonia

10        was reacting to.

11   A    Yeah.

12   Q    At that time did you know somebody had been shot inside?

13   A    I didn't know for sure, no, I just assumed.

14   Q    You assumed that?

15   A    Yeah.  I didn't --

16   Q    You assumed that at that time or some later time?

17   A    Some later time.

18   Q    And so when Ms. West or Antonia was reacting, you didn't

19        know what she was reacting to.  Did you?

20   A    No.

21   Q    Had you ever been at any other location where Ms. -- where

22        you saw Ms. West see somebody get shot?

23   A    No.

24   Q    So you don't know what she was reacting to?

25   A    No.
```

| | | |
|---|---|---|
| 1 | Q | Just that she was upset. It could have been -- it may |
| 2 | | have been that -- as Mr. Griffin would have you believe, |
| 3 | | that she was upset about her brother shooting somebody. |
| 4 | | Right? |
| 5 | A | Yes. |
| 6 | Q | Or it might have been that she was just merely upset |
| 7 | | because she was just in a room where somebody got shot? |
| 8 | A | Yes. It could have been anything. |
| 9 | Q | It could have been anything? |
| 10 | A | Yes. |
| 11 | Q | And your thought that she knew who shot the person who had |
| 12 | | been shot was just speculation on your part? |
| 13 | A | Yes. |
| 14 | Q | And again it was based upon nothing other than what? |
| 15 | A | Just what she was saying, I can't believe he did that, and |
| 16 | | that's really it. |
| 17 | Q | And you don't know who she was talking to? |
| 18 | A | No. |
| 19 | Q | And you don't know what she saw? |
| 20 | A | No, I don't. |
| 21 | | MR. CHERNIN: Nothing further from this |
| 22 | | witness. Thank you. |
| 23 | | THE COURT: Redirect? |
| 24 | | MR. GRIFFIN: Nothing. |
| 25 | | THE COURT: You may step down. |

```
 1                    (The witness leaves the stand.)
 2                    MR. CHERNIN:  Judge, are you excusing
 3    Ms. Franceschetti from her subpoena at this point?
 4                    THE COURT:  Is either side going to be
 5    recalling her?
 6                    MR. GRIFFIN:  No.
 7                    MR. CHERNIN:  No.
 8                    THE COURT:  All right.  You are released
 9    from your subpoena, ma'am.
10                    Ma'am, I'm going to have you come up to the
11    witness stand up here.  I'm going to have you remain
12    standing.  I want you to raise your right hand and my
13    clerk will swear you in.
14                    JAIMIE WILLIAMS, being first duly sworn on
15    oath to tell the truth, the whole truth, and nothing but
16    the truth, testified as follows:
17                    THE COURT:  What I'm going to ask you to
18    do, ma'am, is to move your chair in directly to that bench
19    in front of you.  Use the mike and have it just tilted to
20    a level that's comfortable for you to speak into.
21                    THE WITNESS:  Okay.
22                    THE COURT:  Speak up loud and clear.  Begin
23    by stating your full name for the record, spelling your
24    first and last name.
25                    THE WITNESS:  Jaimie, J-A-I-M-I-E, Lynn,
```

```
 1          L-Y-N-N, Williams, W-I-L-L-I-A-M-S.

 2                    THE COURT:  You may begin.

 3     DIRECT EXAMINATION BY MR. GRIFFIN:

 4     Q    Ms. Williams, you talk very, very fast, you make me seem

 5          like I talk slow, so you've got to slow down and let the

 6          court reporter get everything you say, okay.

 7                    THE COURT:  Is that a yes?

 8                    THE WITNESS:  Yes.

 9     Q    And you have to -- you can't nod your head yes or no.  You

10          have to say yes or no.

11     A    Okay.

12     Q    Okay.  You know why you are here today.  Right?

13     A    Yes.

14     Q    You got a subpoena to come down and talk about what

15          happened back on January 30th and 31st of last year.

16          Correct?

17     A    Yep.

18     Q    On that January 30th -- that was a Friday night.  Right?

19     A    Yes.

20     Q    Did you go to Bicardi's?

21     A    Yes.

22     Q    With whom?

23     A    Myself.

24     Q    Anybody else?

25     A    No.
```

```
1   Q   When you were at Bicardi's, did you see people that you
2       knew?
3   A   Yes.
4   Q   Like who?
5   A   Lea -- well, I met Lea up there with her friend Deanna and
6       everyone else.
7   Q   Like what are some of the names?
8   A   Jaimie, Darnell, Isaiah, and then the people at the bar I
9       know, Kevin, Tony.
10  Q   Did you know -- did you see a guy in the bar by the name
11      of Slim or the nickname Slim?
12  A   Yes.
13  Q   And how did you know Slim?
14  A   He was around the people -- around people that I know.
15  Q   And do you see Slim in court today?
16  A   Excuse me?
17  Q   Do you see Slim in court?
18  A   Yes.
19  Q   Where is he in the courtroom and what's he wearing?
20  A   He's got a blue and striped shirt on.  He's right directly
21      in front of me.
22              MR. GRIFFIN:  May the record reflect the
23      witness has identified the defendant.
24              THE COURT:  It does.
25  Q   Did you speak with Slim at Bicardi's?
```

| | | |
|---|---|---|
| 1 | A | I didn't have really conversations with him, no. |
| 2 | Q | Did he speak to you? |
| 3 | A | Yes. |
| 4 | Q | What did he say? |
| 5 | A | He asked if I could buy him a beer and I said no. |
| 6 | Q | You said no? |
| 7 | A | Yes. |
| 8 | Q | And what did he do then? |
| 9 | A | He called me -- he said fuck you, bitch. |
| 10 | Q | Did he seem to you to be drunk? |
| 11 | A | Yeah -- yes. |
| 12 | Q | Do you recall telling the police that he appeared |
| 13 | | intoxicated and was not acting right? |
| 14 | A | Yes. |
| 15 | Q | And when someone isn't acting right, what does that mean |
| 16 | | to you when you say that? |
| 17 | A | Not acting right? |
| 18 | Q | Yeah. |
| 19 | A | That they were intoxicated.  They weren't -- they weren't |
| 20 | | sober, like they wouldn't conduct themselves normally if |
| 21 | | they were not intoxicated. |
| 22 | Q | Like they would ask you to get them a beer, you would say |
| 23 | | no, and they would say what he said, that's the kind of |
| 24 | | thing when somebody isn't acting right? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | At some point did you move from Bicardi's over to the |
| 2 | | after-set there on Mineral? |
| 3 | A | Yes, I drove. |
| 4 | Q | You were not present however when the shooting took place. |
| 5 | | Right? |
| 6 | A | No, I was not. |
| 7 | Q | Why not? |
| 8 | A | 'Cause I got told to leave, I got my coat and I left and I |
| 9 | | got Lea and we went to my car. |
| 10 | Q | Who told you to leave? |
| 11 | A | Isaiah. |
| 12 | Q | And what did he tell you? |
| 13 | A | He said, Jaimie, get your coat, there's going to be some |
| 14 | | drama. |
| 15 | Q | And to you what does drama mean? |
| 16 | | MR. CHERNIN:  Objection.  Relevance. |
| 17 | | THE COURT:  Overruled.  I'll allow it. |
| 18 | Q | Well, drama doesn't mean a play like in the theatre like a |
| 19 | | drama as opposed to a comedy.  Right? |
| 20 | A | No. |
| 21 | Q | It means something else? |
| 22 | A | Yes. |
| 23 | Q | Like what? |
| 24 | A | Maybe there was going to be altercations, drama, that's -- |
| 25 | | drama, altercations.  Maybe something was going to happen. |

| | | |
|---|---|---|
| 1 | | It's just drama. |
| 2 | Q | Drama means that things are going to be kind of like maybe |
| 3 | | a fight, maybe worse, but nothing pretty? |
| 4 | A | Could be, could be. |
| 5 | Q | Right. Nothing pretty? Drama doesn't mean there's going |
| 6 | | to be a dance in the bathroom? |
| 7 | A | No, no. |
| 8 | Q | Okay. Did you leave? |
| 9 | A | Yes, I did. |
| 10 | Q | And where did you go? |
| 11 | A | To my car. |
| 12 | Q | With whom? |
| 13 | A | Lea. |
| 14 | Q | And drove away? |
| 15 | A | I started my car and I went to put it in drive and it |
| 16 | | stalled because it was cold outside, so I had to wait and |
| 17 | | have my car warm up and then -- |
| 18 | Q | Which lead to you being here today. |
| 19 | A | Yes. |
| 20 | Q | Why? |
| 21 | A | Why? |
| 22 | Q | In other words, what was it about the fact that you had to |
| 23 | | stay and warm up your car, what happened next? |
| 24 | A | Because -- oh, my car wouldn't let me go, it stalled, and |
| 25 | | then people came and asked if -- if they -- if they could |

```
 1            have a ride in my car and I gave them a ride.

 2      Q     And who were those people?

 3      A     Antonia, Donald, Jay, and Don, Don's girl friend, I don't

 4            really know her name.

 5      Q     Is there a picture up there of a woman?  Right by your

 6            right --

 7                          THE COURT:  No, all the pictures have been

 8            taken down.

 9                          MR. GRIFFIN:  Oh, I'm sorry.

10                          MR. CHERNIN:  Are you showing her Exhibit

11            12?

12                          MR. GRIFFIN:  Yes.

13      Q     This is a photograph marked Exhibit 12.  Do you recognize

14            the person in that photograph?

15      A     Yes.

16      Q     Who is that?

17      A     Antonia.

18      Q     Is she -- back then was she a friend of yours?

19      A     An acquaintance.

20      Q     And Exhibit 22 -- does that say 22?

21      A     Yes.

22                          THE COURT:  Is that a yes.

23                          THE WITNESS:  Yes.

24      Q     Do you know that guy?

25      A     Yes, I do.
```

| | | |
|---|---|---|
| 1 | Q | Who is that? |
| 2 | A | That's Jay.  He was in my car. |
| 3 | Q | So Jay, Antonia, Donald and Donald's girl friend -- |
| 4 | A | Yes. |
| 5 | Q | -- get into your car? |
| 6 | A | Yes. |
| 7 | Q | Front seat, back seat, trunk? |
| 8 | A | In the back seat 'cause Lea was in the passenger side.  I |
| 9 | | don't know what the order they were sitting in, but they |
| 10 | | were in my car. |
| 11 | Q | And what went on there when they got in your car? |
| 12 | A | They asked me to drop them off at the designated |
| 13 | | locations. |
| 14 | Q | And when -- from the time they got in your car until the |
| 15 | | time they were all gone, was there any conversation? |
| 16 | A | Yes, there was. |
| 17 | Q | Okay.  What was that? |
| 18 | A | Antonia seemed all nervous or -- and just agitated and she |
| 19 | | came in there saying I can't believe he shot him, I can't |
| 20 | | believe he shot him. |
| 21 | Q | And what was Donald's reaction to that if any? |
| 22 | A | Donald told her to shut the fuck up. |
| 23 | Q | Did you know why he said that? |
| 24 | A | I have no idea, no. |
| 25 | Q | And was that the last you saw or ever heard of Antonia? |

| | | |
|---|---|---|
| 1 | A | Physically? |
| 2 | Q | Ever in any way, letter, phone -- |
| 3 | A | No. |
| 4 | Q | What happened? |
| 5 | A | She called a couple times. |
| 6 | Q | When? |
| 7 | A | The next day and probably -- I can't -- a couple days |
| 8 | | after I believe. |
| 9 | Q | Was that unusual? |
| 10 | A | Well, she doesn't usually call me a lot if that's what you |
| 11 | | are asking. |
| 12 | Q | Well, I'm asking you for her to call you a couple times |
| 13 | | within a short time span like that was unusual? |
| 14 | A | Yes. |
| 15 | Q | Okay.  And did you talk to her? |
| 16 | A | No. |
| 17 | Q | Ever? |
| 18 | A | On the phone, no.  After that, no. |
| 19 | Q | At any point did you tell her something like on the phone |
| 20 | | that you didn't want to know about what happened, she was |
| 21 | | the one that has the problems with what she witnessed? |
| 22 | A | Yes. |
| 23 | Q | When did you tell her that? |
| 24 | A | When she called.  I -- which -- |
| 25 | Q | Take your time.  Take a minute if you need it. |

```
 1   A    In the car -- in the car -- in the car I said I don't want
 2        to know what happened, I don't want to know anything,
 3        that's you -- that's your problem.  You people jumped in
 4        my car, I gave you a ride, I thought I was being a good
 5        Samaritan.
 6   Q    So do you know why she kept calling you then?
 7   A    No, I didn't answer the phone.
 8   Q    How did you know it was her?
 9   A    Caller I.D.
10   Q    You talked with the police about this on February 2nd.
11        Right?
12   A    Yes.
13   Q    Okay.  So that would have been now technically Monday?
14   A    Yes.
15   Q    Okay.  And do you remember where that interview took
16        place?
17   A    Oak Creek Country Kitchen, my work of place -- place of
18        work.
19   Q    How long you talk to them?
20   A    Probably a good hour, hour and a half I believe.
21   Q    They went through different photographs with you to see if
22        you could identify who was at Bicardi's, who was at the --
23   A    Yes.
24   Q    Who was at the after-set.  Correct?
25   A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | And when you talked to them, I assume your memory was a |
| 2 | | little bit fresher than it was today about everything that |
| 3 | | had happened? |
| 4 | A | Yes. |
| 5 | Q | Okay.  Do you recall telling the police about the incident |
| 6 | | where Mr. Wilber asked you for the beer and all that?  Do |
| 7 | | you recall telling them that that had happened at the |
| 8 | | after-set? |
| 9 | A | It didn't happen at the after-set. |
| 10 | Q | Okay.  Did -- that's -- did you tell the police that? |
| 11 | A | No, I -- not to my knowledge, no, 'cause it was -- it |
| 12 | | didn't happen -- he didn't ask me that there.  So maybe |
| 13 | | that was a typo or something. |
| 14 | Q | Do you recall telling them that at the after-set Slim |
| 15 | | appeared to be agitated or -- |
| 16 | A | To my knowledge I don't think I said that. |
| 17 | Q | Okay.  You don't recall or you didn't say it or you are |
| 18 | | not sure? |
| 19 | A | I'm not sure.  It's -- I'm not sure.  It was a long time |
| 20 | | ago.  I'm not sure. |
| 21 | Q | Were you with Lea the whole time at the after-set?  I know |
| 22 | | it was a relatively short time you were there, but were |
| 23 | | you there with her the whole time? |
| 24 | A | Yeah, she rode with me. |
| 25 | Q | And did you see or hear the defendant say anything to her? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you recall telling the police that you weren't sure |
| 3 | | what was actually said, but you heard Slim arguing with |
| 4 | | people in the kitchen? |
| 5 | A | There -- I -- there --everybody was at that party.  There |
| 6 | | was a lot of people, there were all kinds of voices, but I |
| 7 | | never said that I heard Slim arguing 'cause there were too |
| 8 | | many people in that house and I wasn't in the kitchen to |
| 9 | | know what was going on.  I was in the -- there was the |
| 10 | | kitchen, the living room, and then the family room.  I was |
| 11 | | way in the family room. |
| 12 | Q | And did you -- do you recall telling the police that what |
| 13 | | Isaiah told you was get your coats, there's going to be |
| 14 | | some drama with Slim? |
| 15 | A | I do not remember saying Slim's name.  I remember having |
| 16 | | Isaiah tell me get your coats, there's going to be some |
| 17 | | drama.  I don't remember saying Slim's name, no. |
| 18 | Q | Okay.  And do you recall telling them that at 12:20 p.m. |
| 19 | | according to your caller I.D. Antonia had called and left |
| 20 | | you a message which meant that on January 31st at |
| 21 | | 12:20 p.m. -- which would have been, you know, about 9 |
| 22 | | hours or so after this all happened out there at the |
| 23 | | after-set -- that Antonia called you? |
| 24 | A | Yes. |
| 25 | Q | And that she called and left a message, and then you |

1    called her back, and before she could start talking about

2    anything, you told her that you were upset and didn't want

3    to hear anything and then told her you did not want -- you

4    told her that you did not want to know about what

5    happened, that she was the one that had the problems with

6    what she witnessed?

7  A    Yes.

8  Q    That was over the phone?

9  A    Yes.

10 Q    Okay.  You didn't hear any gunshots while you were warming

11       up the car.  Right?

12 A    No, I was too far away from the house.

13 Q    And after that conversation with Antonia, how many times

14       after that do you think she tried to call you back?

15 A    Maybe one time.

16 Q    So you had already basically told her that you didn't want

17       to talk to her, but she was still trying to call you?

18 A    Yes.

19 Q    Was there anyone else that -- at any time in Bicardi's, at

20       any time in the after-set, any time that -- before the

21       people got in your car, did you see anyone else acting out

22       of sorts or unusual or rude?

23 A    No.

24 Q    And other than Mr. Wilber?

25 A    Well, rephrase that please.

```
1    Q    Did anyone else ever tell you that night fuck you, bitch?

2    A    No.

3    Q    Do people talk to you like that often?

4    A    No.

5    Q    And after when these four people got in your car, did you

6         know what had happened?

7    A    No.

8    Q    When did you find out it was a shooting?

9    A    Well, when Antonia said that, that's when I knew somebody

10        got shot because of her saying that in my car.

11   Q    Saying what?

12   A    I can't believe he shot him, I can't believe he shot him.

13   Q    When she said that, did you believe she knew who had done

14        it?

15             MR. CHERNIN:  Well, objection.  It calls

16        for speculation.

17             MR. GRIFFIN:  About what she believed?

18             THE COURT:  Well, objection overruled.

19             MR. CHERNIN:  As to why he believed what

20        somebody else believed?

21   Q    In other words, when she said I can't believe he shot him,

22        I can't believe he shot him, did you think that she had

23        knew who had done it?

24   A    I think so, yes, because of her saying those statements.

25             MR. GRIFFIN:  Nothing further.
```

```
 1                    THE COURT:  Cross.

 2      CROSS EXAMINATION BY MR. CHERNIN:

 3      Q    When Mr. Griffin asked you if there were some errors made

 4           in the reports that the police wrote, you were given an

 5           opportunity to review those reports some time in the last

 6           few days.  Right?

 7      A    Today, yes.

 8      Q    Today.  And when you read them, you said, hey, there's

 9           something wrong here.  Is that correct?

10      A    Yes.

11      Q    And on February 1st of 2004 when you made these

12           statements -- I'm sorry -- 2nd, it was that Monday -- on

13           February 2nd, 2004, when you were making that -- those

14           statements to the police, you weren't trying to lie to

15           them.  Were you?

16      A    No.

17      Q    They were putting down their words as to something.

18           Right?

19      A    Yes.

20      Q    And it wasn't your choice of words.  Right?

21      A    No.

22      Q    Now, when you received a call -- first of all, you said

23           you were friends with Antonia or acquaintances of Antonia

24           West, but were friends with other people that she was

25           friends with.  Is that correct?
```

| | | |
|---|---|---|
| 1 | A | No, meaning they are all acquaintances. The only friend |
| 2 | | that I consider is a friend is Lea. |
| 3 | Q | Okay. So people -- other people that you knew, knew |
| 4 | | Antonia. Correct? |
| 5 | A | Yes. |
| 6 | Q | And so on February 1st at 12:20 p.m. when you looked at |
| 7 | | your caller I.D., you recognized Antonia's number. How is |
| 8 | | it that you knew it was Antonia's number if you were only |
| 9 | | acquaintances with her? |
| 10 | A | Because it came up as Wilber and that's their last name, |
| 11 | | so that's -- that's -- and it's Sandy Wilber, I know that, |
| 12 | | I know the phone -- I mean, I know the name, but she's |
| 13 | | called me once or twice before that, but that's not a |
| 14 | | friend, it's an acquaintance. |
| 15 | Q | Okay. And when you received that call but didn't accept |
| 16 | | it, how do you know that it was her calling you from Sandy |
| 17 | | Wilber's residence as opposed to somebody else that knew |
| 18 | | you, that knew her? |
| 19 | A | I don't believe -- I believed it was Antonia that called |
| 20 | | me. It could have been, but I believed it was Antonia. |
| 21 | Q | That's just your belief based upon your guess. Right? |
| 22 | A | Yes, my assumption. |
| 23 | Q | And with respect to the knowledge of what Antonia knew, |
| 24 | | had you ever been at another location where Antonia had |
| 25 | | witnessed somebody being shot? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | And so you've never experienced Antonia's reaction to |
| 3 | | watching somebody be shot or being in a room where |
| 4 | | somebody else was shot? |
| 5 | A | No, I -- no. |
| 6 | Q | And when Antonia tried to call you and you made the |
| 7 | | statement to her, you said that you started talking right |
| 8 | | away and just started saying, look, don't call me, |
| 9 | | whatever you want -- whatever you know about is your |
| 10 | | business, leave me alone.  Right? |
| 11 | A | Yes. |
| 12 | Q | What did she say to you?  Did she say hello, Jaimie? |
| 13 | A | I cannot remember, it was a long time ago, but all I know |
| 14 | | is I told her whatever happened is your business, I don't |
| 15 | | want to know anything, I'm done. |
| 16 | Q | So the point is you don't know anything? |
| 17 | A | No. |
| 18 | Q | Correct? |
| 19 | A | No, I just assumed.  I assumed, so I told her don't call |
| 20 | | me no more. |
| 21 | Q | And your assumption may be correct and it might not be |
| 22 | | correct.  Correct? |
| 23 | A | Correct. |
| 24 | | MR. CHERNIN:  Thank you. |
| 25 | | THE COURT:  Any redirect? |

1              MR. GRIFFIN:  No.

2              THE COURT:  You may step down.

3              (The witness leaves the stand.)

4              THE COURT:  Is either side going to be

5    recalling this witness?

6              MR. GRIFFIN:  No.

7              MR. CHERNIN:  No.

8              THE COURT:  Ms. Williams, you are now

9    released from your subpoena.  Sidebar with the lawyers.

10             (Whereupon, an off the record discussion

11   was had.)

12             THE COURT:  All right.  Thank you, ladies

13   and gentlemen, for your patience today.  The lawyers have

14   advised me that this is the last witness for the day, the

15   State has advised me of that, and I am going to take up

16   some matters now in the next 20 minutes to try and see

17   where we are at with witnesses and so forth.

18             I had indicated to you I was going to try

19   to keep you abreast of where we are going in terms of time

20   frames.  I will know a little bit better at the end of the

21   day today because I'm going to have a discussion with the

22   lawyers about the remaining witnesses and what else needs

23   to be done.  I'm also going to make some additional

24   rulings outside your presence, as I've told you I've been

25   doing all along, and that is, as I've advised you from the

1    beginning, my role is to determine the law, your role is

2    to be the fact finders, and you will have more of an

3    instruction on that issue when we come to the jury

4    instruction phase of the trial.

5                 Tomorrow morning you -- well, tonight one

6    of my deputies will -- again, get all your belongings

7    together.  Collectively you will go out.  We are not going

8    to have you stay.  You are all going to be escorted back

9    to the Courthouse, and from there how you depart to your

10   cars or to your bus stops or whatever is obviously your

11   direction, but the deputies will escort you back down.

12                Tomorrow morning I want you to report to

13   Jury Management at 8:15 and you will remain down in Jury

14   Management together -- and they will be advised of this --

15   until my deputies come down to bring you up to the trial

16   and into the jury room.

17                In addition, while you are down there, you

18   are not to commingle, in fact, we will advise Jury

19   Management that they are to have you off to a separate

20   area, but you are not to commingle with other jurors or

21   prospective jurors, you are not to discuss the case with

22   anyone -- any staff member or anyone else until directed

23   to do so by this Court.  So when you get down -- when you

24   report to Jury Management -- and don't stager in early at

25   8 or 8:05 or 8:10.  At 8:15 report to Jury Management and

```
 1    they will have -- will be advised and have a room or a
 2    separate area for you to be in.  My deputies will be down
 3    there within 5, 10 minutes to pick you up, bring you up to
 4    the jury room together as a group.
 5                    Again, the same admonition, please don't
 6    discuss this case with each other, with anyone until
 7    directed to do so by this Court.  In addition, when you go
 8    home tonight, make sure that you get a good night's rest
 9    and come back ready to work.  Again tomorrow morning I'll
10    be in a better position, as I said earlier, to hopefully
11    give you better guidance on how many more days that we're
12    going to be on the record here before we get to the
13    conclusion of the trial.  It will be my best guess, but it
14    will be a better guess tomorrow morning than it is
15    tonight.
16                    All right.  Thank you all, ladies and
17    gentlemen.  We will see you tomorrow morning.
18                    (The following proceedings were held
19    outside the presence of the jury.)
20                    THE COURT:  The Court wants to make a
21    record of two additional matters that came up in the
22    afternoon session.  One of which is a -- something that
23    occurred actually on the record involving the lawyers and
24    their desire to have a sidebar about it and the other
25    involves something that occurred over the lunch hour and a
```

1    ruling that the Court made based on that information that
2    I became aware of.
3                          The first issue has to do with an
4    objection -- or has to do with what I believe is Exhibit
5    41.  The lawyers started to advise me off the record about
6    a -- a particular written statement I believe it was, and
7    it was marked Exhibit 41, about three pages long, that
8    Mr. Griffin wanted to examine or ask questions of
9    Mr. Niles about and that it purported to be a written
10   statement from Mr. Niles concerning another legal matter,
11   particularly a homicide that the Police Department was
12   investigating and believed that Mr. Niles had some
13   information concerning or knew something about, the
14   purpose of which was for Mr. Griffin as I understood his
15   position to be able to -- well, it was -- I believe it was
16   two parts, but I will allow both sides to comment and to
17   supplement the record.  The first reason I understood
18   Mr. Griffin wanted to introduce it through Mr. Niles was
19   that it would be additional evidence of additional matters
20   that were discussed during the time frame that Mr. Chernin
21   had explored with Mr. Niles on cross examination, that is,
22   how long the witness had been held -- whether in custody
23   or not, had been held by the police in connection with
24   questioning in this matter, and there was a long line of
25   questions on cross examination by Mr. Chernin of Mr. Niles

1    about that issue and the length that he had been kept --

2    that is, Mr. Niles had been kept or held concerning this

3    matter.  Mr. Griffin wanted to be able as I understood it

4    at sidebar to explore whether or not during the course of

5    this time that Mr. Niles had been held other matters in

6    addition to this investigation had been talked about and

7    whether he had been questioned about that by the police,

8    the purpose of which is to establish for the jury or at

9    least portray to the jury that there were other reasons as

10   to the length or why Mr. -- to account for the time that

11   Mr. Niles had been ostensively held by the police for

12   questioning.

13           In addition, as I understood it,

14   Mr. Griffin wanted to establish whether or not there was

15   anything about Exhibit 41, that is, another statement

16   purportedly written or signed by Mr. Niles that was either

17   twisted or fabricated or in some way made up by the police

18   as he had on cross examination indicated he believed had

19   happened with his statements in Exhibit 36 and 37.

20           The issue -- that's what I understood was

21   the purpose of having that document used by the State in

22   its redirect of Mr. Niles after the lunch hour.  The issue

23   came up from the defense's perspective as I understood it

24   as to whether or not in introducing that document to the

25   witness Mr. Griffin would be allowed to refer to it as

```
 1            that he was -- Mr. Niles was -- was being asked by the

 2            Milwaukee Police Department or detectives about another

 3            homicide.  Mr. Chernin had preferred that -- believed that

 4            that was inflammatory and believed that it would be more

 5            appropriate and just as useful for the State to simply

 6            refer to it as simply another matter.  The State then in

 7            sort of a exchange at sidebar with the defense asked how

 8            this was inflammatory to the defendant and what would be

 9            the inflammatory nature towards the defendant and at that

10            point I believe Mr. Chernin indicated that that was a good

11            question and the Court indicated to -- that I was siding

12            with the State, that while it may have some

13            inflammatory -- I'm not so sure that it does, but to the

14            extent it does, it goes to the witness on the witness

15            stand, not the defendant himself.  Without some sort of a

16            nexus or correlation to the defendant, I was not going to

17            sustain the objection.  I think that is a fairly accurate

18            summary of what we talked about at sidebar on that issue,

19            gentlemen.  Mr. Griffin, you may supplement the record on

20            that point.

21                       MR. GRIFFIN:  I -- I agree, that's what

22            happened.

23                       THE COURT:  Mr. Chernin, you may supplement

24            the record on that point.

25                       MR. CHERNIN:  I have nothing to add.
```

```
1                    THE COURT:  With respect to the second
2       issue, the one that I talked about that happened off the
3       record, having no connection to the defendant so my
4       comments aren't intended to be interpreted that way at
5       all, but it has to do again with the operation -- the
6       smooth operation of this court and the attempts by this to
7       continue to make sure that the sanctity of the jury, the
8       sanctity of the trial process is respected and upheld so
9       as to insure the defendant has a fair trial.  In that
10      regard the Court on an ongoing basis noticed two things
11      with respect to two individuals in the gallery.  One
12      individual was in the -- the young darker skinned male
13      sitting in the front seat who appears to the Court to have
14      been here all week, I know that he was wearing a red shirt
15      on an earlier date, today he was in the front row sitting
16      next to a young lady at times sleeping on her or embracing
17      or hugging her, he had an orangish yellow shirt on.  To
18      the rear in the rear seat gallery just over the
19      individuals' that I've just described left shoulder was
20      another young what appeared to be dark skinned or
21      African-American male that had a blue -- a pale blue shirt
22      on.  Again, this is an individual that I've noticed in the
23      gallery on at least one prior occasion other than today's
24      date.  The Court indicated to the bailiffs that with
25      respect to the female and the male in the blue shirt, that
```

they should remove their gum and be instructed to do that
at one of the breaks and that the gentleman in the
orangish yellow shirt was instructed to stop sleeping on
the female next to him in front of the presence of the
jury.  About 35 minutes into the lunch hour, which was
about 12:35, 12:40, deputies advised me that as they were
patrolling the hallway directly outside my chambers area
and the jury room area, the gentleman in the orangish
yellow shirt was leaning directly up against the door that
I use to have access to this courtroom from the outside
hallway and had his ear pressed up against the door.  The
deputies had advised him to move away from the door, and
as soon as they turn their back and were walking away from
the scene, the individual apparently returned to the same
position and was again leaning up against the door in an
attempt to as the deputies described it to me listen in.
The deputy indicated to me that in fact it was his belief
that the individual in the orangish yellow shirt was still
right outside the door, that if I were to open my door, he
would be right there.  I opened the door and sure enough
he was right there within about a foot of the door.  I
advised the deputies when we came back in that they should
instruct the defendant -- or the individual, the gentleman
in the orangish yellow shirt that I've observed in the
gallery, that he was forbidden from lingering in that

1     immediate area and that if he did not cooperate, he is to

2     be instructed or directed out of this building.  The

3     deputies advised me that he in fact was told just that and

4     his response was -- and this is a paraphrase, but a fairly

5     accurate quote I believe -- do you fucking own the hallway

6     now too, and my deputies indicated that if he did not

7     move, they were going to cite him for disorderly conduct.

8     The individual then said this is fucked.  Apparently

9     the -- some individual, I'm lead to believe that it may be

10    the defendant's mother, intervened and indicated that --

11    and told all of them that they should leave and they all

12    left together.  So she was cooperative from the best of

13    what my deputies have advised me, the older female in the

14    gallery, and the other individuals followed suit when she

15    left and they followed and were lead out as well.

16              Both the gentlemen -- the gentleman in the

17    blue shirt was also observed by the deputies on his cell

18    phone.  Just as I had indicated yesterday, I had observed

19    people coming in and out, and he was one of them.  That

20    after witnesses were on the stand, individuals would --

21    that were in the gallery, including the gentleman that I

22    observed today in a pale blue shirt, leaving to go down

23    and to be or to mingle in the immediate area if not

24    directly next to witnesses in the case in direct violation

25    of my sequestration order.  Today he was observed by the

1   deputies on his cell phone as he would exit the court and

2   was heard to have said to someone on the other end

3   something to the effect of have you finished your

4   testimony yet, oh, that's shit, and then hung up when he

5   observed the deputies coming near him.

6            For those reasons and because of the

7   information that has been provided to me and because again

8   of my own observations of some of these ongoing activities

9   in the gallery from my perspective up here on the bench

10  and so as not to create any issue in front of the jury,

11  the Court has directed the deputies that those two

12  individuals are barred from further -- from participating

13  in any way, including sitting in the gallery during these

14  proceedings.  I believe there is a sufficient basis for

15  that.  They were acting in an appropriate fashion in

16  direct contravention of not only the Court but the

17  deputies' directives, and when confronted with this

18  behavior, again responded in a totally inappropriate

19  fashion.  They have not demonstrated to this Court's

20  satisfaction that they are able to comply with even the

21  most basic or simple directives of the Court with respect

22  to conduct in the courtroom in front of the jury or in

23  compliance with sequestration orders that I am issuing in

24  this case or have issued in this case.

25            With respect to the defendant's mother, she

1    was advised that she is welcome back to this court, that
2    the directive is directed specifically to those two
3    individuals and those two individuals only. Any and all
4    other family members that have been here and have not been
5    a part of any of these issues are certainly welcome back,
6    these are public courtrooms, and have not demonstrated to
7    me in any way, shape or form that they should be under
8    such an order and so they were advised by my deputy, Roy
9    Felber, that they may return for the remainder of these
10   proceedings and that the order was limited for purposes of
11   my ruling to the two individuals that I have attempted to
12   describe here today.
13            In addition, the defense counsel just a few
14   moments ago when we were in chambers and the Court was
15   trying to determine whether or not we had any additional
16   testimony anticipated tonight attempted to explain to me
17   what he understood or -- in terms of any facial -- perhaps
18   inappropriate facial gestures from the witness, Oscar
19   Niles, that I may have seen and misinterpreted. I
20   indicated that I know what I had seen and it is different
21   from what defense counsel is attempting to explain to me,
22   but I have indicated that he will certainly have an
23   opportunity to put that on the record. I further
24   indicated to him that my comments were directed to
25   Mr. Niles, I admonished Mr. Niles, I indicated to

```
1          Mr. Niles that that behavior would not be acceptable of
2          what I have observed, and I know that he knows that I know
3          what he looked at and what he did because when I
4          confronted him directly here, which is on the record and
5          the parties are free to look at the transcript from
6          yesterday -- from earlier today in which I had the
7          exchange with Mr. Niles, Mr. Niles when I said you know
8          exactly what I'm talking about acknowledged and shook his
9          head and said, yes, ma'am.  I said that is -- you are not
10         to do that anymore or something to that effect.  My
11         admonition to the witness I believe was correct and
12         appropriate given the circumstances of what I had observed
13         and his interaction with the State's counsel and it was in
14         no way attributed to Mr. Wilber, the defendant in this
15         case, only to the extent that it was in Mr. Wilber's
16         direction that those facial -- that facial gesture had
17         been made.  I in no way in my comments was implying or
18         inferring that Mr. Wilber had incited the witness or had
19         directed him to do that.  I just simply indicated that --
20         and again the record should reflect this -- that it was
21         this Court's impression that the facial nod and gesture --
22         facial gesture which involved the mouth and eye of the
23         witness was directed in the immediate direction of the
24         defendant.  That observation was not intended to serve as
25         inculpatory behavior on the part of the defendant himself.
```

1    It was only when the defendant again reacted in what I
2    believed to be again an inappropriate fashion to this
3    Court's admonitions and rulings, when I observed him
4    laughing, that this Court then directed its attention to
5    Mr. Wilber and indicated do you find any of this funny.
6    It is that behavior that the Court was citing Mr. Wilber
7    with, not implicating him in any type of improper behavior
8    with the witness on the witness stand.  Mr. Chernin, you
9    wanted to provide this Court as you attempted to in
10   chambers with your observations or explanation of that
11   incident.
12             MR. CHERNIN:  I think with the Court's
13   further clarification now on the record, that's fine.
14   I -- there's nothing more that need be said.
15             THE COURT:  It's 5:35, gentlemen, and I
16   obviously need to make a ruling at some point on this
17   demonstrative evidence, but I am more interested at this
18   point quite honestly 'cause I think I do understand the
19   issues -- the issue as I understand it is that the State
20   wants to use demonstrative evidence.  The defense's
21   position is twofold, No. 1, it's testimonial in nature.
22   While it may be demonstrative, it is testimonial in nature
23   and it is distinguishable from Hubanks in that regard and
24   should not be allowed.  To the extent that it is non
25   testimonial in nature, it is still highly prejudicial and

1    suggestive to the jury and should not be allowed.

2                    The Court started to ask the State --

3    because they are the proponent of the evidence -- why it

4    is relevant, and that's the test of any evidence that's

5    put in demonstrative or otherwise, what is its relevance

6    and how will it -- in the case of demonstrative evidence,

7    how will it aid or assist the trier of fact, that is, the

8    jury.  The State will need to respond to that and that was

9    a proper question I believe raised by the defense when

10   they were even talking about the first half of their

11   objection to this, which is whether it's testimonial in

12   nature or not.  The State has already argued its point

13   that it doesn't believe for the reasons it's already

14   stated that it is testimonial in nature, but I will allow

15   both sides within that framework because I think that is

16   the issues -- those are the issues as I see them on this

17   point to future elaborate and I will make my final ruling

18   on that tomorrow morning.

19                    I do need to go through the witness list,

20   gentlemen, particularly with you, Mr. Griffin.  I have

21   been keeping track of some things and I want to, just so

22   that I get a better sense, a ballpark feeling about where

23   we are going here, if you look at the State's witness

24   list, who is it that you intend to -- remaining witnesses

25   that you intend to call tomorrow and in what order?

1      MR. GRIFFIN:  The citizens you mean?

2      THE COURT:  Any police officers or citizen

3 witnesses.  Just witnesses generally.

4      MR. GRIFFIN:  Well, I will start with the

5 citizens.  Jeranek Diaz.

6      THE COURT:  All right.

7      MR. GRIFFIN:  Richard Torres.

8      THE COURT:  Yes.

9      MR. GRIFFIN:  Jill Neubecker.

10      THE COURT:  Anyone else?

11      MR. GRIFFIN:  Citizen wise?

12      THE COURT:  Citizen wise.

13      MR. GRIFFIN:  No.

14      THE COURT:  All right.  Law enforcement?

15      MR. GRIFFIN:  Tim Duffy -- these are

16 possible still, I mean, I -- you know, I'm not -- Joe

17 Erwin.

18      THE COURT:  One moment.  Go ahead.

19      MR. GRIFFIN:  Scott Gastrow, Eric

20 Villarreal, Rubin Burgos, Kent Corbett, Mike Caballero.

21 It's possible Greg Schuler.  He took statements from both

22 Jeranek Diaz and Richard Torres, but I don't expect I will

23 need him, but it's possible.

24      THE COURT:  You have three citizens.  I've

25 got all the others.

1          MR. GRIFFIN:  Lewis Johnson.

2          THE COURT:  Go ahead.  He was the one that

3     we had added, along with Officers Jose Lazo and Gilbert

4     Collato.

5          MR. GRIFFIN:  And those are the other two.

6     Now I can tell the Court that it's extremely possible that

7     with Detective Corbett I would then not need to call

8     Detective Caballero, but I assume the Court is asking me

9     sort of the -- not every single possible witness, but

10    narrowing it down to a list of possible witnesses who are

11    truly possible.  Am I sort of understanding it correctly?

12         THE COURT:  Yes.

13         MR. GRIFFIN:  I don't mean to talk like

14    Mr. Niles, but so --

15         THE COURT:  All right.

16         MR. GRIFFIN:  It's about 11 or 12.  To be

17    totally honest with the Court, my guess is it will be more

18    like 9 or 10.

19         THE COURT:  Well, it's about 14 all

20    together.

21         MR. GRIFFIN:  Oh.

22         THE COURT:  And your guess is that it may

23    be closer to 11 or 12.

24         MR. GRIFFIN:  Correct.  For example -- and

25    some will be quick, I mean, for all I know, there will be

```
 1        a stipulation that the defendant was arrested on February
 2        20th by Officer Collato at such and such an address and
 3        the time and date.  Corbett and Caballero were partners,
 4        there may be no need to call them.  Gastro and Villarreal
 5        are partners, there may be no need to call them both, but
 6        again --
 7                    THE COURT:  Who do you expect to call first
 8        tomorrow morning?
 9                    MR. GRIFFIN:  Joe Neubecker along with Lazo
10        and -- and then Lazo and Erwin to deal with the burning
11        barbecue stuff.
12                    MR. CHERNIN:  So you have no intent to call
13        Buschmann?
14                    THE COURT:  Detective Carl Buschmann is
15        listed as a potential.  I did not hear his name called
16        off.
17                    MR. GRIFFIN:  I thought the defense was
18        calling Detective Buschmann, but --
19                    THE COURT:  Let me turn to that right now.
20        Mr. Chernin, of the -- two things.  No. 1, who do you
21        expect to be calling?
22                    MR. CHERNIN:  Well, I --
23                    THE COURT:  You had listed --
24                    MR. CHERNIN:  Judge, Bill Kohl.
25                    THE COURT:  That's correct.
```

1      MR. CHERNIN:  Phia Ly.

2      THE COURT:  One moment.

3      MR. GRIFFIN:  Can we go off the record for

4  a second, Judge?

5      (Whereupon, an off the record discussion

6  was had.)

7      THE COURT:  Let's go back on the record.

8  Bill Kohl, Phia Ly.  And who else, Mr. Chernin?

9      MR. CHERNIN:  Your Honor, I think we are

10  going to be able to have a stipulation.  We will have that

11  for the Court with respect to Mr. Ly.  And then

12  Mr. Bernhagen is the person who measured Mr. Wilber's foot

13  and I'm not -- I'm still not certain what the Court is

14  allowing the State to --

15      THE COURT:  Yes, you are, and so

16  Mr. Bernhagen's testimony would not be permissible because

17  I'm not going to be getting into any evidence -- I've

18  already indicated to you twice now, Mr. Chernin, and I

19  will reiterate a third time, any questions about what the

20  people from Timberland did or didn't do, said or didn't

21  say with respect to their versions of what this shoe size

22  was that was recovered from the grill is not going to be

23  permissible, so in that regard, there is nothing to

24  compare it with in terms of Mr. Wilber's shoe size.

25  Although you can certainly ask Mr. Wilber what his shoe

1    size is to the extent that that is relevant.  The Court
2    has indicated to you that the area of -- of cross
3    examination on the materials recovered from the grill is
4    again limited to whether or not the detectives -- and I
5    believe it was either Buschmann or Glidewell because I
6    know Glidewell has been added to your list -- whoever it
7    is that wrote the report or reports, whatever detectives
8    they were, with respect to the recovery of materials from
9    the grill outside the residence on 26th, 27th and Forest
10   Home, that they can certainly be questioned about their
11   reports -- or their investigations which are covered in
12   their reports.  The investigation being whether or not
13   they were able to conduct any additional -- whether or not
14   they conducted any additional investigation into the
15   identification of that material that was found and
16   recovered from the grill, and secondly, whether or not
17   that investigation in terms of the identification of that
18   material was successful, and then finally, whether or not
19   it was tied -- whether they were able to establish that it
20   was tied to the defendant in any way, shape or form.  My
21   expectation is given that I've read that report, that the
22   answer to that is no.  Yes, they conducted an
23   investigation to try to determine what the contents of
24   that grill were and whether or not those contents were
25   tied forensically to the defendant.

```
 1                    MR. CHERNIN:  Okay, those are two different

 2          groups of officers, two different groups of detectives

 3          because it was Erwin that found -- Erwin and Duffy that

 4          found the shoes, so I'm going to have to call Buschmann

 5          unless -- Carl Buschmann or Michael Wesolowski to say that

 6          they conducted investigations that lead to nothing -- lead

 7          to no tie -- lead to nothing tying these to Mr. Wilber.

 8          So, fine, so then my witnesses -- if they are not going to

 9          include Mark Bernhagen or Phia Ly, I will need either

10          Detective Buschmann or Detective Wesolowski.

11                    THE COURT:  Well, it sounded as if you were

12          going to have Bill Kohl.  I haven't denied his -- I assume

13          he's still a witness.

14                    MR. CHERNIN:  Yeah, Bill is still a witness

15          and Bill --

16                    THE COURT:  And Phia Ly -- well, you've

17          indicated -- and I don't want to presume anything -- that

18          there's some stipulation as to what Phia Ly -- I don't

19          know who this witness is or what connection they have to

20          this incident, but it sounds as if what you are telling

21          me, whatever they are going to be testifying to, the State

22          is going to stipulate to.  Mr. Griffin, is that correct?

23                    MR. GRIFFIN:  Right, she owns the -- is it

24          a he or a she?

25                    MR. CHERNIN:  It's a he.
```

1          MR. GRIFFIN:  He owns the building and he

2     would be called to talk about the fact that the

3     measurements Mr. Kohl --

4          THE COURT:  Owns the building where?

5          MR. GRIFFIN:  At 1128 West Mineral and

6     Mr. Kohl took measurements in there after there had been

7     some remodeling.  To say that while the interior

8     decorating has changed, the building is sort of the same.

9     I don't expect Mr. Kohl to lie about anything, I would be

10    shocked if he did, and so I can't believe that I'm going

11    to be hitting Mr. Kohl on the notion of, yeah, those are

12    different cabinets unless it somehow relates to the

13    events, but --

14         MR. CHERNIN:  Well, the facing of the

15    cabinets are different, but the footing is the same.

16         MR. GRIFFIN:  And the cabinets are in the

17    pictures up there.

18         MR. CHERNIN:  Right, but these are

19    different -- well, we have different pictures because we

20    took some more recent pictures.  The cabinet facing is not

21    the same color as the color that -- on the day that it was

22    taken.  They now have -- there's a -- I'm showing it to

23    Mr. Griffin -- there's a new white counter top and a --

24         THE COURT:  What is this evidence intended

25    to show?

1      MR. CHERNIN:  Oh, it supports the

2  measurements that we took, Your Honor, of the interior and

3  where people were standing at the time.

4      MR. GRIFFIN:  Based on --

5      MR. CHERNIN:  Based upon witness testimony.

6  So what it shows is the measurements that are reflected in

7  those diagrams that are not to scale, we've got the actual

8  measurements, and Mr. Lee's testimony would have been that

9  he refaced the cabinets, but that the cabinets are in the

10  same location and in the same footing as the cabinets were

11  on January 31st.

12      THE COURT:  Let me back up.  The relevant

13  evidence is that Mr. Kohl will testify that he took

14  measurements on -- of the inside of that residence of each

15  of the rooms and other particulars.

16      MR. CHERNIN:  Some additional measurements

17  that were not taken by Detective Casper.

18      THE COURT:  Of those rooms and that these

19  are the actual measurements of them and you expect the

20  measurements to be different -- not different or just in

21  addition to what the State has had Detective Tom Casper

22  testify to with -- relative to Exhibit 1?

23      MR. CHERNIN:  Right, Detective Casper --

24      THE COURT:  Yes or no?

25      MR. CHERNIN:  Yes, and I will give you an

1    example.  Detective Casper didn't tell us the width of the

2    cabinets from the east wall of the kitchen -- I'm sorry --

3    the south wall of the kitchen to the north edge of the

4    cabinet, so we have that measurement as well.

5                THE COURT:  Why would we need Mr. Phia Ly

6    or any photographs to support Mr. Kohl's testimony if the

7    State is going to concede that those are Mr. Kohl's

8    measurements.

9                MR. CHERNIN:  Well, Your Honor, I didn't

10   know that until now and that they were going to concede

11   that these measurements are correct, and we have some

12   photographs that Mr. Kohl is going to refer to in his

13   testimony.  The facing on the cabinets is different than

14   the -- in our photographs than in Exhibit 14 and 15.  For

15   example, 14 and 15 have dark wood cabinets.

16               THE COURT:  But why is that important to

17   what happened, why is that relevant?  What is the cabinet

18   color, the fact that the cabinets were changed since

19   this -- after this incident occurred relevant to this case

20   at all?

21               MR. CHERNIN:  Because the measurements

22   would be -- remain unchanged, in other words, the

23   distances in the -- in the cabinets that appeared in the

24   photographs from January 31st of 2004 and those

25   photographs that were taken by Mr. Kohl of those -- of the

1    new cabinets, that the measurement of the cabinets is the
2    same.  They used the same size cabinets to replace those
3    that had been in the pictures in January of 2004.
4            THE COURT:  Do you have any reason to doubt
5    that, Mr. Griffin?
6            MR. GRIFFIN:  Of course not.  I mean, we're
7    going to see them in the picture anyways.  Right?  What --
8    let's assume they are off by a half an inch, let's assume
9    they are off by a inch, who cares.
10           MR. CHERNIN:  Right, but they are
11   different, so I didn't know if you would know that by
12   looking at the pictures.
13           MR. GRIFFIN:  Mr. Kohl can simply say they
14   are different and the landlords told him true or not that
15   they were the same measurements, the cabinets took up the
16   same width, depth and height.  I don't care.
17           THE COURT:  And Mr. Kohl can testify to the
18   fact that he interviewed the owner and the owner advised
19   him that these are the same.  While that may be hearsay,
20   it's going to be permissible hearsay by virtue of the
21   State's agreement or stipulation that what Mr. Kohl is
22   saying is true, that he took these measurements?
23           MR. GRIFFIN:  I have no intent of objecting
24   on hearsay grounds.
25           MR. CHERNIN:  Then it is fine.  This

1    discussion has taken longer than it would have taken to
2    present Mr. Ly, I'm telling you, I mean, his testimony is
3    very short, we've got it down, so I won't call Mr. Ly on
4    that basis.
5              Then the other person would be
6    Mr. Bernhagen. Mr. Bernhagen's testimony would become --
7    would not be relevant unless somehow it comes out that it
8    was a size 12 shoe that the officers recovered from the
9    grill.
10             THE COURT: But that's not coming in.
11             MR. CHERNIN: Okay.
12             THE COURT: I've already directed the
13   parties that that's not coming in.
14             MR. CHERNIN: Okay. Well, and, Your Honor,
15   just to preserve the record, we're not waiving the
16   argument as to relevancy, and I respect the Court's
17   already ruled on that, but I just want to make that a
18   continuing part of the record, that we are not agreeing
19   that the stuff recovered from the grill is relevant.
20             THE COURT: It is what?
21             MR. CHERNIN: Relevant.
22             THE COURT: You've objected and told me and
23   your client made it adamantly clear yesterday at noon that
24   this Court didn't really know what it was talking about
25   when it made that ruling, so I think I get the picture, I

1    mean, short of you coming and putting a hammer over my
2    head, I -- I think I'm, you know, bright -- reasonably
3    bright enough to figure out that you and your client don't
4    agree.  Is that a reasonable assessment to say that you
5    and your client don't agree with my ruling?
6              MR. CHERNIN:  Yes, but I would never use a
7    hammer, Your Honor, perhaps --
8              THE COURT:  Never mind.  All right.  Who
9    else?  What about this Herb Glidewell.
10             MR. CHERNIN:  Herb Glidewell may testify in
11   the event that the State doesn't agree that Mr. Wilber was
12   on his way to my office to turn himself in to the police
13   at the time that the warrant squad arrested him on the
14   street, that he was taken into custody by the warrant
15   squad.
16             THE COURT:  We had a discussion about this
17   earlier and it was off the record and I remember advising
18   you, Mr. Chernin, that there's some dangers with how you
19   present this particular tact because I will not allow you
20   to become a witness and you are or could be -- and there's
21   a strong, strong possibility that you could be depending
22   on the tact that you take.  If you insert yourself in
23   these proceedings, then Mr. Wilber's entitled to another
24   counsel, so that's a real dangerous or dicey area and I
25   think I did communicate that to you a couple days ago,

1      which is why I need to know what it is that you are going

2      to try and present in that regard.

3                    MR. CHERNIN:  That Detective Glidewell had

4      made arrangements to come to my office on I believe it was

5      February 20th of 2004 -- I think that was the date --

6      maybe the 21st of 2004 for the purpose of having

7      Mr. Wilber surrender himself to the detective.

8                    THE COURT:  Again, I'm not sure -- I'm not

9      clear on that.  Let me put it this way, are -- how is that

10     going to come in?

11                   MR. CHERNIN:  Detective Glidewell would

12     testify that he had made arrangements to come to my office

13     to take Mr. Wilber into custody.

14                   THE COURT:  And why is that relevant?

15                   MR. CHERNIN:  Just as the shoes might be

16     argued to be consciousness of guilt, you can also argue

17     consciousness of I turned myself in, of good conduct.

18                   THE COURT:  Well, but somebody has to make

19     that assertion.  It sounds as if the defendant has to make

20     that assertion.  So is the defendant going to take the

21     witness stand, I was turning myself in pursuant to an

22     agreement I had made with law enforcement or my lawyer had

23     made on my behalf with law enforcement.  How else does

24     that --

25                   MR. CHERNIN:  Well, I'm not certain on law

1    enforcement can't make the representation that they were

2    coming to take him into custody, otherwise how would the

3    warrant squad have known to come to my office at -- I

4    think it was 12:30 on that day or 1:30.

5                   THE COURT:  So you want to be able to put

6    Herb Glidewell on the stand to ask him how it was that

7    Mr. Wilber came into custody?

8                   MR. CHERNIN:  Yes.

9                   THE COURT:  And how do you propose to do

10   that?  How do you propose to ask him that?

11                  MR. CHERNIN:  Detective Glidewell, did you

12   make arrangements -- did you make arrangements to come and

13   take Mr. Wilber into custody at 839 North Jefferson on

14   February 20th or 21st of 2004.

15                  THE COURT:  Do you know what his answer is

16   going to be?

17                  MR. CHERNIN:  Yes.

18                  THE COURT:  Mr. Griffin?

19                  MR. GRIFFIN:  Well, I mean, this is truly

20   testimonial.  We're getting to the defendant's intent on

21   February 20th.  The only source of any of this information

22   could be initially from Mr. Wilber to Mr. Chernin to

23   Mr. Glidewell and ultimately whether he turned himself in

24   or not, the only -- the only point is unless Mr. Wilber

25   testifies and wants to put some spin on it or whatever or

1    whatever he wants to say about it. The point of his being

2    arrested on the 20th is all I'm trying to establish. The

3    fact that he was arrested, you know, out on the street or

4    whatever isn't my point.

5              THE COURT: It does go to -- that's the

6    point I'm trying to make with you, Mr. Chernin, that's --

7    I mean, the same argument you are making as Mr. Griffin

8    has correctly pointed out about having the defendant do

9    some demonstration, that clearly -- if it goes to state of

10   mind, I -- if you are going to say that him pointing at a

11   board goes to state of mind, clearly his -- and it's

12   testimonial nature therefore, clearly his communicating to

13   you that he's going to -- or to the detective through you

14   that he's going to turn himself in, that is a state of

15   mind issue and that is testimonial in nature. Now -- and

16   that's why I asked you, how is that going to come in. You

17   said, well, clearly it can come in through a detective,

18   through law enforcement. Not for the purposes by which

19   you want to argue it, which is you want to then be able to

20   say to the jury see -- in your closings, consciousness of

21   innocence, he was going to turn himself in.

22             MR. CHERNIN: Are you saying --

23             THE COURT: That is testimonial in nature.

24             MR. CHERNIN: Are you saying it's not

25   relevant either?

1          THE COURT:  No, I'm talking about -- why is
2     it -- you know, how is that not testimonial.  All right.
3     That's why I've asked you who are you going to get that in
4     through.  You can't get state of mind in through the
5     detective.  Which leads me to the last issue that I've,
6     you know, got to cover with you which is at some point you
7     are going to I assume make a decision with -- in
8     conjunction with Mr. --
9          MR. CHERNIN:  Right.
10          THE COURT:  -- Wilber about whether or not
11     he is going to take his -- exercise his fifth amendment
12     right and I'm going to need to know through colloquy with
13     you whether or not you talked to him about his Sixth
14     Amendment right to testify and his Fifth Amendment right
15     to be free from self-incrimination, that that's been
16     explained to him, that he understands those constitutional
17     rights, that no one has pressured him or promised him
18     anything to waive or to exercise them in any regard, that
19     has to be done with him outside the presence of the jury.
20          MR. CHERNIN:  I'm well aware of that and we
21     have not yet made that determination.
22          THE COURT:  Have we made a determination as
23     to whether or not the defendant if he does take the
24     witness stand has a prior criminal record?
25          MR. CHERNIN:  Yes.

1        THE COURT: And what his convictions are?

2        MR. CHERNIN: Yes.

3        THE COURT: I have yet to hear a

4    stipulation on convictions, gentlemen.

5        MR. GRIFFIN: I gave the record to

6    Mr. Chernin. I counted them up and circled them. I want

7    to say it's something along the line of five adjudications

8    and four criminal convictions, but I don't -- I gave it to

9    him a day or two ago and I don't recall specifically.

10       MR. CHERNIN: And I -- right now I -- I

11   don't know what -- I think that is the right number. I

12   think that is the right number.

13       THE COURT: Have you talked to Mr. Wilber

14   about that? So that if I ask him that on the record, did

15   you talk to your client, did you talk to your lawyer about

16   this, are you in agreement with this or disagreement.

17       MR. CHERNIN: Yes, I will talk to him about

18   that at the time we decide whether or not he wants to

19   testify.

20       THE COURT: But that's an issue that needs

21   to be -- those are the things that I'm hoping or had hoped

22   that would be cleared up ahead of time so we are not

23   running into 5 o'clock on Friday afternoon debating that

24   issue.

25       MR. CHERNIN: Well, we certainly will know

| | |
|---|---|
| 1 | that, Your Honor. I would -- does this Court anticipate |
| 2 | that we are going to finish the State's case tomorrow? |
| 3 | THE COURT: No, we are not going to finish |
| 4 | anything tomorrow. We will be lucky if we get through |
| 5 | three or four witnesses the way we are going. Quite |
| 6 | honestly this trial my expectation now is to advise the |
| 7 | jury quite honestly this is going into Wednesday of next |
| 8 | week. I've got a judge, a colleague, who is expecting |
| 9 | Mr. Griffin to try a homicide case in another court on |
| 10 | Monday. There are people who are expecting you gentlemen |
| 11 | in other places on Monday and you are going to have to |
| 12 | tell them you are now -- as I am having to tell certain |
| 13 | individuals who are expecting to try cases in my court on |
| 14 | Monday, that all bets are off, that we are going into in |
| 15 | all likelihood not only Monday, but a good portion of |
| 16 | Tuesday. |
| 17 | MR. CHERNIN: And, Your Honor, I think |
| 18 | another -- in that regard -- and we will certainly let you |
| 19 | know by Monday what Mr. Wilber intends to do. That will |
| 20 | give him some time to deal with that issue. The other |
| 21 | thing is that on the 22nd I believe one of the jurors has |
| 22 | a flight arranged to L.A. |
| 23 | THE COURT: No, that's a different one. |
| 24 | MR. CHERNIN: Okay. |
| 25 | THE COURT: Different juror who did not |

```
 1          make the panel.  Go back and check your notes.

 2                          MR. CHERNIN:  I didn't.  I will.

 3                          THE COURT:  All right.  That's it, folks.

 4          We will see you here at 8:30 tomorrow morning.

 5                          (Whereupon, the proceeding concluded.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    STATE OF WISCONSIN      )
                              )   SS.
 2    COUNTY OF MILWAUKEE     )

 3

 4

 5

 6

 7

 8                 I, Cynthia A. Dobbs, certify that I am the

 9    official court reporter assigned to report the proceedings

10    herein for the Circuit Court; that the foregoing pages,

11    numbered 3 through 180 inclusive, have been carefully

12    compared by me with my stenographic notes; that the same

13    is a true and correct transcript of all such proceedings

14    taken on the 17th day of February, 2005.

15                 Dated this 17th day of October, 2005.

16

17

18

19

20    _____

21                 Cynthia A. Dobbs
                    Certified Shorthand Reporter

22

23

24

25
```