STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
BRANCH 05

_____

STATE OF WISCONSIN,

            Plaintiff,     JURY TRIAL
    -vs-               Case No.04CF000609

DANNY L. WILBER,

           Defendant.

_____


CHARGE:  First Degree Intentional Homicide While
         Armed with a Dangerous Weapon

_____


February 18, 2005
Milwaukee, Wisconsin
Safety Building-Room 316


BEFORE:

    THE HONORABLE MARY M. KUHNMUENCH
    CIRCUIT JUDGE


APPEARANCES:

JAMES GRIFFIN, Assistant District Attorney,

    Appeared on behalf of the State of Wisconsin.


MICHAEL CHERNIN, Attorney-at-Law,
    Appeared on behalf of the defendant.

    Defendant appeared in person.




Lori J. Cunico
Official Court Reporter

# I N D E X

WITNESS                                                    PAGE

JILL NEUBECKER

Direct Examination by Attorney Griffin                      56
Cross Examination by Attorney Chernin                       65


JOSEPH ERWIN

Direct Examination by Attorney Griffin                      66
Cross Examination by Attorney Chernin                       72


LOUIS JOHNSON

Direct Examination by Attorney Griffin                      74
Cross Examination by Attorney Chernin                       86
Redirect Examination by Attorney Griffin                    98


JERANEK DIAZ

Direct Examination by Attorney Griffin                     112
Cross Examination by Attorney Chernin                      167
Redirect Examination by Attorney Griffin                   176
Recross Examination by Attorney Chernin                    185

JOSE LAZO

Direct Examination by Attorney Griffin                     188
Cross Examination by Attorney Chernin                      191
Redirect Examination by Attorney Griffin                   191

KENT CORBETT

Direct Examination by Attorney Griffin                     194
Cross Examination by Attorney Chernin                      205
Redirect Examination by Attorney Griffin                   213


RICHARD TORRES

Direct Examination by Attorney Griffin                     219

2

I N D E X (cont'd.)

WITNESS                                                    PAGE

GREGORY SCHULER

Direct Examination by Attorney Griffin              285
Cross Examination by Attorney Chernin               303


EXHIBITS                                      ID'd      REC'd

42 - Photo                                     58
43 - Photo                                     58
44 - Photo                                     59
45 - Photo                                     59
46 - Canister Containing Shoes                 68        323
47 - Canister Containing Shoes                 68        323

27 - Statement of Antonia West                 75
10 - Photo                                     83
 1 - Scene Diagram                            133
20 - Booking Photo                            139
15 - Photo                                    145
19 - Booking Photo                            161

 6 - Photo Lineup                             162
15 - Photo                                    172
49 - Statement of Bill Kohl                   181
31 - Statement of Donald Jennings             194
38 - Diagram                                  195
39 - Diagram                                  203

14 - Photo                                    209
 8 - Photo                                    221        248
 9 - Photo                                    221        248
18 - Booking Photo                            223
22 - Booking Photo                            224
12 - Photo                                    224

14 - Photo                                    242
17 - Photo Array                              264
51 - Diagram                                  272
15 - Photo                                    274
25 - Photo                                    277
 6 - Photo Lineup                             286

53 - Statement of Jeranek Diaz                287

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 3 of 325   Document 61-24

```
 1              TRANSCRIPT OF PROCEEDINGS:

 2              THE COURT:  State of Wisconsin v.

 3      Danny Wilber, 04CF000609, first degree

 4      intentional homicide while armed with a

 5      dangerous weapon.  Appearances please.

 6              ATTORNEY GRIFFIN:  Assistant DA

 7      Jim Griffin for the State, along with Tom

 8      Casper, Detective Tom Casper, of the Milwaukee

 9      Police Department.

10              ATTORNEY CHERNIN:  Michael

11      Chernin appearing on behalf of Danny Wilber.

12      Danny Wilber is here, appears in person.

13              THE COURT:  All right.  The court

14      wants to conclude the issue of -- and its

15      ruling on the issue of demonstrative evidence

16      that the State is proposing to introduce to

17      the jury.  And since they are the proponent of

18      the evidence in the court I believe that the

19      burden is on them to establish to the court's

20      satisfaction that it's relevant testimony and

21      that it will assist the trier of fact to

22      understand an issue or -- or a question in

23      fact in -- in the trial.

24              And in that regard, as I

25      understood it the State wishes to have the
```

4

```
 1        defendant stand and to point to a designated

 2        -- stand at the defense table stand at a

 3        designated spot on a -- a board that's about

 4        two feet wide by, it looked to court to be

 5        about ten feet tall, and where there is a line

 6        that has already been delineated and

 7        another -- I'm not quite sure if there was

 8        another line on it or not, or if it was

 9        designated by a spot, but I'll let the State

10        indicate what the form of the evidence is and

11        why it's -- why it's relevant and will assist

12        the trier of fact.

13                  Go ahead, Mr. Griffin.

14                  ATTORNEY GRIFFIN:  Judge, the

15        board has I think actually been marked as

16        Exhibit 40, although it's back behind the jury

17        box, not where the jury can see it, but in any

18        event, it's on the witness -- or the exhibit

19        list.  Part of what I expect will be

20        Mr. Chernin's closing argument, and part of

21        what this case is about, of course, is was it

22        Danny Wilber, where was he, where was the

23        victim, was he close enough, all of those

24        kinds of things that the court knows from

25        having listened to openings, from having seen
```

5

1          some of the witnesses up until this point.

2                      My original thoughts, and I think

3          perhaps what has sort of tainted a lot of --

4          not -- informally was that my initial thought

5          was that I would have Mr. Wilber point with a

6          fake gun in his hand actually to a person such

7          as one of my fellow DA's, or something like

8          that, who is five eight, to show the angle.

9          And I have, in considering all that and

10         understanding sort of informally and in

11         discussions with you and Mr. Chernin, at this

12         point all I want Mr. Wilber to do is to point

13         without any kind of fake weapon in his hand or

14         anything like that, to a spot, to show the

15         jury essentially the downward angle that is --

16         would have resulted or would be the angle if

17         Mr. Wilber were the shooter.

18                      I think that, for example, if

19         this were a case where the person was not

20         standing up straight when he was shot, and I

21         expect the testimony to be that Mr. Diaz was

22         just standing there, so maybe the

23         demonstration has to wait till that happens,

24         but for a bullet to go in at that angle, at

25         that height, with a downward angle, requires

6

```
 1        essentially one of two things.  But regardless
 2        of how it happens -- strike that.  One being
 3        that the shooter, when he held the weapon to
 4        Mr. Diaz's head, had the weapon higher than
 5        five eight, at a downward angle, or that the
 6        weapon itself was below that spot on
 7        Mr. Diaz's head, but Mr. Diaz's head was
 8        turned, and I'm demonstrating sort of for the
 9        court, leaning way back and starting to do
10        what I call a limbo type position, and that
11        someone below that could then get, as we know,
12        that kind of downward angle.
13              Mr. Diaz's head would have had to
14        have been -- actually his nose would have had
15        to have been past the point of straight up to
16        the ceiling.  I don't know if I'm explaining
17        that well to court.  If we drop that gun into
18        the hand of someone who's five six or five
19        eight, they'd have to be pointing the gun
20        upward at Mr. Diaz's head from their shoulder
21        area, which would obviously be below five
22        eight, their arm would be upward and
23        Mr. Diaz's head would have to be tilted
24        backward to get that kind of an angle.  Things
25        which are obviously ridiculous.
```

7

```
 1          Part of what we do with the jury

 2     is we tell them to use their common sense.

 3     And I don't think the jury -- I think the

 4     State has a right to show that while the jury,

 5     in walking in and out of the room has seen

 6     Mr. Wilber standing, and they know he's a tall

 7     man, I think Mr. Niles testified he was maybe

 8     six two, I think Ms. West testified he was six

 9     nine, but there's no specific evidence on the

10     record for this jury about where Mr. Wilber

11     would be specifically in relation to a -- a

12     five eight victim in terms of his arm angle.

13          I'm reasonably certain that were

14     the situation to the contrary, there would be

15     much discussion, as there should be, and

16     argument, or would be from the defense, about

17     how that angle was impossible.  That if the

18     wound, for example, were in Mr. Diaz's

19     buttocks at an upward angle, it would have had

20     to have been a midget who shot him and not

21     someone who was six eight or six nine or

22     whatever height it is in fact that Mr. Wilber

23     is.

24          So is I think it's relevant

25     because it establishes for the State our whole
```

8

```
 1     theory -- one of the parts of our theory the
 2     case in the notion that Mr. Wilber --
 3     obviously the State's whole theory is that
 4     Mr. Wilber is the shooter.  And that when he
 5     holds his arm out and points it at a five
 6     eight person, in this case a spot on the
 7     board, the argument would be that it was a
 8     person, that he gets the downward angle.
 9             Now, I -- I agree that having
10     Mr. Wilber hold a gun, pointing it at a
11     person, all those things, those would be I
12     think unduly suggestive, unduly prejudicial,
13     and there's a way to accomplish the same
14     without that kind of prejudice.  But I think
15     that -- I understand that I'm the DA, but I
16     try and think if I were on a jury would I find
17     that kind of thing helpful to me.  Would it
18     help establish the fact that of the realm of
19     possible shooters in this case, it's a very
20     small group of people who could have done this
21     obviously, there's not that many people in the
22     house or in the kitchen at the time this
23     shooting happened.
24             And there's only one who's as
25     tall as him and there's only one whose arm,
```

9

```
1     when he holds his arm straight out, if he held
2     it straight out and fired he would have missed
3     Mr. Diaz, the bullet would have sailed over
4     Mr. Diaz's head.  He has to have a downward
5     angle.  And while I understand there's
6     arguments to be made that perhaps Mr. Diaz's
7     head was tilted one way or another, the
8     physical reality of it is that the gun had to
9     be above five eight pointed in a downward
10    angle.  And Mr. Wilber is one of the people in
11    that house, the only one, unless he was
12    sitting on a -- someone else was on a stool,
13    or I believe Mr. Chernin suggested steps or
14    something like that, that could do that,
15    unless again, Mr. Diaz's head was completely
16    arched back, I think past the point where his
17    nose would have been straight up toward the
18    ceiling at exactly the time the bullet entered
19    his head.  And we know this gun was two to
20    three inches from his scalp at the time it was
21    fired.  So for those reasons I believe it's
22    relevant.
23              And while I believe that
24    there's -- there's always some potential
25    prejudice to this, this -- that notion is --
```

10

```
 1       is I think well established that in theory
 2       every moment I spend in here in front of the
 3       jury is to prejudice Mr. Wilber.  That's what
 4       I'm supposed to do.  I'm supposed to put in
 5       evidence that makes it look like he's the
 6       killer, otherwise I'm -- I'm not doing
 7       anything particularly useful.
 8                 The question becomes is the
 9       relevancy not outweighed by the danger of
10       unfair prejudice, substantially outweighed by
11       the danger of unfair prejudice.  In other
12       words, when the jury sees Mr. Wilber point to
13       that spot on the board, will that overcome
14       reason, will they then be making their
15       decision based on sympathy, prejudice,
16       passion, emotion, a desire to vent rage about
17       a crime in the community that his -- his race
18       or anything like that?  No.  His height and
19       the angle of this gunshot are an important
20       part of this case, from the State's
21       perspective.  The same way how Mr. Diaz ended
22       up lying on the floor in the position he did
23       is an important factor for the defense.  I
24       expect to hear a lot of it from Mr. Chernin in
25       closing.
```

11

```
 1                    So that's why I think it's

 2       relevant and why I think that while there may

 3       be some prejudice here.  I don't think it's

 4       the kind of unfair prejudice that -- that in

 5       any way substantially outweighs the

 6       relevance.  Again, I know I look at things my

 7       way, I don't see any unfair prejudice here.  I

 8       can't think of any unfair prejudice, unless of

 9       course the court rules that it's testimonial.

10       If it's testimonial then really we don't get

11       to that issue, I agree I can't do it, I'm not

12       going to sneak it in through the back door or

13       anything like that.

14                    But I -- I think that for

15       Mr. Wilber to hold his arm up and point to a

16       spot on a board that's at five eight is

17       relevant to the issues in this case for the

18       reasons I've said, and that relevance is not

19       substantially outweighed by the danger of

20       unfair prejudice, the confusion of any of the

21       issues, it's not cumulative, and I believe it

22       will assist the trier of fact in terms of

23       understanding the spatial relationships

24       between Mr. Diaz's head, the entrance gunshot

25       wound and the person who I obviously believe
```

12

```
 1          and am arguing is the shooter.
 2                          THE COURT:  Mr. Chernin.
 3                          ATTORNEY CHERNIN:  Well, I assert
 4          as I have the past several days, that the --
 5                          THE COURT:  I'm going to have you
 6          use the mike.
 7                          ATTORNEY CHERNIN:  I'm sorry.
 8          That the matter is -- that the request being
 9          made by the District Attorney's office is one
10          that compels burden shifting, in that it is
11          testimonial.  Now, how is it testimonial?
12          Well, if Mr. Wilber is a right-handed person,
13          he's being compelled to raise his right hand.
14          If he's left-handed or engages in certain
15          actions with his left hand, I don't know, I
16          mean, he might throw right and bat left, bat
17          left and throw right.  And we don't know what
18          -- how he would hold a gun.  And so what in
19          effect it does is it creates an inference that
20          Mr. Wilber is revealing how he would engage in
21          his personal thoughts as it applies to
22          shooting a gun.  And that is testimonial.
23                          So that's the issue that is
24          looked at in Hubanks at 173 Wis. 2d 1, a 1993
25          Court of Appeals case, and Mallick, State v.
```

13

```
 1      Mallick at 210 Wis. 2d 427 and that's a Court
 2      of Appeals case from 1997.  The court in -- I
 3      don't recall if it was -- I think it was on
 4      the record reference, referred to Pennsylvania
 5      v. Muniz.  The Muniz case really deals with an
 6      out-of-court matter.  It's not an in-court
 7      demonstration, so I don't think it's
 8      applicable in this case.  I think the two
 9      cases that really focus on in-court
10      identifications are the two Wisconsin Court of
11      Appeals cases.
12              So the first part of it -- of my
13      argument is that the State is requesting that
14      Mr. Wilber engage in, first of all,
15      testimonial conduct.  And we know that a
16      statement can be nonverbal contact -- or
17      nonverbal conduct, as that is defined in the
18      evidentiary code, if you look at Section
19      908.01 under the definition of statement.  So
20      if -- it would be a statement and conduct can
21      be a statement.
22              Now, the difference as I see it
23      between Hubanks, which is a closer analogy to
24      what Mr. Griffin is requesting than the
25      Mallick case, in Hubanks there was the request
```

14

```
1        for an in-court identification.  The in-court
2        identification relates to a statement made in
3        the course of an armed robbery -- or maybe it
4        was sexual assault.
5                    THE COURT:  Sexual assault.
6                    ATTORNEY CHERNIN:  I'm sorry, I
7        meant sexual assault.  And it is a sexual
8        assault case.  And there it was for the
9        purpose of allowing the witness to engage in
10       an in-court identification.  Here there's no
11       testimony in the record.
12                   THE COURT:  Let's stop right
13       there.
14                   ATTORNEY CHERNIN:  Yeah.
15                   THE COURT:  There the words --
16       the exact words that were ostensibly used by
17       the assaulters, those that were sexually
18       assaulting the victims in that case in the
19       Hubanks case, were the defendant was asked to
20       repeat those exact words in front of the
21       jury.  And I guess I'm trying to understand
22       how -- how -- and I don't mean to suggest that
23       you'd be arguing it, but it seems to -- what
24       you seem to be suggesting by your argument
25       thus far is that this demonstration would
```

15

```
1          somehow be -- have more prejudice or would be
2          more testimonial in nature than an individual
3          who's actually asked in court in front of a
4          jury to speak words, not to -- and to speak
5          words that were used ostensibly by the
6          attackers in the assault.
7                      It seems to me that that's, you
8          know, one could make the argument, and I'm
9          sure the defense did in that case, that that's
10         clearly testimonial and -- and highly
11         inflammatory, because of the nature of the
12         words that were used, and that to ask a
13         defendant to essentially assume the position,
14         at least through wordage of the actual
15         attackers in front of the jury, seems to be
16         highly inflammatory, and yet the -- the
17         court -- the trial court said, no, that --
18         that -- to both questions, and especially to
19         the second one with respect to the prejudice,
20         it could be cured by an instruction, and the
21         Court of Appeals agreed with the circuit court
22         judge and assistant district attorney.
23                      ATTORNEY CHERNIN:  But you see,
24         that was the problem in Hubanks for the
25         defense.  One of the things that they didn't
```

16

```
1     argue, and that's footnote 7, addresses the
2     inflammatory and prejudicial issue.
3                     THE COURT:  No, they argued it
4     but not in the context of the statements, they
5     argued it in terms of the defendant's refusal
6     to do it and the instruction that the judge
7     gave to the jury.
8                     ATTORNEY CHERNIN:  Right.  But
9     that -- that was a different issue, Your
10    Honor, because the -- the -- the issue that
11    they were addressing was when Judge Randa
12    said, here's the instruction that I'm going to
13    give, that's what they argued was
14    prejudicial.  They didn't argue that the
15    conduct itself was prejudicial.  And I'm
16    focusing on the matter in footnote 7, where if
17    we're going to -- and I haven't quite gotten
18    on that point yet in my argument, but let me
19    respond to the court's --
20                    THE COURT:  Just the testimonial
21    issue that you've raised thus far.
22                    ATTORNEY CHERNIN:  Right, the
23    testimonial issue.  Let me respond what the
24    court's inquiry was.  The matter that -- the
25    distinction between what makes testimonial is,
```

17

```
 1        for example, if -- if Wilber were wearing a
 2        hood over his face during the course of an
 3        identification request for an in-court
 4        identification, I think it's clear that the
 5        court can make Mr. Wilber take off a face mask
 6        or put on a face mask, if that would help an
 7        in-court identification.
 8                    THE COURT:  But that -- let me
 9        just stop you there.
10                    ATTORNEY CHERNIN:  Yeah.
11                    THE COURT:  Let's get off this
12        identification issue, because what you seem to
13        be suggesting -- and I don't think there's any
14        case law that supports this -- is that
15        demonstrative evidence in court is limited to
16        identification.  I don't think the Hubanks
17        case says that at all.
18                    ATTORNEY CHERNIN:  Well, it
19        doesn't say that, but that's what the issue
20        was that they were exploring.
21                    THE COURT:  Right.
22                    ATTORNEY CHERNIN:  And so I'm
23        saying this is different than that, so I don't
24        think that Hubanks is controlling.
25                    THE COURT:  Explore that with
```

18

```
 1      me.  In fact, if -- if demonstrative evidence
 2      can be used for identification purposes of an
 3      individual in court, a defendant in court,
 4      what arena do you put this into?  This type of
 5      demonstration.  If this is not identification,
 6      what is it?  That seems to be your -- your
 7      position, that it's something else that's not
 8      permissible by demonstrative evidence.
 9                  ATTORNEY CHERNIN:  Well, because
10      there's no one that has identified this man as
11      holding up a gun to --
12                  THE COURT:  But that's not what
13      the State -- I want you to respond to the
14      State's argument.  The State's argument is
15      we're not offering it for identification,
16      Judge, we're offering it to -- our theory of
17      the case is that the defendant's size is
18      consistent and -- and the way he does -- the
19      angle of his arm as I understand it is
20      consistent with other evidence that has
21      already been presented in this case, and that
22      he anticipates is something that you're going
23      to be rebutting and arguing in your defense,
24      and that is the trajectory of the bullet from
25      an upward to a downward, from a back to a
```

19

```
 1      forward, from a left to a right angle.

 2               And we've already had testimony

 3      from Doctor Jentzen on that point, and that

 4      that -- and it was established, I believe

 5      through Doctor Jentzen, that from the State's

 6      questioning, that the trajectory, or the line

 7      of the bullet, and even added points on that

 8      line to be the gun nozzle, you assume that

 9      that's one point on the line, the back of the

10      head is another point on the line, which is

11      the entry wound, and the exit wound, which is

12      in the nasal cavity on the --

13               ATTORNEY CHERNIN:  It's one inch

14      below the orbital.

15               THE COURT:  That that is the

16      final point on the line, that that is all

17      consistent with a downward trajectory.

18      Meaning that someone would have to have been,

19      from the State's perspective, and I assume

20      they're going to argue the law of physics,

21      that it was a downward -- someone had to be

22      above the individual, the victim in this case,

23      when the shot was actually fired.  And that

24      the defendant's height is very consistent with

25      that theory, and that they want to be
```

20

1    available to demonstrate that -- the spatial
2    points through the -- through the defendant
3    doing this demonstration.  That's what the
4    State is offering it for.  I don't think it's
5    for identification.
6              ATTORNEY CHERNIN:  Well, then
7    you've hit the nail on the head, Your Honor,
8    because the only thing that that can be doing
9    is asking for this defendant to engage in
10   testimony against --
11             THE COURT:  How?  But see that's
12   where I'm losing you, because what the Hubanks
13   case said, you've hit on it twice but you
14   haven't persuaded me yet, Mr. Chernin, and
15   that is somehow this goes to the defendant's
16   state of mind, and it is actually, you know,
17   requiring him -- that's why it's testimonial
18   in nature, because it's getting to his psyche
19   somehow and forcing him to communicate what
20   was going on in his mind at the time of the
21   shooting.  That demonstration to me doesn't
22   show that.
23             The demonstration that the State
24   is suggesting is, you know -- and they've
25   taken away one aspect that would be

21

```
 1        inflammatory, that is the firearm itself,

 2        whether it was going to be a plastic one, and

 3        they are not asking him to point, they are --

 4        at any individual, they are asking him to

 5        point at an angle or a line on a board.  How

 6        is that suggestive -- and it's to demonstrate

 7        the -- as I understood it, the spatial

 8        dynamics of what's going on here in terms of

 9        the State's theory of the case -- how is that

10        going to the defendant's state of mind?

11        Because that's the key, Mr. Chernin.  You've

12        raised it twice and it is what you maybe

13        talked about, it's not going to his state of

14        mind, but you think that it does.  So tell me

15        how it does.

16                  ATTORNEY CHERNIN:  Well, now the

17        court's asked me a different question, and I

18        think I've answered that one.  Mr.  --

19                  THE COURT:  No, no, you haven't.

20        I'm not -- you have said that, you know, it's

21        testimonial in nature.  To be testimonial in

22        nature, at least if you're going to be quoting

23        from Hubanks, it requires -- what Hubanks was

24        arguing directly goes to his state of mind,

25        that the jury's going to believe that those
```

22

1    are the things he was thinking as he then said
2    them at the scene, and the court determined
3    that it was not testimonial in nature.
4              So what is it about this
5    demonstration in this case, as the State has
6    explained it to the court and to you, that is
7    testimonial in nature, that goes to the
8    defendant's state of mind --
9              ATTORNEY CHERNIN:  Okay.
10             THE COURT:  -- and thus forcing
11   him to compel him to testify in violation of
12   his Fifth Amendment right?
13             ATTORNEY CHERNIN:  Is Mr. Wilber
14   right-handed or left-handed, Your Honor?
15             THE COURT:  I don't know.  And I
16   don't know that it makes a difference for
17   purposes of the demonstration.
18             ATTORNEY CHERNIN:  Well --
19             THE COURT:  I haven't heard that
20   from the State, except they want him to point.
21             ATTORNEY CHERNIN:  What?
22             THE COURT:  They simply want him
23   to point with an arm extended.  I don't
24   particularly care what he is, if he's left or
25   right-handed.  For purposes of the

23

```
 1      demonstration I don't know that he has -- I
 2      mean, if he wants to raise his right hand, if
 3      he's wants to use his left hand, if the State
 4      directs him to just point it's up to him, I
 5      suppose, to point with whichever hand he wants
 6      and whatever arm he wants.
 7                  ATTORNEY CHERNIN:  Well, then
 8      that's what's testimonial, Your Honor, because
 9      --
10                  THE COURT:  Because he's going to
11      have to think, what am I, am I right-handed or
12      left-handed, and that the shooter now is left-
13      handed somehow?
14                  ATTORNEY GRIFFIN:  He can point
15      with both if he wants, that way there's no
16      indication that -- we'll pick which one out of
17      the hat, we can tell the jury we picked L so
18      he can point with his left first, R with his
19      right second, that's not the point.  And I
20      don't think there's any question in here, and
21      I'd like Mr. Chernin to respond, if you
22      ordered this defendant right now to go in back
23      and point to that board while we videotaped
24      him, would there be any reason we couldn't
25      play that videotape for the jury?  None?
```

24

```
 1                    THE COURT:  That's the point I'm

 2          trying to get to, but Mr. Chernin says there

 3          is, because his first objection is that it's

 4          different, unique, from the specifics in

 5          Hubanks because this is clearly testimonial in

 6          nature, and I'm failing to see it.  And so I

 7          need you to convince me, Mr. Chernin.

 8                    ATTORNEY CHERNIN:  First of all,

 9          let me respond to Mr. Griffin.  If you were to

10          go back there and say, you know, Mr. Wilber

11          you have an absolute right to remain silent,

12          anything you say or do, and the 'or do' can be

13          held against you.

14                    ATTORNEY GRIFFIN:  That's not his

15          right.  He doesn't have a right to refuse

16          things without the jury finding out, like that

17          he refused to be in a lineup, he refused court

18          ordered handwriting exemplars or things like

19          that, that's the point.  If the court orders

20          him to do certain things he has to do them

21          or -- or essentially pay the cost of the

22          inference for refusing to do that.  He has a

23          right to not raise his arm in front of the

24          jury, but the jury has a right then to know

25          that.
```

25

```
 1                    But I apologize, you know what --
 2              THE COURT:  I -- I really would
 3        like to take this issue back over.
 4              Mr. Chernin --
 5              ATTORNEY GRIFFIN:  Sorry.
 6              THE COURT:  -- you raised two
 7        points yesterday and I wrote them down and I
 8        just wanted be able to flesh them out a little
 9        bit fuller for me, because on the issue --
10        first issue, the issue of testimonial in
11        nature, I'm stuck and I need you to convince
12        me.  I don't see how this demonstration is any
13        more testimonial than -- than what was clearly
14        allowed in the Hubanks case, where somebody
15        actually was required to state words that
16        ostensibly were used by individuals engaged in
17        a sexual assault.  How this demonstration is
18        somehow more testimonial in nature than that,
19        I'm -- I'm failing to see it.
20                    And the point that they raised in
21        Hubanks case, and that I keep coming back to,
22        is something that have you have raised twice,
23        which is that it goes to state of mind, where
24        you're actually asking him to make some
25        definitive, you know, what was going through
```

26

```
1    his head when he was actually saying these
2    words or exercising his choice as to what arm
3    he's going to use, I'm failing to follow that
4    argument.
5              I -- I -- the demonstration as I
6    understand it, is -- and I've raised some
7    other issues along the way because I wanted to
8    make sure that I wasn't misinterpreting your
9    position -- and that demonstrative evidence
10   can be used for a variety of things.  If it's
11   going to -- it's admissible beyond just
12   identification, which was the issue in the
13   Hubanks case.  So I wanted to make sure that
14   we were clear on that, that you're not telling
15   me, well, whoa, whoa, whoa, unless it's used
16   for identification, because it seemed like you
17   were suggesting that, then it's demonstrative
18   evidence that can't be used, and I don't know
19   that that's the case.
20             Demonstrative evidence comes in a
21   lot of different forms, stand up, speak these
22   words, try a glove on, put a sweatshirt on and
23   pull it over your head.  You've given that
24   example.  There are a variety of different
25   things that a court has ordered in terms of
```

27

```
 1      demonstrative, that is a demonstration in

 2      front of the trier of fact, if it will assist

 3      them in their -- in their, you know, visually

 4      in exercising their duty, which is to, you

 5      know, to be a trier of fact, to determine what

 6      facts are true or not true, or have been

 7      proven or not proven by the evidence.  That's

 8      their role.

 9                 Will this -- and that's why I

10      keep focusing in and trying to get both of you

11      to sort of -- and I've made Mr. Griffin do it

12      and I'm making you do it, I made Mr. Griffin

13      tell me, why is this relevant, and if it is

14      relevant, what, you know, what's prejudicial

15      about it or unduly prejudicial, such that I

16      should not allow it.  He's responded to that.

17      You're indicating to me, that, Judge this is

18      testimonial in nature, and I -- and I'm not

19      buying that.

20                 ATTORNEY CHERNIN:  Well, it's

21      either you're not buying it or I haven't given

22      you an example that you can understand, so let

23      me try it one more time.

24                 THE COURT:  Okay.

25                 ATTORNEY CHERNIN:  And I
```

28

```
1        appreciate what the court is saying.
2                    THE COURT:  Go ahead.
3                    ATTORNEY CHERNIN:  Let's talk
4        about the -- all of the examples that the
5        court gave were matters where, try on a hood,
6        say these words, whatever, however you want to
7        couch those, first of all, those -- those all,
8        as I would see them, would be witnesses saying
9        that the person who committed the crime did X,
10       Y or Z.  Had a hood, said these words, painted
11       his face green, whatever.
12                   THE COURT:  Correct.
13                   ATTORNEY CHERNIN:  Okay.  Now the
14       difference here is that there is -- in those
15       types of situations, the identification --
16       those are being offered in support of other
17       witnesseds' testimony from the stand, where
18       they're saying a six seven guy, this would be
19       in this case, a six seven guy stuck out his
20       right arm, held a gun to the back of Diaz's
21       head, pulled the trigger.  Okay.
22                   THE COURT:  That's one fact.
23                   ATTORNEY CHERNIN:  Then --
24       then --
25                   THE COURT:  But what about the --
```

29

```
1       wait a minute -- what about the evidence,

2       Mr. Chernin, that we have from Doctor Jentzen,

3       which you cross examined him on these

4       points --

5                   ATTORNEY CHERNIN:  Yes.

6                   THE COURT:   -- in terms of the

7       location, not only the distance of the shot,

8       the location of the victim's body, the

9       location of the entrance wound, the exit

10      wound, what kind of a path was that in, the

11      doctor both on direct and cross examination

12      has put evidence in consistent with the

13      State's theory of the case, as they have

14      explained it in their opening, and as the case

15      has, you know, folded thus far through their

16      examination of witnesses of a downward

17      trajectory.  That is that whoever shot the

18      victim in this case, David Diaz, who the

19      record is reflecting was between five six or

20      five eight, depending on shoe size or

21      whatever, or soles or heels of a shoe, and

22      that the bullet, the entrance wound, came from

23      an angle from a downward to -- from an upward

24      to a downward trajectory, that if you were to

25      draw a line that's we're talking about.
```

30

```
1              ATTORNEY CHERNIN:  Okay.

2              THE COURT:  And what would have

3    prevented to -- for the jury to have

4    visualized that -- in fact the witness, Doctor

5    Jentzen, was attempting to try and to

6    demonstrate that for the jury.  And there was

7    no objection on that in terms of his position

8    that this was the way, from the autopsy, the

9    wound -- the injury had to have occurred

10   from -- in his thinking, in his -- the way he

11   reconstructed this from the entrance wound and

12   the exit wound, that it had to come from

13   someone who was ostensibly in a -- in a

14   position to have a downward angle upon

15   Mr. Diaz's head.

16             What would have prevented the

17   State from asking the defendant at that point

18   to have stood up with that board as the -- as

19   the -- as the witness is -- Doctor Jentzen is

20   describing this, so that the defendant could

21   be a participant to demonstrate that in front

22   of the jury about how using that board that

23   the State has created, about how that angle

24   would visually -- to -- to demonstrate the

25   spatial angles, the visualization of what the
```

31

1    doctor was testifying to to the jury?  Would

2    that have been impermissible demonstration

3    evidence?

4              ATTORNEY CHERNIN:  Well, if

5    Doctor Jentzen had said that it required a six

6    seven person to get this particular angle with

7    this particular person, I -- I -- I guess that

8    even that would create a problem, but Doctor

9    Jentzen didn't say -- all that Doctor Jentzen

10   says, it's a downward angle, we all know it's

11   a downward angle.  How does having my client

12   participate and show that this is how he would

13   have done it that the angle?

14             THE COURT:  He's not being asked

15   to demonstrate how he would have done it.

16             ATTORNEY CHERNIN:  Yes, he is.

17             THE COURT:  He's being asked to

18   extend his arm to a point, a given point on a

19   board.

20             ATTORNEY CHERNIN:  No, that's

21   not.  It's how he would have participated in

22   this type of conduct.  And that's what you're

23   asking him to do.  How he would have created

24   this path of a downward bullet.  And that's

25   what you're trying to put him on the stand to

32

```
 1    do -- or not on the stand, but in fact it's on
 2    the stand by having him do that.  And --
 3              THE COURT:  How is that
 4    inconsistent with having a defendant state
 5    words that were actually said by an attacker
 6    at the scene of a sexual assault?
 7              ATTORNEY CHERNIN:  Because --
 8              THE COURT:  That's as if what the
 9    jury was hearing, these are the words that
10    came from this man at the scene.
11              ATTORNEY CHERNIN:  No.  If one of
12    these witnesses were to get up and say, you
13    know, if I saw this -- if I saw Danny Wilber
14    holding his arm out to somebody who's five
15    eight, that's how I could identify him being
16    the person who I saw doing the shooting.
17    That's using him for demonstrative purposes of
18    -- that's being a -- demonstrative evidence of
19    something that was offered as evidence.  It's
20    demonstrative, it's showing evidence.
21              THE COURT:  And this isn't?
22              ATTORNEY CHERNIN:  This is not.
23    This is creating evidence through Mr. Wilber's
24    acts, not through the --
25              THE COURT:  Would it be creating
```

33

```
1        evidence if we used somebody else to do it?

2                    ATTORNEY CHERNIN:  No, but --

3                    THE COURT:  Why is it not

4        creating evidence to have -- if it's an issue

5        that's not a fact in evidence?  What

6        difference does it make who does it?

7                    ATTORNEY CHERNIN:  Because that's

8        the whole point of the Fifth Amendment, it's

9        having him Mr. Wilber incriminate himself.

10       You can have -- you can have, you know, Doctor

11       J come in here and do it, who's six seven, I

12       don't -- you know, that's fine.  If Mr. --

13                   THE COURT:  But you've just said

14       that would be creating evidence.

15                   ATTORNEY CHERNIN:  Yes, there's

16       nobody that said that a six seven guy lined it

17       up -- lined up this arm.

18                   THE COURT:  Then it's not okay

19       that we could have Doctor J or anybody else

20       for demonstration either?

21                   ATTORNEY CHERNIN:  Sure, it is.

22       He can put on a demonstration, he can put on

23       this demonstration with Doctor Jentzen,

24       whoever he wants to, he just can't do it with

25       this person.
```

34

```
 1                    THE COURT:  Okay.  Then what
 2         relevance -- now we're getting to it.  If that
 3         demonstration is permissible, what -- for what
 4         relevance is it?
 5                    ATTORNEY CHERNIN:  I'm not the
 6         proponent of it, I don't know what his offer
 7         of relevance is.
 8                    THE COURT:  But you're saying --
 9                    ATTORNEY CHERNIN:  I don't know.
10         You're asking me to say what the relevance is
11         to Mr. Griffin.  I don't know.
12                    THE COURT:  You're agreeing that
13         it would be permissible, under what basis do
14         you think it would be permissible?  If you're
15         the judge under the scenario you created,
16         you're -- you believe that the State could put
17         that kind of evidence in in front of the
18         jury?  It's only when we get into the arena of
19         having your guy, the defendant, do it, that it
20         becomes impermissible.  And that all goes
21         to -- it's not the creation of evidence,
22         because if it's creation of evidence then
23         whoever does the demonstration it's going to
24         be impermissible.  But if it's because it's --
25         the difference is when it's -- when your guy
```

35

1     does it that somehow that's testimonial, we're
2     back to the same very same issue I asked you
3     before.
4                    ATTORNEY CHERNIN:  No, but then
5     that is it, I mean then it becomes
6     testimonial, because you -- what -- the person
7     that you're looking at, the person that has
8     the Fifth Amendment right against self-
9     incrimination is the person who's seated next
10    to me.
11                   THE COURT:  All right.
12                   ATTORNEY CHERNIN:  Having
13    somebody else do it, I mean if -- if it is
14    permissible, then having somebody else doing
15    it is they're engaging in the incriminatory
16    conduct.  They're doing the incriminatory
17    display, saying this is what it is.  It's not
18    permissible.
19                   THE COURT:  And a defendant in
20    Hubanks being asked to restate words used at a
21    crime scene of a sexual assault is not
22    incriminatory?
23                   ATTORNEY CHERNIN:  The difference
24    is in Hubanks the witness said this is what
25    the person did.  There's nobody --

36

```
 1              THE COURT:  And having the
 2       defendant get up and say those words is not
 3       against -- in violation of his Fifth Amendment
 4       right, to be free from self-incrimination,
 5       putting himself right into the position of
 6       whatever it is that -- who the attacker was,
 7       saying those words that the defendant's now
 8       being made to say those exact words in front
 9       of a jury, that that's not incrimination?
10              ATTORNEY CHERNIN:  That was
11       identification, and -- and it may be an
12       incriminatory identification.
13              THE COURT:  And yet the court
14       allowed it.
15              ATTORNEY CHERNIN:  Yes, the court
16       allowed it.
17              THE COURT:  You just happen to
18       disagree with it?
19              ATTORNEY CHERNIN:  I -- I -- I
20       have other issues with Hubanks, I understand
21       what the law is on that.  And I'm saying, yes,
22       if you -- if you asked Mr. -- if somebody came
23       in here and said that Mr. Wilber before the
24       shot said, you know, David Diaz, I don't like
25       you, bang, okay, and the only way that
```

37

1    somebody could identify the shooter was to

2    have Mr. Wilber say, David Diaz, I don't like

3    you, I'd agree that Hubanks says that you can

4    make him do that.  That's for purposes of --

5    of offering the jury supporting evidence based

6    upon evidence offered by another witness, and

7    it's demonstrative of that evidence.

8            This is not demonstrative of any

9    evidence but for Mr. Griffin's theory that

10   there is the only way that this could happen.

11   I mean, you know, I'm not six seven, I'm five

12   eight, and if I'm -- if I -- if I have -- if I

13   pulled Mr. --

14            THE COURT:  Mr. Chernin, I get

15   your point because you've raised that before,

16   but that goes to the weight, not the

17   admissibility.  Those are the very arguments

18   you're going to be able to make to the

19   State -- or to the jury rather, about what the

20   significance of that evidence is, if any.

21   That there are so many variants and variations

22   that are inconsistent with it, we don't know,

23   you know, the State says this, but we don't

24   know any of these things, why isn't that

25   handled through the arguments that you give,

38

```
1        that you make as to the weight the jury should
2        give that, consistent with any other
3        admissibility evidence?
4                      ATTORNEY CHERNIN:  Okay.  As I
5        understand it, the court is ruling against me
6        on the testimonial issue.
7                      THE COURT:  Correct.
8                      ATTORNEY CHERNIN:  But now is
9        saying, let's look at the -- the undue
10       prejudice issue --
11                     THE COURT:  Correct.
12                     ATTORNEY CHERNIN:  -- because
13       you're saying, look, this might confuse the
14       jury because there's so many variables out
15       there as to how it occurs that --
16                     THE COURT:  I'm not saying that.
17       I'm saying if that's what you believe, that
18       there are so many other responses that that
19       evidence could give, that's your theory,
20       that's your obligation, then I would assume to
21       argue that to the jury that -- the weight that
22       they should give.
23                     ATTORNEY CHERNIN:  I'm not
24       talking about weight, now we're talking about
25       this could serve to confuse the jury because
```

39

```
1        there are so many variables, and I don't -- I

2        really -- it doesn't matter to me which -- if

3        the court says this is testimonial or unduly

4        substantially -- substantially unfair

5        prejudice, I don't care which way you rule for

6        me, but, okay, if that's what the court's

7        saying, that it's substantially unfair --

8                        THE COURT:  I didn't say that.

9                        ATTORNEY CHERNIN:  Well, not yet.

10                       THE COURT:  You want to argue

11       that.  Go ahead.

12                       ATTORNEY CHERNIN:  Not yet, but

13       I'm hoping you'll join me today.

14                       THE COURT:  I know, but I want

15       you to tell me how, so get there.

16                       ATTORNEY CHERNIN:  Okay.  Well,

17       because when evidence is a waste of time and a

18       needless presentation of cumulative evidence,

19       one, we know this is a downward arm, this is

20       cumulative of being a downward arc, it doesn't

21       serve any other purpose.  Doctor Jentzen's

22       already displayed what a downward arc is, so

23       it's cumulative.  Is it a waste of time?  I

24       think it's a waste of time because it's so --

25       there's so many variables as to how this could
```

40

```
1    have happened and we don't have anybody saying
2    exactly where David Diaz was standing at this
3    time.

4              We have a general area.  We don't
5    know -- we haven't had anybody say that there
6    wasn't somebody standing behind him.  We have
7    heard testimony saying that the gunshot came
8    from the living room area, that's all that's
9    in the record so far.  We don't have anybody
10   saying that Danny Wilber was behind David
11   Diaz.  Can we agree on that?

12             THE COURT:  I'm not agreeing on
13   anything.  I'm not the trier of fact here.

14             ATTORNEY CHERNIN:  Okay.  But you
15   haven't heard any evidence to suggest that
16   Mr. Wilber was anywhere other than in front of
17   David Diaz.

18             THE COURT:  That's your
19   position.  Go ahead.

20             ATTORNEY CHERNIN:  We have that.
21   Is it misleading to the jury?  I think it is
22   misleading, because of the many different
23   variables.  We have the downward arc, that's
24   fine.  Is it confusing?  I think it's a bit
25   confusing, because so far we have nothing to
```

41

```
1    suggest that Mr. Wilber was behind this dead
2    man to suggest that he was the one that fired
3    the shot in the downward trajectory.
4              But lastly, is it unfairly -- is
5    there a danger of unfair prejudice?  Does this
6    substantially outweigh the value of this
7    evidence?  And the unfair prejudice in this
8    case does, because what it does is it creates
9    a menacing picture through the defendant
10   himself of the conduct of him on that night,
11   and so far there's nobody that's offered that
12   evidence.  And all we're trying to do is
13   humiliate Mr. Wilber, make him look like a
14   menacing animal in front of this jury.  And
15   that's unfair.  If Mr. Griffin wants to argue
16   that, that's fine, but don't make him pose in
17   that way.  That's unfair.
18             THE COURT:  Is it unduly
19   prejudicial?  Two different concepts.
20             ATTORNEY CHERNIN:  Is it unduly
21   prejudicial?  Well, yes, it is.
22             THE COURT:  You're putting the
23   words as to what that act will demonstrate, a
24   menacing animal.  You saying it doesn't make
25   it so.  That's the only conclusion that
```

42

1    somebody could draw from that demonstration.

2                  ATTORNEY CHERNIN:  What else is

3    it intended to mean?

4                  THE COURT:  What the State has

5    indicated.

6                  ATTORNEY CHERNIN:  What's that?

7                  THE COURT:  Mr. Griffin.

8                  ATTORNEY GRIFFIN:  Well, first of

9    all, how someone pointing to a board makes

10    them look like a menacing animal is a little

11    beyond me, and I think that's just the

12    judgment call the court's going to have to

13    make.  I'll say this.  If the court finds that

14    Mr. Wilber pointing to that spot on a board

15    makes him look like a menacing animal I will

16    withdraw my request.  Mr. Chernin must walk

17    around quite frightened if he thinks every

18    time somebody walks around pointing at

19    something they look like a menacing animal.

20                  And for what it's worth, and just

21    for the record, I even said to Mr. Chernin at

22    one point, if this were a situation we were

23    asking the guy to, you know, show his parts,

24    private parts or whatever, to the jury in some

25    kind of bizarre fashion or something, those

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 43 of 325   Document 61-24

1    kinds of things would be unduly prejudicial or
2    make his him look strange or funny in a way
3    that's unfair. All he's going to do is
4    point -- or he doesn't even have to point, he
5    can hold all of his fingers out, palm down at
6    that spot on the board. That's all I'm
7    looking for.

8                  He doesn't have to put a mean
9    face on or pretend he's holding a gun or -- or
10   say anything scary or act out of control and
11   crazy and aggressive and geeked up and pumped
12   up, and all the things we've heard about him
13   that morning. So I just disagree
14   categorically with that description that
15   that's what's going to happen here. We could
16   have him put on a hoody, have him pull the
17   hoody over his face, put his hands in the
18   pockets, kind of crouch over so the jury could
19   see what he would look like in that position,
20   then he might look menacing. There's nothing
21   like that here.

22                  ATTORNEY CHERNIN: Well, the
23   other thing that -- and I would add because I
24   think I see which way the court is leaning,
25   and I'm hoping you're not -- is that if you're

44

1    going to ask Mr. Wilber to do this right now,

2    he has a restraining device on his arm which

3    will be exposed to the jury, and I would ask

4    that that item be removed if the court is

5    inclined.

6              THE COURT:  Why would that be

7    exposed to the jury?  He's got a shirt on, you

8    had indicated it's the same thing he was

9    wearing the other day when I asked you why you

10   didn't bring the sweater to cover it up you

11   said, it would be too warm in here, but

12   besides it appears to be completely covered by

13   his clothing.

14             ATTORNEY CHERNIN:  Right, from

15   this position.  But if he's -- I mean --

16   Danny, could you show her your arm.  I mean,

17   there's -- it's obvious that there's something

18   on here.

19             THE COURT:  Well, one of the ways

20   you do that is to simply pull his -- excuse

21   me?

22             THE DEFENDANT:  I pull my thing

23   here.  My shirt here.

24             THE COURT:  Thank you.  I thought

25   you were being disrespectful to the court

45

```
 1    again.  I get that impression from time to
 2    time when you sigh or make noises emanating
 3    from your -- from your vocal words,
 4    demonstrating to this court a certain level of
 5    disgust.  It could just be me.
 6              THE DEFENDANT:  I have nothing to
 7    say, Your Honor.
 8              THE COURT:  I'm sorry?
 9              THE DEFENDANT:  I have nothing to
10    say, Your Honor.
11              THE COURT:  Well, you said it
12    already.  You already said it.
13              Mr. Chernin, please advise him
14    about his conduct in this court, because as I
15    said the other day, I'm not going to have you
16    folks mistake my kindness for weakness.  I
17    have been doing this as restrained as I can
18    outside the presence of the jury, and given
19    his outburst the other day, he's lucky he
20    hasn't been charged with threatening a judge,
21    that he hasn't been charged with disorderly
22    conduct, that he hasn't been charged with
23    contempt.  And you know whereof I speak.
24              ATTORNEY CHERNIN:  Well, Judge --
25              THE COURT:  And I am not going to
```

46

```
1    continue to run my court with this gentleman,
2    you know, being disrespectful to me from the
3    minute he comes in the court till the minute
4    he leaves.  I'm not going to tolerate it and I
5    don't have to, quite honestly.  I don't have
6    to.  Tell me if I have to.  I don't think I
7    do.  I don't think there's anything in the
8    rules of judicial conduct that require a judge
9    to be disrespected and do nothing about it.
10   Tell me if I'm wrong.  I'm not going to.
11   Today's the end.  You do it again, we are
12   going to add additional restraints to you in
13   front of the jury.
14            ATTORNEY CHERNIN:  Well --
15            THE COURT:  I'm done,
16   Mr. Chernin.
17            ATTORNEY CHERNIN:  I --
18            THE COURT:  I'm going to have him
19   go in the back again with you and you are
20   going to spend some time with him, explaining
21   to him the proper conduct in court.  I am not
22   going to sit here from 10:00 o'clock this
23   morning until 6:00 o'clock tonight having the
24   defendant show utter disregard and respect for
25   this court.  It ain't gonna happen.  I'm not
```

47

```
1    going to enable that kind of disrespectful,
2    inappropriate conduct in a court of law.  It
3    ain't gonna happen on my watch, period.
4                    ATTORNEY CHERNIN:  Judge, we're
5    well aware of that fact.  I'm not arguing with
6    you.
7                    THE COURT:  He doesn't seem to
8    get it, Mr. Chernin.
9                    ATTORNEY CHERNIN:  I will talk to
10   him.  I do believe that Mr. Wilber understands
11   it and I know that he did not mean any
12   disrespect.
13                   THE COURT:  Mr. Chernin --
14                   ATTORNEY CHERNIN:  Yes.
15                   THE COURT:  -- he doesn't mean
16   any disrespect, then why do it?
17                   ATTORNEY CHERNIN:  He sighed,
18   Your Honor.  And what we will do is the
19   prop -- and I know what he's sighing about --
20   when we asked if we could cover up this side
21   of his arm, the cufflink doesn't hold on that
22   side.  And, Judge, the only thing we could do
23   is this, if you're going to rule that you're
24   going to allow this demonstration and he's
25   going to have to stick up his hand, all we ask
```

48

```
 1     is that we do the best we can to try to cover
 2     the restraint that's on his arm.  And that's
 3     what we're asking -- that's what I'm asking
 4     for now.  You haven't ruled yet, so let me not
 5     jump ahead.
 6                    THE COURT:  The court's going to
 7     take a ten-minute break.  The defendant can go
 8     back in the holding cell and you can chat with
 9     him back there.
10                    (Break taken.)
11                    THE COURT:  Recalling State of
12     Wisconsin v. Danny Wilber, 04CF000609, first
13     degree intentional homicide while armed with a
14     dangerous weapon.  Appearances please.
15                    ATTORNEY GRIFFIN:  Assistant DA
16     Jim Griffin for the State with Detective Tom
17     Casper of the Milwaukee Police Department.
18                    ATTORNEY CHERNIN:  Michael
19     Chernin appearing on behalf of Danny Wilber.
20     Danny Wilber is present in the courtroom.
21                    THE COURT:  The court has had an
22     opportunity to read the relevant case law,
23     I've heard the arguments of the parties and
24     I'm actually going to deny the State's request
25     for this demonstration.  The court's denying
```

49

```
1    it for a couple of reasons.  First of all,
2    most of the -- and while this wasn't
3    articulated in the way I would have liked by
4    the defense, most of the cases that invoked
5    demonstrative evidence are -- in fact go
6    directly to identification.  Identification is
7    not an issue and hasn't been an issue at this
8    point raised by the State.
9                      And in fact, the State has
10   indicated that the evidentiary value, if any,
11   of this demonstration, particularly if it's
12   used by -- if the defendant's going to be the
13   one being asked to do it, to me has very
14   little, if minimal, value to the jury.  And to
15   the extent that it would have value, it is
16   unduly confusing.  It can create all sorts of
17   other additional issues.  Number one, we don't
18   know where or what the position the defendant
19   was in ostensibly when the shots went off.
20   Secondly, we don't know what position the
21   victim was in, whether he was standing or
22   seated, whether he was front or back.   We
23   don't know any of those things at this point.
24                      We do know that the State's
25   theory and some evidence consistent with the
```

50

```
1        State's theory has been presented.  The
2        State's theory that the only one in that
3        kitchen tall enough to invoke any kind of a
4        wound from an upward to a downward position is
5        Danny Wilber, the defendant.

6                    And I think, just as the State
7        has correctly pointed out, common sense can
8        indicate to the jury that one of the very
9        distinct possibilities of a -- and there's
10       nothing foreclosing the State from arguing
11       this consistent with their theory in front of
12       the jury, that one would -- that if in fact
13       Danny Wilber is the only one, as the evidence
14       points to, that was the tallest one in the
15       kitchen, and if in fact as the doctor
16       testified it came from an upward to a downward
17       position, that is the trajectory of the -- of
18       the bullet, the shot, consistent with the
19       entrance and exit wounds, the State is free to
20       argue the natural inferences of that in front
21       of a jury, which is that it should have and
22       could have and in fact did come from the
23       defendant, who was the tallest one in that
24       room.  And his size is consistent with the
25       trajectory of that bullet as described by
```

51

1      Doctor Jentzen in his testimony.

2             There are in fact quite a few --

3 so I don't see that my foreclosing the State

4 from this demonstrative evidence, which is

5 really supposed to be a clarification point

6 for the jury, and I think it has minimal value

7 in that regard, in fact, I think the State,

8 even through its -- its demonstration as I

9 understood it, and having the defendant just

10 have his hand out in a -- in a direct line

11 pointing at a predesignated point on a board

12 that is ostensibly at a level of five foot

13 eight, I don't know from what I'm seen thus

14 far that that has any -- brings any clarity to

15 the picture at all. Because there's only --

16 the difference in terms of the -- the angle, I

17 mean his arm, as far as jury is going to be

18 seeing, and as far as I've seen, is almost

19 straight out, maybe or perhaps a dip, but

20 there's so many different ways that that could

21 be manipulated in terms of did he drop his

22 shoulder, did he -- was he on his tip toes,

23 was he flatfooted, all of those kinds of

24 things that the defense was trying to argue,

25 saying that there's just so many variants

52

```
 1     here, Judge, that it really doesn't have any

 2     evidentiary value.  And to the extent that it

 3     does, the State already has evidence in on

 4     this point and this is just cumulative.  And

 5     so for those reasons I agree.

 6                  The State is free to argue this

 7     point, that's their theory of the case, they

 8     have evidence in that already points to that

 9     and they can certainly make arguments to the

10     jury on the inferences.  The only caveat to

11     this is that if in fact the defense puts in

12     evidence that is in their case, or if in fact

13     the defendant gets on the stand and starts

14     to -- the issue of angles or other

15     possibilities comes into play, then for

16     rebuttal purposes the State has -- will have

17     some leeway and the court will revisit the

18     issue to determine whether or not it's

19     appropriate for the State to be able to

20     rehabilitate his case on this particular issue

21     through such a demonstration in front of the

22     jury.

23                  But in its case in chief the

24     court is not satisfied that it goes to

25     identification, that's not a issue, and for
```

53

the purpose that it's being offered, I find
that it has minimal evidentiary value and its
prejudice outweighs that, and so I'm going to
deny the State's request.

ATTORNEY GRIFFIN: Very quickly,
Judge, can I have Mr. Wilber simply stand up
and put the board with that mark on it next to
him?

THE COURT: No. You can have him
stand up and for the jury to see what his
height is, or for them to at least get a view
of him as to what his size is from just
standing. They've had an opportunity
obviously when they come in and out he's been
standing, but if you would like to, as part of
any demonstration to clarify his size, you can
certainly have him stand. But anything in
connection with that board or pointing in your
case in chief is going to be denied.

ATTORNEY GRIFFIN: And is the
court foreclosing me from saying -- bringing
in Mr. Chisholm and Mr. Molitor and having
Mr. Chisholm point at Mr. Molitor's head?

THE COURT: No.

ATTORNEY GRIFFIN: Thank you.

54

```
 1                    THE COURT:  All right.  Let's
 2       have the State -- or let's have the jury
 3       brought in and let's -- let's bring the
 4       witness in. I just want to see if I recognize
 5       the witness.
 6                    No.  No, I don't recognize her.
 7       I'm going to have you bring her all the way up
 8       to the witness stand.
 9                    DEPUTY:  All rise for the jury.
10                    (Jury in box.)
11                    THE COURT:  Please be seated.
12       I'm going to have you remain standing.  I'm
13       going to have you raise your right hand,
14       ma'am, and you'll be sworn in by my clerk.
15                    JILL NEUBECKER, called as a
16       witness herein, having been first duly sworn,
17       was examined and testified as follows.
18                    THE CLERK:  Please be seated.
19                    THE COURT:  I'm going to have you
20       begin, ma'am, by stating your full name for
21       the record, spelling your first and last
22       name.  I'm going to ask you to use the mike
23       and to speak loudly and clearly into the
24       microphone.
25                    THE WITNESS:  Jill, J-I-L-L,
```

55

```
 1        Renee, R-E-N-E-E, Neubecker,
 2        N-E-U-B-E-C-K-E-R.
 3                    THE COURT:  You may begin.
 4                    DIRECT EXAMINATION:
 5    BY ATTORNEY GRIFFIN:
 6    Q.   Ma'am, how old are you?
 7    A.   40.
 8    Q.   Did you just have some surgery last weekend?
 9    A.   Yes, I broke my ankle.
10    Q.   You're you feel good enough at least to
11         testify; correct?
12    A.   I guess.  They came and got me.
13    Q.   Where do you live?
14    A.   2548A West Forest Home Avenue.
15    Q.   And is that a single-family home, a duplex,
16         what?
17    A.   Duplex.
18    Q.   Do you live in the upper or lower?
19    A.   The upper.
20    Q.   Who lives in the lower -- strike that.
21                    Who used to live in the lower
22         last January and February?
23    A.   Wanda Tatum.
24    Q.   Who else?
25    A.   That's all I know of.  And her daughter.
```

56

```
 1   Q.   Did you ever see any of her family members

 2        there?

 3   A.   Just visiting.

 4   Q.   Like who?

 5   A.   Her mother, Sandra Wilber.

 6   Q.   Anyone else?

 7   A.   Her sister Antonia.

 8   Q.   Did you ever see Danny Wilber?

 9   A.   I seen Danny one time over there.

10   Q.   When was that?

11   A.   I can't recall.

12   Q.   Do you remember on February 1st -- that would

13        have been a Sunday, February 1st of 2004, the

14        police coming to your house right around noon?

15   A.   Yes, I do.

16   Q.   Do you know why they were there?

17   A.   They were looking for Danny as far as they

18        told me.

19   Q.   And you told them about something unusual that

20        had happened out there at your residence in

21        the back yard just the night before, which

22        would have been the night of January 31st;

23        correct?

24   A.   I don't believe I told 'em anything unusual,

25        no.
```

57

```
1    Q.   Well, you told 'em something about an old

2         barbecue that you had back there; right?

3    A.   One that I discarded, just got rid of, yes.

4    Q.   What do you mean, you just got rid of it?

5    A.   It wasn't used, it was just sitting out there,

6         because I had one on my top porch.

7    Q.   Did you tell the police that someone had been

8         using that grill for something the night of

9         January 31st?

10   A.   A lot of people use that grill.

11   Q.   Right, I understand that, ma'am.  But is that

12        what you told them?

13   A.   Yeah.

14   Q.   And who are all the people that use that old

15        grill of yours?

16   A.   Neighbors, friends.

17   Q.   And I'm going to show you some pictures.  This

18        one's marked Exhibit 42.  Do you recognize

19        that?

20   A.   Yes, I do.

21   Q.   What is it?

22   A.   It's my apartment.

23   Q.   That's the front of it?

24   A.   That's downstairs.

25   Q.   Exhibit 43, what do we see in that photo?
```

58

```
 1    A.    Back yard with a barbecue grill.

 2    Q.    Which grill?  The one that you were using at

 3          that time for cooking or the old one?

 4    A.    The old one.

 5    Q.    The one that you've now gotten rid of?

 6    A.    Yes.

 7    Q.    Exhibit 44, is that that same grill?

 8    A.    Yes.

 9    Q.    Only now it's open; correct?

10    A.    Correct.

11    Q.    And Exhibit 45, do you recognize that or not?

12    A.    Not from the photo.

13    Q.    It just looks like the inside of a grill?

14    A.    Correct.

15    Q.    You don't know if it's the same one?

16    A.    I don't know.

17    Q.    Okay.  This would have been the middle of

18          winter?

19    A.    Correct.

20    Q.    And do you remember what you told the police

21          you thought someone was cooking in that grill

22          the night before?

23    A.    I told the police I smelled something on fire,

24          I thought it was my house, 'cuz I smelled a

25          real strong smoke odor.  That's all I told
```

59

```
 1        them.  I didn't know -- I didn't tell them I
 2        didn't know what was in the grill or anything,
 3        but I knew someone had used it.
 4   Q.   Do you recall telling Officer Lazo that the
 5        night before you thought you smelled smoke,
 6        like somebody was burning clothes or
 7        something?
 8   A.   No, I did not say that.
 9   Q.   You didn't?
10   A.   No, I didn't.  I just said I smelled smoke
11        coming from the barbecue.
12   Q.   And you didn't tell the officer that it
13        smelled like something, somebody was burning
14        clothes or anything?
15   A.   No, I just said it smelled funny, it didn't
16        smell like someone was cooking food.
17   Q.   It didn't?
18   A.   No, it didn't.
19   Q.   Did it smell to you like clothes?
20   A.   I don't know what clothes smell like being
21        burned.
22   Q.   When you smelled that what did you do?
23   A.   I actually looked out my back porch because I
24        thought my house was on fire.
25   Q.   And what did you see?
```

60

```
1    A.    I just seen smoke.  And I thought -- I thought
2          the neighbor's house was on fire or there was
3          a fire somewhere.
4    Q.    And is that -- did you call the fire
5          department right away?
6    A.    No.
7    Q.    What did you do?
8    A.    I didn't do anything.
9    Q.    Did you at some point notice, oh, it's just
10         coming from the grill?
11   A.    Yes, I just looked down and it was smoking.
12   Q.    From the grill?
13   A.    Correct.
14   Q.    And did you later talk to your neighbors and
15         find out who it was that had been using that?
16   A.    No.  They weren't home.
17   Q.    Somebody was burning something other than food
18         in your grill the night of --
19   A.    It wasn't my grill.
20   Q.    Your old grill?
21   A.    Correct.
22   Q.    Somebody was burning something other than food
23         in there on January 31st?
24   A.    I guess, yeah.
25   Q.    And when the police came to your house, you
```

61

```
 1       mentioned it to them?
 2   A.  Correct.
 3   Q.  Why?
 4                   ATTORNEY CHERNIN:  Judge, this is
 5       the area that I indicated that I have a
 6       continuing --
 7                   THE COURT:  Running objection.
 8       So noted.
 9                   ATTORNEY CHERNIN:  Thank you,
10       Your Honor.
11                   THE WITNESS:  Continue?  What am
12       I --
13   BY ATTORNEY GRIFFIN:
14   Q.  Sure.  Why -- why did you tell the police,
15       hey, somebody's burning something back in my
16       old grill back there?
17   A.  I didn't tell them someone was burning
18       anything in my old grill.  They asked me if it
19       was my grill and I told them no, it was not my
20       grill.  They asked me if they could have
21       permission to go look at a grill and I said
22       you can take it, it's not mine, I don't care
23       what you do with it, was my exact word.
24   Q.  Before that night, when was the last time that
25       old grill of yours had been used?
```

62

```
 1   A.   I have no idea.  That grill's been sitting out

 2        there for so long.  We had one on our top

 3        porch, so I don't know when the last time the

 4        grill was used.

 5   Q.   Well, you said your neighbors used it, your

 6        friends used it --

 7   A.   It --

 8                   THE COURT:  Wait until he

 9        finishes asking the question, then you can

10        answer.

11   BY ATTORNEY GRIFFIN:

12   Q.   You said your neighbors used it, your friends

13        used it, all those kind of things, when --

14        when -- when did they do all of those kinds of

15        things?

16   A.   I believe it was in the summertime, sir.

17   Q.   So from the summertime to January 31st that

18        you know of no one used that grill?

19   A.   They could have used it.  I don't know, I'm

20        not home all the time.

21   Q.   Where are you like at night usually?

22   A.   I'm just anywhere, friend's house, I don't

23        know.  I don't keep a note of everywhere I go.

24   Q.   So on January 31st though at night you were

25        home?
```

63

```
1    A.    Yes, I was.

2    Q.    And you smelled something unusual?

3    A.    Yes.

4    Q.    And you went to the back to look?

5    A.    Correct.

6    Q.    And sure enough, there's smoke coming out of

7          the grill, but there's nobody there?

8    A.    Right.

9    Q.    And the next day when the police show up, you

10         mention to them something, or they simply

11         asked, hey, is that grill in the back yours?

12   A.    They came up and asked me, was that my grill.

13   Q.    And you said?

14   A.    I said that that grill has been out there for

15         as long as we were getting rid of it, it was

16         just in the back yard.  We have one on the top

17         porch, a new one.

18   Q.    You didn't mention anything to the police at

19         all about just the night before somebody had

20         been burning something in there?

21   A.    No, I did not.

22   Q.    Do you know what the police found?

23   A.    No, I don't.

24   Q.    Were you familiar with your neighbors and

25         friends or anyone else burning things or using
```

64

```
1       that grill for anything other than grilling
2       steaks, fish, hot dogs, brats?
3    A. No sir.
4    Q. So before January 31st at least, you know no
5       one had used that grill to burn anything or to
6       use it anything other than for food
7       preparation?
8    A. Correct.
9                   ATTORNEY GRIFFIN:  Nothing
10      further.
11                  THE COURT:  Cross.
12                  CROSS EXAMINATION:
13   BY ATTORNEY CHERNIN:
14   Q. So when you looked outside and saw smoke
15      coming out of that old barbecue did you see
16      any people around it?
17   A. No, I didn't, sir.
18                  ATTORNEY CHERNIN:  I have no
19      further questions.
20                  THE COURT:  Any redirect?
21                  ATTORNEY GRIFFIN:  No.
22                  THE COURT:  You may step down.
23                  THE WITNESS:  Thank you.
24                  (Witness excused.)
25                  ATTORNEY GRIFFIN:  Detective
```

65

1    Erwin's out there, Judge, he was there
2    earlier.
3                    THE COURT:  They've asked for
4    him.
5                    Detective, raise your right hand
6    and my clerk will swear you in.
7                    JOSEPH ERWIN, called as a witness
8    herein, having been first duly sworn, was
9    examined and testified as follows.
10                   THE CLERK:  Please be seated.
11                   THE COURT:  Detective, I'm going
12   to have you state your full name for the
13   record, spelling your first and last name.
14                   THE WITNESS:  Joseph Erwin,
15   J-O-S-E-P-H, E-R-W-I-N.
16                   THE COURT:  You may begin.
17                   DIRECT EXAMINATION:
18   BY ATTORNEY GRIFFIN:
19   Q.   Detective Erwin, I want to talk about February
20        1st of 2004.  Do you remember that day and
21        that time?
22   A.   Yes.
23   Q.   It was about 11:30 p.m. that you went out to
24        Ms. Neubecker's residence there on 2548 West
25        Forest Home; right?

66

```
1   A.   Yes.

2   Q.   Why did you go there?

3   A.   I had been summoned there by some warrant

4        squad -- uniform warrant squad officers who

5        stated that they had some information

6        regarding some burn material, and I had been

7        checking for the suspect in this case, Danny

8        Wilber.

9   Q.   I'm going to show you some photographs marked

10       42 through 45, 42, 43, 44 and 45.  Can you go

11       through them one by one and tell the jury what

12       we see in each of these pictures.

13                    ATTORNEY CHERNIN:  I'm sorry, can

14       I see 43, because I don't recall that one.  I

15       saw 42 and 44 and 45.  I'm sorry.  Okay.

16                    (Discussion off the record.)

17                    ATTORNEY CHERNIN:  Okay.  Got it.

18                    THE COURT:  Go ahead.

19  BY ATTORNEY GRIFFIN:

20  Q.   What do we see in each of those photographs?

21  A.   Exhibit 42 shows a photograph of the front

22       entrance to that address of 2548 West Forest

23       Home.  Exhibit 43 is a photograph of a Weber

24       type grill that was at the rear of that

25       address in the rear yard.  Exhibit 44 is a
```

67

```
1        photo of that Weber grill with the lid up,
2        showing material inside, giving an overall of
3        the whole grill.  And Exhibit 45 is basically
4        a close up of material underneath the grill
5        portion.  It's a -- shows burn material that's
6        inside the grill itself.
7   Q.   When you say burn material, were you able to
8        make out what any of that material was?
9   A.   Most of it I could not, but through sifting
10       through it I found the soles of a -- what
11       appeared to be a a pair of shoes.
12  Q.   Anything else?
13  A.   I believe there was a cigarette butt in there
14       as well.
15  Q.   Was that a Newport?
16  A.   Yes.
17  Q.   I'm going to show you, Detective, what's been
18       marked as Exhibit Numbers 46 and 47.  Do you
19       know what these are?
20  A.   Yes.  These are cans that I use to package the
21       soles of the shoes that I found, which I
22       ultimately had recovered from the grill.
23                 ATTORNEY CHERNIN:  Judge, just
24       again for the record, the court is noting
25       my --
```

68

```
 1                    THE COURT:  I have a running

 2        objection, Mr. Chernin.  That will do.

 3                    ATTORNEY CHERNIN:  Okay.  Thank

 4        you.

 5                    THE COURT:  We have a running

 6        objection, Mr. Chernin.  If you have anything

 7        else, you need to do it at side bar.

 8                    ATTORNEY CHERNIN:  Your Honor,

 9        just --

10                    THE COURT:  Do you have anything

11        else?  Let's do it at side bar.

12                    ATTORNEY CHERNIN:  Okay.

13                    (Side bar.)

14                    THE COURT:  You may continue.

15                    ATTORNEY GRIFFIN:  Judge, with

16        permission I'm going to ask Detective Erwin to

17        bring the cans over by the desk and open

18        them.

19                    THE COURT:  He may.

20    BY ATTORNEY GRIFFIN:

21    Q.   I'm going to ask you, Detective Erwin, to

22         return now to the witness stand with the cans

23         now that they're open.  Can you just show to

24         the jury what's inside those cans.  Pull them

25         out.  Are you able to know what company made
```

```
1        those soles?

2   A.   Based on the markings on the bottom of this

3        sole of the shoe, it has the name Timberland

4        on them, which is visible on both soles.

5   Q.   And those were found in the grill on February

6        1st of 2004?

7   A.   Yes.

8   Q.   The grill that's in those photographs at 2548

9        West Forest Home?

10  A.   Yes.

11  Q.   Besides those two shoe soles and the

12       partially -- the cigarette butt from the

13       Newport cigarette, did you find anything else

14       that you could identify inside that grill

15       besides ash?

16  A.   No.

17  Q.   Were there charcoal briquettes and things we

18       see in there?

19  A.   Yes.

20  Q.   Did you talk to Miss Neubecker?

21  A.   Yes, I did.

22  Q.   And what did she tell you about that grill?

23  A.   She told me that the grill at one time did

24       belong to her, but that she had purchased a

25       new grill and had placed that grill in the
```

70

```
 1         back yard.  I did request her permission,
 2         determining that she was the owner of the
 3         grill, if I could look in it, and she did give
 4         me that permission.
 5    Q.   Why did you want her permission to look in
 6         that grill?
 7    A.   Just to make sure that it didn't belong to
 8         anybody else and make sure that I had proper
 9         consent, in case I did find anything of
10         evidentiary value in there.
11    Q.   And how was it that that grill so to speak
12         came to your attention in the first place?
13         Why did you want to look in there?
14    A.   The officers -- the uniform officers that I
15         had gone to meet had informed me that they had
16         received --
17                   ATTORNEY CHERNIN:  Objection.
18         Hearsay.
19                   ATTORNEY GRIFFIN:  Let me
20         rephrase.
21                   THE COURT:  Rephrase.
22    BY ATTORNEY GRIFFIN:
23    Q.   You knew, did you not, at first that
24         Ms. Neubecker didn't want her name used in any
25         of this; right?
```

71

```
 1    A.    Yes.

 2                        ATTORNEY CHERNIN:   Objection.

 3          Hearsay again.

 4                        THE COURT:   Overruled.   I'll

 5          allow it.

 6    BY ATTORNEY GRIFFIN:

 7    Q.    Was that part of the reason you wanted to get

 8          her permission for the grill?

 9    A.    Yes.

10    Q.    Did Ms. Neubecker tell you when she thought

11          things had been getting burned in that grill?

12                        ATTORNEY CHERNIN:   Objection.

13          Hearsay.

14                        THE COURT:   Overruled.   I'll

15          allow it.

16    A.    No.

17    BY ATTORNEY GRIFFIN:

18    Q.    She told that to someone else?

19    A.    Yes.

20    Q.    A different officer?

21    A.    Yes.

22                        ATTORNEY GRIFFIN:   Nothing

23          further.

24                        THE COURT:   Cross.

25                        CROSS EXAMINATION:
```

72

```
 1   BY ATTORNEY CHERNIN:

 2   Q.   Detective Erwin, did you or anyone else to

 3        your knowledge submit the Newport cigarette

 4        for any sort of testing?  Scientific testing?

 5   A.   I don't believe I did, but I don't know if it

 6        was done by any other officers or any other

 7        detectives.

 8   Q.   And the same with the shoes?

 9   A.   I did submit the shoes to the Wisconsin

10        Regional Crime Lab in attempt to determine if

11        there was any DNA evidence or any other

12        evidence that they could find on the shoes or

13        soles of the shoes.

14   Q.   And what, if anything, did you learn as that

15        part of your investigation?

16   A.   It was my understanding that the crime lab --

17        or our Wisconsin crime lab does not deal with

18        identification of shoes or shoe prints, and we

19        were told that -- to seek other sources for

20        that information.

21   Q.   So you have no information as to who those

22        shoes belong to?

23   A.   No.

24                  ATTORNEY CHERNIN:  Thank you.

25                  THE COURT:  Any redirect?
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 73 of 325   Document 61-24

```
 1                    ATTORNEY GRIFFIN:  No.

 2                    THE COURT:  Detective, you may

 3        step down.

 4                    (Witness excused.)

 5                    ATTORNEY GRIFFIN:  Call Detective

 6        Louis Johnson.

 7                    THE COURT:  Detective Johnson,

 8        I'm going to have you come on up to the

 9        witness stand.  I'm going to have you remain

10        standing, raise your right hand and my clerk

11        will swear you in.

12                    LOUIS JOHNSON, called as a

13        witness herein, having been first duly sworn,

14        was examined and testified as follows.

15                    THE CLERK:  Please be seated.

16                    THE COURT:  Detective, begin by

17        stating your full name for the record,

18        spelling your first and last name if you

19        would, sir.

20                    THE WITNESS:  Louis Johnson.

21        First name spelled L-O-U-I-S, last name

22        spelled J-O-H-N-S-O-N.

23                    THE COURT:  You may begin.

24                    DIRECT EXAMINATION:

25        BY ATTORNEY GRIFFIN:
```

74

```
 1   Q.   Sir, what do you do for a living?

 2   A.   I'm a City of Milwaukee police detective.

 3   Q.   How long have you been on the force, how long

 4        have you been a detective?

 5   A.   I've been on the force since January 25th of

 6        1988, I've been a detective since July 3rd of

 7        '94, which is going on 11 years.

 8   Q.   On February 2nd of 2004, along with your

 9        partner Randy Olson, did you interview a woman

10        by the name of Antonia West?

11   A.   Yes.

12   Q.   Did she identify herself to you as Danny

13        Wilber's sister?

14   A.   Yes, she did.

15   Q.   I'm going to show you, Detective, what's been

16        marked as Exhibit 27.  Do you recognize that?

17   A.   Yes.

18   Q.   What is it?

19   A.   It's a Milwaukee police report, PA45A and 45B,

20        handwritten report made out by myself.

21   Q.   That particular report, the vast majority of

22        it, with the exception of maybe Ms. West's

23        signatures and initials, was written by who?

24   A.   That was written by myself.

25   Q.   You've read it in preparation for testimony
```

75

```
 1           here today; correct?

 2    A.     Yes.

 3    Q.     Did you ever read that statement to Ms. West?

 4    A.     Yes, I did.

 5    Q.     When?

 6    A.     Directly after we had went over the interview

 7           and after handwriting it in her presence.

 8    Q.     In your mind is it a fair and accurate

 9           recitation and summary of what Ms. West told

10           you about the events of Danny -- excuse me --

11           David Diaz's death on January 31st of 2004?

12    A.     Yes, it is.

13    Q.     I want to turn your attention first to page 1

14           of 8.  There is an area there where it asks

15           father, mother, brother, sister, things like

16           that; correct?

17    A.     Yes.

18    Q.     And on the line where it says brother, it says

19           Wilber Danny L, black male, 25 years of age

20           2548 West Forest Home Avenue, no phone.  Do

21           you see where that is?

22    A.     Yes, I do.

23    Q.     Where did you get that information from?

24    A.     I got that information from Antonia West.

25    Q.     Ms. West told you that?
```

76

```
1    A.    Yes.

2    Q.    Detective, I want to be clear about this.    Did

3          you make that up?

4    A.    No, I did not.

5    Q.    The part about her father being up north, her

6          mother at 1910 South 26th Street, with a phone

7          number, her sister Wanda Tatum at 2548 West

8          Forest Home with no phone, where did all of

9          that information come from?

10   A.    I received all of that from Antonia West.

11                    ATTORNEY GRIFFIN:    Could I have

12         one second, Judge.

13                    THE COURT:    You may.

14   BY ATTORNEY GRIFFIN:

15   Q.    There's more information, her boyfriend, that

16         she doesn't work, how far she went in school,

17         that she's never been arrested, how long she's

18         lived in Milwaukee.    Is there anything on this

19         page that didn't come from Antonia West, and

20         if so, tell us which part.

21   A.    Everything that's on this -- page 1 of this

22         report that we're referring to all came from

23         Antonia West.

24   Q.    Including the part about, can read and write?

25   A.    That's correct.
```

```
 1   Q.   What were you asking her that for?

 2   A.   I always -- 'cuz I want to know who and the

 3        person that I'm interviewing if they

 4        understand exactly what's being said, be it

 5        verbally, in writing, and if they -- 'cuz if

 6        they -- during the conclusion of this and

 7        during the course of this there may be some

 8        times that she would have to read and

 9        understand my handwriting, at the conclusion,

10        just so when we're going through there if

11        she -- I'm well aware that she's of able mind

12        and knows her -- what she -- what can be read

13        and what can be -- if she can read and if she

14        can write.

15   Q.   At any time when you were with Ms. West that

16        day did you have her read anything?

17   A.   Yes.

18   Q.   How or what -- I mean, how did that come

19        about?

20   A.   At the -- at the conclusion of going over

21        everything after she had already informed me

22        that she can read and write and getting her

23        medical condition and all that sort of stuff,

24        that she -- I had her read a couple of the

25        lines at the beginning of it and at the
```

78

```
 1        conclusion, as well as verbatim as I'm reading
 2        it, I'm next to her and she's reading along
 3        with me.
 4   Q.   But you're the one at that point that's
 5        reading it out loud to her?
 6   A.   That's correct.
 7   Q.   Why would you read it out loud to her?   I
 8        mean, isn't this your chance at the end to
 9        sneak something in on her and sneak the juicy
10        part that you want in that she won't give you,
11        so to speak?
12   A.   No.  I want to make sure that when I read it
13        out loud to 'em that if there's something in
14        there that they didn't say, or they didn't
15        think was said, was meant the way they said
16        it, they -- that we would strike that, we
17        would cross it out or make a correction.
18   Q.   At the bottom of the page, for example, has
19        asthma, no other medical or emotional
20        problems, not under the influence of alcohol
21        or drugs, what's that all about?
22   A.   Basically I want to make sure that her of sane
23        mind and not under the influence of any drugs,
24        alcohol or anything like that that would mess
25        up their train of thought or what -- so they
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 79 of 325   Document 61-24

```
 1        understand what's being said and what's
 2        happening during the course of this interview.
 3   Q.   Ms. West was not in your mind a suspect;
 4        right?
 5   A.   No.
 6   Q.   Although it's fair to say when you interviewed
 7        her at that point her brother Danny Wilber
 8        was?
 9   A.   Yes, he was.
10   Q.   And is there any particular reason that you
11        did not write down in that exhibit -- and I
12        forget the number, 27?
13   A.   27, yes.
14   Q.   Is there any reason that you did not write
15        down in here, Ms. West told me that she saw
16        her brother Danny Wilber shoot the victim?
17        How come you didn't write that down in here?
18   A.   'Cuz -- 'cuz she didn't tell me that.
19   Q.   Well, but when she -- she was just initialing
20        anything you wrote in the page without reading
21        it or you reading it to her; isn't that right?
22   A.   No, she only initialed -- she initialed each
23        paragraph and each page of the complete
24        report, as well as her signature at the end
25        should be, of the information that I read back
```

80

1          to her as she read along, and that she was

2          agreeing to what was in the content of this

3          report during the course of this interview.

4     Q.   On what's marked page 2 of 8, about a third or

5          so of the way down there's a signature,

6          Antonia West, at the bottom of each page I see

7          the initials AW, and then again at the end of

8          the document I see a couple of Antonia's West

9          initials and signatures.  Can you explain to

10         the jury what all of those signatures and

11         initials are at the end of each paragraph,

12         page, all of that?

13    A.   I just wanted -- at the end of each paragraph

14         basically I wanted to be sure in my mind as

15         well as the person that's being interviewed,

16         that the content of what was being read to

17         them, and what's being said here is that they

18         are agreeing to that's what they told me.  And

19         that's why I have them do it after every

20         paragraph, either initial it or -- or their

21         signature as well as each page.

22    Q.   In fact, where a paragraph ends in the middle

23         of a line, did you have her initial it to show

24         that you didn't go in and add anything after

25         that?

1   A.   That's correct.

2   Q.   For example, on page 3 of 8, down in the last

3        couple of lines there's -- in the -- in the

4        first to last line there's three different

5        cross outs, and it looks like next to each one

6        of the initials AW, then in the last line

7        there's another cross out with the initials

8        AW.  What's going on there?

9   A.   During the course of me hand writing this in

10       her presence and going over it, I had some

11       incorrect information written in and it was

12       corrected by her, that being Antonia West.

13       And I crossed out and put in the correct

14       information and she initialed that I was

15       putting in the correct information because it

16       wasn't correct.

17  Q.   So in other words, as opposed to just crossing

18       something out yourself and changing it, you

19       have her recognize and acknowledge that the

20       change was made with her knowledge?

21  A.   Yes.

22  Q.   With her approval?

23  A.   Yes.

24  Q.   What was she like with you?  I mean, what was

25       the demeanor?  Was she disrespectful to you?

82

```
1          Swearing at you?  Rude?

2     A.   She was fairly cooperative.  She was not

3          rude.  She was evasive at times.  Other than

4          that she was not a problem during the course

5          of this interview.

6     Q.   How long did the interview last?  In other

7          words, what time did it start?  What time did

8          it end?

9     A.   We started at 11:30 a.m. and concluded it at

10         4:01 p.m. on the 2nd of February, '04.

11    Q.   I want to direct your attention, Detective, to

12         page 8 of 8, the very last paragraph.  Do you

13         want to read that paragraph just to refresh

14         your memory real quick?  Okay.

15    A.   Yes.

16    Q.   I'm going to show you a picture, a photograph

17         marked Exhibit Number 10 of a woman.  Did you

18         show at the very end there that picture to

19         Ms. West?

20    A.   Yes.

21    Q.   That's the picture of Lea Franceschetti --

22    A.   Yes.

23    Q.   -- which you talk about in that last

24         paragraph.  Then it reads, when the gunshot

25         went off she may have been in shock and may
```

83

```
 1        have said, quote, you shot him, get out of
 2        here, closed quote, but would not know who she
 3        would have been talking to.  I want to direct
 4        your attention first to the part in quotes,
 5        you shot him, get out of here.  Who's -- why
 6        is that in quotes?
 7   A.   Because that's exactly the way she -- she --
 8        she had stated it to me.
 9   Q.   She did not tell you that she said that, she
10        specifically told you she may have said that?
11   A.   She said she may have said that.
12   Q.   I'm assuming at some point you confronted her
13        then with information you had that -- that
14        somebody was saying she said that; right?
15   A.   That's correct.
16   Q.   She had not mentioned that to you in the
17        initial part of the interview though; right?
18   A.   That's correct.
19   Q.   Did you make that up?
20   A.   No.
21   Q.   Did you add that in there on your own without
22        ever reading it to her, without ever telling
23        her you were putting it in there and then get
24        her to initial and sign this document?
25   A.   No, I did not.
```

84

```
 1   Q.   And at any time in the interview with Miss
 2        Antonia West, did she tell you that at the
 3        time the gunshot went off Danny Wilber was in
 4        her line of sight?
 5   A.   No.  He was behind.  She said she had her back
 6        to him.
 7   Q.   That she was headed off to the bathroom;
 8        right?
 9   A.   That's correct.
10   Q.   Did she ever tell you after the shot she saw
11        Danny Wilber pat himself down to see if he was
12        shot?
13   A.   No.
14   Q.   Did she ever say anything like that at all in
15        the almost five hours that you were with her?
16   A.   No, she did not.
17   Q.   Were you not in fact, Detective, leaving all
18        the things out that maybe made Danny Wilber
19        not the shooter and putting anything in that
20        you could that would make it look like he
21        was?  Isn't that what you were doing?
22   A.   No.
23   Q.   Were weren't you twisting her words and
24        forcing her to say things that she didn't want
25        to say and scribbling yet other things down on
```

85

1      the paper and getting her to initial it?

2  A.   No.

3  Q.   Was there anything like that at all, sir?

4  A.   No.

5                    ATTORNEY GRIFFIN:   Nothing

6       further.

7                    THE COURT:   Cross.

8                    CROSS EXAMINATION:

9  BY ATTORNEY CHERNIN:

10  Q.   Detective Johnson, when you approach a person

11       that you're going to question, you do it based

12       upon some training and experience that you've

13       developed in conducting an interview; is that

14       true?

15  A.   Yes.

16  Q.   And you've been conducting interviews, many,

17       many, many interviews, we could probably try

18       to count them, but we can't since at least the

19       time you became a detective on July 3rd of

20       1994; isn't that correct?

21  A.   Yes.

22  Q.   And you did some field interviews and

23       developed some techniques when you were

24       working as a patrol officer between 1988 and

25       1994 when you became a detective; right?

                         86

```
1    A.    That's correct.

2    Q.    And you have a college degree; is that

3          correct?

4    A.    Yes.

5    Q.    And what's that degree in?

6    A.    Bachelor's in criminal justice, minor in

7          psychology, University of Minnesota.

8    Q.    And you use what you learn in your criminal

9          justice and psychology courses in order to

10         conduct an interview to get people to tell you

11         and -- tell you information; isn't that fair

12         to say?

13   A.    Yes, I use that as well as my experience and

14         training.  Yes.

15   Q.    And isn't it true that you've also taken some

16         seminars in conducting interviews?

17   A.    Yes.

18   Q.    And those are in-training or in-service

19         training; is that correct?

20   A.    In-service, non-service -- out-of-service type

21         seminars, yes.

22   Q.    And one of the reasons that you've taken those

23         seminars and why you've conducted so many

24         interviews is because you're very good at

25         conducting interviews; correct?  Is that fair
```

87

```
 1          to say?  Do you think you're good at
 2          conducting interviews?
 3     A.   Yes, I do.
 4     Q.   Okay.  Now, you've cracked some very difficult
 5          cases by getting people to make admissions
 6          that one wouldn't ordinarily expect; isn't
 7          that fair to say?
 8     A.   I've interviewed numerous people and have
 9          gotten confessions.  I've interviewed
10          witnesses and gotten the truth out of people,
11          yes.
12     Q.   Surprising that some people would confess to
13          some of the things that they have; isn't that
14          true?  I mean, telling on themselves
15          completely; right?
16     A.   Yes.
17     Q.   Now, you knew from your interview with Antonia
18          West that she was a person of limited
19          education; isn't that fair to say?
20     A.   Yes.
21     Q.   And, for example, on page 8 of your interview
22          when she says that she may have said
23          something, did she explain to you what she
24          meant by may have said something, that it's
25          possible, or that she said it?  What did that
```

88

```
 1      mean?  Is it just a possibility, a
 2      probability, a likelihood that she said it?
 3      What -- what -- what did she define that as
 4      meaning?
 5  A.  Basically she was saying to me she possibly
 6      could have said that, but can't recall
 7      exactly, but it wasn't like she didn't say
 8      it.  And she could have very easily have said
 9      that, yes.
10  Q.  Now, you'd have to agree that this is a rather
11      old fashioned, old school way of conducting
12      interviews, by having police officers write
13      down what happens, as opposed to using
14      audiotape or videotape; isn't that true?
15  A.  We don't -- do not use those, so that's not
16      part of our -- our process that we do in our
17      interviews.
18  Q.  It's not part of your practice; right?
19  A.  Correct.
20  Q.  But when you've taken courses and dealt with
21      other jurisdictions, you know that other
22      jurisdictions do use audiotape and videotape
23      for the purposes of interviewing witnesses and
24      suspects; isn't that true?
25  A.  Yes.
```

89

```
1    Q.   But the City of Milwaukee Police Department

2         chooses not to do that; right?

3    A.   That's correct.

4    Q.   Now, in the whole time in Exhibit 8 that you

5         questioned Antonia West, did she ever indicate

6         or say that she saw or observed her brother

7         standing behind David Diaz?

8    A.   If I recall she -- she stated that he was one

9         of the -- the victim, David Diaz, was one of

10        the males that was standing in front of her

11        brother attempting to calm him down.

12   Q.   Is that -- can you look at your report and

13        tell us where you see that language.

14                  Let's just save time.  It's on

15        page 8 of 8; correct?

16   A.   Yes.

17   Q.   And it's right above where she initials that

18        second paragraph?

19   A.   Correct.

20   Q.   And the language that she uses was what, sir,

21        that you recorded?

22   A.   You want me to read it, I'll read that

23        paragraph.

24   Q.   Do you recall exactly what she said?

25   A.   Yes.
```

1  Q.  What did she say?

2  A.  That the victim was one of the guys that was

3     standing in front, I mean, they're trying to

4     calm her brother down.  It's the same person

5     she saw later that was laying there on his

6     stomach shot.

7  Q.  Dead?

8  A.  Dead.  Correct.

9  Q.  Sorry, I didn't want to interrupt you, but I

10    thought where you were going.

11            So in what she's communicating to

12    you, it's that David Diaz was one of the

13    people in front of her brother, not -- and her

14    brother was not behind that individual;

15    correct?

16 A.  All I recall is that she said he was one of

17    the ones standing in front of him attempting

18    to calm him down.

19 Q.  Okay.  Again, she never says that Danny was

20    behind David Diaz, you never recorded anything

21    like that?

22 A.  I never recorded that, no.

23 Q.  And from what you know that's not the case,

24    correct, that Danny Wilber was not behind

25    David Diaz, according to the witnesses;

91

```
 1      correct?

 2                    ATTORNEY GRIFFIN:  Well, I

 3      object.  That -- that's not true.

 4                    ATTORNEY CHERNIN:  Okay.  Let's

 5      hit the other witnesses that you interviewed

 6      then.

 7                    THE COURT:  The objection is

 8      sustained.

 9                    ATTORNEY CHERNIN:  I'll withdraw

10      that question.

11  BY ATTORNEY CHERNIN:

12  Q.  You interviewed Antonia West after you

13      interviewed a person named Richard Torres;

14      isn't that true?

15  A.  Yes, we did.  Myself and I believe my partner

16      at the time, Detective Randy Olson, may have,

17      yeah, interviewed Mr. Torres.  Correct.

18  Q.  And so at the time do you recall how long your

19      interview took place with Mr. Torres?

20  A.  No, I would have to look at the reports and

21      see exactly what time that was.

22                    ATTORNEY GRIFFIN:  Judge, may I

23      see you on the side for a minute.

24                    (Side bar.)

25                    THE COURT:  Objection is
```

92

```
 1      sustained.

 2  BY ATTORNEY CHERNIN:

 3  Q.   You had met an individual by the name of

 4       Richard Torres prior to your interview of

 5       Antonia West; isn't that true?

 6  A.   I believe so, yes.

 7  Q.   Now, you attempted -- if I -- and correct me

 8       if I'm wrong -- when you're engaged in this

 9       interview process is it your practice to ask

10       questions of an individual?

11  A.   Basically it's my nature -- basically I inform

12       them what the nature of the investigation is.

13       I let them know their whereabouts, that they

14       are possible witness, I have information that

15       they were present when this occurred, and in

16       their own words if they could kind of tell me

17       what actually happened.  And in the course of

18       them telling me that, when there were some

19       information that was not clear to me, based on

20       what they were saying, I would interject and

21       ask them, wait, stop there, can -- now where

22       were you at, you know, then I would interject

23       questions during that.

24                 I didn't -- I don't just come out

25       and run off questions.  I let them tell me in
```

93

```
 1        their own words what's going on, what
 2        happened, why -- why they were there, where
 3        they were coming from, so on, so forth.
 4   Q.   Okay.  Now, Mr. Griffin asked you if Antonia
 5        West ever told you that she saw or observed
 6        Danny Wilber patting himself down, and I
 7        assume that that means after the shot was
 8        fired.  Do you recall him asking you that
 9        question?
10   A.   Yes, I do.
11   Q.   And you said that she did not tell you that;
12        isn't that correct?
13   A.   Correct.
14   Q.   Did you ever ask her if she saw or observed
15        Danny Wilber patting himself down after the
16        shot was fired?
17   A.   I believe we talked about things of what her
18        brother had done, and what had occurred after
19        he -- after the shot went off, and she gave me
20        indication of what that was.
21   Q.   Now, and in your report you don't indicate
22        that she said that she observed Danny patting
23        himself down; correct?
24   A.   Correct.
25   Q.   But again, you never asked her whether she saw
```

94

```
 1        or observed him patting himself down; correct?
 2    A.  No, we talked about everything that could have
 3        possibly happened and what had occurred, and
 4        we went over things, as you see from a five-
 5        hour interview it was pretty -- pretty
 6        detailed and we go into a lot of information.
 7        She did not ever say at any time that her
 8        brother was patting himself down.  Did we
 9        interject and talk about that?  We did go into
10        that, a little of everything, throughout the
11        course of the interview.
12    Q.  As part of your interview, you never showed
13        her a diagram; did you?
14    A.  No, I did not.
15    Q.  And in the course of your interview you never
16        developed any information -- so this is
17        clear -- you never developed any information
18        from her at the time of the shooting that
19        Danny Wilber was behind David Diaz?
20    A.  Her statement was that he -- her brother was
21        behind her and she was headed to the restroom,
22        that was her statement of where he was.  And
23        that she last saw her brother Danny, and the
24        victim was in front of her -- in front of him
25        attempting to calm him down.  Nothing about
```

```
 1          being behind that I recall.

 2    Q.    Okay.  Now, at the time of the interview, your

 3          interview took place on February 1st of 2004;

 4          is that correct?  Or was it 2002?  I'm sorry.

 5          I apologize, wait a minute.  One moment.

 6                        Your interview took place on

 7          February 2nd -- I'm sorry -- of 2004; isn't

 8          that correct?

 9    A.    That's correct.

10    Q.    Now, at that time that you conducted your

11          interview of Antonia West, had you seen the

12          autopsy report that was prepared on February

13          18th of 2004, or would that have been

14          impossible?

15    A.    February 18th?

16    Q.    Yes.  You couldn't have seen the autopsy that

17          prepared on February 18th of 2004 on February

18          2nd of 2004 because the autopsy report had not

19          been prepared yet; correct?

20    A.    I'm not sure where what you're asking.  I

21          mean, you're asking me three questions now.

22    Q.    Do you know -- let me withdraw that question

23          and reask it.

24                        Do you know when the autopsy

25          report was prepared?
```

96

```
 1   A.    No, not without looking at the individual file

 2         or seeing when it was.  No, I do not.

 3   Q.    Have you seen Exhibit 32 before?

 4   A.    I don't recall reviewing this at any time, no.

 5   Q.    Okay.  Is an autopsy report something that you

 6         might review in the course of engaging in the

 7         investigation of a homicide?

 8   A.    Yes, at times.

 9   Q.    And are you familiar with -- well, I'll save

10         that.  I withdraw the question.

11               Well, let me ask this then.  Do

12         you know that the autopsy report says that the

13         shot was fired from back to front?

14   A.    I don't -- I don't have no recollection of

15         what it would have said, other than what's

16         based in possibly on the report, so there's

17         many reports that go through on a daily basis.

18               THE COURT:  Did you at any time

19         read the autopsy report?

20               THE WITNESS:  No, I didn't.

21               THE COURT:  All right.  So --

22               ATTORNEY CHERNIN:  Thank you, no

23         further questions.

24               ATTORNEY Griffin:  May I, Judge?

25               THE COURT:  You may.
```

97

```
 1                    REDIRECT EXAMINATION:

 2    BY ATTORNEY GRIFFIN:

 3    Q.   I want to refer your attention to page 6 of

 4         8.   That is the part that you wrote, where as

 5         she referred to, everything started getting

 6         crazy; right?  At the third line down?

 7    A.   Yes.

 8    Q.   Okay.  In other words, now we're into sort of

 9         the more heart of it, meaning the -- the few

10         moments that actually matter in all of this,

11         which are the moments leading up to the

12         shooting; correct?

13    A.   Yes.

14                    ATTORNEY CHERNIN:  Your Honor,

15         objection.  Basis 90 -- outside the scope of

16         cross or -- yes, outside the scope of cross.

17                    THE COURT:  Overruled.

18    BY ATTORNEY GRIFFIN:

19    Q.   There is a part in there about the chain

20         snatching and people trying to -- her trying

21         to calm Danny Wilber down; right?

22    A.   Yes.

23    Q.   Okay.  In that particular paragraph after

24         she -- you wrote, you know, he, Danny kept on

25         talking loud.  West states she then just
```

98

```
 1          walked away from Danny towards the bathroom
 2          door and at least three Hispanic males
 3          approached Danny to talk with him.  Is that
 4          what she told you?
 5   A.     Yes.
 6   Q.     Did you make that up?
 7   A.     No, I did not.
 8   Q.     Did you invent it?
 9   A.     No.
10   Q.     Did you embellish it in any way?
11   A.     No.
12   Q.     Did she deny seeing Danny choke or punch
13          anyone?
14   A.     Yes, she did.
15   Q.     And she was very upset at Danny now because
16          he, Danny, wouldn't listen to her?
17   A.     Yes, that's correct.
18   Q.     Now, the next paragraph is actually sort of
19          the moment of the gunshot; right?
20   A.     Yes.
21   Q.     And I'm going ask you to read that paragraph
22          to the jury.
23   A.     West states she hears one gunshot go off in
24          the area directly behind her where her brother
25          Danny and the Hispanic males were talking in
```

99

```
 1          the kitchen.  West states she then ducks her
 2          head down and then looked back up where she
 3          thought the gunshot came from and everyone was
 4          running out of the front door.  West denies
 5          seeing anyone with a gun and now doesn't even
 6          see her brother Danny.  Period.  West states
 7          she then runs past the victim who's lying on
 8          his stomach in the kitchen near a wall.
 9          Period.  West denies seeing her brother Danny
10          or his friends once she gets outside.  West
11          states she then runs up to Jamie's white four-
12          door car and Jamie and Lea were inside the car
13          warming it up.  West states both Jamie, white
14          female, 20 years of age, blond and brown
15          streaks in her hair, and Jamie's friend Lea,
16          white female, twenties, brown hair, were both
17          in the party but had left before the shooting
18          happened.
19     Q.   In that particular part she is telling you
20          that in the moments before the shooting and in
21          the moments after the shooting she didn't even
22          see her brother?
23                    ATTORNEY CHERNIN:  Objection.
24                    THE COURT:  Sustained.
25          Rephrase.
```

100

```
 1    BY ATTORNEY GRIFFIN:

 2    Q.    What did Ms. West tell you about seeing her

 3          brother in the moments up to and after the

 4          shooting?

 5    A.    She didn't see him.

 6    Q.    What did she tell you about what the Hispanic

 7          males who had approached him to calm him down,

 8          about where they were in the moments just

 9          before and after the shooting?

10    A.    The victim, which was one of the persons

11          there, was laying in front -- I'm sorry, I

12          gotta go back and rephrase that.  If you can

13          do your question again please.

14    Q.    Sure.  In other words, Miss West sees three

15          Hispanic males approaching Danny; right?

16    A.    Yes.

17    Q.    And what did -- did she tell you she watched

18          them do?

19    A.    She -- she didn't see them do anything other

20          than go up to her brother and she -- she

21          couldn't see 'em.  She didn't see 'em at all.

22    Q.    Where did the gunshot come from, according to

23          what she heard?

24    A.    From behind her.

25    Q.    Which was where?
```

Case 1:10-cv-00179-WCG  Filed 08/29/19  Page 101 of 325  Document 61-24

1  A.  Which from the -- where her brother was.  The
2      area --
3  Q.  With the three Hispanic males?
4  A.  Correct.
5  Q.  Did she ever tell you that she was looking at
6      her brother and those Hispanic males when the
7      shot went off?
8  A.  No, she was not.
9  Q.  Did she ever tell you that she ever saw her
10     brother Danny again after the shooting?
11 A.  No.
12 Q.  Did she ever tell you the next day she saw her
13     brother?
14 A.  No.
15 Q.  Between the moments before the shooting when
16     she turned her back and in the time you
17     interviewed her on February 2nd, how many
18     times had she seen her brother Danny?
19 A.  She didn't see him anymore.
20 Q.  At all?
21 A.  At all.
22             ATTORNEY GRIFFIN:  Nothing
23     further.
24             THE COURT:  Recross.
25             ATTORNEY CHERNIN:  None.

102

```
 1                         THE COURT:   Detective, you may
 2       step down.
 3                         THE WITNESS:   Thank you.
 4                         THE COURT:   I'm going to ask you
 5       to tender all of those reports and pictures
 6       back to my clerk as you pass by.
 7                         THE WITNESS:   Okay.
 8                         (Witness excused.)
 9                         THE COURT:   All right.   We'll
10       take a break for you folks to use the
11       facilities.
12                         DEPUTY:   All rise for the jury
13       please.
14                         (Jury out of box.)
15                         THE COURT:   Please be seated.
16       State is indicating that it has some issues,
17       number one, it has a witness, Jeranek Diaz,
18       that it's going to -- Mr. Griffin, I'm going
19       to have you call Mr. Jeranek Diaz now.
20                         ATTORNEY GRIFFIN:   Could you have
21       Mr. Diaz come in.   Can Officer Lazo just take
22       a seat or --
23                         THE COURT:   Please.
24                         Mr. Diaz, come in please.
25       Mr. Diaz, I'm going to have you come on in,
```

103

1    sir.  I'm going to have you come on up to the
2    witness stand.  Come on up here.  Hands out of
3    your pockets.  Raise your right hand.
4              JERANEK DIAZ, called as a witness
5    herein, having been first duly sworn, was
6    examined and testified as follows.
7              THE COURT:  Have a seat please.
8    Is Spanish your first language?
9              JERANEK DIAZ:  No.  English.  I
10   understand English.
11             THE COURT:  All right.  Have a
12   seat.  Mr. Diaz, I've asked you to come into
13   court at this time because there's two issues
14   that have been brought to my attention with
15   respect to your potential testimony.  Number
16   one, I want to make a record of this outside
17   the presence of the jury.  The lawyers have
18   indicated that you have a prior criminal
19   record.  There is a question as to what that
20   record is, how many juvenile adjudications, if
21   any, you have, and how many adult criminal
22   convictions you have.
23             Have you been given an
24   opportunity to review your criminal record
25   with either the district attorney or the

1   defense counsel?

2                    JERANEK DIAZ:  No ma'am.

3                    THE COURT:  Would you like an

4   opportunity to do that so you can --

5                    JERANEK DIAZ:  No ma'am.

6                    THE COURT:  Pardon me?

7                    JERANEK DIAZ:  No ma'am.

8                    THE COURT:  You don't care what

9   kind of convictions you have?

10                   JERANEK DIAZ:  It's no felonies.

11  No nothing.  It's only for driving.

12                   ATTORNEY GRIFFIN:  Well, just so

13  you know, Judge, he has a record in Texas as

14  well that he may not be counting.  So it's

15  around ten or fifteen, it's somewhere between

16  there total.

17                   THE COURT:  Let me explain how

18  this works.  When you are on the witness stand

19  and under oath, lawyers can ask you whether or

20  not you've ever been convicted of a crime.

21  And you have to answer that truthfully

22  obviously.  And then if the answer to that is

23  yes, they get to ask you how many times, how

24  many convictions you have.  And you have to

25  answer that truthfully obviously.  And it goes

1      to -- and the jury will be instructed on your
2      veracity, that you have been convicted of --
3      as a witness you have prior convictions, it
4      goes to your veracity which is your
5      truthfulness on the witness stand.  And the
6      jury will be given a jury instruction that
7      tells them that, along with any other witness
8      that has testified or is going to testify that
9      has a prior criminal record.  That's the only
10     purpose for which the jury can use that
11     information.

12                 In addition, neither lawyer can
13     ask you anything additionally about your
14     criminal record so long as you have answered
15     it truthfully, consistent with what your
16     record is.

17                 JERANEK DIAZ:  Yes.

18                 THE COURT:  If your record shows
19     15 convictions, whether it's felonies or
20     misdemeanors, and you say you've never been
21     convicted of a crime, then the lawyers have an
22     opportunity to impeach you by taking your
23     criminal record out and confronting you with
24     it and asking you if you remember this
25     conviction or that conviction.

106

```
 1                     JERANEK DIAZ:  Yes.
 2                     THE COURT:  If you answer it
 3     truthfully, consistent with what their record
 4     shows, that it's ten or nine or eight or
 5     whatever it is, that's as far as they can go,
 6     they can't ask you anything further about it.
 7     Do you understand everything that I've told
 8     you thus far?
 9                     JERANEK DIAZ:  Yes, I do.
10                     THE COURT:  Okay.  I'm going to
11     need you to really sit up close to that
12     microphone, use the mike and speak up real
13     loud and clear.
14                     THE WITNESS:  Yes.
15                     THE COURT:  The record should
16     reflect this is witness Jeranek Diaz.
17     Mr. Diaz, I'm going to have you spell your
18     first name.
19                     JERANEK DIAZ:  J-E-R-A-N-E-K.
20                     THE COURT:  And your last name.
21                     JERANEK DIAZ:  D-I-A-Z.
22                     THE COURT:  The second issue
23     that's come up is that the district attorney
24     has indicated to me that while you were under
25     subpoena, which is a court order, compelling
```

```
 1      you to testify in this matter, and in fact, if
 2      you refuse or -- or don't wish to abide by the
 3      court order, the court can be asked whether or
 4      not I wish to issue what's called a body
 5      attachment, where you'll be taken into custody
 6      by law enforcement.  I haven't been asked to
 7      do that yet, but I've been told that you're
 8      antsy.  Actually I've been told a couple of
 9      witnesses are antsy.
10              While that's unfortunate, that's
11      the nature of this business.  Just because you
12      get antsy, doesn't mean that you get to break
13      subpoena.  I don't know, where do you have to
14      go today?
15              JERANEK DIAZ:  I got things to
16      do.
17              THE COURT:  What do you want --
18      do you have to do today?
19              JERANEK DIAZ:  Oh, my baby -- I
20      left her with the -- an unexpected baby-
21      sitter, and she ain't feeling too good.  And I
22      was -- I thought it was only going to take a
23      couple hours though, I figure it was going to
24      be like two hours, but it's been since 9:00
25      this morning, so.  And she ain't got a phone
```

108

```
 1     where I can contact her.
 2                     THE COURT:  And where is -- where
 3     is your mother or other individuals or the
 4     baby's mother?
 5                     JERANEK DIAZ:  She's at work.
 6                     THE COURT:  When does she get off
 7     work?
 8                     JERANEK DIAZ:  She don't get off
 9     till 4:00.
10                     THE COURT:  Okay.  And then she
11     will take care of the child?
12                     JERANEK DIAZ:  Yes.
13                     THE COURT:  So who made
14     arrangements for the baby-sitter?
15                     JERANEK DIAZ:  I did.
16                     THE COURT:  So you have a baby-
17     sitter that's watching your child right now?
18                     JERANEK DIAZ:  Yes.
19                     THE COURT:  Okay.  If you don't
20     have a baby-sitter, who watches the child?
21                     JERANEK DIAZ:  I do.
22                     THE COURT:  Okay.  Are you
23     employed?
24                     JERANEK DIAZ:  No, I'm not.
25                     THE COURT:  Okay.  You have to
```

109

```
1        make arrangements to make sure that you have a
2        baby-sitter for the child, because you're
3        going to be called to the witness stand, from
4        what I understand, today, and -- in fact
5        you're going to be called to the witness stand
6        this morning yet, and it's going to go over
7        after the lunch hour into the afternoon.  And
8        you are under a court order, a subpoena, to
9        appear.
10                     JERANEK DIAZ:  Yes.
11                     THE COURT:  You violate that
12       court order, there's several options that I
13       have.  One is to have law enforcement come and
14       get you pursuant to a body attachment.  I'm
15       sure that that's not going to be necessary;
16       right?
17                     JERANEK DIAZ:  No ma'am.
18                     THE COURT:  Okay.  All right.
19       Let's give him an opportunity to look at his
20       criminal record.  Do you have that, Mr.
21       Griffin or Mr. Chernin?
22                     ATTORNEY CHERNIN:  Yes, Your
23       Honor.
24                     ATTORNEY GRIFFIN:  Judge, I
25       believe it's ten convictions.
```

110

```
 1                    (Discussion off the record.)
 2                    DEPUTY:  All rise for the jury
 3       please.
 4                    (Jury in box.)
 5                    THE COURT:  You may be seated.
 6                    Mr. Chernin, Mr. Griffin, side
 7       bar.
 8                    (Side bar.)
 9                    THE COURT:  All right.  Mr. Diaz,
10       I'm going to have you stand, I'm going to ask
11       you to raise your right hand once again and my
12       clerk will swear you in.
13                    JERANEK DIAZ, called as a witness
14       herein, having been first duly sworn, was
15       examined and testified as follows.
16                    THE CLERK:  Please be seated.
17                    THE COURT:  Mr. Diaz, I'm going
18       to have you move your seat as comfortably into
19       that bench in front of you so that you can
20       speak real loud and clearly into the
21       microphone.  I need you to begin by stating
22       your full name for the record, spelling your
23       first and your last name.
24                    THE WITNESS:  Jeranek Diaz.
25       J-E-R-A-N-E-K, D-I-A-Z.
```

```
 1                    THE COURT:  You may begin.
 2                    DIRECT EXAMINATION:
 3    BY ATTORNEY GRIFFIN:
 4    Q.   Mr. Diaz, how old are you?
 5    A.   I'm 28 years old.
 6    Q.   Any kids?
 7    A.   Yes.  I got a son, my son in Texas, and a
 8         daughter here in Milwaukee.
 9    Q.   What do you do for a living?
10    A.   I been unemployed, but I'm a -- let me see,
11         like I be a subs constructor.
12    Q.   A what?
13    A.   Subs constructor.
14                    THE COURT:  A sub.
15                    THE WITNESS:  Constructor.
16    BY ATTORNEY GRIFFIN:
17    Q.   Contractor?
18    A.   Yes.
19                    THE COURT:  A subcontractor?
20    A.   Yes.
21    BY ATTORNEY GRIFFIN:
22    Q.   How long have you lived up here in Milwaukee?
23    A.   Since early nineties, sir.
24    Q.   Do you know a guy by the name of Richard
25         Torres?
```

112

```
 1    A.    Yes, I do.

 2    Q.    Do you know him by a nickname?

 3    A.    I just know him by Richard.

 4    Q.    Did you ever call him Vato?

 5    A.    I heard people called him Vato, but I don't

 6          call him Vato.

 7    Q.    What's your nickname?

 8    A.    Rock.

 9    Q.    Do people call you sometimes Rocky?

10    A.    Rocky or Rock, yes.

11    Q.    Okay.  And guys that aren't your family

12          members, guys like your age that are your

13          friends, parties, they would all call you

14          Rock?

15    A.    Yes.

16    Q.    Have you ever been convicted of a crime?

17    A.    Yes, I have.

18    Q.    How many times?

19    A.    Ten different times.

20    Q.    I want to talk about last January, January

21          31st of 2004.  Were you over at David Diaz's

22          house when he got shot?

23    A.    Yes, I was.

24    Q.    Did you see anyone in that house that

25          morning -- because it was the early morning
```

113

```
1          hours; right?

2     A.   Yes, it was.

3     Q.   Did you see anyone with a gun?

4     A.   No, I didn't.

5     Q.   Didn't see anybody?

6     A.   No.

7     Q.   Did you tell the police that you did?

8     A.   Well, they picked me up right the next day and

9          I was feeling -- I never been through

10         something like this, and they just picked me

11         up and brought me downtown, asked me a whole

12         bunch of questions from different issues and

13         matters, and they're throwing a lot of

14         questions at me.

15    Q.   How did you answer 'em?

16    A.   Well, that was like a year ago, I don't -- it

17         was a whole bunch of different questions, and

18         they just told me if I see someone, I said no.

19    Q.   You told 'em no?

20    A.   Yes.

21    Q.   You told the detectives when -- you didn't

22         tell the detectives, for example, that Slim

23         pointed the gun at David Diaz?

24    A.   No.

25    Q.   You didn't tell them that at that point he,
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 114 of 325   Document 61-24

```
 1         meaning Jeranek, ducked down to avoid being
 2         shot himself?
 3   A.    No, it was -- that was not the way it was.
 4   Q.    Well, how was it?
 5   A.    Well, 'cuz earlier today they gave you this
 6         statement that I had made myself to read it,
 7         to go by it, and I seen there was some stuff
 8         that it wasn't the way I had told them that it
 9         happened.
10   Q.    My question to you, Mr. Diaz, is did you duck
11         down to avoid being shot?
12   A.    No.
13   Q.    You never ducked?
14   A.    No.
15   Q.    Did you hear a gunshot fired?
16   A.    Yes, I did.
17   Q.    Where?
18   A.    In the kitchen.
19   Q.    In the kitchen?
20   A.    Around the area, it sound so close, it sound
21         like right in the kitchen.
22   Q.    Like how far away from you was that gunshot?
23   A.    Like three feet, four feet away.
24   Q.    How far was David away from you?
25   A.    Like two feet.
```

115

```
1   Q.   Where did the gunshot come from?

2   A.   I got no idea.

3   Q.   Was David looking at you when he got shot?

4   A.   He was standing right next to me looking over

5        here.

6   Q.   Toward the living room?

7   A.   No, towards the kitchen.

8   Q.   He was looking toward the kitchen?

9   A.   Yes.

10  Q.   Did you tell the police that you believe the

11       gunshot was fired from Slim's gun, because the

12       sound of it came from the location that Slim

13       was holding the gun?

14  A.   No.

15  Q.   Never told them that?

16  A.   Well, I said that after I had gotten hit by --

17       but not by -- not by no gun or nothing, it was

18       some physical fighting going on, and then I

19       was barely going like this, see what happened

20       to me, I thought I had gotten a busted lip and

21       that's when it went off.  But I never did duck

22       down or seen anybody with a gun or nothing.

23  Q.   Do you remember telling the police that you

24       saw Slim hold the gun under his coat and run

25       out the front door?
```

116

```
 1   A.   No, I told 'em I seen Slim duck down and --
 2        and by the time I looked down, 'cuz my friend
 3        was on the floor, and I just seen him went
 4        down like this, he covered his head, he looked
 5        around, and when I looked up everybody was
 6        gone.
 7   Q.   Who -- who -- who covered his head up like
 8        that?
 9   A.   Mr. Slim.
10   Q.   When you say Mr. Slim, do you see that guy in
11        court today?
12   A.   Yes, I do.
13   Q.   Can you point him out by where he's sitting
14        and what he's wearing?
15   A.   He's sitting right here with the striped
16        shirt.
17                  ATTORNEY GRIFFIN:  May the record
18        reflect the witness has identified the
19        defendant.
20                  THE COURT:  It does.
21   BY ATTORNEY GRIFFIN:
22   Q.   Did you also tell 'em that Slim's sister
23        Antonia, who was also in the kitchen, yelled
24        out, oh my God, you shot him, get out of here,
25        you shot him?
```

117

```
1    A.    I just heard some yelling in the background
2          and I wasn't really paying attention what was
3          going on because it was, oh, my God, dying,
4          bleeding on the floor, so I wasn't paying -- I
5          just heard all this commotion in the
6          background.  When I looked up everybody was
7          gone.
8    Q.    Did you tell the police, sir, that Slim's
9          sister, who was also in the kitchen, yelled
10         out, quote, oh my God, you shot him, get out
11         of here, you shot him, closed quote?
12   A.    I just -- I just said I heard --
13   Q.    Did you tell the police that?
14   A.    No.
15   Q.    That's my question sir.
16   A.    No.
17   Q.    You never told them that?
18   A.    I said I heard commotion and everybody yelling
19         and jumping, and they even pushed me -- pushed
20         me around, but by the time I looked up
21         everybody was gone.
22   Q.    Did you tell the police that after Slim ran
23         out the front door you went to the front door
24         and observed Slim running around the corner?
25   A.    No.
```

118

```
1   Q.   Never told them that?

2   A.   I just walked out like this, there was nobody

3        out there.  Nobody was out there, no cars or

4        nothing.  Only my car.

5   Q.   When you talked to the police, do you remember

6        Detective Schuler?

7   A.   I remember him.

8   Q.   Okay.  Kind of a bigger-bellied guy?

9   A.   Yes.

10  Q.   Did you lie to him?

11  A.   Excuse me?

12  Q.   Did you lie to him?

13  A.   No, I didn't lie to him.

14  Q.   You told him the truth; didn't you?

15  A.   Excuse me?

16  Q.   You told him the truth?

17  A.   Well, I told him what I remember, yes.

18  Q.   Okay.  And you talked to him on February 1st

19       of 2004?

20  A.   Right the next date.

21  Q.   Would have been Sunday.

22  A.   Yes.

23  Q.   The shooting happened in the early morning

24       hours of Saturday.

25  A.   Yes.
```

119

```
1    Q.    And did you talk to him about having been at a
2          bar before the after hours?
3    A.    Yes, we were at a bar before.
4    Q.    What bar was that?
5    A.    Some bar on 27th Street.  Bacardi's or
6          something like that.
7    Q.    Well, you went to a bunch of different taverns
8          you told the detective; right?
9    A.    Yes, we going out.
10   Q.    Who did you go out with?
11   A.    With my girlfriend.
12   Q.    Who is that?  Just her first name.
13   A.    Her name was at the time -- let me see.  My
14         girlfriend's name?
15   Q.    Yes.
16   A.    Chrissy.
17   Q.    Did you go out with Vato that night too?
18   A.    No.
19   Q.    What about David Diaz?
20   A.    David Diaz was with me.
21   Q.    What about his wife?
22   A.    They were together.
23   Q.    Do you know her name?
24   A.    No.  I just know it's Cindy.
25   Q.    Do you know her name is Adriana Diaz?
```

120

```
 1   A.   Nope.

 2   Q.   That night did you buy a case of Corona and a

 3        case of Bud?

 4   A.   Yes, we did.

 5   Q.   And were you going to drink a couple of those

 6        and then finish the rest after bar closing?

 7   A.   Yes.

 8   Q.   And that's what you told the detective; right?

 9   A.   Yes.

10   Q.   Did you tell the detective you left at around

11        9:00 p.m. to go to some taverns?

12   A.   Yes.  We left around 9:00 -- 9:30, somewhere

13        around.

14   Q.   And that's what you told the detective?

15   A.   That we had left out to go out to the taverns.

16   Q.   And did you tell the detective that in your

17        car was Heather, David Diaz and Mr. Diaz's

18        wife?

19   A.   Yes.

20   Q.   And that in the second car were Vato, Claudia

21        and Armando?

22   A.   Yes.

23   Q.   Is that true?

24   A.   I think that's who it was in the car.

25   Q.   Well, it's been awhile; right?
```

121

```
1   A.   Yes.

2   Q.   But when you were telling the detective all

3        these things, at least up to till this point

4        you weren't lying, you were telling the

5        detective what happened that night?

6   A.   On yeah, what I remembered.

7   Q.   Right.  Did you tell them that you went to a

8        tavern called Lenny's at 68th and National and

9        drank for a little bit.  And after that you

10       went to the Macho, M-A-C-H-O, Lounge, down on

11       the east side, and after leaving the Macho

12       Lounge they decided to meet over at Bacardi's

13       on 27th and Lincoln?

14  A.   I don't really remember, but it -- it wasn't

15       like that.

16  Q.   Well, do you remember telling the detective

17       these things?

18  A.   Not a Macho Lounge or nothing.

19  Q.   When you talked to the detective about these

20       things were you lying to him?

21  A.   I wasn't lying.  I was telling him what I

22       remembered.

23  Q.   Okay.  And your memory was way better back

24       then about all of this than it is today?

25  A.   Well, it's been a while already.
```

122

```
1    Q.  Is that a yes, your memory was better then
2        than today?
3    A.  It was better then than today?
4    Q.  Yeah.
5    A.  No.
6    Q.  Your memory of all this is better today than
7        it was a year ago or was your memory better a
8        year ago?
9    A.  Probably a year ago.
10   Q.  Did you tell the police that the second car
11       containing Vato, Claudia and Armando never
12       made it to Bacardi's, your group stayed at
13       Bacardi's until approximately bar closing,
14       which would have been about 2:30 a.m.?  Did
15       you tell the detective that?
16   A.  I don't remember.
17   Q.  Do you remember that happening?
18   A.  Yes.
19   Q.  So you went to Bacardi's?
20   A.  I went to Bacardi's.
21   Q.  And you don't recall seeing Vato there?
22   A.  I don't recall.
23   Q.  Did you see Slim there?
24   A.  Yes.
25   Q.  What about his sister Antonia?
```

123

```
 1   A.   No, I don't recall seeing her.

 2   Q.   Did you see Tony Valdez?

 3   A.   Yes, I did.

 4   Q.   How about Luciano?

 5   A.   I don't know Luciano.

 6   Q.   Did you tell the detective that there was a

 7        group of Hispanic and black individuals that

 8        they knew at Bacardi's and they talked about

 9        going over to David's house after bar closing

10        for an after set?

11   A.   Yes.

12   Q.   And was that true?  Is that what happened?

13   A.   Yes, we got together after the bar and we went

14        to the house.

15   Q.   What's an after set to you?

16   A.   Well, it's where you just hang out, have some

17        beers, talk to your friends and that's about

18        it.  Call it a night, then go home.

19   Q.   Did you tell the police -- strike that.

20                    Did you drive over to Mr. Diaz's

21        house at approximately 2:30 or 2:40, and at

22        that time was David Diaz, his wife and

23        Heather, were they all with you?

24   A.   Yes.

25   Q.   And did you tell the detective that?
```

124

```
1    A.   Yes.
2    Q.   Once you arrived at the house did you see
3         Vato, Claudia and Armando waiting outside in
4         that second car?
5    A.   They were inside waiting.
6    Q.   In the car or in the house?
7    A.   In the house.
8    Q.   Did you tell the detective that once you
9         arrived at the house with your group you saw
10        Vato, Claudia and Armando waiting outside in
11        that second car?
12   A.   I just remember they were out there waiting
13        for us.  We just got there and we walked in
14        the house.
15   Q.   After that, it -- a group of black and
16        Hispanic friends from the bar arrived shortly
17        thereafter?
18   A.   Yes.
19   Q.   And everybody then went inside?
20   A.   Yes.
21   Q.   Did that include Slim?
22   A.   Yes.
23   Q.   Who did Slim get there with?  Do you remember?
24   A.   I don't remember.
25   Q.   Everybody was on the first floor; is that
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 125 of 325   Document 61-24

```
 1        right?

 2   A.   Yes.

 3   Q.   How about Cindy, David Diaz's wife, appeared

 4        to feel uncomfortable and had gone upstairs;

 5        is that right?

 6   A.   I assume she went upstairs.

 7   Q.   Did you see her head up the stairs?

 8   A.   No.

 9   Q.   You just knew through word of mouth that she

10        was upstairs?

11   A.   Yes.

12   Q.   How close were you and David Diaz?

13   A.   I had just met him like four -- four months

14        before this happened.

15   Q.   Was he a friend of yours?

16   A.   Yes.

17   Q.   Is it true that you had asked somebody what

18        was up with that, meaning Cindy going

19        upstairs, and somebody told you that Cindy had

20        that been hit with a barbell and got upset?

21   A.   I don't even know nothing about that.

22   Q.   Did you tell the detective that?

23   A.   No.

24   Q.   Did you tell the detective that David Diaz

25        went upstairs shortly thereafter and after a
```

126

```
 1        short time he came downstairs, and then when
 2        he came downstairs he was angry because
 3        somebody had hit his wife with a barbell and
 4        he wanted people to quote, leave his house
 5        now, closed quote?
 6   A.   That's what I heard.
 7   Q.   Was that true?
 8   A.   Yes.
 9   Q.   And that's -- you told the detective all these
10        things; right?
11   A.   No, well, I didn't see nothing like that goin'
12        on or nothing.
13   Q.   I'm talking about what you heard.
14   A.   I didn't even tell the detective about it.
15   Q.   About what?
16   A.   About her getting hit, 'cuz I didn't see
17        nothing getting hit.
18   Q.   So you would have no idea where the detective
19        would have come up with that?
20   A.   Probably somebody else's statement or
21        something.
22   Q.   Okay.  And did you tell them that at that time
23        when David came down, a guy by the name of
24        Slim was upset at the party?
25   A.   Yes.
```

127

```
 1   Q.   Did you tell the detective that Slim was

 2        acting quote, goofy, as if he was quote,

 3        possessed, closed quote?

 4   A.   I didn't say that.

 5   Q.   You didn't -- so you would have no idea why

 6        the detective would put that in quotes, even

 7        in his --

 8   A.   No.

 9   Q.   No?

10               Was Slim attempting to get into a

11        fight with a Hispanic male by the name of Jay?

12   A.   Yes.

13   Q.   Okay.  Who's Jay?

14   A.   Jay is a friend.  I don't know his name, I

15        just know Jay.

16   Q.   Did Slim say to Jay, I'm going to fuck you up,

17        I don't care if you want to fight, I'll wait

18        for you outside, closed quote?

19   A.   I don't know.  I didn't hear that.

20   Q.   No?

21   A.   I was in the living room when everything was

22        going on.

23   Q.   Did you tell the detective that?

24   A.   No.

25   Q.   Did you -- did you see Slim snatch Jay's
```

128

```
 1        necklace and rip it off?  Rip part of it off

 2        Jay's neck?

 3    A.  I didn't see that either, I was in the living

 4        room.

 5    Q.  Did you tell the detective you saw it?

 6    A.  No.

 7    Q.  So you didn't know anything about Slim

 8        snatching any necklace?

 9    A.  Um-umm (meaning no).  Nope, I didn't.

10    Q.  And you wouldn't have mentioned that to the

11        detective?

12    A.  No, but I -- I knew something had gone on with

13        the necklace, but I didn't see it, and I --

14        I -- I wasn't -- I was in the living room, I

15        didn't even hear that going on.

16    Q.  You were in the living room during this whole

17        time?

18    A.  Yes.

19    Q.  Okay.  At that point did Slim and Jay start to

20        tussle?  You wouldn't know 'cuz you were in

21        the living room; right?

22    A.  Yes.

23    Q.  And you didn't tell the detective that at that

24        point Slim and Jay started to tussle; right?

25    A.  No, 'cuz I didn't see 'em.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 129 of 325   Document 61-24

```
 1   Q.   Did Jay kept telling Slim that he didn't want
 2        to fight?
 3   A.   I wasn't there to see him say that.  I
 4        didn't --
 5   Q.   Did you tell the detective that at -- when
 6        Slim and Jay started to tussle, Jay kept
 7        telling Slim that he did not want to fight?
 8   A.   I didn't see him arguing or fight, I just
 9        heard that they were going on, but I stayed in
10        the living room talking with the party I was
11        talking to.
12   Q.   Did you tell the detective Jay kept moving
13        around the table in the kitchen attempting to
14        avoid Slim, and at that point David Diaz came
15        into the kitchen and told Slim that he had his
16        family upstairs and Slim should not be
17        disrespecting his house and his family?
18   A.   Yes, he did came out -- down from -- he came
19        down and he did say that they were getting too
20        loud, for them to leave, they were going to
21        get loud.
22   Q.   Did you hear Slim or see Slim tell David Diaz,
23        I don't give a fuck about you and your family,
24        I'll burn this mother fucking crib down with
25        or without your family, closed quote?
```

130

```
 1   A.   No.

 2   Q.   Did you tell the detective that, sir, that

 3        that's what Slim had said?

 4   A.   No.

 5   Q.   Did you -- did you tell the detective that

 6        David did not respond to Slim, but seemed

 7        upset and turned around and talked to you in

 8        Spanish, and told you to get rid of Slim and

 9        to get him out of the house?

10   A.   That's when David Diaz came into the living

11        room, he got me to go talk to Slim, to tell

12        him.   That's when I went and told Slim to take

13        it easy, come outside or something, you know.

14   Q.   Did you then approach Slim and tell Slim to

15        chill, to relax, that quote, it doesn't have

16        to be like that, closed quote?

17   A.   Yes.

18   Q.   So at this point you went back into the

19        kitchen, all that other stuff you weren't

20        there for, if it happened?

21   A.   I wasn't in the kitchen, this is my first

22        time -- I was barely going in the kitchen for

23        the first time that night.

24   Q.   So that -- when -- the first time you walked

25        into that kitchen was to tell Slim to chill?
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 131 of 325   Document 61-24

```
1    A.    Yes.

2    Q.    And you never saw him grab Jay's necklace?

3    A.    No.

4    Q.    And when you talked to Detective Schuler, you

5          knew nothing about any necklace at that point?

6    A.    I just had heard about it, but I didn't know

7          nothing about it, who had done what or what

8          happened with that necklace.

9    Q.    Who did you hear about it from?

10   A.    Well, there in the -- in the house when

11         everybody was saying the necklace was laying

12         on the table.

13   Q.    Everybody was saying that?

14   A.    Well, that I seen it on the table.

15   Q.    When did you see it on the table?

16   A.    When I walked into the kitchen.

17   Q.    And how did you know how it had gotten on the

18         table?  How did you know that Slim had

19         snatched it?

20   A.    Well, I didn't know.

21   Q.    Oh.  And you never told the detective that

22         Slim snatched it; right?

23   A.    No.

24   Q.    When you told Slim it doesn't have to be like

25         that, did he then tell you, quote, I'll fuck
```

132

```
 1          you up?
 2     A.   He tell me?
 3     Q.   Yeah, did Slim tell you that?
 4     A.   Yeah, he got into some words with me.
 5     Q.   And did he say, let's box, let's box outside,
 6          I'm tired of you Mexicans?
 7     A.   Yes.
 8     Q.   That's what Slim said to you?
 9     A.   Yes.
10     Q.   And that's what you told the detectives?
11     A.   Yes.
12     Q.   And did you then tell Slim, fuck that, let's
13          fight right here?
14     A.   Yes.
15     Q.   At that point did Slim then grab you by the
16          neck and start to squeeze you, meaning choke
17          you?
18     A.   He tried to hold me against the wall by my
19          neck and I moved away.
20     Q.   I'm going to ask you to look, Mr. Diaz, at
21          Exhibit Number 1.  You can step down and take
22          a look at it.  Do you recognize this?  I'm
23          going to ask you to stand over there so the
24          jury can -- stand right where it's -- okay.
25               Do you recognize this as sort of
```

133

```
  1        a layout of David Diaz's house?

  2   A.   The first floor, yes.

  3   Q.   Okay.  The living room area down in here, the

  4        kitchen down in here, I mean up in this area?

  5   A.   Yes.

  6   Q.   And the kitchen table was kind of a wood one

  7        in the middle?

  8   A.   Yes, it was.

  9   Q.   Where were you and Slim when Slim was choking

 10        you?

 11   A.   I was right here, right next to this door.

 12   Q.   And again, you're pointing on this exhibit to

 13        the area of this residence which is just to

 14        the left on the diagram of where the number 11

 15        is written in in ink, 11 feet, just a little

 16        bit above and to the right of the head of the

 17        body figure on there; right?

 18   A.   Yes.

 19   Q.   Okay.  And how long was he choking you?  Or

 20        squeezing you?

 21   A.   Not for long, not for long, he just laid his

 22        hand on me and I moved it right over.

 23   Q.   Okay.  At this point -- hang on a second --

 24        you and Slim are right here, where is Vato?

 25              ATTORNEY CHERNIN:  Excuse me,
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 134 of 325   Document 61-24

```
 1        Mr. Griffin, I don't want to interrupt, but

 2        for the sake of the record, when you said

 3        'right here,' can you describe it.

 4                    ATTORNEY GRIFFIN:   Right where he

 5        pointed to before.

 6                    ATTORNEY CHERNIN:   Where on

 7        the --

 8                    ATTORNEY GRIFFIN:   The same place

 9        that I made a record of before.

10                    ATTORNEY CHERNIN:   Okay.

11   BY ATTORNEY GRIFFIN:

12   Q.   You and Slim are right here where you

13        indicated before; right?

14   A.   Yes.

15   Q.   Where is David?

16   A.   Right next to me.

17   Q.   Just what would be a little bit to the south?

18   A.   Like two feet away.

19   Q.   And where is Vato?

20   A.   I don't know where Vato was.

21   Q.   Where is Slim's sister?  If you recall.

22   A.   I don't know, they was all in here in the

23        kitchen.

24   Q.   Where was Jay?

25   A.   Jay was over here.
```

135

```
1    Q.   And what about Donald or Donny?

2    A.   I don't know Donny.

3    Q.   Okay.  And when you said Jay was here, you

4         were talking to the area of -- on this --

5         again on Exhibit Number 1, just to the left of

6         the square with the circle number 2 that

7         represents the table, just to the left or just

8         west of the table?

9    A.   Just to the left.

10   Q.   Okay.  Do you remember a -- a -- kind of a

11        medium complexion, African-American gentleman

12        over here by the sink maybe rolling a blunt or

13        anything like that?

14   A.   No, I don't.

15   Q.   Was Jay rolling a blunt?

16   A.   No, he wasn't.

17   Q.   And where was Cindy Diaz, Adriana Diaz,

18        David's wife?

19   A.   I don't know.  She was nowhere on the first

20        floor.

21   Q.   Okay.  Were people from the party going

22        upstairs?

23   A.   No.

24   Q.   How many people were in the front room

25        while -- when you left the front room to go
```

136

```
 1        tell Slim to chill out and he ended up choking

 2        you, how many people were still in the front

 3        room?

 4   A.   I don't recall, probably like 13 -- 10 people.

 5   Q.   Do you recall any girls being in there?

 6   A.   Girls.

 7   Q.   What about Isaiah?

 8   A.   Isaiah?  I don't know if he was there.

 9   Q.   What about Tony?

10   A.   He had left already.  Tony had left.

11                  ATTORNEY GRIFFIN:  If you could

12        have a seat again.

13   BY ATTORNEY GRIFFIN:

14   Q.   While -- strike that.

15                  While you and Slim were fighting,

16        or he was choking you and you knocked his hand

17        away, did Vato come to help you?

18   A.   No.

19   Q.   No?  Do you recall telling the police that

20        while Slim is attempting to fight you Vato

21        comes to help you?

22   A.   Yeah, 'cuz first he's trying to choke me and I

23        pushed him away, and then he -- he punched me.

24   Q.   Who did?

25   A.   Slim did.  He jabbed me, but I moved and he
```

137

```
 1        just -- he just -- he didn't get to hit me
 2        real hard, he just like, I -- I got to move
 3        out of the way.  He didn't hit me.
 4   Q.   Did you tell the police that Vato punched Slim
 5        a couple of times and became involved in the
 6        fight?
 7   A.   Yes.  After, after he hit me with his fist
 8        that's when they started going at it, yeah.
 9   Q.   Okay.  So at some point you become aware again
10        then of Vato there in the kitchen with you?
11   A.   I don't know where he was at, all of the
12        sudden he was there.
13   Q.   Right.  He's right there where you and Slim
14        are?
15   A.   Yes.
16   Q.   And David's right there too; right?
17   A.   Yes.
18   Q.   Anybody else?
19   A.   I don't remember who else.
20   Q.   What about Isaiah?
21   A.   I don't remember.  I don't know if he had left
22        or what.
23   Q.   Did you see Vato punch Slim a couple times?
24   A.   No, 'cuz it happened so fast just when I was
25        checking out my lip, seeing if I had a busted
```

138

```
 1          lip, I just seen him wrestling or something,
 2          and that's when I just heard the gun went off.
 3     Q.   Did you tell the police that a second guy by
 4          the name of Isaiah also joined in the fight,
 5          that Isaiah was a friend of Slim's, but
 6          believed Slim was out of order and acting
 7          crazy, and that's why Isaiah also started to
 8          punch on Slim?
 9     A.   I don't know.  I still to right now I don't
10          know who that other guy was.  I only know he
11          was Richard, it was Richard, and I don't know
12          who that other dude was.
13     Q.   I'm going to show you a picture marked Exhibit
14          20.  Do you know that guy?
15     A.   I know that guy, yes.
16     Q.   Is that Isaiah?
17     A.   That's Isaiah.
18     Q.   Is that the Isaiah that was at the party?
19     A.   I think he was at the party.
20     Q.   And when you talked to Detective Schuler, and
21          you said Isaiah, would that be the Isaiah you
22          were talking about?
23     A.   Yes, he was there.
24     Q.   Did Isaiah come in and help out or you don't
25          recall?
```

139

```
 1   A.   I don't recall who it was.
 2   Q.   And again, you were not lying to the detective
 3        when you spoke to him; correct?
 4   A.   Well, I don't remember who it was.
 5   Q.   And would you not have told the detective
 6        Isaiah though unless it was true?
 7   A.   Yes.
 8   Q.   Okay.  Do you recall telling the detective
 9        that part about Isaiah was a friend of Slim's,
10        but believed that Slim was out of order and
11        acting crazy, and that's why Isaiah also
12        started to punch on Slim?
13   A.   Because I don't even -- I didn't see -- I
14        didn't know -- I don't know whether it was
15        Isaiah who was doing it.  I don't -- even a
16        lot of people had left, I don't know if he was
17        one of the guys who had left like minutes
18        before this happened.
19   Q.   The place kind of emptied out?
20   A.   Yes, kind of.
21   Q.   Because of all the stuff going on in the
22        kitchen?
23   A.   No, not 'cuz of that, because of -- I don't
24        know, everybody started leaving.
25   Q.   Did you tell the police that both Vato and
```

140

```
 1          Isaiah punched Slim two to three times?

 2    A.    No.

 3    Q.    Did you see Slim get punched a couple of times

 4          by at least two different people?

 5    A.    I just seen 'em, they brought 'em down from

 6          his jacket, they pulled him down, and he

 7          was -- he was down like this.  He was down and

 8          the guys were hitting him.

 9    Q.    And did you tell them that at this point Slim

10          bent down slightly and reached into his jacket

11          and pulled out a handgun?

12    A.    No.

13    Q.    You never told the detective that?

14    A.    I never seen the gun.

15    Q.    Did you tell the detective that, sir?

16    A.    No, I didn't.

17    Q.    If you did tell the detective that, would you

18          have been lying?

19    A.    No.

20    Q.    Did you tell the police that this handgun was

21          a silver handgun with black grips and you

22          thought it was a semiautomatic?

23    A.    No.

24    Q.    You never said anything like that to the

25          detective?
```

141

```
 1   A.    I never seen no gun.

 2   Q.    But you would agree with me though that if you

 3         told the detective these things, it was true?

 4                   ATTORNEY CHERNIN:  Objection.  It

 5         calls for --

 6   A.    What do you mean?

 7                   ATTORNEY CHERNIN:  Question's

 8         vague.

 9                   THE COURT:  You started to say

10         speculation.  Overruled.  Question's vague.

11         Overruled.  I'll allow it.  Rephrase it

12         though, Mr. Griffin.

13   BY ATTORNEY GRIFFIN:

14   Q.    Mr. Diaz, when you spoke to Detective Schuler,

15         everything you told him was what you believed

16         at that moment to be correct and accurate and

17         true; right?

18   A.    Yes.

19   Q.    Okay.  And was the detective taking notes when

20         you talked to him?

21   A.    Yes.

22   Q.    Did you see a silver handgun with black grips?

23   A.    No, I didn't.

24   Q.    Did you make that up for the detective?

25   A.    No.
```

142

```
 1   Q.   Did you tell the detective that Slim pulled
 2        this gun out and now pointed it at David Diaz,
 3        who was still standing close by in the
 4        kitchen?
 5   A.   No, I didn't.  I didn't state that.
 6   Q.   And you never saw that of course?
 7   A.   No sir.
 8   Q.   Did you tell the detective that Diaz, David
 9        Diaz, had just turned around and was about to
10        leave the kitchen?
11   A.   No.  He had -- I don't know what he did when I
12        just got hit, I don't know what happened.  I
13        was just like this, and I just remember seeing
14        him standing next to me, and boom, that's when
15        it went off.  I don't -- I don't remember
16        seeing nothing like pointing the gun at nobody
17        or nothing.
18   Q.   And a year ago you remember things a lot
19        better though; right?
20   A.   I -- I remember things a lot better?
21   Q.   Yeah.  You wouldn't forget about the gun;
22        would you?
23   A.   No, I wouldn't.
24   Q.   Your memory's not that bad?
25   A.   No.
```

143

```
 1   Q.   I mean, if you had seen Slim point a gun at
 2        David Diaz's head and shoot --
 3   A.   Yes.
 4   Q.   -- you would remember that?
 5   A.   Yes, I would have.
 6   Q.   And you wouldn't have told the detective that
 7        you saw Slim with a gun unless you had seen
 8        Slim with a gun?
 9   A.   Yes.
10   Q.   So you never told this to the detective?
11   A.   I never told him I seen him with a gun
12        pointing at nobody.
13   Q.   Did you tell the detective, as I asked before,
14        that David Diaz had just turned around and was
15        about to leave the kitchen?
16   A.   No, I didn't say that either.
17   Q.   Did you tell him that Slim pointed the gun at
18        David Diaz?
19   A.   No, I just seen Slim fighting with the guys
20        when the gun went off and I just seen him duck
21        down.
22   Q.   Right.  Mr. Diaz, it's very clear what you're
23        saying today, my question is, did you tell the
24        detective that back then?
25   A..  Well, that's what they wrote down, they were
```

144

```
 1        asking me all these questions and --
 2    Q.  What questions were they asking you, sir?
 3    A.  I don't know.  They were asking me the
 4        questions that are on the statement.
 5    Q.  Exhibit 15, they were talking to you about
 6        this; weren't they?
 7    A.  Yes.
 8    Q.  Your guy, your friend, your buddy, David Diaz;
 9        right?
10    A.  Yes.
11    Q.  The guy who got shot in the head two feet from
12        where you were standing?
13    A.  Yes.
14    Q.  And you told them you saw Slim with a gun;
15        didn't you?
16    A.  No.
17    Q.  You never said that?  You never said silver
18        gun with black grips that he pointed it out,
19        David turned around to go into the living room
20        and boom, he point at his head and shot him?
21    A.  No, 'cuz Slim was handling the two guys when
22        the gun went off.  He was fighting with two
23        guys, that's when I just seen the smoke going
24        off.
25    Q.  You saw the smoke going off?
```

145

```
 1    A.    The smoke going, just went and I just seen
 2          smoke going up on the -- inside the -- the
 3          kitchen.
 4    Q.    From where?
 5    A.    I don't know.
 6    Q.    Are you talking about the smoke that comes out
 7          of the barrel of a gun?
 8    A.    I don't know.
 9    Q.    Just smoke?
10    A.    I just seen smoke.
11    Q.    Did you smell it?
12    A.    I didn't smell it.
13    Q.    Where was that?  As you're -- stand up for a
14          minute.  On this diagram, when the shot goes
15          off, are you standing with this wall to your
16          back?
17    A.    Yes.
18    Q.    Okay.  And point to where David would be.  No,
19          don't turn, keep looking at me, the wall's
20          behind you, where's David?
21    A.    David's standing right next to me.
22    Q.    Where is Slim?
23    A.    Slim's right there in front of me.
24    Q.    Right there.  So if Slim had reached out his
25          arm, for example, and put it to the back of
```

146

```
 1      David's head, that gun barrel would have been

 2      how close to David's head?  Inches?

 3   A. Probably right on it.

 4   Q. Right on it, like two inches away; am I right?

 5   A. You're right.

 6                   THE COURT:  We're going to take a

 7      break.  Mr. Griffin, please be seated.  It's

 8      ten minutes after the hour of twelve.  Ladies

 9      And gentlemen, I've been advised that the

10      luncheon has been brought up in the back room

11      waiting for you.  We're going to reconvene at

12      1:15.

13                   DEPUTY:  All rise for the jury

14      please.

15                   (Jury out of box.)

16                   THE COURT:  Please be seated.

17      Mr. Diaz, I'm going to remind you that you

18      remain under oath.  We're going to reconvene

19      and have you back up on the witness stand at

20      1:15 this afternoon.  You may step down, sir.

21                   ATTORNEY GRIFFIN:  Could you just

22      remind him, Judge, I haven't actually spoken

23      to him, that he's not to discuss --

24                   THE COURT:  I have a

25      sequestration order in place.  What a
```

147

```
1          sequestration order is, Mr. Diaz, is that you
2          are not to discuss your testimony with
3          anyone --
4                    THE WITNESS:  Okay.
5                    THE COURT:  -- until -- until
6          directed to do so by this court.
7                    THE WITNESS:  I hear you.
8                    THE COURT:  Do not allow anyone
9          to approach you and discuss your testimony.
10         And you're ordered back to the witness stand
11         at 1:15.
12                   THE WITNESS:  All right.
13                   THE COURT:  We're on our lunch
14         break.  We'll reconvene at 1:15.
15                   (Lunch break taken.)
16                   THE COURT:  Recalling State v.
17         Danny Wilber, 04CF000609, first degree
18         intentional homicide while armed with a
19         dangerous weapon.  Appearances please.
20                   ATTORNEY GRIFFIN:  Assistant DA
21         Jim Griffin for the State with Detective Tom
22         Casper of the Milwaukee Police Department.
23                   ATTORNEY CHERNIN:  Michael
24         Chernin appearing on behalf of Danny Wilber,
25         who appears in person.
```

148

```
 1                    Your Honor, before we commence
 2       the jury and return to Mr. Diaz, it -- this is
 3       the first opportunity I've had to ask this.  I
 4       wasn't exactly certain how the shoe evidence
 5       and the burned soles and the can --
 6                    ATTORNEY GRIFFIN:  I'm going to
 7       just -- can we deal with this like maybe at
 8       the end of the day, because we're going to
 9       talk about an issue that isn't going to become
10       relevant today; correct?
11                    ATTORNEY CHERNIN:  No, I don't --
12       I don't think it would be.
13                    ATTORNEY GRIFFIN:  If I may, I
14       think Mr. Chernin wants to talk about --
15                    ATTORNEY CHERNIN:  We'll talk
16       about it.
17                    THE COURT:  Yeah, timing wise to
18       do such -- to engage in any additional legal
19       conversations and -- and keep the jury out of
20       the box doesn't seem -- if it's not something
21       that's relevant to today's proceedings seems
22       to be a -- seems to be a waste of time, and
23       I'm not going to do that.  We'll do it at the
24       end of the day today or on the morning of the
25       time if it becomes relevant.
```

149

```
 1                       Let's bring the jury out.

 2                       DEPUTY:  All rise for the jury.

 3                       (Jury in box.)

 4                       THE COURT:  We're going to

 5          continue with the direct examination of this

 6          witness on the State's behalf.

 7                       Mr. Griffin.

 8     BY ATTORNEY GRIFFIN:

 9     Q.   Mr. Diaz, I believe we were talking about you

10          seeing smoke in the kitchen from something.

11     A.   Yes.

12     Q.   Right?

13     A.   Yes.

14     Q.   Moments after -- instants after the gunshot;

15          right?

16     A.   Right after the gunshot, yes.

17     Q.   Okay.  I'm going to ask you to assume for a

18          minute that this is that kitchen wall again

19          with your back to it; right?

20     A.   Yes sir.

21     Q.   I'm going to ask you to come down and stand

22          right here with your back up against the

23          wall.  I don't know if you remember whether

24          your back was touching the wall or not, but I

25          want you to point for a minute exactly where
```

150

```
 1          David Diaz would be.

 2     A.   Right next to me.

 3     Q.   Okay.  And you're pointing again with your

 4          left hand out, you say right next to you.  Do

 5          you remember, for example, could you have

 6          touched his shoulder, or you don't recall that

 7          specifically?

 8     A.   What do you mean, touch his shoulder?

 9     Q.   If you had reached out could you have touched

10          him?

11     A.   Yes.  Yes.

12     Q.   Okay.  And do you recall, for example, was he

13          facing you, was he facing the wall, the living

14          room, the kitchen, the cabinets?  About as

15          best you recall, where was he and what was he

16          looking at?

17                    ATTORNEY CHERNIN:  At what point

18          in time?

19     BY ATTORNEY GRIFFIN:

20     Q.   In the moments before the shooting.  The

21          moments before as you were rubbing your lip

22          thinking, boy, he hit me?

23     A.   He was looking forward to the kitchen.

24     Q.   I'm sorry?

25     A.   He was looking forward.
```

151

```
1    Q.   So he would have been --

2    A.   To the table --

3              THE COURT:  Let's just stop.

4         Let's just stop.  Let's stop for one moment.

5         Mr. Chernin, raise an objection, don't

6         interrupt the direct examination.

7         Mr. Griffin, make sure when you ask the

8         question, you allow the witness to respond.

9         And, Mr. Diaz, please wait until the entire

10        question has been asked of you, otherwise this

11        record is going to be extremely muddled.

12             ATTORNEY CHERNIN:  I'm sorry.  My

13        objection was vague, Your Honor.

14             THE COURT:  It was just an

15        interruption, an inappropriate one at that.

16        Let's continue.

17   BY ATTORNEY GRIFFIN:

18   Q.   In other words, in the instance before there

19        was a bang and you saw smoke, were you

20        shoulder to shoulder with David Diaz?

21   A.   No, I wasn't.

22   Q.   Where was Mr. Diaz?  I'll assume your position

23        here and you be Mr. Diaz.  David Diaz.

24   A.   Mr. Diaz was right here, right next to me.

25   Q.   And where is Slim?
```

152

```
 1   A.   Right in front, right like three feet away
 2        from me.
 3   Q.   And a little bit on a diagonal from you?
 4   A.   Yes.
 5   Q.   Where was Vato?
 6   A.   Right -- right in front of Slim.
 7   Q.   Okay.  So in other words, between you and Vato
 8        is Slim?
 9   A.   Yes.
10   Q.   Okay.  And is there anyone else in that
11        immediate area there around the four of you?
12   A.   No.
13   Q.   Okay.  If you would take the stand again.
14                  As I recall, you were saying
15        earlier this morning that you did not see Slim
16        with a gun that -- that morning, early morning
17        hours; right?
18   A.   No sir.
19   Q.   You never saw him with a silver handgun with
20        black grips?
21   A.   No sir.
22   Q.   And even more importantly, or just as
23        importantly, you sure as heck never told any
24        detective that you saw Slim with a silver
25        handgun with black grips?
```

153

```
 1  A.  No sir.

 2  Q.  Did you duck down when you heard the shot?

 3  A.  I don't recall.  I just remember the gunshot

 4      went out when I was rubbing my lip like this,

 5      and I just heard that.  And after that I

 6      just -- I saw -- I just heard the gunshot went

 7      off.

 8  Q.  Okay.  I'm going to ask you to come off the

 9      witness stand again, stand with your back to

10      that wall.  You're rubbing your lip, right?

11      The gunshot goes off.  Point to where it came

12      from.

13  A.  Here.  Somewhere around there.  It was so loud

14      and this is small kitchen I just heard it go

15      off right like close to me.

16  Q.  You're pointing with your left hand sort of

17      off in what we'll call a left direction.

18  A.  Yes, 'cuz when I was -- that's where it went

19      off.

20  Q.  Which would have been, again, assuming David's

21      right next to you --

22  A.  David's right next to me.

23  Q.  If I hold a gun to his head and shoot, that

24      would be where the gunshot was coming from?

25  A.  Not right in front of me, it was like on the
```

154

```
 1        side over here.

 2   Q.   On the side over there?

 3   A.   Yes.

 4   Q.   If you would take the stand.

 5                    And at what point, Mr. Diaz I

 6        assume then -- Mr. David Diaz fell right in

 7        front of you?

 8   A.   Yes, he did.

 9   Q.   And did you look to your left?

10   A.   I just looked down 'cuz he was on the floor.

11   Q.   Well, who was to the left there behind him?

12   A.   I didn't see.

13   Q.   You didn't see it or you didn't see anybody?

14   A.   I didn't see anybody.  I didn't see.  I just

15        seen my friend going down, so I just followed

16        him down with my eyes.

17   Q.   And then you took off running to your left?

18   A.   Out the front door, yes.

19   Q.   Well, you pointed straight ahead.  If your

20        back's to the wall, wouldn't the front door

21        have been straight to your left?

22   A.   Yes.

23   Q.   So after you see David go down you take off

24        this way to your -- to your left, this way

25        toward the front door?
```

```
1    A.    Yes.

2    Q.    And who was between you and the front door?

3    A.    Nobody at the time.  Everybody had left.

4    Q.    Did you see Slim put the gun back under his

5          coat?

6    A.    No.

7    Q.    Did you tell the police that after you saw

8          David Diaz go to the ground Slim was now

9          putting the gun back under his coat?

10   A.    No.

11   Q.    Did you tell the police that you saw Slim hold

12         the gun under his coat and run out the front

13         door?

14   A.    No.

15   Q.    Did you tell the police that you heard Slim's

16         sister Antonia, who was also in the kitchen,

17         yell out, oh my God, you shot him, get out of

18         here, you shot him?

19   A.    I just heard commotion and girls yelling and

20         stuff, but I don't recall exactly what they

21         were shouting out and yelling.  I just

22         remember them -- everybody yelling, and by the

23         time I looked up everybody was gone.

24   Q.    Did you tell the police that you heard Slim's

25         sister say, oh my God, you shot him, get out
```

156

```
 1        of here, you shot him?

 2    A.  No.  I just heard people yelling and

 3        screaming, oh my God, he got shot, or

 4        whatever, you know.  But I -- I don't recall

 5        Antonia saying -- yelling anything out about

 6        you shot him or nothing, I just remember the

 7        girls yelling.

 8    Q.  Did you tell the detective that Slim -- that

 9        after Slim ran out the front door you went out

10        the front door and saw him running around the

11        corner?

12    A.  No, I'd seen everybody leaving and I went out,

13        everybody was gone.

14    Q.  When you ran out the very front door, how long

15        did it take you after David Diaz was shot to

16        get out that front door?

17    A.  Like two minutes.

18    Q.  What did you do?

19    A.  I was checking out my friend.

20    Q.  What do you mean, checking him out?

21    A.  Yeah, 'cuz he -- he wasn't still dead, he was

22        moving.

23    Q.  He was still like --

24    A.  Shaking and stuff, and I thought he was going

25        to be all right.  But I was like, Dave, don't
```

157

```
 1        die, don't die, what's up, Dave, and he didn't
 2        say nothing.  He just shook a couple of times
 3        and he stopped shaking.
 4    Q.  And boom, you headed out the front door?
 5    A.  That's when I looked up, there was nobody
 6        around, I just left.  I walked out the front
 7        door and there was nobody out there either.
 8    Q.  Do you remember now everybody else that was in
 9        that kitchen besides you, Danny, Vato and
10        David?
11    A.  No, I don't.
12    Q.  Do you remember telling the police back in
13        February who else was in there?
14    A.  No.  We -- we were -- we had been out
15        drinking, so it was at like 3:00 in the
16        morning or something, I was kind of drunk.
17    Q.  Do you remember telling the police that also
18        in the kitchen was -- besides you, David
19        and -- and Vato, was Slim, Isaiah, a friend of
20        Slim's, Jay, a guy you might have called
21        Dumpy?
22    A.  See, I don't know about Dumpy.
23    Q.  Who is Slim's cousin?
24    A.  I don't know.
25    Q.  You don't know?
```

158

```
 1    A.    I don't know Slim's cousin Dumpy.  I don't

 2          know.

 3    Q.    Could it have been Donny?

 4    A.    I don't know.

 5    Q.    Or Dunny or something like that?

 6    A.    I don't know.

 7    Q.    But you described to the police some cousin of

 8          Slim's who was also in the kitchen; right?

 9    A.    No.  No, Dumpy.

10    Q.    Right, but --

11    A.    I didn't know who was there or if they were

12          related or anything.  I didn't know.  I didn't

13          know 'em like that.

14    Q.    Do you recall telling the detective on

15          February 1st that there was a black Indian

16          male, 28 years of age, about five nine, 160

17          pounds, who was Slim's cousin?

18    A.    No, 'cuz I didn't know him.  I didn't even

19          know he's got a cousin.

20    Q.    Did you tell the police that Tonia, the sister

21          of Slim, or maybe a cousin, black female, 25

22          years of age, five four, 160 pounds, and the

23          guy who was in the report as Dumpy's

24          girlfriend was also there?

25    A.    Dumpy's girlfriend?
```

159

```
1   Q.   Yeah.

2   A.   I don't know.

3   Q.   Who you described as a Hispanic female, 21,

4        five five, 120 pounds.

5   A.   I don't know about that.

6   Q.   Did you also tell the police there was also

7        another black man who you didn't know, an

8        unknown black male who's 30, five ten, 200

9        pounds, wearing a brown and orange leather

10       jacket?

11  A.   Yes, I recall seeing him there.

12  Q.   Where was he?

13  A.   He was standing like three feet to my right.

14  Q.   Toward the stove?

15  A.   Towards the stove, yes.

16  Q.   Who was he a friend of?

17  A.   I don't know.  Not my friend.

18  Q.   Was he David's friend?

19  A.   No, he was black.  He wasn't David's friend.

20  Q.   Was he Vato's friend?

21  A.   I don't know.

22  Q.   Did you tell the police that that guy wearing

23       the brown and orange leather jacket, that you

24       believed he was a friend of Slim's?

25  A.   Well, I don't know, they were just there
```

160

```
 1        together in the kitchen.  I didn't say who was

 2        friends with or nothing.

 3   Q.   You didn't tell the police that you thought he

 4        was one of Slim's friends?

 5   A.   From being black.

 6   Q.   That's why you would have made that

 7        association?

 8   A.   Yes.  Yes.

 9   Q.   Did you also tell the police that inside the

10        residence but not in the kitchen was Claudia,

11        Heather, Cindy, David Diaz's wife, Nando or

12        Fernando, who was a friend of Vato's, and

13        Javy?

14   A.   I don't know Fernando or Javy.

15   Q.   You don't know Javy?

16   A.   No.

17   Q.   Is he a friend of the defendant's?

18   A.   I got no idea, Dude.  Or Fernando, I don't

19        know no Fernando either.

20   Q.   I'm going to show you a photograph that's been

21        marked as Exhibit 19.  Do you know that guy or

22        recognize him?

23   A.   Yes, I recognize him.

24   Q.   Who is it?

25   A.   Javy.
```

161

```
 1   Q.   So you do know a Javy?

 2   A.   I do know a Javy.

 3   Q.   But you don't know anyone named Fernando or

 4        Nando or anything like that?

 5   A.   No, I don't.

 6   Q.   Okay.  I'm going to show you a -- what I call

 7        a photo array or a photo lineup.  It's been

 8        marked as Exhibit Number 6.  Do you recognize

 9        that?

10   A.   Yes, I do.

11   Q.   What is it?

12                  ATTORNEY CHERNIN:   May I

13        approach, because I have seen it, but I'm not

14        sure which one of the arrays it is.  Thank

15        you.

16   BY ATTORNEY GRIFFIN:

17   Q.   What is that?

18   A.   It's a picture of guys, a picture of Slim

19        circled up.

20   Q.   Which one is Slim in that photo array?

21   A.   This one right here.

22   Q.   Where is he on the thing?  Top?  Bottom?

23   A.   On the bottom middle.

24   Q.   In the what?

25   A.   Bottom middle.
```

162

```
1    Q.   Bottom middle?

2    A.   Yes.

3    Q.   Is there a circle around his picture?

4    A.   Yes, it is.

5    Q.   Is that your signature next to it?

6    A.   Yes, it is.

7    Q.   Why did you circle and sign that picture?

8    A.   Because they asked me if I knew Slim, and I

9         said, yeah, I know Slim.  And they was like,

10        circle if you see him, so I circled him.

11   Q.   When you were with the detective did you

12        positively identify Slim, the guy in that

13        picture I should say, as Slim and the person

14        that did the shooting in this offense?

15   A.   They were just saying he was a suspect and

16        they told me if that was Slim, and I said yes,

17        that's Slim right there.

18   Q.   Weren't you back on February 1st telling the

19        police, sir, that Slim was the shooter?

20   A.   No.

21   Q.   Did they show you photo arrays or photos of

22        anyone else?

23   A.   Yes, they did.

24   Q.   Did you talk to the police about what, if

25        anything, Slim was drinking?
```

163

```
 1   A.   They asked me what he was drinking.  I told
 2        'em we had Bull Watch and Smirnoffs to drink.
 3   Q.   Did the police ask you whether he was drinking
 4        a Corona or a Budweiser, and you said neither,
 5        that Slim was drinking some type of clear
 6        alcoholic beverage?
 7   A.   No, I just remember saying that he was
 8        drinking a clear bottle.
 9   Q.   Do you remember telling the police that when
10        Slim started drinking this he made a -- kind
11        of an odd face and asked, what was this that
12        he was drinking?
13   A.   No.
14   Q.   And you thought it was either a Smirnoff or a
15        Mike's Hard Lemonade or something like that?
16   A.   I don't recall.
17   Q.   You don't recall that happening?
18   A.   No.
19   Q.   Did you tell the police that on February 1st?
20   A.   They asked me what he was drinking, and I just
21        told 'em I remember he was drinking something,
22        but not Budweiser, something out of a clear
23        bottle.
24   Q.   Do you recall telling the police how when he
25        drank it he made kind of an odd or a funny
```

164

```
1        face?

2    A.  I don't remember now.

3    Q.  So it's possible you told 'em that, you just

4        don't remember it?

5    A.  I don't recall.

6    Q.  Did you tell the police the David Diaz was not

7        a violent individual, and even when Slim

8        threatened to beat him, David Diaz stated

9        nothing and turned around and walked slightly

10       away from him and told you in Spanish to have

11       the guy leave?

12   A.  Yes, that's when he came to the living room to

13       tell me.

14   Q.  So that part you did tell the police --

15   A.  Yes.

16   Q.  -- as well?  Not only that happened, and you

17       told the police it happened?

18   A.  What do you mean?

19   Q.  Well, is it true that David Diaz said nothing

20       and turned around and walked slightly away

21       from Slim when Slim threatened him?

22   A.  Yes.

23   Q.  What did Slim threaten him with?

24   A.  I don't know.  I was in the living room.

25   Q.  When you talked to Detective Schuler, where
```

165

```
1          was that interview?

2     A.   I don't remember.

3     Q.   How long did it last, approximately?

4     A.   Like -- I don't recall, sir.  Like an hour.

5     Q.   And in the entire time that you were with

6          Detective Schuler, I want to know if you told

7          him any lies.

8     A.   If I told him any lies?

9     Q.   Yep.

10    A.   No, I just told 'em what -- what I had seen,

11         what I thought what happened.

12    Q.   Are you an MP or did you used to be?

13    A.   I am not an MP, never used to be.

14    Q.   Never?

15    A.   No.

16    Q.   Did you ever, to any of the detectives, any

17         detectives, like Detective Schuler, tell 'em

18         you were afraid about all of this?

19    A.   Yeah, 'cuz I never been involved in something

20         like this.

21    Q.   Well, did you ever say to him or to anybody in

22         the world that you were afraid about this

23         because of Slim and what you'd seen him

24         done -- seen him do?

25    A.   No, 'cuz I didn't see him do nothing.
```

166

```
1    Q.   And you've never told anyone in the world that
2         you saw him with a gun; right?
3    A.   No.
4    Q.   You've never told anyone in the world that you
5         saw Slim in that kitchen at 1128 West Mineral
6         with a gun?
7    A.   No, I didn't see him with no gun.
8    Q.   And you never saw him point it at David Diaz's
9         head?
10   A.   No sir.
11   Q.   And you've never told anyone that?
12   A.   No sir, not -- I don't recall.
13   Q.   You don't recall?
14   A.   No.
15                    ATTORNEY GRIFFIN:   Nothing
16        further.
17                    THE COURT:   Cross.
18                    CROSS EXAMINATION:
19   BY ATTORNEY CHERNIN:
20   Q.   Mr. Diaz, you weren't so afraid of Slim on
21        January 31st, 2004 that you wouldn't confront
22        and fight with him; is that true?  You weren't
23        so afraid of him that you wouldn't fight?
24   A.   I wasn't afraid of him.
25   Q.   Are you afraid of him now?
```

167

```
 1   A.   No, I'm not.

 2   Q.   Before I get to these, let me -- let me ask

 3        you another question, is -- you have with

 4        you -- thank you -- on February 1st of 2004

 5        did the police give you the opportunity to

 6        review the piece of paper that you read

 7        earlier today?

 8   A.   No, they didn't.

 9   Q.   And you heard Mr. Griffin ask you questions

10        about -- about Detective Schuler.  According

11        to what you read today, was it Detective

12        Schuler that prepared that report?

13   A.   The statement, yes.

14   Q.   Now, in February of 2004 you weren't given an

15        opportunity to review what was typewritten;

16        were you?

17   A.   No, I wasn't.

18   Q.   Did there come a time in July of 2004 when you

19        were given an opportunity to look at that

20        report?  Did you meet with somebody, Bill

21        Kohl?

22   A.   Somebody did bring it up to me.

23   Q.   Okay.  You don't remember his name?

24   A.   No, I don't.

25   Q.   If I described an older white guy taller --
```

168

```
1    A.    With the long hair.

2    Q.    -- with a long pony tail?

3    A.    Yes.

4    Q.    Did he give you an opportunity to review the

5          report that you read again today?

6    A.    Yes.

7    Q.    And in July did you engage in questions and

8          answers with Mr. Kohl, or that guy with the

9          long hair?

10   A.    Yes.

11   Q.    And in July did you tell him that you were at

12         a house party on January 30th of 2004 on

13         Mineral Street in Milwaukee?

14   A.    Yes, I did.

15   Q.    That of course is not correct, it was January

16         31st; isn't that correct?

17   A.    It was January 30th, it was 31st.

18   Q.    And did you tell Mr. Kohl that there were some

19         guys in the kitchen of this residence at 1128

20         West Mineral?  Did you tell Mr. Kohl that?

21   A.    Yes, I did.

22   Q.    Did you tell him that Danny Wilber, also known

23         as Slim, was very intoxicated?  Did you tell

24         him that?

25   A.    No.
```

169

1  Q.  Did you tell him that Slim and you were
2      arguing over a Cadillac that you had sold to
3      Slim?
4  A.  Yes.
5  Q.  Did you tell him that Vato -- you've heard
6      Mr. Griffin talk about Vato, you know him as
7      Richard Torres; correct?
8  A.  Yes, I do.
9  Q.  Are you related to Richard Torres?
10 A.  No, I'm not.
11 Q.  You're not his uncle?
12 A.  No.  He's not related to me, he's related to
13     one of my girls, my girlfriend.
14 Q.  Okay.  Did you tell Mr. Kohl that Vato,
15     another Mexican, and the victim, David Diaz,
16     were also there in the kitchen?  I guess was
17     also there?
18 A.  Yes.
19 Q.  Did you tell him that an argument escalated
20     between Slim and you?
21 A.  Yes.
22 Q.  Did you tell them that Slim hit you in the
23     head, a glancing blow off of your cheek?
24 A.  He didn't hit me in the head, he hit me in
25     my -- in my lip.

170

```
 1   Q.   A glancing blow off of your cheek?

 2   A.   Yes.

 3   Q.   And that's what you described here in court

 4        today?

 5   A.   Yes, I did.

 6   Q.   Did you tell him that you turned and you heard

 7        a shot and then you saw smoke from the shot?

 8   A.   Yes.

 9   Q.   Did you tell Mr. Kohl that you saw David Diaz

10        on the floor with a gunshot wound to his head?

11   A.   Yes.

12   Q.   Did you tell him that Slim was next to you

13        holding his head in his hands covering

14        himself?

15   A.   He wasn't next to me, but now that I remember

16        he was -- he ducked down and to stop fighting,

17        to stop -- the fight stopped, and I seen

18        everybody get down, and then when I looked

19        down everybody was gone.

20   Q.   Do you recall telling Mr. Kohl that you denied

21        your statement to the police in which you

22        identified Slim as the person that shot David

23        Diaz?

24   A.   Yes.

25   Q.   I'm going to show you what's been marked as
```

171

```
 1          Exhibit 15.  I'm going to ask you to hold it
 2          so that you can see it.  And also, could you
 3          hold it so you can answer questions and have
 4          the jury see it as well.
 5                    Now, Mr. Diaz, does that picture,
 6          Exhibit 15, show you where David Diaz landed
 7          after he was shot that night?
 8     A.   That's exactly where he landed when he got
 9          shot.
10     Q.   Okay.  And were his feet located -- when he
11          was standing near you you were standing at the
12          door?
13     A.   Right around here, yes.
14     Q.   Okay.  Right around here.  And you're pointing
15          to the -- what in that picture would be the
16          right edge of the door; correct?
17     A.   Yes, it would.
18     Q.   And Mr. Diaz, if he was, according to you,
19          several feet -- I believe you said two feet
20          away from you, so that you would be able to
21          reach out and touch him with your shoulder,
22          was he at the other edge of the door frame, at
23          least that far back?
24     A.   Must have been like on the other side of the
25          door edge, yes.
```

172

```
 1   Q.   And if he was on the other side of the door
 2        edge would he have been behind the counter?
 3   A.   Behind the counter.
 4   Q.   If one were to draw a line straight from the
 5        counter to the door, he would have been -- his
 6        feet would have been behind the counter; is
 7        that correct?
 8   A.   Yes, he would.
 9   Q.   Now, you just testified -- and I know this is
10        probably pretty painful for you -- or was it
11        painful for you?
12   A.   It's been painful.
13   Q.   Sorry to see your friend lying there trembling
14        and dying on the floor.
15   A.   Yes, it was painful to see my friend like
16        that.
17   Q.   And according to what you said earlier,
18        everybody else had run out of the kitchen at
19        that point while you were watching your
20        friend's last moments?
21   A.   Yes.
22   Q.   Did you move or push David Diaz's body in any
23        way?
24   A.   No, I didn't.
25   Q.   Did you see anyone else move or push David
```

173

```
 1        Diaz's body?

 2   A.   No, I didn't.

 3   Q.   I'm going to show you that picture again, and

 4        I know it's difficult, but when you were going

 5        through your demonstration -- and could you

 6        show that to the jury again -- when you were

 7        going through your demonstration with

 8        Mr. Griffin, you said that Richard Torres was

 9        somewhere in the vicinity on that picture,

10        Exhibit 15, could you point to the location

11        where you saw Richard Torres where he was

12        standing at the moment of the shot, the moment

13        that you heard the shot.

14   A.   He was standing right in front of the sink,

15        right here.

16   Q.   So he was closer to David -- he was between

17        David Diaz and -- or let me ask it this way.

18        Was he between David Diaz and Slim?  Was

19        Richard Torres between David Diaz and Slim?

20   A.   Richard Torres was in front of Slim and David

21        Diaz was to the side of both of 'em.

22   Q.   Was to the side of both of them and to the

23        side of you?

24   A.   To the side of both of them and to the side of

25        to me.
```

174

```
1   Q.   And so when Mr. Griffin was demonstrating
2        somebody reaching over to shoot Mr. Diaz from
3        behind, you never saw Danny Wilber, Slim,
4        doing that; did you?
5   A.   No, I didn't.
6   Q.   Mr. Diaz was your friend; was he not?
7   A.   Yes, he was.
8   Q.   And if you could help solve his murder would
9        you do so?
10  A.   I would do anything to get whoever did it.  I
11       would help 'em out so he could get the
12       judgment he deserves.
13  Q.   And it was not -- and it would not be doing
14       that judgment --
15  A.   For somebody who didn't do it.
16  Q.   And it wouldn't be that judgment --
17  A.   For Slim.
18  Q.   -- to point at Slim as the person who shot
19       David Diaz; is that true?
20  A.   That's correct.
21  Q.   I'm sorry, let me just ask you one last
22       question.  Did you ever see Danny Wilber,
23       other -- other than after Mr. Diaz was on the
24       floor, did you ever see Danny Wilber behind
25       David Diaz?
```

175

```
1    A.    No, I didn't.  He was fighting with the two
2          guys.
3    Q.    And he was fighting with two guys and you;
4          right?
5    A.    Well, I was behind him and I was checking on
6          my lip, I was ready to go fight with them and
7          that's when I went out, so the fight stopped.
8    Q.    And David Diaz was not involved in this fight;
9          was he?
10   A.    He wasn't a violent person, he wasn't
11         involved.
12   Q.    And so the person that they're saying that
13         Slim shot was not even involved in the fight;
14         right?
15   A.    Exactly, he wasn't involved.  He wasn't
16         involved in the fight.
17   Q.    And Slim didn't pull a gun on you; did he?
18   A.    Not on me.
19   Q.    And he didn't pull a gun on Richard Torres
20         either; did he?
21   A.    No, not that I -- I didn't see that, no.
22   Q.    Thank you.
23                    THE COURT:  Anything further,
24         Mr. Griffin?
25                    REDIRECT EXAMINATION:
```

176

```
 1   BY ATTORNEY GRIFFIN:

 2   Q.   Mr. Diaz, I know this is all very painful for

 3        you now, I can see that, but I want to know,

 4        at the moment of the shot, I want you to name

 5        all of the people that were within an arm's

 6        length of David Diaz.

 7   A.   It was myself, and the closest people I seen

 8        was Richard and Slim, and whoever --

 9        whoever -- whoever that other dude was

10        fighting with -- with Richard against Slim,

11        that's it.  I don't -- I don't remember seeing

12        nobody else around, nothing, 'cuz that's --

13        the entrance behind David was the entrance to

14        the living room.

15   Q.   And the other dude that was fighting with

16        Slim, was he white, Hispanic, black, Asian?

17   A.   I don't know his nationality is.

18   Q.   What's his name?

19   A.   I don't even know his name.

20   Q.   Well, didn't you tell the police that it was

21        Isaiah?

22   A.   No, I didn't.  I -- I named that Isaiah was

23        there, but I didn't say Isaiah was the one who

24        stood up for me.  I don't know who -- who --

25        who else besides Richard stood up for me.
```

177

```
 1   Q.   Did you ever describe Isaiah as being a guy
 2        that punched on Slim?
 3   A.   No, I -- I -- I said he was there, he was
 4        there at the after set, but I didn't say -- I
 5        told him I was -- I didn't know who the second
 6        guy was.  I told him it was Richard Torres and
 7        I don't know who else.
 8   Q.   So besides you, David, Slim and Vato, there's
 9        another guy?
10   A.   Yes.
11   Q.   Okay.  And that's a Hispanic guy?
12   A.   I don't know who he is.  I don't know.
13   Q.   You don't remember if he was white, black or
14        Hispanic?
15   A.   I don't remember exactly.
16   Q.   You sure it was a guy?
17   A.   Yes, 'cuz the girls were together in the
18        living room.
19   Q.   Okay.  So you can see him sort of in your mind
20        that it's a guy, not a woman?
21   A.   Yes.
22   Q.   Okay.  And what race is he, in your mind?
23   A.   Like I said, I can't -- I don't know.  I can't
24        say 'cuz I ain't sure about it.
25   Q.   Okay.  Well, was he a real, real fat guy?
```

178

```
1   A.  No, he was average guy like me.

2   Q.  Average guy like you.  Could you stand up for

3       a minute.  And I want you to step down here

4       and I want you to point your arm straight out

5       right there.  I'm going to mark that on the

6       wall.  That's a red line here, sort of -- is

7       it all right if I write on the wall like that,

8       Judge?

9               THE COURT:  Well, it's a little

10      late now, Mr. Griffin.

11              ATTORNEY GRIFFIN:  Sorry.  Before

12      I put his initials next to it let me get a

13      sticky and I'll put his initials next to it.

14  BY ATTORNEY GRIFFIN:

15  Q.  We'll put Jeranek Diaz right there.  Okay?

16  A.  Yes.

17  Q.  Okay.  Okay.  Now go ahead.  You can take the

18      seat.  Do you know how tall Slim is?

19  A.  No, I don't.

20  Q.  Well, give it your best estimate.

21  A.  Like six nine, six ten, seven foot.

22  Q.  Would you refer to him as pretty damn tall?

23  A.  Yeah, I know he's tall.

24  Q.  And who else in that party was as tall as him?

25  A.  I don't know.
```

179

```
 1    Q.   Well, at the moment of the shooting, besides
 2         Slim, it's all Hispanic guys, right, except
 3         for the one guy who you don't who was there,
 4         who you don't know, who wasn't Isaiah, whose
 5         race you can't remember, but who you're sure
 6         was a guy; right?
 7    A.   Yes.
 8    Q.   Okay.  Were -- was any of those guys even
 9         close to his height?
10    A.   Well, there was all different kind of guys,
11         but I can't remember if they were all high or
12         not as tall as him though.
13    Q.   Right at the moment of the shooting, within an
14         arm's length of David Diaz was there anyone as
15         close to -- as tall as this guy?
16    A.   No.
17    Q.   Everyone was more around your height, other
18         than Slim?
19    A.   Most likely.
20    Q.   Do you know how tall David was?
21    A.   Shorter than me, like my height.
22    Q.   What about Richard Torres?
23    A.   He's like me.
24    Q.   And what about the -- the black, white,
25         Hispanic unknown male?
```

180

```
1    A.   I don't remember.

2    Q.   I mean, do you remember him being like, whoa,

3         like Slim?

4    A.   No.

5    Q.   This -- you came down here one other time a

6         couple months ago?

7    A.   In January.

8    Q.   Yeah, and you talked to Detective Schuler,

9         didn't you, about this statement that Mr. Kohl

10        took?

11   A.   Oh, I don't know.  He talked to me but I -- I

12        don't remember, he was -- he -- he did come

13        and talk to me after whatever happened in

14        here, we talked out there.

15   Q.   No, but I mean, didn't he ask you -- I'm going

16        to show you Exhibit 49, didn't Detective

17        Schuler ask you about that and ask you what

18        was up with that, and how was it that you're

19        saying now that Danny wasn't the shooter and

20        all that, and you told him that wasn't true,

21        that Slim was the shooter?

22   A.   No.

23   Q.   You didn't tell him that out in the hallway

24        out there?

25   A.   No.
```

181

```
 1    Q.   Think about it, Mr. Diaz, you're under oath.

 2         I want you to make sure before you answer

 3         this, remember you're under oath, did you say

 4         anything like that to Detective Schuler ever?

 5    A.   I don't recall.

 6    Q.   And the guy that came out to talk to you,

 7         Mr. Kohl, did he tell you who he worked for?

 8    A.   I don't remember him telling me, I wasn't

 9         paying attention.  I just knew he wanted to

10         talk to me about this homicide case, and I

11         didn't even want to talk to him about it, you

12         know.

13    Q.   Well, you knew he wasn't a cop; right?

14    A.   No, I didn't know he was a cop.

15    Q.   Did he -- I'm sorry, Judge.

16              Did he tell you he was a cop?

17    A.   No, not that I remember.

18    Q.   Did he tell you that he was working for the

19         defense in this case?

20    A.   I don't know.  I don't remember.  I remember

21         him introducing himself to me.  I don't

22         exactly remember what he told me.

23    Q.   Do you remember him telling you that he was

24         working for Danny Wilber?

25    A.   I don't know.  He just said -- I don't recall,
```

182

```
 1         I don't recall that.

 2   Q.    And there's no question, I mean, we all agree

 3         that at that point you told him sort of what

 4         you're saying now, it's only a short

 5         paragraph, but that -- that you basically took

 6         back your statement from the police; correct?

 7   A.    Right.

 8   Q.    And did you tell him, what I told the police

 9         was a lie, or I never said those things to the

10         police?  Which was it?

11   A.    I never said those things.

12   Q.    That's what you told him?

13   A.    I suppose.

14   Q.    Well, what do you mean you suppose?

15   A.    Well, yes, that's what I told him.

16   Q.    Which?  That I never said those things?

17   A.    I never said those things.

18   Q.    Okay.  So I need to know now, Mr. Diaz, one

19         more time, did you or did you not say those

20         things to Detective Schuler?  Take a minute

21         before you answer that, or a second, and think

22         about what you're about to say and then let me

23         know.  Is it possible you said those things to

24         Detective Schuler?

25   A.    Not -- I didn't say all those things to
```

                              183

```
1       Detective Schuler.

2    Q. Some of them?

3    A. Well, some of the statement that I -- the

4       statement, that is correct, but most of them

5       is not correct.

6    Q. Is there any possibility, possibility that at

7       some point in your conversation with Detective

8       Schuler you kind of got confused and said you

9       did see Slim with the silver handgun with

10      black grips, but you really didn't mean it?

11      Is that possible?

12   A. No, it -- it was right the next day and I

13      hadn't gotten any sleep or ate any food, so

14      I -- I wasn't properly like with my senses.  I

15      was like shocked out -- shocked out of this,

16      what had happened to my friend.  I ain't never

17      been involved in something like that.  I was

18      just like traumatized about it, I didn't know

19      but -- just what happened.

20   Q. So other than Vato, you, Slim and the other

21      guy, who else could -- was within an arm's

22      length of David Diaz when he got shot?

23   A. I don't know.  I wasn't paying attention to

24      the other thing.  I was just -- like I told

25      you, I was just looking at what happened to me
```

184

```
 1          and, boom, that went off, I wasn't paying

 2          attention nothing else going on in that room.

 3    Q.    Point where you saw smoke.

 4    A.    Right there.

 5    Q.    Right there.  Right by David's head?

 6    A.    Right by Dave's head.

 7                    ATTORNEY GRIFFIN:  Nothing

 8          further.

 9                    THE COURT:  Recross.

10                    RECROSS EXAMINATION:

11    BY ATTORNEY CHERNIN:

12    Q.    Well, Mr. Diaz, earlier you said in

13          examination by Mr. Griffin that Jay was in the

14          kitchen somewhere; right?

15    A.    Yes, he was in there.

16    Q.    And you said that there was some people that

17          you didn't know by name that were in the

18          kitchen; right?

19    A.    Yes.

20    Q.    And was one of those people who you didn't

21          know by name the other guy who was involved in

22          the fight with Richard and --

23    A.    That other guy.

24    Q.    -- and -- and Slim and you, and you don't know

25          the other guy's name; right?
```

185

```
 1   A.    I don't know.  I don't really -- I can't
 2         picture who he was or who he is.
 3                        ATTORNEY CHERNIN:  I have no
 4         additional questions.
 5                        ATTORNEY GRIFFIN:  Nothing.
 6                        THE COURT:  You may step down.
 7         You can just leave that.  Thank you.
 8                        Either side going to be recalling
 9         this witness?
10                        ATTORNEY GRIFFIN:  It's possible.
11                        THE COURT:  You remain --
12         Mr. Diaz.
13                        THE WITNESS:  Yes ma'am.
14                        THE COURT:  What we had discussed
15         earlier, you remain under the subpoena, that
16         is the court order to return here for any
17         further testimony by the State or by the
18         defense should it become necessary.
19                        THE WITNESS:  Yes.
20                        THE COURT:  All right, sir.
21                        THE WITNESS:  Am I able to leave
22         now?
23                        THE COURT:  You're able to leave
24         for right now.
25                        THE WITNESS:  But I won't be
```

186

```
 1          needed today later on?

 2                   THE COURT:  I don't know, sir.

 3                   THE WITNESS:  Do you guys know

 4          where to contact me?

 5                   THE COURT:  If you head out the

 6          people for the State will tell you what you

 7          need to do.

 8                   (Witness excused.)

 9                   THE COURT:  State has leave to

10          call its next witness.

11                   ATTORNEY GRIFFIN:  Is Officer

12          Lazo there?  Why don't you have him come in.

13                   THE COURT:  Officer, I'm going to

14          have you raise your right hand, my clerk will

15          swear you in.

16                   JOSE LAZO, called as a witness

17          herein, having been first duly sworn, was

18          examined and testified as follows.

19                   THE CLERK:  Please be seated.

20                   THE COURT:  Officer, what I'm

21          going to ask you to do is just move your chair

22          in as close to the bench as comfortable for

23          you.  Begin by stating your full name for the

24          record, spelling your first and last name.

25                   THE WITNESS:  First name is Jose,
```

187

```
 1          J-O-S-E, last name is Lazo, L-A-Z-O.

 2                    THE COURT:  You may begin.

 3                    DIRECT EXAMINATION:

 4     BY ATTORNEY GRIFFIN:

 5     Q.  Sir, what do you do for a living?

 6     A.  I work for the City of Milwaukee, police

 7         officer.

 8     Q.  How long have you been on the force?

 9     A.  A little bit over ten years.

10     Q.  On February 1st of last year, 2004, a little

11         before noon, did you go to 2548 West Forest

12         Home, looking for Danny Wilber, to arrest him

13         if he was there?

14     A.  Yes.

15     Q.  And why did you go to that address?

16     A.  'Cuz that's the last known address where we

17         know him to live at.

18     Q.  When you were there did you speak with a woman

19         by the name of Jill Neubecker?

20     A.  Yes.  The upstairs tenant.

21     Q.  Yeah?

22     A.  Yes.

23     Q.  Okay.  And did she give you some information

24         about something that I guess you might call

25         unusual, although she might not, but unusual
```

188

```
 1      about something going on in her back yard?
 2                      ATTORNEY CHERNIN:  Objection.
 3      Leading.  And I anticipate this is eliciting a
 4      hearsay response.
 5                      THE COURT:  Well, overruled on
 6      the objection of hearsay, but it is leading.
 7      Rephrase, Mr. Griffin.
 8  BY ATTORNEY GRIFFIN:
 9  Q.  Did Ms. Neubecker provide you with information
10      about something that had occurred at her
11      residence the night before, meaning what would
12      have been the night of January 31st?
13  A.  Yes, she -- she stated to me --
14                      ATTORNEY CHERNIN:  Objection.
15      He's --
16                      THE COURT:  On hearsay?
17                      ATTORNEY CHERNIN:  On hearsay,
18      yes.
19                      THE COURT:  Overruled.  I'll
20      allow it.
21  A.  She stated to me that that night, the night
22      before or early that morning, she smelled
23      smoke coming from her back yard.
24  BY ATTORNEY GRIFFIN:
25  Q.  Was she able to describe for you at all
```

189

```
1        anything beyond smoke, what that particular
2        smoke smelled like?
3                    ATTORNEY CHERNIN:  Objection.
4        Calls for hearsay.
5                    THE COURT:  I'll note your
6        running objection.  Overruled.  You may
7        answer.
8    A.  She said that it was a -- it wasn't your
9        regular smoke, but she smelled something of
10       like clothing burning.  Stuff like -- like
11       that.
12   BY ATTORNEY GRIFFIN:
13   Q.  And did she indicate to you where that was
14       happening?
15   A.  From the smoke she said it was coming from her
16       back yard.  From a grill.
17   Q.  Did she indicate to you, when you say clothing
18       or something, did she use that word?
19   A.  She -- she used clothing.
20   Q.  She didn't tell you something like, I don't
21       know what it was, Officer, it was just an odd
22       smell, I couldn't tell if it was clothes or --
23       or something --
24   A.  She said it was clothing or something, but it
25       wasn't your regular grill smoke.
```

190

```
 1   Q.   She didn't say it smelled like someone had
 2        burned brats or a steak or sword fish; right?
 3   A.   Right.
 4                  ATTORNEY GRIFFIN:   Nothing
 5        further.
 6                  THE COURT:   Cross.
 7                  CROSS EXAMINATION:
 8   BY ATTORNEY CHERNIN:
 9   Q.   Officer Lazo, is it true that you did this
10        investigation in February of 2004 when you --
11        when you met with Ms. Neubecker?
12   A.   Yes.
13   Q.   Is it true that you didn't write a report
14        about that involvement with Ms. Neubecker
15        until December 11th of 2004?
16   A.   Correct.
17   Q.   Ten months later?
18   A.   Yes.
19   Q.   Did you write any earlier reports about that?
20   A.   No, I relayed that message to another police
21        officer.
22                  ATTORNEY CHERNIN:   I have no
23        further questions of this witness.
24                  REDIRECT EXAMINATION:
25   BY ATTORNEY GRIFFIN:
```

191

1   Q.   Why was that, Officer?  What was it about
2        Ms. Neubecker that you didn't make that
3        information public right away?
4   A.   Well, we were checking the residence, but I --
5        I -- when I got back to the -- to the downtown
6        area I mentioned it to another officer, that
7        she had mentioned that there was a -- a -- a
8        smoke or coming -- or some type of thing
9        coming from the -- from the back yard over her
10       house.
11  Q.   Did she wish to remain anonymous about that
12       information?
13                   ATTORNEY CHERNIN:   Objection.
14       This calls -- clearly calls for hearsay.
15                   THE COURT:   Overruled.  I'll
16       allow it.
17  A.   Yeah, she didn't -- she didn't want no part.
18  BY ATTORNEY GRIFFIN:
19  Q.   Did she explain to you why?
20  A.   No, she didn't.  She just said she didn't want
21       to be involved in this.
22  Q.   And when people don't want to be involved but
23       give you information, do you try to protect
24       their anonymity if you can?
25  A.   Yes.

192

```
 1   Q.   And what happened in December was you were

 2        told, okay, you gotta give up her name now; is

 3        that right?

 4   A.   Correct.

 5             ATTORNEY GRIFFIN:  Nothing

 6        further.

 7             THE COURT:  Recross.

 8             ATTORNEY CHERNIN:  Nothing.

 9             You may step down, Officer.

10             (Witness excused.)

11             THE COURT:  State may call its

12        next witness.

13             ATTORNEY GRIFFIN:  Call Richard

14        Torres.

15             (Side bar.)

16             THE COURT:  Detective, raise your

17        right hand and my clerk will swear you in.

18             KENT CORBETT, called as a witness

19        herein, having been first duly sworn, was

20        examined and testified as follows.

21             THE CLERK:  Please be seated.

22             THE COURT:  I'm going to ask you

23        to start out by stating your full name.

24        You're clearly not Richard Torres, so would

25        you state your full name and spell your first
```

193

```
 1        and last name for the record.

 2                      THE WITNESS:  Kent Corbett.

 3        K-E-N-T, C-O-R-B-E-T-T.

 4                      THE COURT:  Thank you.  You may

 5        begin.

 6                      DIRECT EXAMINATION:

 7   BY ATTORNEY GRIFFIN:

 8   Q.   Sir, what do you do for a living?

 9   A.   I'm a detective with the City of Milwaukee

10        Police Department currently assigned to the

11        Homicide Unit.

12   Q.   How long have you been on the force, how long

13        have you been a detective?

14   A.   I've been on the police force for 15 years and

15        a detective for about 8 years, a little over 8

16        years.

17   Q.   I'm going to show you what's been marked as

18        Exhibit 31.  Do recognize it?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's a photocopy of a statement that I took

22        from Donald Jennings.

23   Q.   Is it missing a page from its original?  In

24        other words, a sketch of the scene?

25   A.   Yes, it is.
```

194

```
 1   Q.   I'm going to show you another exhibit that's
 2        been marked 38.  Do you recognize that?
 3   A.   Yes.
 4   Q.   What is Exhibit 38?
 5   A.   That's the original sketch that should have
 6        been attached to the original statement that I
 7        took of Donald Jennings.
 8   Q.   The first exhibit that I showed you is
 9        actually a photo of the original that's kept
10        in what's called the -- the M File that the
11        Milwaukee Police Department keeps for each
12        homicide; correct?
13   A.   Correct.
14   Q.   And the other Exhibit 38 is the actual
15        original from that file, because it has red
16        ink and black ink that doesn't transfer over
17        to the photo; right?
18   A.   That's correct.
19   Q.   Okay.  I want to talk first about the
20        statement itself, which I think is 31?
21   A.   Yes.
22   Q.   Is that a fair and accurate summary of what
23        Donald Jennings told you about all of this?
24   A.   Yes, it is.
25   Q.   Okay.  And the other exhibit, 38, that
```

195

```
 1        particular exhibit, in addition to being a
 2        hand drawn sketch of the scene, has initials
 3        all over it; correct?
 4   A.   Yes, it does.
 5   Q.   What was the purpose of that document and what
 6        was it used for in your conversation with
 7        Donald Jennings?
 8   A.   During my interview with Donald Jennings, to
 9        be able to understand where some of the people
10        that attended this party, if you will, at the
11        house, to be able to understand where they
12        were situated just before and during the
13        shooting incident.  I had him point to areas
14        where specific people were, and once he did
15        indicate where so and so was, I put the
16        corresponding initials to that individual.
17   Q.   For example, there are initials on there, DJ;
18        correct?
19   A.   Yes.
20   Q.   And those are sort of by what would be the
21        sink of the kitchen?
22   A.   Yes.
23   Q.   And who's that supposed to represent?
24   A.   Donald Jennings.
25   Q.   And did you yourself put that D -- the
```

1          initials DJ there?

2     A.   Yes, I -- I wrote that there.

3     Q.   And was that at your direction, his direction,

4          your partner's direction?  Who said, put the

5          initials DJ there to show that that's where

6          Donald Jennings was?

7     A.   That was at Donald's Jennings' direction.  He

8          pointed to that spot and that's where I put

9          the initials.

10    Q.   The different initials that are on that page

11         are AW, DW, ON, and different things like

12         that; correct?

13    A.   Yes.

14    Q.   And there's, for example, two sets of

15         initials, DW, one in black, one in red?

16    A.   Correct.

17    Q.   Were any of those initials on that page when

18         you first put it in front of Donald Jennings?

19    A.   No.

20    Q.   Didn't you in fact have all those initials on

21         there and everybody where you wanted them and

22         then just got him to say, yeah, yeah, that's

23         where everybody was?  Is that how it went?

24    A.   No.

25    Q.   How did it go?

```
1  A.   I asked him where Oscar Niles was, for
2       example, and he would point on the sheet,
3       right here, and then that is where I put
4       initials for Oscar Niles.  And we went down
5       for as many people that he could remember that
6       he knew the names of that were in the kitchen
7       at the time that this happened, that's the
8       initials I -- I put the initials to the
9       corresponding spots when he pointed to them.
10      There's even a spot on there with an X that
11      just -- he says, well, I don't know who -- I
12      don't know who this -- this guy was, but he
13      was standing right here.  So I used that, an
14      X.
15 Q.   Why are the initials DW on there twice?
16 A.   Before and during the shooting.  Two different
17      spots.
18 Q.   According to Donald Jennings, the way he
19      explained it to you, who were the people in
20      the immediate vicinity of the victim during
21      the shooting?
22 A.   Danny Wilber and Jeranek Diaz.
23 Q.   At the -- underneath where the red initials
24      are, there's sort of some arrows pointing?
25 A.   Yes.
```

198

```
1    Q.    What are those?

2    A.    That indicates where he said that other people

3          started coming into the kitchen, and I wrote

4          the word 'others' by those arrows.

5    Q.    Was he able to explain to you, for example,

6          how it was that since he was at the sink he

7          could see back into the living room?

8    A.    No, no, I don't think he was indicating that

9          he could see into the living room.  It's just

10         that's where the doorway leading from the

11         doorway to the kitchen was, and that's where

12         he could see people coming into the kitchen

13         from the living room.

14   Q.    I want to talk for a minute as well about how

15         that diagram got created in terms of when the

16         interview started, when it ended, when that

17         happened.  What date did you interview

18         Mr. Jennings?

19   A.    On September 14th of 2004.

20   Q.    September?

21   A.    I'm sorry, March.  I'm sorry.

22   Q.    March 14th of '04?

23   A.    That's correct.

24   Q.    What time did the interview start, what time

25         did it end?
```

```
 1   A.   It started at 7:49 p.m. and ended at
 2        10:59 p.m.
 3   Q.   Was it difficult to get Mr. Jennings to talk
 4        to you?
 5   A.   I wouldn't say difficult.
 6   Q.   What would you say?
 7   A.   Well, he would talk, he -- he would speak to
 8        us and talk to us, whether or not he was
 9        telling the entire truth at the time, and --
10        and so that might have taken a little time for
11        him to get it out, but he got it out.
12   Q.   What he wanted you -- what he told you finally
13        was the truth was different from what he was
14        telling you at the beginning of the interview,
15        to some degree?
16             ATTORNEY CHERNIN:  Objection to
17        the characterize.  This is vouching for the
18        credibility of another witness.
19             THE COURT:  Overruled.  I'll
20        allow it.  Rephrase the question because it is
21        leading.
22             ATTORNEY GRIFFIN:  Sure.
23   BY ATTORNEY GRIFFIN:
24   Q.   Let's not use the word the truth, let's say
25        like final statement, what he wanted to tell
```

200

```
 1          you.  Was he saying things different, say in

 2          the last hour than in the first hour, to some

 3          degree or not?

 4     A.   I think that would be fair to say.

 5     Q.   Did you provide Mr. Jennings at the end of the

 6          statement with an opportunity to sign

 7          anything?

 8     A.   Yes.

 9     Q.   And when did that come up?

10     A.   After I wrote the statement out, after we went

11          through it together and I wrote the statement

12          out I read it back to him as he was there,

13          gave him the opportunity to read along if he

14          cared to, and at the end I asked if the

15          statement that we had just gone over was the

16          truth and if it was correct.  And he said it

17          was.  Then I put a -- an X at the end of the

18          statement.

19     Q.   On what page?

20     A.   Be on page 9 -- I'm sorry, on page 8 of 8, and

21          asked him if he would care to sign it, and he

22          said he didn't want to sign it.  He says, I

23          don't sign papers.

24     Q.   Now, at some point before that moment was

25          there a question about when he had ever
```

Case 1:10-cv-00179-WCG  Filed 08/29/19  Page 201 of 325  Document 61-24

```
 1        seen -- if he had ever seen Mr. Wilber with a
 2        gun before?
 3   A.   No.  No, we did not ask him that question,
 4        until I asked him if he wanted to sign this.
 5   Q.   How did that happen then?
 6   A.   After we were finished and I -- and I asked
 7        him if he signed it, then before we left the
 8        room, I think my partner was the one that
 9        asked him, hey, had you ever seen Danny Wilber
10        with a gun before.  Just as a -- like just an
11        additional question that we failed to ask him
12        during the bulk of the interview.
13   Q.   Had he already declined to sign, what would be
14        called the first eight pages of the statement?
15   A.   Yes.
16   Q.   And that -- that part about where you asked
17        him about Mr. Wilber ever having a gun is
18        actually added in sort of at the bottom of
19        page 8; correct?
20   A.   Yes.
21   Q.   And did you give him an opportunity to sign a
22        summary of that question and his answer?
23   A.   Yes.
24   Q.   And what did he say?
25   A.   He says no.
```

202

```
 1   Q.   When in the course of this interview was the

 2        diagram done, the sketch where you were

 3        placing initials in to represent where the

 4        different people were according to what

 5        Mr. Jennings told you?

 6   A.   Sometime in the -- in the middle of the

 7        interview, while the interview was still

 8        taking place and before I actually wrote the

 9        statement out.

10   Q.   I'm going to show you what's been marked as

11        Exhibit 39.  Do you recognize that?

12   A.   Yes.

13   Q.   What is it?

14   A.   It's a photocopy of the original diagram that

15        I made during the interview with Donald

16        Jennings.

17   Q.   You would agree that on that exhibit there's

18        no red ink anywhere?

19   A.   Correct.  It's just black and white.

20   Q.   Did you in fact present that document to

21        Mr. Jennings the way it is there and then

22        later after he was gone take a red pen and add

23        in some red things on there?

24   A.   No.

25                    ATTORNEY GRIFFIN:  Could I just
```

203

```
 1          have a second, Judge?

 2                          THE COURT:  You may.

 3     BY ATTORNEY GRIFFIN:

 4     Q.   Did Mr. Jennings, in the time you were with

 5          him, ask for anything that you didn't give

 6          him?  You know, food, rest, water, anything

 7          like that?

 8     A.   No.

 9     Q.   Or were any creature comforts given?

10     A.   I believe so.  He was given a -- a restroom

11          break, but he didn't ask for anything else.

12     Q.   And what happened when you were done with

13          him?  He was -- he was in custody on an

14          unrelated warrant; correct?

15     A.   I believe so, yes.

16     Q.   Okay.  It's fair to say that Mr. Jennings did

17          not call you or anyone from the Department and

18          say, hey, I gotta tell you what happened here,

19          man, and then he came in or you went and got

20          him or anything like that?

21                          ATTORNEY CHERNIN:  Well, I'm

22          going to object to the form of the question.

23          How would this -- 906.02.

24                          THE COURT:  State your objection.

25                          ATTORNEY CHERNIN:  Lack of
```

204

1    personal knowledge.  As this officer can

2    clearly indicate whether Mr. Jennings called

3    him, but as to whether he called any other

4    officer, that's Mr. Griffin's question.

5              THE COURT:  Rephrase.  He can

6    certainly ask him whether or not he knows if

7    that happened.

8              ATTORNEY GRIFFIN:  I'll withdraw

9    it, Judge.

10             THE COURT:  Question's withdrawn.

11             ATTORNEY GRIFFIN:  Nothing

12   further.

13             THE COURT:  Cross.

14             CROSS EXAMINATION:

15   BY ATTORNEY CHERNIN:

16   Q.   Now, Detective Jennings -- I'm sorry,

17        Detective Corbett, this is Mr. Jennings'

18        statement.  Prior to coming to court here

19        today, did you have the opportunity to review

20        the statement that you took from Mr. Jennings?

21   A.   Yes.

22   Q.   So -- and you did that for the purpose of

23        allowing you to answer questions that were

24        posed to you about that statement from

25        Mr. Griffin; correct?

205

```
 1   A.   Yes.

 2   Q.   Did you give Mr. Jennings the opportunity to

 3        review his statement prior to him coming in to

 4        court to testify earlier in these proceedings?

 5   A.   I did not.

 6   Q.   Now, in the entire course -- oh, you had this

 7        conversation with Mr. -- during the time that

 8        you had this conversation with Mr. Jennings,

 9        did he ever tell you that David Diaz was

10        behind -- or I'm sorry, that Danny Wilber was

11        behind David Diaz?

12   A.   I don't recall if he said that.

13   Q.   Well, you don't reflect that in your

14        statement, Exhibit 31; do you?

15   A.   I don't believe so.

16   Q.   And in the diagram, Exhibit 38 I believe it

17        is; is that correct?

18   A.   Yes.

19   Q.   In that diagram that's not to scale; is it?

20   A.   No.

21   Q.   And in the area that it shows Danny Wilber, I

22        think the legend that you have says -- well,

23        there's several -- the legends indicates Danny

24        Wilber during the shooting; is that correct?

25   A.   Yes, that's written in red.
```

206

```
 1   Q.   Okay.  And when Danny Wilber -- according to
 2        Mr. Jennings, where Danny Wilber was located
 3        during the shooting was in front of David
 4        Diaz; correct?
 5   A.   Yes.
 6   Q.   Although David Diaz could have been turned
 7        around and facing the living room, I mean
 8        according to the diagram, it's not clear what
 9        direction David Diaz was facing; right?  Am I
10        correct?
11   A.   That's true.
12   Q.   But you took it to understand that David Diaz
13        was facing the kitchen, because that's what he
14        said in the statement; correct?
15   A.   Yes.
16   Q.   And so you understood that and you understood
17        that Danny Wilber, according to what
18        Mr. Jennings was telling you, was facing David
19        Diaz; correct?
20   A.   Yes.
21   Q.   So you went through a bunch of other items
22        with Mr. -- I'm sorry, a bunch of different
23        questions with Mr. Jennings about who was
24        located within that kitchen; correct?
25   A.   Yes.
```

```
 1   Q.   And in fact, there was an X there; right?   And
 2        that indicates an unknown Hispanic male?
 3   A.   Yes.
 4   Q.   Did you ask Mr. Jennings where that unknown
 5        Hispanic male was at the time of the shooting
 6        or during the shooting?   Because he's not --
 7        that X is never moved in red; is it?
 8   A.   No.
 9   Q.   And the red is to indicate where people were
10        during the time of the shooting; correct?   Is
11        that correct?
12   A.   Well, where two people were, yes.
13   Q.   Okay.
14   A.   Not necessarily where everyone was.
15   Q.   Okay.   But no one -- you weren't really
16        concerned where everyone else was, you just
17        asked about where Danny Wilber and David Diaz
18        were; correct?
19   A.   Yes.
20   Q.   And you don't know where X, the unknown
21        Hispanic male, was; do you?
22   A.   At the time of the shooting?
23   Q.   At the time of the shooting.
24   A.   No.
25   Q.   And so he could have been involved in that
```

```
 1          fight as well; correct?
 2    A.    I had no information to -- to indicate that
 3          from anyone.
 4    Q.    You never asked Jeranek Diaz where that
 5          unknown Hispanic male was; did you?  Or you
 6          didn't?
 7    A.    No.
 8    Q.    And during the course of your interview with
 9          Mr. Jennings, he indicated that the shot came
10          from a vantage point outside of his viewing
11          area; correct?
12    A.    He mentioned there was some obstruction with
13          some kitchen cabinets.
14    Q.    Okay.  Have you been inside of 1128 West
15          Mineral?
16    A.    Yes.
17    Q.    And I'll show you what's been marked as
18          Exhibit 14.  Are those the kitchen cabinets to
19          which he was referring?
20    A.    Yes.
21    Q.    And so according to Mr. Jennings -- if you can
22          hold this so the jury can see it too --
23          according to Mr. Jennings, Mr. Jennings on the
24          diagram is in front of the kitchen sink;
25          correct?  Am I correct?
```

209

```
 1   A.   Not directly in front of it, but near it, yes.

 2   Q.   And his view is obstructed of items or what's

 3        occasioned to be happening to his right;

 4        correct?

 5   A.   Yes.

 6                  ATTORNEY GRIFFIN:  Are we talking

 7        about in the kitchen?

 8                  ATTORNEY CHERNIN:  In the

 9        kitchen, yes.

10   BY ATTORNEY CHERNIN:

11   Q.   So that -- and Mr. Jennings tells you that he

12        cannot see where the shot was fired from;

13        correct?

14   A.   Well, he's saying his -- his -- his view is

15        partially obstructed to his right.

16   Q.   To his right?

17   A.   But that's where the shot came from.

18   Q.   And that's where the shot came from, from the

19        area from which his view is obstructed;

20        correct?

21   A.   Partially obstructed, yes.

22   Q.   Okay.  And Mr. Jennings never tells you that

23        he sees his cousin Slim engaged in the

24        shooting; correct?  Am I correct in that

25        regard?
```

210

```
 1    A.    Yes.

 2    Q.    And so Mr. Jennings had told you and that --

 3          and when you go through the statement, and the

 4          final statement, and -- and if you ask him if

 5          this is true and correct, what you now know to

 6          be true and correct is that Donald Jennings

 7          could not see who the shooter was, that's one

 8          of the things that he says is true and

 9          correct, and you say is true and correct;

10          right?

11                    ATTORNEY GRIFFIN:  I'm going to

12          object.  The detective's not saying that's

13          true and correct.  He can't.

14                    ATTORNEY CHERNIN:  Well, his

15          report indicates that what he's saying is what

16          is reported is true and correct.

17                    THE COURT:  Ask him it that way

18          then.

19    BY ATTORNEY CHERNIN:

20    Q.    Okay.  Are you saying that what your report

21          says is true and correct?

22                    ATTORNEY GRIFFIN:  I object to

23          the form of that question.

24                    THE COURT:  Sustained.

25                    ATTORNEY GRIFFIN:  In what way?
```

211

```
 1                    THE COURT:  Sustained.

 2        Rephrase.

 3   BY ATTORNEY CHERNIN:

 4   Q.   What does it mean on your document when you

 5        say something is true and correct?

 6   A.   I'm asking if the -- in this case, if Donald

 7        Jennings agrees that this is true and correct.

 8   Q.   And what he's telling you is true and correct

 9        is that his view is partially obstructed and

10        that he cannot see -- he did not see the

11        shooter; correct?

12   A.   Correct.

13   Q.   And that his cousin Slim was not the shooter;

14        correct?

15   A.   I don't -- I don't -- no, the statement does

16        not say that Slim was not the shooter, he just

17        said that he didn't see the shooter.

18   Q.   And he -- but if he couldn't see the shooter

19        then and he told you where Slim was standing,

20        'cuz from what you said he could see Slim

21        during the shooting, isn't it just the logical

22        conclusion that if he couldn't see the shooter

23        but he could see and tell you where Slim was

24        during the shooting, that Slim was not the

25        shooter?
```

212

```
 1                    ATTORNEY GRIFFIN:  I'm going to
 2           object to that question.
 3                    THE COURT:  Sustained.
 4    BY ATTORNEY CHERNIN:
 5    Q.   You asked Mr. Jennings the question where Slim
 6         was during the shooting; correct?
 7    A.   Yes.
 8    Q.   And he's able to indicate on that diagram
 9         where Slim is; correct?
10    A.   Yes.
11    Q.   And the way that he can do that is because he
12         must have been able to see where Slim was;
13         correct?  Otherwise he wouldn't be able to
14         tell you where he was; right?
15                    ATTORNEY GRIFFIN:  Well, I'm
16           going to object to that as well.  That calls
17           for a conclusion that this detective can't
18           make.
19                    THE COURT:  Sustained.
20                    ATTORNEY CHERNIN:  Thank you.  I
21           won't go any further.  Thank you.
22                    THE COURT:  Redirect.
23                    REDIRECT EXAMINATION:
24    BY ATTORNEY GRIFFIN:
25    Q.   Detective, page 6 of 8 of Exhibit -- is it 31?
```

213

```
 1   A.   Yes.

 2   Q.   Very middle of the page, Torres appeared that

 3        he -- Torres was going to break up the fight

 4        between Wilber and Jeranek.  Do you see that?

 5   A.   Yes.

 6   Q.   And Wilber, what's the next sentence?

 7   A.   Stated that Wilber had his back --

 8                  ATTORNEY CHERNIN:  I'm going to

 9        object.  Are you asking the detective to read

10        what's in the report or are you asking him a

11        question about the report?

12                  THE COURT:  Do you have an

13        objection?

14                  ATTORNEY CHERNIN:  Yes.

15                  THE COURT:  I assume you're

16        directing that at me, you're asking me to make

17        a ruling here, right, because that's who would

18        have to make the ruling, right.  So phrase

19        your objection please.

20                  ATTORNEY CHERNIN:  Then -- then

21        it's an improper form of impeachment, if

22        that's what he's attempting to do.

23                  THE COURT:  It's not an improper

24        form of impeachment, but I'm going to sustain

25        it on other grounds.  Rephrase, Mr. Griffin.
```

214

1    BY ATTORNEY GRIFFIN:

2    Q.   At the moment of the shot, what did

3         Mr. Jennings tell you his position was

4         relative to Mr. Wilber and what part of

5         Mr. Wilber's body he could see?

6    A.   He said he was standing -- he meaning

7         Jennings -- was standing near the kitchen

8         sink, and that Wilber was to his right near

9         the entrance of the kitchen from the living

10        room.

11   Q.   Did he tell you that Wilber had his back

12        towards him at that point?

13   A.   Yes.   Him meaning Jennings.

14   Q.   Correct.   That at that point he's going

15        through the -- we're now talking really the

16        moments before the shot goes off; correct?

17   A.   That's correct.

18   Q.   Did he tell you that Wilber had his back

19        towards him?

20   A.   Yes.

21   Q.   That he didn't see anyone with any guns at

22        that point, but he heard a shot?

23   A.   That's correct.

24   Q.   So according to Donald Jennings, what he told

25        you was at the moment of the shot Danny

```
 1        Wilber's back was to him?

 2   A.   Correct.

 3                    ATTORNEY GRIFFIN:  Nothing

 4        further.

 5                    THE COURT:  Cross.

 6                    ATTORNEY CHERNIN:  I have no

 7        additional questions.

 8                    THE COURT:  Detective, you may

 9        step down.

10                    THE WITNESS:  Thank you.

11                    (Witness excused.)

12                    THE COURT:  Ladies and gentlemen,

13        we'll take our afternoon recess, we'll be back

14        on the record in -- at five minutes to the

15        hour of three.

16                    DEPUTY:  All rise for the jury

17        please.

18                    (Jury out of box.)

19                    THE COURT:  You may be seated.

20                    Mr. Griffin, you had indicated

21        yesterday at the end of the day that -- from

22        my notes that the remaining witnesses are on

23        your list, that is Detectives Schuler, Burgos,

24        Gastrow, Villarreal, Duffy and Michael

25        Caballero, that's six, and citizen witnesses
```

216

```
1        Richard Torres, that's seven witnesses that
2        you have left.  Whom do you anticipate calling
3        yet this afternoon?
4                    ATTORNEY GRIFFIN:  I would -- I
5        just may be calling Richard Torres, and
6        Detective Schuler is on his way in from out of
7        town, which isn't far, it's Madison.  I know
8        he's driving here now, so he thought he would
9        be here about 4:00, so -- so even if I needed
10       to interrupt Mr. Torres, Detective Schuler is
11       leaving town, I think Monday morning leaving
12       the State, so I'd like to get --
13                   THE COURT:  You're talking about
14       Rich Torres and Detective Schuler?
15                   ATTORNEY GRIFFIN:  Correct.
16                   THE COURT:  And then what would
17       be left for Monday?
18                   ATTORNEY GRIFFIN:  Villarreal,
19       Mike Caballero, Burgos --
20                   THE COURT:  Gastrow and Duffy?
21                   ATTORNEY GRIFFIN:  -- Gastrow,
22       Duffy, if we can't work out a stipulation I'd
23       have Officer Collado as well.  But I don't
24       know if ultimately -- well, I have nothing
25       further.
```

217

```
 1                    THE COURT:  All right.  We're

 2       going to take our break.  We'll be back on the

 3       record at 3:00 o'clock.

 4                    (Break taken.)

 5                    DEPUTY:  All rise for the jury.

 6                    (Jury in box.)

 7                    THE COURT:  You may be seated.

 8       State has leave to call its next witness.

 9                    ATTORNEY GRIFFIN:  Richard

10       Torres.

11                    THE COURT:  Mr. Torres, I'm going

12       to have you remain standing.  Raise your right

13       hand and my clerk will swear you in.

14                    RICHARD TORRES, called as a

15       witness herein, having been first duly sworn,

16       was examined and testified as follows.

17                    THE CLERK:  Please be seated.

18                    THE COURT:  Mr. Torres, what I'm

19       going to ask you to do is to pull that chair

20       in directly into the bench in front of you,

21       use the microphone and have it at a level

22       that's comfortable for you to speak into.

23       Speak up loud and clear, begin by stating your

24       full name for the record, spelling your first

25       and last name.
```

218

```
1                    THE WITNESS:  Richard Torres.
2        T-O-R-R-E-S.
3                    THE COURT:  You may begin.
4                    DIRECT EXAMINATION:
5    BY ATTORNEY GRIFFIN:
6    Q.   Mr. Torres, how old are you?
7    A.   I'm 33 years old.
8    Q.   And what part of town do you live in?
9    A.   Milwaukee.
10   Q.   North side, south side, east side, west side?
11   A.   South side.
12   Q.   What do you do for a living?
13   A.   I'm a student.
14   Q.   Where at?  What are you studying, I guess is a
15        better way.
16   A.   Studying for high school equivalence.
17                    THE COURT:  High school
18        equivalency test?
19   A.   Yes.
20   BY ATTORNEY GRIFFIN:
21   Q.   You mean your HSED?
22   A.   Yes.
23   Q.   How long have you lived in Milwaukee?
24   A.   Most of my life.
25   Q.   Have you ever been convicted of a crime?
```

219

```
 1  A.   Yes.

 2  Q.   How many times?

 3  A.   Eight times.

 4  Q.   On January 31st of last year, 2004, were you

 5       in the kitchen there on West Mineral when

 6       David Diaz got shot?

 7  A.   Yes.

 8  Q.   At the time David Diaz got shot, either in the

 9       moments immediately before or immediately

10       after or during, did you see anyone with a

11       gun?

12  A.   Yes.

13  Q.   Who was that?

14  A.   Slim.

15  Q.   When you say Slim, the guy you call Slim,

16       that's a nickname?

17  A.   Yes, it's a nickname.

18  Q.   And do you see that guy in court today?

19  A.   Yes, I do.

20  Q.   Can you point him out by where he's sitting

21       and what he's wearing?

22  A.   Blue sweater or shirt.

23  Q.   And you also pointed; correct?

24  A.   Correct.

25                    ATTORNEY GRIFFIN:  May the record
```

220

```
 1         reflect the witness has identified the
 2         defendant by description and by pointing.
 3                    THE COURT:  It does.
 4    BY ATTORNEY GRIFFIN:
 5    Q.   Before that day had you ever seen the
 6         defendant?
 7    A.   No.
 8    Q.   Were you aware of Mr. Diaz, Jeranek Diaz,
 9         selling him an old Cadillac, a used Cadillac
10         about a year or so before?
11    A.   Yeah, he told me about it.  No, I know who he
12         was.
13    Q.   Jeranek Diaz, you know him; right?
14    A.   Yes.
15    Q.   What's his nickname?
16    A.   Rocky.
17    Q.   Rocky?  Do some people call him Rock?
18    A.   Rock, yes.
19    Q.   What's your nickname?
20    A.   Vato.
21    Q.   Is that V-A-T-O?
22    A.   V-A-T-O.
23    Q.   I'm going to show you some photographs, first
24         I'm going to show you Exhibits 8 and 9.  This
25         is 8 and this is 9.  Take a look at 'em.
```

221

```
 1        Who's in those pictures?

 2   A.   This is myself.

 3   Q.   I'm going to ask you to -- it's a little bit

 4        far from the jury, but over here on the side

 5        of your -- your -- what would be your left

 6        eye, in both of these pictures there appear to

 7        be some kind of reddening on them, what's that

 8        from?

 9   A.   I was hit in the eye twice.

10   Q.   By who?

11   A.   By Slim.

12   Q.   When you say you were hit in the eye twice, do

13        you mean you were hit in the left eye?

14   A.   Yes.

15   Q.   And was getting hit by the defendant twice,

16        did that leave those marks on your face?

17   A.   Correct.

18   Q.   You've been in fights before in your life;

19        haven't you?

20   A.   Correct.

21   Q.   How many?

22   A.   Quite a few.

23               ATTORNEY CHERNIN:  I'm sorry, I

24        didn't hear the --

25               ATTORNEY GRIFFIN:  Quite a few.
```

```
 1                    THE COURT:  Quite a few.

 2                    ATTORNEY CHERNIN:  Quite a few.

 3       I'm sorry.

 4  BY ATTORNEY GRIFFIN:

 5  Q.   During this -- when you got hit twice by Slim

 6       did you get any hits laid on him?

 7  A.   No.

 8  Q.   Did Isaiah?

 9  A.   I think he did.

10  Q.   Is Isaiah your friend or Slim's friend?

11  A.   Actually he's a friend of Rocky.

12  Q.   I'm going to show you a photograph marked

13       Exhibit 20.  Well, can you read the number on

14       there?  Is it 20 on that sticker?

15  A.   Yes.

16  Q.   Okay.  Exhibit 20, who is that?

17  A.   This would be Isaiah.

18  Q.   And Isaiah is the guy -- was he also in the

19       kitchen right when David got shot?

20  A.   Yes.

21  Q.   While we're at it we'll show you a couple more

22       photos.  Exhibit 18, do you know that guy?

23  A.   Yes.

24  Q.   Who is that?

25  A.   This is Tony.
```

223

```
1    Q.   And is he a friend of yours?

2    A.   Yes.

3    Q.   And Exhibit 22, do you know that guy?

4    A.   Yes.

5    Q.   Who's that?

6    A.   Friend Jay.

7    Q.   Jay?

8    A.   Yeah.

9    Q.   Is he a friend of yours?

10   A.   Yes.

11   Q.   Is he also a friend of Slim's?

12   A.   Yes.

13   Q.   Exhibit 12, do you know that person?

14   A.   No.

15   Q.   Was -- have you ever seen her before in your

16        life?

17   A.   Yes.

18   Q.   When?

19   A.   In the kitchen in my friend David's house.

20   Q.   When David got shot?

21   A.   Right.

22   Q.   Do you know who she is now?

23             THE COURT:  One moment.

24        Mr. Griffin, I'm going to have you slow down a

25        little bit.  Also, Mr. Torres, really remember
```

                                224

```
1        to keep your voice up, okay, use the mike and
2        just really remember to speak up loud and
3        clear into the mike.  Go ahead.
4   BY ATTORNEY GRIFFIN:
5   Q.   Exhibit 12, do you know who that is?
6   A.   Yes.
7   Q.   You do.  Now, back then did you know who she
8        was?
9   A.   No, I didn't.
10  Q.   Do you know who she is in relationship to the
11       defendant?
12  A.   Yes.
13  Q.   Who?
14  A.   His sister.
15                      ATTORNEY GRIFFIN:  And for the
16       record, Judge, 12 is Antonia West.
17  BY ATTORNEY GRIFFIN:
18  Q.   The guy in Exhibit 22 here, the guy you called
19       Jay, do you know what he is?  What his
20       relationship is to the defendant, if any?
21  A.   Probably an associate.
22  Q.   But not family?
23  A.   No, not family.
24  Q.   Exhibit 19, do you know that gentleman?
25  A.   Yes.
```

225

```
1   Q.   What's his name?

2   A.   Javy.

3   Q.   Javy?

4   A.   Yes.

5   Q.   And is he a friend of yours?

6   A.   No.

7   Q.   Okay.  But you know him?

8   A.   Associate, yes.

9   Q.   Okay.  And is he -- what's his relationship,

10       if any, to the defendant?

11  A.   I would say associate and friend.

12  Q.   On the night that David -- and let me back up

13       a minute.  David Diaz, what was he to you?

14  A.   Good friend of mine.

15  Q.   He was living at 1128 West Mineral; correct?

16  A.   Correct.

17  Q.   Did he live there with his wife?

18  A.   Yes.

19  Q.   And what was her name?

20  A.   Adriana.

21  Q.   Adriana, but everyone called her --

22  A.   Cindy.

23  Q.   -- Cindy?  Were you also living there --

24  A.   Yes, I was.

25  Q.   -- at the time David got shot?
```

226

```
1   A.   Yes.

2   Q.   Was there anyone else living there besides you

3        three?

4   A.   Yes, there was.

5   Q.   Who's that?

6   A.   Heather.

7   Q.   And who is Heather to you?

8   A.   A friend.

9   Q.   Friend, girlfriend, just friend?

10  A.   Just friend.

11  Q.   How long had you been living there on West

12       Mineral before David got shot?

13  A.   About over half a year.

14  Q.   And how long had you known David?  In other

15       words, had it been years?  A year?

16  A.   I met him when he first came from California,

17       which was 1998.

18  Q.   The night that he died was actually in the

19       early morning hours of a Saturday; right?

20  A.   Yes.

21  Q.   That Friday night had you gone out?

22  A.   Yes, we had gone out.

23  Q.   Where had you gone?

24  A.   We went to a few clubs.

25  Q.   Was one of them the Macho Lounge or something
```

227

```
1        like that?  Do you recall?

2   A.   Yes.

3   Q.   And did you end up at a place called

4        Bacardi's?

5   A.   No, I didn't.

6   Q.   You didn't go to Bacardi's?

7   A.   That's right.

8   Q.   Which one's -- besides the Macho Lounge or

9        whatever, was there another place?

10  A.   A friend of mine, his name is Fernando, was an

11       ex-bouncer at Galaxia, so we decided to go

12       there.

13  Q.   Does Rock know Fernando?

14  A.   No, he doesn't.

15  Q.   Where was Galaxia?

16  A.   It's on 13th and Lincoln.

17  Q.   Do you remember about what time you guys all

18       headed out that night?

19  A.   Yes.

20  Q.   What time?

21  A.   About 10:00 -- 10:30.

22  Q.   Who went?  In other words, in the group that

23       you were with initially, when you guys first

24       headed out who was with you?

25  A.   Well, we started out as girl and guy partners,
```

228

```
1          which I was going out with Claudia, and David
2          was with his wife, and Rocky was accompanying
3          Heather, and my friend was the only one solo,
4          which was Fernando.
5    Q.    Did you go to Galaxia first?
6    A.    Yes.
7    Q.    And then where?
8    A.    That was only place we went.
9    Q.    Did you ever get to the Macho Lounge that
10         night yourself?
11   A.    That was the first place that we went to.
12   Q.    Okay.  Sorry.  Where was the first place you
13         went to?
14   A.    Was the Macho Lounge.
15   Q.    And then?
16   A.    After that we went to Galaxia, but the other
17         group of people went to Bacardi Lounge.
18   Q.    Did you yourself ever make it to the
19         Bacardi's?
20   A.    No, I didn't.
21   Q.    From Galaxia where did you go?
22   A.    From Galaxia we went to the house.
23   Q.    On Mineral?
24   A.    On Mineral.
25   Q.    Was there a plan that day, in other words,
```

229

```
 1        when you first left Mineral at say 10:00 or
 2        10:30 was there an idea already in your mind
 3        that after bar time you guys would be all
 4        going back there?
 5   A.   A few people were invited, yes.
 6   Q.   But as is common in those things, the few
 7        people invite a few people who invite a few
 8        people?
 9   A.   Right.  Correct.
10   Q.   Okay.  Do you remember about what time you got
11        back to West Mineral?
12   A.   I'd say about close to 3:00 o'clock.
13   Q.   How long, as best you recall, from the time
14        you got back to the time the shooting
15        happened?  Hours?
16   A.   About an hour -- maybe about -- just about 45
17        minutes.
18   Q.   During that time that you were there, before
19        the shooting, was there anybody out of control
20        acting -- that was causing trouble?
21   A.   Yes.
22   Q.   Who was that?
23   A.   That would be Slim.
24   Q.   Other than Slim anybody?
25   A.   Other people who were lifting weights.
```

230

```
 1   Q.   Let's back up with the lifting weight problem
 2        or issue, whatever.  What was going on with
 3        that?
 4   A.   They were having a weightlifting like contest
 5        in the front room, because they seen the
 6        weights down there that we usually work out
 7        with, and I guess they were getting out of
 8        control by slamming 'em on the floor.  And at
 9        one time I heard that Adriana got hit with
10        a -- with a weight or something like that.
11   Q.   Adriana is David's wife?
12   A.   Wife, yes.
13   Q.   Was that what -- was that what ultimately led
14        to the weightlifting session ending?
15   A.   Yes, 'cuz they were told to keep it down or to
16        leave.
17   Q.   So was the defendant one of the guys
18        weightlifting?
19   A.   Yes.
20   Q.   If you know.
21                    Where were you when all that was
22        going on?
23   A.   I was in the living room and I was -- I went
24        upstairs for a little while.
25   Q.   Who was upstairs?
```

231

```
1    A.   At the time it was my girlfriend Claudia and
2         Dave's wife and a friend Fernando was up in my
3         room.  Also Heather was in the stairway.
4    Q.   Were you -- was there anything before the
5         weight part of it, the weights and all that,
6         was there anything -- any particular tension
7         in the house or anything like that?
8    A.   There had been like tension before from a
9         different -- like group of people that were
10        there from a week ago or so.  But --
11   Q.   And --
12   A.   -- it was just something that really didn't
13        bother me at that time.
14   Q.   Were they there again this night?
15   A.   One of the persons was.
16   Q.   Who was that?
17   A.   That would be Ricky.
18   Q.   Do you know his full name?
19   A.   No, I don't.
20   Q.   Is it Jose something?  If you know.
21   A.   I'm not sure.
22   Q.   Is he black, white, Hispanic, Asian?
23   A.   Hispanic.
24   Q.   Was he in the kitchen when the shooting
25        happened?
```

Case 1:10-cv-00179-WCG  Filed 08/29/19  Page 232 of 325  Document 61-24

```
1   A.   No, he wasn't.

2   Q.   Was he in the house?

3   A.   He was in the house.

4   Q.   Where?

5   A.   In the living room.

6   Q.   The part about the weightlifting, how long

7        does all that go on?

8   A.   About 12 -- 15 minutes.

9   Q.   And then is it David then -- David Diaz that

10       puts the end to all that, that says that's got

11       stop, or how did that go?

12  A.   No, actually he was upstairs and he just

13       didn't like the crowd being downstairs 'cuz

14       all the beverages were gone and people started

15       bringing their own paraphernalia and stuff

16       like that out.

17  Q.   Their own what?

18  A.   Like marijuana and stuff out.

19              THE COURT:  The word you used

20       earlier was paraphernalia?

21              THE WITNESS:  Yes.

22              THE COURT:  Meaning as in drug

23       paraphernalia?

24              THE WITNESS:  Yes.

25              THE COURT:  Thank you, sir.
```

233

```
 1    BY ATTORNEY GRIFFIN:

 2    Q.   You'd been out drinking that night; right?

 3    A.   Correct.

 4    Q.   How would you describe your level of

 5         drunkenness at this point?  Extremely, buzzed,

 6         in the middle?

 7    A.   No.  Mild.  Mild.

 8    Q.   Do you recall what you were drinking?

 9    A.   Domestic beer.

10    Q.   Like Buds, MGD's, what's your --

11    A.   Yeah, basically MGD.

12    Q.   Just something brewed here?

13    A.   Yes.

14    Q.   After the weightlifting thing, what happened?

15    A.   Well, after the weightlifting thing, my friend

16         just told everybody to go, he went

17         downstairs.  And as I came downstairs behind

18         him there was already an argument inside the

19         kitchen.

20    Q.   When you say your friend, who are you

21         referring to that came down the stairs ahead

22         of you?

23    A.   David Diaz.

24    Q.   Where was Rock?

25    A.   Rock was already downstairs in the kitchen.
```

234

```
 1   Q.   When you came out of those stairs, is the
 2        kitchen then, as you get to the bottom of
 3        those stairs there's the kitchen to your left
 4        or to your right?
 5   A.   To the left.
 6   Q.   Did you go in the kitchen?
 7   A.   Yes, I did.
 8   Q.   And what was the cause of the commotion in
 9        there?
10   A.   Slim was arguing with Jay in the kitchen.
11   Q.   Do you know what that argument was about?
12   A.   It was about Jay puffing his chest out at Slim
13        from other parties, and this particular night
14        too I guess he was talking with him.
15   Q.   How did that confrontation go?
16   A.   Slim had a -- pulled Jay's chain right off of
17        his neck.
18   Q.   What kind of chain was it?
19   A.   A silver chain.
20   Q.   Was it one of those, you know, around the neck
21        kind or one of those ones that hangs down?
22   A.   A little bit long, kind of like midway.
23   Q.   Did you see the defendant grab that chain?
24   A.   Yes, I did.
25   Q.   Do you recall where Jay and the defendant were
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 235 of 325   Document 61-24

```
 1        in the kitchen when that happened?

 2   A.   Yes.

 3   Q.   I'm going to ask you to look at this.  You can

 4        step off there if you would for a minute and

 5        take a look at it, so that you -- I'm going to

 6        ask you to stand right there so the jury can

 7        still see and hear you.

 8                     Okay.  Do you recognize this as a

 9        sketch of 1128 West Mineral?

10   A.   Yes, I do.

11   Q.   It's marked as Exhibit Number 1.  Have you

12        ever seen this diagram before today?

13   A.   No.

14   Q.   Do you recognize the living room sort of at

15        the south, as you go up on this diagram, what

16        would be north, the back of the house has the

17        kitchen?

18   A.   Yes.

19                     ATTORNEY CHERNIN:  Judge, can I

20        position myself so that I can see?

21                     THE COURT:  You may.

22   BY ATTORNEY GRIFFIN:

23   Q.   I want you to point to the area of the kitchen

24        where Jay and the defendant were when the

25        defendant snatched his necklace, as you
```

236

```
 1      recall.

 2   A.  Okay.  Jay, these two right around here.

 3   Q.  And you're pointing again to -- assuming that

 4       this square with the two in it is the table,

 5       you're talking would be the bottom left-hand

 6       corner off that, in the kitchen off that

 7       corner of the table?

 8                  THE COURT:  One moment,

 9       Mr. Griffin.

10                  Make sure you keep your voice up,

11       Mr. Torres.

12                  THE WITNESS:  Thank you.

13   BY ATTORNEY GRIFFIN:

14   Q.  When you saw the defendant and Jay over in

15       this area of the kitchen, if you could point

16       on there where you were.

17   A.  I came down at first and I seen 'em do that,

18       so I was over here, but close to the table.  I

19       told them to cool off and stuff like that.

20       Jay was over here and he was over here.

21   Q.  When you say he was over here --

22   A.  Slim.  Slim is over here.

23   Q.  And you're pointing with the pointer to the

24       area of the kitchen on this diagram just above

25       the letter E where it says kitchen; correct?
```

237

```
 1   A.   Yes.

 2   Q.   And before you pointed to where Jay was in the

 3        area of the kitchen off of what would be the

 4        top --

 5   A.   Top corner.

 6   Q.   -- top left corner of the table?

 7   A.   Yes.

 8   Q.   Where are the stairs that you came down?

 9   A.   The stairs come back down here.

10   Q.   And --

11   A.   Behind the kitchen wall.

12   Q.   Did you approach the defendant?

13   A.   Did I approach him?

14   Q.   Yeah.

15   A.   I went towards him, yes, I did.

16   Q.   What did you tell him?

17   A.   I told him to give Jay's shit back.

18   Q.   And did you offer any words of advice to the

19        defendant about how he should behave?

20   A.   I just told him he needs to chill out or he

21        would have to leave.

22                  THE COURT:  Make sure you keep

23        your voice up.

24   BY ATTORNEY GRIFFIN:

25   Q.   As best you recall, when you come in the
```

238

```
1        kitchen and move towards the defendant, where
2        is David?
3   A.   David is like right by the back door.
4   Q.   And what about Rock?
5   A.   Rock is right next to him.
6                 ATTORNEY GRIFFIN:  Do you want
7        him to -- and me to switch maybe, Judge, since
8        he's a little quieter, he would be talking to
9        the reporter.
10                THE COURT:  That might be a
11       better idea.
12  BY ATTORNEY GRIFFIN:
13  Q.   Now you're moving over again.  You had the
14       defendant --
15                THE COURT:  One moment.
16                Mr. Torres, I'm going to have you
17       step back a little bit though so that you're
18       not blocking the view of the jury.  Thank you,
19       sir.
20  BY ATTORNEY GRIFFIN:
21  Q.   You have the defendant over by the E in
22       kitchen sort of; correct?
23  A.   Correct.
24  Q.   You move toward him and tell him to chill out,
25       you said that Dave was over by the door, and
```

239

```
 1       where was Rock?

 2  A.   Rock was right here by the door also.

 3  Q.   You're pointing again on this diagram very

 4       near what would be on the -- the -- just to

 5       the left of the number 11 here, 11 foot 8 on

 6       the top right of the chart; correct?

 7  A.   Correct.

 8  Q.   Okay.  What are Rock and David doing?  As best

 9       you recall.

10  A.   They were talking.

11  Q.   When you came toward the defendant what

12       happened next?

13  A.   He started walking over here by David and by

14       Rock, and I guess David had told Rocky to tell

15       Slim to either tell his friends to leave or go

16       home.  So he didn't want to hear that so he

17       went over by Rocky and started saying some

18       words to him, saying like, oh, I don't care

19       what you are or who you with, whatever, you're

20       not going to talk to me this way, and started

21       choking him.

22  Q.   As -- as Rock and the defendant are having

23       their little argument or whatever, where are

24       you?

25  A.   I myself am right here, right where he was
```

240

```
 1          standing right close by.

 2    Q.    And where is David?

 3    A.    And David is still right over here.

 4    Q.    How close are -- where the defendant and Rock

 5          are, how close is David to them?

 6    A.    Right next to 'em.

 7    Q.    As close as we are or closer?

 8    A.    About as close as we are or even closer.

 9                    ATTORNEY CHERNIN:  Could -- for

10          the record, Judge, you want to say about how

11          far that is, the distance.

12                    THE COURT:  Mr. Griffin, I'm

13          assuming is going to clarify that for us.

14                    Go ahead, Mr. Griffin.

15                    ATTORNEY GRIFFIN:  Five feet.

16          Four feet.

17                    THE COURT:  The distance between

18          the defendant and the -- or the prosecutor and

19          the witness from the court's visual is a

20          distance of about three to four feet.  You may

21          continue.

22                    ATTORNEY CHERNIN:  Right.  Well,

23          I would respectfully say it's --

24                    THE COURT:  Mr. Chernin, you

25          asked the court to do it, I've done it.  Move
```

241

```
 1      along.
 2                        ATTORNEY CHERNIN:  Well, Your
 3           Honor --
 4                        THE COURT:  We'll have a side bar
 5           then.
 6                        (Side bar.)
 7                        THE COURT:  You may continue.
 8      BY ATTORNEY GRIFFIN:
 9      Q.   Mr. Torres, I'm going to show you now a
10           photograph that's been marked as Exhibit 14.
11           I'm going to ask you to take a look at it.
12      A.   Okay.
13      Q.   Do you recognize that?
14      A.   Yes, I do.
15      Q.   The space in that kitchen as we see in this
16           picture, it's a little bit tighter than is on
17           this particular diagram; right?
18      A.   Yes.
19      Q.   In other words, my -- could -- could two
20           people shoulder to shoulder walk in the space
21           between the kitchen and the sink right next to
22           each other, you know, walk together, or would
23           you have to go one at a time?  In this space
24           right in here.
25      A.   You can actually walk two -- within the
```

242

```
 1        tables, not right there.  It's usually in the
 2        middle.
 3   Q.   The table's usually in the middle?
 4   A.   Right.
 5   Q.   The foot that we see back there, is that David
 6        Diaz?
 7   A.   Yes.
 8   Q.   At the time you saw the defendant and Rock
 9        engaged in their physical altercation, would
10        their spot, when that happened, be on this
11        picture?  In other words, when you saw the
12        defendant grab Rock, where were they?
13   A.   Right by this plug fixture right here.
14   Q.   You're talking about the little outlet there
15        on Exhibit 14?
16   A.   Right.
17   Q.   And where was David at that point?
18   A.   David was right -- right by the door.
19   Q.   You're pointing to the white door in this
20        picture and really the right side of it?
21   A.   Right side.
22   Q.   And where were you?
23   A.   I was right here by the sink.  Actually this
24        is my hat.
25   Q.   That's your hat?
```

243

```
 1   A.   Yes.

 2   Q.   Do you recall a guy by the name of Donald

 3        Jennings being in this kitchen?

 4   A.   I don't know Donald Jennings.  I don't recall

 5        the name.

 6   Q.   What about maybe the defendant's cousin?  Do

 7        you remember the defendant's cousin being in

 8        there?

 9   A.   Yes.

10   Q.   What did you call him?

11   A.   Darnell.

12   Q.   Darnell?

13   A.   Yes.

14   Q.   Was there anyone else in the kitchen?

15   A.   Yes, there was other girls in the kitchen

16        also.

17   Q.   Was one of them the defendant's sister?

18   A.   Yes.

19   Q.   Where was she about?

20   A.   Over here by the stove.

21   Q.   You're pointing -- again, point to it on the

22        picture, put your finger on there.

23   A.   Right here.

24   Q.   You're pointing on this picture, what would be

25        the lower end of the stove?
```

244

```
 1    A.    Right.

 2    Q.    Okay.  What did the defendant do to Rock?

 3    A.    Choked him and also punched him in the mouth.

 4    Q.    What did Rock do to the defendant that you

 5          saw?

 6    A.    Was pushing him off, telling him that he

 7          wasn't scared of him.

 8    Q.    Did the -- did the defendant make some comment

 9          to Rock about Rock being an MP?

10    A.    Yes, he did.

11    Q.    What was that?

12    A.    That he didn't care if he was an MP or who the

13          hell he was, that he couldn't talk to him like

14          that.

15    Q.    What's an MP?

16    A.    A -- a gang affiliation with Mexican Posse.

17    Q.    Was Rock MP?

18    A.    Used to be.

19    Q.    And it's fair to say that in the gang world --

20          you know something about the gang world; don't

21          you?

22    A.    Yes.

23    Q.    That -- that you may stop affiliating with a

24          gang, but for most people and for the rest of

25          the world that's what you are forever; right?
```

245

```
 1   A.   You're associated with them forever, yes.

 2   Q.   Okay.  Did the altercation between the

 3        defendant and Rock take seconds, minutes,

 4        hours, days?  How long?

 5   A.   I say less than a minute.

 6   Q.   And what did you do?

 7   A.   Well, after I seen him hit Rocky in the mouth,

 8        which is my friend, I grabbed him from behind

 9        his jacket in attempt to either push him out

10        the door or to leave.

11   Q.   Grabbed who?

12   A.   Slim.

13   Q.   From behind?

14   A.   From behind.

15   Q.   So do you know whether or not Slim knew you

16        were coming at that point?

17   A.   No, he didn't.

18   Q.   And what happened when you grabbed him from

19        behind?

20   A.   I lost balance, because someone either hit him

21        or pushed him and knocked both of us to lose

22        balance and he twisted out of it, as we stood

23        up he punched me twice in the eye.

24   Q.   And that's what -- what left your marks on

25        your face in Exhibits 8 and 9?
```

246

```
 1   A.    Correct.

 2                  ATTORNEY GRIFFIN:  Judge, I'd ask

 3         that Exhibits 8 and 9 be published to the

 4         jury.  First I'll move 8 and 9 into evidence.

 5                  THE COURT:  I'm double checking

 6         my notes.  I don't believe they have been

 7         received into the record at this time.

 8                  ATTORNEY GRIFFIN:  You're right,

 9         they haven't.  I'll move them into evidence at

10         this time.

11                  THE COURT:  I take that back.

12         Exhibit -- it's Exhibit 8 and 9?

13                  ATTORNEY GRIFFIN:  Yes.

14                  THE COURT:  They have not been

15         received into the record.  Are you moving them

16         in at this time?

17                  ATTORNEY GRIFFIN:  Yes.

18                  THE COURT:  Any objection?

19         Exhibit 8 and Exhibit 9 are the photographs of

20         the --

21                  ATTORNEY CHERNIN:  No, Judge.

22                  THE COURT:  -- of the witness,

23         Richard Torres.

24                  ATTORNEY CHERNIN:  I'm sorry, no

25         objection.
```

```
 1                    THE COURT:  Court will receive
 2        Exhibit 8 and Exhibit 9 into the record at
 3        this time.
 4                    (Exhibits Number 8 and 9 were
 5        received into evidence.)
 6                    ATTORNEY GRIFFIN:  Permission to
 7        publish.
 8                    THE COURT:  Permission granted.
 9                    They've been published.  You may
10        continue.
11                    ATTORNEY GRIFFIN:  Thank you.
12   BY ATTORNEY GRIFFIN:
13   Q.   You grabbed the defendant from behind and he
14        turned around, that's when he punched you?
15   A.   Yes.
16   Q.   Where are you in that kitchen when the
17        defendant punches you?
18   A.   By the kitchen sink.
19   Q.   Again on Exhibit 14, point to the -- if you
20        would -- on this picture where you were
21        when -- when the defendant punched you.
22   A.   Right here.
23   Q.   You're pointing to what would be the left sink
24        basin as you look at it?
25   A.   Yes.
```

248

```
 1   Q.   Okay.  What happened when he punched you?

 2   A.   He hit me kind of hard, so I blacked out a

 3        little bit.

 4   Q.   Did you actually go down the floor

 5        unconscious?

 6   A.   No, I leaned up against the second sink.

 7   Q.   And when you did that what happened?

 8   A.   I heard a gunshot.

 9   Q.   Where was the gunshot coming from?

10   A.   To the right of me.  To the right side of

11        my -- my ear.

12   Q.   And who was to the right of you?

13   A.   At that time it was Slim.

14                ATTORNEY GRIFFIN:  I'm going to

15        ask you to again step off, if I may, and I'm

16        going to ask if Detective Casper can join me,

17        Judge, just as another body used to show where

18        people were.

19                THE COURT:  You may.

20   BY ATTORNEY GRIFFIN:

21   Q.   Mr. Torres, I'm going to ask you to come

22        down.  I want you to assume -- I want you to

23        stand over here.  Was the sink to your back

24        when you got punched?

25   A.   Yes.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 249 of 325   Document 61-24

```
 1   Q.   Okay.  So we're going to assume just for the
 2        minute the sink is sort of right behind you.
 3        Okay.  And this would be sort of the doorway
 4        back into the living room --
 5   A.   Yes.
 6   Q.   -- as I pointed to the witness box, which is
 7        now to your right and then behind you in that
 8        area; right?
 9   A.   Yes.
10   Q.   Point to where the kitchen table would be
11        then.
12   A.   Kitchen table would be right up on -- right
13        above here.
14   Q.   Where would the door be that's in Exhibit 14,
15        this -- this white door?
16   A.   White door would be right about here.
17   Q.   How far is that door --
18             THE COURT:  You're pointing off
19        to the right with your right arm extended off
20        to the right of the courtroom in the direction
21        of the window, and the -- and the -- what's
22        been labeled previously as Exhibit 1.
23   BY ATTORNEY GRIFFIN:
24   Q.   As you stand where you are now, is this wall
25        about that far or would the door have been a
```

```
 1        little bit closer or a little bit further

 2        away?

 3   A.   Just about this distance.

 4   Q.   Now I want you to have Detective Casper stand

 5        where Slim was.

 6   A.   He --

 7                   THE COURT:  We need you to keep

 8        your voice up.

 9   A.   He would be probably around right about here.

10   BY ATTORNEY GRIFFIN:

11   Q.   And again, put yourself back where you were.

12        And this is after he punches you?

13   A.   After he punches me.

14   Q.   So you've gone over by the wall and gotten

15        him, he turns around, punches you twice?

16   A.   Yeah, and steps back to his position.

17   Q.   Is that about the approximate distance that

18        you recall?

19   A.   Yes.

20   Q.   Now I'm going to stand where you are, I'll be

21        you now, and I want you to show the jury where

22        David Diaz was.

23   A.   David was right about here.

24   Q.   And how was he facing?

25   A.   Just as I'm standing right now.
```

251

```
1    Q.   So you have right now, again, if I'm you, I'm
2         looking at your back?
3    A.   Um-hmm (meaning yes).
4    Q.   The defendant is directly to your left;
5         correct?
6    A.   Yes.
7    Q.   Okay.  And you are looking at a direction that
8         would have you in the house, in any event, be
9         looking in a southeasterly -- is that right --
10        no, northeasterly direction; correct?
11   A.   Correct.
12   Q.   Okay.  Now I'm going to go assume David's
13        position and you go back and take yours.
14        Okay.
15                   This was the point where you
16        recall everyone being at the moment of the
17        gunshot?
18   A.   Yes.
19   Q.   And where is Rock?  Like if -- if I'm David
20        where is Rock?
21   A.   Right next to him.
22   Q.   In -- on -- on what would be towards his back
23        side?
24   A.   His front side.
25   Q.   His front side.  In other words, over here
```

252

```
 1        where this --
 2   A.   Right.
 3                   ATTORNEY GRIFFIN:  What do you
 4        call this, Judge?
 5   A.   Yeah.
 6                   THE COURT:  Pointing to the
 7        easel?
 8                   ATTORNEY GRIFFIN:  Yes, the
 9        easel.
10   BY ATTORNEY GRIFFIN:
11   Q.   Was this about the right distance?
12   A.   Yes.
13   Q.   Okay.  Was there anyone behind David at that
14        point that you could see?
15   A.   No one I could see to my right, no.
16   Q.   Is Isaiah there with you guys?
17   A.   Yes.
18   Q.   Where is Isaiah?
19   A.   Just some -- right by the side of Slim.
20   Q.   When you say Isaiah is by the side of Slim, do
21        you mean between Slim and Rock, or by the
22        other side of Slim by you?
23   A.   If his sister is there then Isaiah was in the
24        kitchen behind Slim's sister.
25   Q.   Where is Slim's sister at this point?
```

253

```
 1   A.   By the stove.

 2   Q.   Again, that would be up where I'm pointing

 3        towards that wall, which would have been

 4        directly north of where David is?

 5   A.   Yes.

 6   Q.   Not directly, but north of where he is?

 7   A.   Right.

 8   Q.   Okay.  After Slim hits you, you said you sort

 9        of black out, see stars, how would you

10        describe it?

11   A.   Like kind of black out, seeing white.

12   Q.   At that point you hear a gunshot?

13   A.   I heard a gunshot.

14   Q.   Do you see anyone with a gun?

15   A.   I heard the gunshot, when I came back to I did

16        see someone with a gun.

17   Q.   Who is that?

18   A.   Slim.

19   Q.   Okay.  In other words, that would be the

20        detective?

21   A.   Yes.

22   Q.   And where is David at that point?

23   A.   David's already falling from his position

24        towards the kitchen stove.

25   Q.   Falling what would be -- if I'm David again
```

254

```
 1        I'm going to fall toward my left and toward
 2        the floor?
 3   A.   Yes.
 4   Q.   Okay.  At that point did you know where David
 5        was shot?
 6   A.   Yes.
 7   Q.   I mean to the point where you didn't --
 8   A.   I didn't know exactly like when he got shot,
 9        but I seen that he was falling from the
10        gunshot.
11   Q.   Could you see where it was?
12   A.   Yes.
13   Q.   Can you point on my body where it was?  As
14        best you recall.
15   A.   Right about here.
16   Q.   And you're pointing to what would be my left
17        ear about an inch or so up above my left ear?
18   A.   Yes.
19   Q.   Okay.  You did not see the shot that killed
20        David; correct?
21   A.   Correct.
22   Q.   In other words, do you know what muzzle flash
23        is?
24   A.   No, I don't.
25   Q.   When someone fires a gun and the sparks that
```

255

```
1        come out of the end of the barrel, did you
2        ever see those?
3   A.   No.
4   Q.   Did you ever see smoke from the gun?
5   A.   No, I don't think so.
6   Q.   When did you see someone with a gun and who
7        was it?
8   A.   After David was falling I did see Slim in a
9        crouched position with a gun.
10  Q.   Okay.  I'm going to have you walk over where
11       Slim was now, and I'm going to ask Detective
12       Casper to just stand -- actually you can go,
13       if you would, Detective, thank you.  Are you
14       still here by the counter where I am?
15  A.   Yes, leaning more towards my left side.
16  Q.   Leaning?
17  A.   Leaning.
18  Q.   Okay.  And what is Slim doing?  If you can
19       show the jury I'll have you do it right now
20       where you are, then we'll turn around, I'll
21       let the jury see it better.
22  A.   Slim has a gun in his hands and he drops down
23       like this.
24  Q.   I'm going to ask you to turn around and show
25       the jury that move that you saw Slim do.
```

256

```
 1   A.   Slim was crouched down with a gun in his hand
 2        and looking around.
 3   Q.   And again, that would be right in front of
 4        you?
 5   A.   Right in front of me.
 6   Q.   What did you do?
 7   A.   Me, I went towards -- towards the bathroom.
 8        Stepped towards the bathroom.
 9   Q.   Away from Slim?
10   A.   Away from Slim.
11   Q.   If you would -- you can take a seat again.
12        Thank you.
13                   Do you recall what kind of gun
14        you saw Slim with?
15   A.   I stated that it was either a nine millimeter
16        or a 380.
17   Q.   Both of which are semiautomatics; right?
18   A.   Correct.
19   Q.   Do you remember the coloring?
20   A.   Black with chrome.
21   Q.   Chrome, chrome with black or black with chrome
22        or what?
23   A.   Black with chrome.
24   Q.   Was there ever a time where Slim was standing
25        with the gun, I mean holding it still?
```

257

```
 1   A.   He had it in his hand, yes.

 2   Q.   Was it his right hand or his left hand?

 3   A.   It was the right hand.

 4   Q.   So as Slim stands here, you're sort of

 5        directly in front of him at the moment that --

 6        right after he hits you?

 7   A.   Right.

 8   Q.   And David is off to his left?

 9   A.   Yes.

10   Q.   Okay.  Do you remember how tall David was?

11   A.   About five nine, five ten.

12   Q.   And when -- at least right after the shooting

13        Slim had the gun in his right hand, kind of --

14        was he moving back and forth the way I am?  In

15        other words, rotating my shoulders?

16   A.   Looking around, yes.

17   Q.   And David is now falling or has fallen to the

18        ground?

19   A.   Has fallen completely.

20   Q.   What did you hear after the gunshot?

21   A.   I heard someone in the kitchen yelling, you

22        shot that guy.

23   Q.   Do you know who that was?

24   A.   I can't recall who it was.

25   Q.   Was it a male or a female?
```

258

```
 1   A.   It was a male.
 2   Q.   What did Slim do?  In other words, as you
 3        moved toward the bathroom, did you keep your
 4        eye on him?
 5   A.   Yes, I did.
 6   Q.   Did he ever point the gun at you?
 7   A.   No, he didn't.
 8   Q.   And what did he do?
 9   A.   He was more in a confused state, kind of
10        confused, didn't know what was really going on
11        because someone turned the lights off.
12   Q.   Do you know who that was?
13   A.   No, I don't know.
14   Q.   Where was the light switch in that room?
15   A.   By the kitchen entrance.
16   Q.   How long was it before -- strike that.
17                    At some point Slim took off out
18        of there?
19   A.   Yes, shortly after the lights went out.  There
20        was still light from the bathroom.
21   Q.   Did you see him run out?
22   A.   Yes, I did.
23   Q.   And what did you do then?
24   A.   I gave chase behind.
25   Q.   You gave chase?
```

259

```
1    A.   To him, yes.

2    Q.   You chased an armed man?

3    A.   Yes.

4    Q.   Why?

5    A.   Because he just killed my friend.

6    Q.   How far did you chase him?

7    A.   I didn't get too far, people were running also

8         from behind and pushing me out of the way.

9    Q.   It's fair to say that after the gunshot there

10        is a mass departure from that house; right?

11   A.   Yes.

12   Q.   And what did you do then?  Did you catch him?

13   A.   No, I didn't.

14   Q.   And what did you do?

15   A.   I walked and turned around and I seen my

16        friend lying there in a pool of blood.

17   Q.   Did you ever get -- I guess -- let me back

18        that up.

19                     When you chased the defendant,

20        did you ever chase him to the point where you

21        left the house?

22   A.   No.

23   Q.   Where did you go get to the front door?

24   A.   Just to the living room.

25   Q.   And then what did you do?
```

260

```
1    A.   I had turned around and seen my friend full of
2         blood.
3    Q.   And after you saw that what did you do next?
4    A.   I had went upstairs, and I had the other
5         friend that was up in my bedroom, told him
6         that I had to leave, that my home boy had just
7         got shot in the kitchen.
8    Q.   Did you tell Adriana that her husband had been
9         shot?
10   A.   I had yelled that David had been shot.
11   Q.   Why did you have to leave at that point?
12   A.   I was in violation of probation and I was --
13        had a warrant.
14   Q.   And how long was it before the police then
15        were able to find you?
16   A.   Within a day.
17   Q.   Did they find you -- did you turn yourself
18        in?  What happened?
19   A.   They had called some other friends of mine and
20        gotten ahold of me, which I initially called
21        them and turned myself in.
22   Q.   Did you end up going back to some kind of, I
23        don't know, a custodial setting so to speak at
24        this point then?
25   A.   Yes, I was in a halfway house.
```

261

1    Q.    For how long?

2    A.    For around six months.

3    Q.    When you turned yourself in, how long did you

4          think you were facing back in jail for that

5          violation of probation?

6    A.    Two years.

7    Q.    Why didn't you just wait till the police found

8          you, then stay on the run as long as you

9          could?

10   A.    Because nobody else know what happened besides

11         myself and the people that were in that

12         kitchen that night.  And most of them were not

13         my friends.

14   Q.    You've talked to Rock about this at least once

15         or twice since then; haven't you?

16   A.    Yes.

17   Q.    And has Rock ever told you that he saw Slim

18         with a gun there in that kitchen?

19   A.    Yes, he have.

20                    ATTORNEY CHERNIN:  Objection.

21         Hearsay.

22                    THE COURT:  Side bar with the

23         lawyers.

24                    (Side bar.)

25                    THE COURT:  Objection is

                              262

```
1        overruled.

2    BY ATTORNEY GRIFFIN:

3    Q.   Mr. Torres?

4    A.   Yes.

5    Q.   When you talked with Rock about this, has he

6         ever told you when you were talking to him

7         that he didn't see Slim with a gun that day?

8    A.   No, he didn't.

9    Q.   What did Rock tell you about what he saw?

10   A.   Basically what I explained, that he was

11        talking with David, and that he had heard a

12        shot and he ducked out of the way.  And when

13        he looked back up that he had seen Slim with a

14        gun.

15   Q.   Did he ever tell you that he saw Slim actually

16        point the gun towards David's head?

17   A.   No, he didn't.

18   Q.   Did he describe the gun that he saw to you

19        ever?

20   A.   He had said that he knew that he had a gun,

21        but he didn't describe what it was.

22   Q.   Now, you also saw at some point another --

23        that Ricky guy with a gun that night; right?

24   A.   Yes, I did.

25   Q.   And do you recall what kind of gun he had?
```

263

```
 1   A.   It was a smaller caliber, like a 25 or 38.

 2   Q.   And was that a semiautomatic as well?

 3   A.   Yes, it was.

 4   Q.   How tall is Ricky?

 5   A.   About five eight, five nine.

 6   Q.   About your size?

 7   A.   Yeah, just about my size.

 8   Q.   And where was he after the shooting?

 9   A.   After the shooting?

10   Q.   Yeah.

11   A.   After the shooting I did not see him.

12   Q.   How many people that night had to tell Slim to

13        chill out or calm down or words to that

14        effect?

15   A.   It was said more than three times.

16   Q.   Did he ever do it?

17   A.   No.

18   Q.   I'm going to show you what's been marked as

19        Exhibit 17.  Do you recognize that?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's a picture of Slim.

23   Q.   It's actually a -- a photo array or a photo

24        lineup or whatever with six different

25        photographs in it; correct?
```

```
 1  A.  Correct.

 2  Q.  And when did you see that?

 3  A.  I saw it with the detectives.

 4  Q.  And do you remember when it was that you

 5      talked to the detectives?

 6  A.  I think it was the 1st of February.

 7  Q.  Of last year?

 8  A.  Of last year.

 9  Q.  And you say it's a picture of Slim, where is

10      the guy you know as Slim in that photo array?

11  A.  In the lower middle section.

12  Q.  Around that picture there's a circle, and then

13      some a -- date and some words and that.  Can

14      you explain what all of that is to the jury.

15  A.  It's my name and the date, and it says, Slim

16      shot David.

17  Q.  Why did you put that on there?

18  A.  Because I him with the gun.

19  Q.  When the shot went off, Mr. Torres, how close

20      was it to you?

21  A.  The distance from the kitchen sink to the door

22      entrance, like three feet, four feet.

23  Q.  Right by where David was?

24  A.  Right where David was -- was at.

25  Q.  How loud was it?
```

265

1   A.   Really loud.

2   Q.   I'm going to ask you a couple questions.  When

3        you met with the police then on February 1st,

4        do you remember where that was that you spoke

5        with them about what had happened there when

6        David got shot?

7   A.   When I first seen him or when I was first --

8   Q.   Interviewed.

9   A.   It was in the County jail.

10  Q.   It was in an interview room over -- actually

11       the Milwaukee Police Department, one of those

12       kind of smaller interview rooms; right?

13  A.   Right.  Same building.

14  Q.   Do you recall telling them that you think you

15       heard a guy named Luciano yell at Slim, you

16       shot him, you shot that guy?

17  A.   Yeah, I -- I recall that.

18  Q.   And did you tell them that you heard a woman

19       who you thought was Slim's sister say, we

20       gotta get out of here, you shot him, let's go?

21  A.   Yes, that came towards from the kitchen.

22  Q.   Okay.  Do you remember telling the police that

23       on February 1st?

24  A.   Yes, I do.

25  Q.   And is it fair to say that about some of this

                          266

```
 1        or parts of this your memory was better back
 2        on February 1st than it is today?
 3   A.   Correct.
 4   Q.   When you spoke to the police on February 1st
 5        about all of this, did you lie to them at all?
 6   A.   No, I didn't.
 7   Q.   Was there anyone in that house that you --
 8        when you were there that was even as close to
 9        being as tall as the defendant?
10   A.   No.
11   Q.   I mean, was there anyone that was six six or
12        taller other than Danny Wilber?
13   A.   No, he was taller than everyone there.
14   Q.   I mean, would you -- in terms of height would
15        you say that -- that Slim is tall, very tall,
16        exceptionally tall?  How would you describe
17        it?
18   A.   Very tall.
19   Q.   Was there anyone like him there at all in
20        terms of height?
21   A.   No one close.
22   Q.   How tall are you?
23   A.   I'm five ten.
24   Q.   I'm going to ask you to step off that --
25        you're five ten?  I'm going to ask you to step
```

267

```
1        off that -- stand right by that board there
2        with those questions on it.  I'm going to --
3        with your shoulder right there.  I'm going to
4        ask you to point straight out with your arm
5        toward the -- toward that.  Okay.  If -- maybe
6        I can do this without writing on the wall this
7        time.  I'm going to ask you to step back a
8        little bit, Mr. Torres, and put your shoulder
9        right up against that wall, and your -- your
10       right arm.
11                    Okay.  Would you agree with me
12       that if I put -- that that's about where your
13       finger would hit the wall?
14   A.  Yes.
15   Q.  Is that a fair spot?
16   A.  Yeah.
17   Q.  Okay.  So if we put this little piece of -- if
18       we put this little piece of paper there.  I'm
19       going to write on the wall, Judge.  I'm going
20       to put this -- okay.  I'm going to ask you to
21       point again, now it won't matter.  Is that
22       about the same spot?  Give or take; right?
23   A.  Yes.
24   Q.  Okay.  So we'll draw the line right there and
25       we'll put your initials, that's about where
```

268

1      you would point if you pointed straight out;

2      correct?

3   A.  Yes.

4   Q.  Okay.  Thank you.

5                  THE COURT:  Could you label that

6      in any way, Mr. Griffin?

7                  ATTORNEY GRIFFIN:  Yes, I put the

8      initials RT on it for Richard Torres.

9                  THE COURT:  Okay.  Thank you.

10  BY ATTORNEY GRIFFIN:

11  Q.  Was David Diaz taller or shorter than you?

12  A.  A little bit shorter.

13  Q.  How many times before that -- that -- when

14      this happened, when David got shot, how many

15      times in your life had you seen the defendant?

16  A.  That was the first time.

17                 ATTORNEY GRIFFIN:  Could I have a

18      minute, Judge?

19                 THE COURT:  You may.

20                 ATTORNEY GRIFFIN:  Could I see

21      you on the side?

22                 THE COURT:  Side bar.

23                 (Side bar.)

24                 THE COURT:  Mr. Griffin, anything

25      further?

269

```
 1                    ATTORNEY GRIFFIN:  Yes.
 2                    THE COURT:  Go ahead.
 3    BY ATTORNEY GRIFFIN:
 4    Q.   Do you recall describing Slim after the
 5         shooting as looking freaked out?
 6    A.   Yes.
 7    Q.   What did you mean by that?
 8    A.   He had a -- a look on his eye of confusion.
 9    Q.   Did you describe it as looking like he wasn't
10         sure what to do next?
11    A.   Right.
12    Q.   At any time, Mr. Torres, after the shooting,
13         before Slim disappeared outside the front door
14         and all that, did you take your eyes off him?
15    A.   Before?
16    Q.   No, after the shooting.  Once you see he's got
17         the gun, did you ever take your eyes off him?
18    A.   No.  He was already running out the door,
19         running out towards the door.
20    Q.   Do you recall the defendant at any point right
21         after the shooting, throwing his hands up in
22         the air like this?
23    A.   No.
24    Q.   Anything like that?
25    A.   No.
```

270

```
 1   Q.   Do you recall him patting himself down to see
 2        if he'd been shot?
 3   A.   No, I don't recall it.
 4   Q.   Did he do that?
 5   A.   No.
 6   Q.   Did you tell the detectives that you got
 7        pissed and tried to chase Slim?
 8   A.   Yes.
 9   Q.   Now, when you first came in to talk to the
10        detectives, it's fair to say that they
11        certainly had some thoughts that it was
12        possible you had shot David; right?  They had
13        no idea at that point who to think of?
14   A.   Right.
15                  ATTORNEY CHERNIN:  Objection.
16                  THE COURT:  Calls for
17        speculation?
18                  ATTORNEY CHERNIN:  Yes.
19                  THE COURT:  Sustained.
20   BY ATTORNEY GRIFFIN:
21   Q.   Did the detectives at any point tell you that
22        they looked -- they might not have used these
23        words, but did the detectives communicate to
24        you in any way that they thought you were a
25        suspect?
```

271

```
 1                    ATTORNEY CHERNIN:  Objection.
 2        Calls for hearsay.
 3                    THE COURT:  No.  Overruled.  I'll
 4        allow that.
 5   A.   They were saying that I -- I could be a
 6        suspect because they had no knowledge of what
 7        happened.
 8   BY ATTORNEY GRIFFIN:
 9   Q.   When they talked to you were you able to give
10        them Slim's name?
11   A.   Just his nickname.
12   Q.   From that they were able to ultimately -- they
13        were able to show you that photo array though
14        and you were able to see exactly who it was
15        that you were talking about?
16   A.   Yes.
17   Q.   I'm going to show you, Mr. Torres, what's been
18        marked as Exhibit 51.  Do you recognize that?
19   A.   Yes.
20   Q.   What is it?
21   A.   It's a sketch of -- one of the detectives
22        sketched out of the house.
23   Q.   Now, in that particular diagram there are
24        different names; correct?
25   A.   Yes.
```

272

```
1   Q.   Some of -- some of them aren't names, like it
2        says 'me,' that means you; correct?
3   A.   Correct.
4   Q.   And you have Jay and a white female and Slim's
5        sister and Luciano and Slim and Rock and David
6        and Ricky and other people watching, all those
7        kind of things; correct?
8   A.   Yes.
9   Q.   Okay.  All the different people that you --
10       well, strike that.
11              This is you telling the
12       detectives where everyone is?
13  A.   Yes, in the kitchen.
14  Q.   The detectives didn't bring this to you with
15       all the X's and names already on there and
16       just asked you if it was right?
17  A.   No.
18  Q.   Okay.  And at this particular moment in time
19       that you're trying to represent here, what are
20       you trying to represent?
21  A.   The household.  Who was who and who was
22       standing where.
23  Q.   In this particular diagram, for example, you
24       and Slim are close, Rock and David are close
25       right there, you see by the side porch?
```

273

```
 1   A.   Yes.

 2   Q.   Okay.  Is the side porch behind the white door

 3        that we see in Exhibit 15?

 4   A.   Yes.

 5   Q.   So when you say that David's right by the side

 6        porch, in this hand diagram, he's actually a

 7        little bit further down out of the kitchen

 8        than the actual door is; correct?

 9   A.   Correct.

10   Q.   This particular diagram, if you will, is not

11        drawn to scale?

12   A.   No, it's not.

13   Q.   You recall David standing again along the

14        right side of this door?

15   A.   Right.

16   Q.   Who's Hubbie, H-U-B-B-I-E, that's on there?

17   A.   Javy.

18   Q.   That's Javy?

19   A.   Yes.

20   Q.   That's the way the detective wrote it?

21   A.   That's the way I wrote it.  I don't know how

22        to spell his name.

23   Q.   Is this your handwriting or the detective's?

24   A.   My handwriting.

25   Q.   Where it says 'Jay friend,' what does that
```

274

```
 1       mean?

 2   A.  It's -- that's actually Slim's cousin.

 3   Q.  Who you also thought was one of Jay's friends?

 4   A.  Right.

 5   Q.  Okay.  And then where you have, for example,

 6       Slim's sister, she's sort of just off the

 7       right side of the table; correct?

 8   A.  Correct.

 9   Q.  And friend of Nando, do you see that up on the

10       top there above the table?

11   A.  Yes.  That's just a friend of mine's friend.

12   Q.  Do you know his name?

13   A.  No, I didn't.

14   Q.  Hispanic or black?

15   A.  Hispanic.

16   Q.  And then white female over to the left of Jay,

17       do you know who that was?

18   A.  I don't recall her name.

19   Q.  Does Andalia sound right or Andelia or

20       anything like that, do you know?

21   A.  No, I don't recall.

22   Q.  Now, you have Slim's sister, for example, in

23       this particular diagram as we look at it to

24       the right of the table, you said before she

25       was over by the stove; correct?
```

275

```
 1   A.   Right.

 2   Q.   Are you sure she wasn't actually walking over

 3        away from you and Slim toward the bathroom?

 4   A.   No, I seen her right there.

 5   Q.   Okay.  From where she was, assuming she had

 6        her eyes open and was actually looking, could

 7        she have seen this?

 8   A.   Yes, it's possible.

 9                  ATTORNEY CHERNIN:  Objection.

10        Vague.  See what?

11                  ATTORNEY GRIFFIN:  The shooting.

12   A.   Yes, it's possible.

13   BY ATTORNEY GRIFFIN:

14   Q.   I mean, if she doesn't have any vision

15        problems, and if her eyes weren't closed, and

16        I mean, she didn't have her back to Slim;

17        right?  She wasn't looking at the stove and

18        Slim's behind her; right?

19   A.   Right.

20   Q.   On this particular diagram where you have, you

21        know, other people watching and Ricky and all

22        that, how are you able to see them from your

23        position in front of the cabinets?

24   A.   When I first came down the stairs I looked

25        over to my right and I seen the people in the
```

276

```
1        living room.
2    Q.  So these people are just in the living room?
3    A.  Right.
4    Q.  Where in the living room?  As you recall.
5    A.  Right by this couch and hanging out right by
6        the doorway.
7    Q.  In the -- in the area between the living room
8        and the kitchen or in the living room?
9    A.  In the living room.
10   Q.  At the time David got shot, we see that his --
11       in this particular photograph, which is
12       Exhibit 25, can you read that number there?
13   A.  25.
14   Q.  25.  It shows David's -- I guess his feet
15       closer to this -- this door frame, his -- his
16       upper body is sort of -- rear end is sort of
17       even with the door and his upper body.  Is
18       that about -- in other words, if we just
19       picked him straight up, would he be where he
20       was?  Did he crumple down and then fall?  Do
21       you recall that specifically?
22                   ATTORNEY CHERNIN:  Well,
23       objection.  This assumes a fact not in
24       evidence because this witness has indicated he
25       didn't see the shooting, so how he would be
```

```
 1        able to tell you about these crumplings and
 2        movements.
 3                    THE COURT:  Overruled.  I'll
 4        allow it.  He has testified that he did make
 5        observations of individuals in their
 6        movements, particularly as it relates to the
 7        defendant just after the shooting.
 8   BY ATTORNEY GRIFFIN:
 9   Q.   Mr. Torres, you talked before as you were
10        standing here what we call the sink, that
11        David was just to your right; correct?
12   A.   Um-hmm (meaning yes).
13                    THE COURT:  Is that a yes?
14                    THE WITNESS:  Yes.
15   BY ATTORNEY GRIFFIN:
16   Q.   As I recall you had David sort of at an angle
17        like this; correct?
18   A.   Yes.
19   Q.   More or less?  Did you see David after the
20        gunshot, was he still standing?  In other
21        words, was he still up or was he already
22        falling or what?
23   A.   He was already falling.
24   Q.   Okay.  In this particular -- in other words, I
25        don't know how to explain this well, but if we
```

278

```
 1        took David from this position and just stood
 2        him straight up so his feet kind of turned, or
 3        he would be actually to the right of the white
 4        door, you know what I'm saying?  In other
 5        words, if you see his feet, his feet are to
 6        the living room side of the white door?
 7    A.  Yes.
 8    Q.  So at the time he got shot was he here in
 9        front of the white door specifically or back
10        more toward the living room?  If you recall.
11    A.  Right -- right here.  Right here.  Right by
12        the door.
13    Q.  Right by the -- you're pointing to what would
14        really be the door frame?
15    A.  Correct.
16    Q.  Point again with your finger so the jury can
17        see it.
18    A.  Right here.
19    Q.  And does he -- as best you recall, did you see
20        him fall?
21    A.  I -- I did see him start to fall.
22    Q.  Okay.  Did he -- I hate -- you know the way
23        you chop a tree and it just falls straight
24        down, other people, their knees may crumple,
25        that kind of thing, do you recall what
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 279 of 325   Document 61-24

1    happened with him?

2  A.  He went like kind of straight down, yes.

3  Q.  Did you hear him hit the ground?

4  A.  Yes, I did.

5  Q.  In this particular kitchen at the time, at

6      moment of the shooting, how many feet are

7      there, as best you recall, from Slim, the

8      defendant, to David?

9  A.  Like three -- three, four feet.

10 Q.  As the defendant reached over with his arm, if

11     he had the gun in his right arm, could he have

12     gotten to David's head?

13 A.  Probably.

14 Q.  Okay.  Now, at one point a guy by the name of

15     William Kohl came to see you, specifically

16     October 30th of last year; right?

17 A.  Yes.

18              ATTORNEY CHERNIN:  No, I don't

19     believe that's true.

20              THE COURT:  Off the record.

21              (Discussion off the record.)

22 BY ATTORNEY GRIFFIN:

23 Q.  Well, you remember it was sometime in the fall

24     of last year; correct?

25 A.  Yes.

```
1    Q.   And did you tell him that you saw Slim slip
2         what you thought was a gun underneath his
3         shirt?
4    A.   Yes.
5    Q.   And did you then tell him that you weren't 100
6         percent sure it was a gun, but you thought it
7         was?
8    A.   I told him that possibly it was.
9    Q.   What else could it have been?
10   A.   Nothing but a -- probably a bar, but I thought
11        he was carrying a bar with him.
12   Q.   A what?
13   A.   Like a piece of piping.
14   Q.   Pipe?
15   A.   Right.  I doubt it.
16   Q.   Do you know why you described it to the police
17        as a semiautomatic handgun?
18   A.   Because I know partially what they look like.
19   Q.   At the moment David got shot was there anyone
20        else close to him?
21   A.   Just the people that were around him, Rock and
22        myself and Slim.
23   Q.   Did you shoot David?
24   A.   No, I did not.
25   Q.   Did Rock?
```

281

```
1   A.   No, he did not.

2   Q.   Did Ricky?

3   A.   I didn't see Ricky at all.

4   Q.   As David's standing there in this kitchen by

5        the door there as you said at the angle he was

6        at, he sort of -- again, this is Exhibit 14 --

7        he's standing sort of right here turned a

8        little bit this way; is that right?

9   A.   Rock's over here and he's talking to Rock this

10       way.

11  Q.   Okay.  Did someone else come in from behind,

12       put a gun to his head and shoot him?

13  A.   Nobody came down the stairs.

14  Q.   Okay.  How about from the living room, did

15       someone run in real quick and put a gun to

16       David's head and shoot him?

17  A.   I don't think so.

18  Q.   The guy that you -- when you said to the

19       police, Slim shot David, what did you mean by

20       that?

21  A.   I seen Slim with the gun, so I assumed that he

22       was the one that shot him.

23  Q.   And when you told the police that Slim's

24       sister yelled, you shot him, get out of

25       here --
```

282

1     A.    It convinced me more that he did.

2                      ATTORNEY GRIFFIN:  Nothing

3           further.

4                      THE COURT:  All right.

5           Mr. Torres, I'm going to have you step down

6           from the witness stand, you're still under

7           oath.  I'm going to have you remain here in

8           the -- in the courthouse -- in the safety

9           building.  We're going to take a break in your

10          testimony, because defense still has an

11          opportunity to cross examine you, but we're

12          going to be calling another witness out of

13          order because of their availability only for

14          today's proceedings.  So we're going to have

15          you step down, we're going to take the other

16          witness and then we'll recall you up to the

17          witness stand.

18                     THE WITNESS:  Okay.

19                     (Witness excused.)

20                     ATTORNEY CHERNIN:  Your Honor,

21          the sequestration -- Your Honor.

22                     THE COURT:  The sequestration

23          order remains in effect.

24                     ATTORNEY GRIFFIN:  Okay.

25                     THE COURT:  State has leave to

                              283

```
1        call its next witness.
2                    ATTORNEY GRIFFIN:  I thank you,
3        Judge.  I'm going to call Detective Schuler.
4                    DEPUTY:  All rise for the jury
5        please.
6                    (Jury out of box.)
7                    THE COURT:  Please be seated.
8                    (Break taken.)
9                    DEPUTY:  All rise for the jury
10       please.
11                   (Jury in box.)
12                   THE COURT:  You may be seated.
13                   State has leave to call its next
14       witness.
15                   ATTORNEY GRIFFIN:  Detective
16       Schuler.
17                   THE COURT:  Detective, raise your
18       right hand and my clerk will swear you in.
19                   GREGORY SCHULER, called as a
20       witness herein, having been first duly sworn,
21       was examined and testified as follows.
22                   THE CLERK:  Please be seated.
23                   THE COURT:  Begin by stating your
24       full name for the record, spelling your first
25       and last name, sir.
```

284

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 284 of 325   Document 61-24

```
 1                    THE WITNESS:  Gregory Schuler.
 2        G-R-E-G-O-R-Y, and Schuler is S-C-H-U-L-E-R.
 3                    THE COURT:  You may begin.
 4                    DIRECT EXAMINATION:
 5   BY ATTORNEY GRIFFIN:
 6   Q.   Sir, you are now a retired detective for the
 7        City of Milwaukee Police Department; correct?
 8   A.   That is correct.
 9   Q.   When did you retire?
10   A.   December 19th of 2004.
11   Q.   And you've come back today in response to a
12        subpoena; correct?
13   A.   That is correct.
14   Q.   You no longer live in Milwaukee County?
15   A.   No sir, I do not.
16   Q.   Do you know why you're here though?  You know
17        which case you're here for; correct?
18   A.   That is correct.
19   Q.   And you've reviewed the reports you filed, and
20        one of them was an interview that you had with
21        a guy by the name of Jeranek Diaz on February
22        1st of 2004; correct?
23   A.   Yes sir.
24   Q.   In that particular interview with Mr. Diaz,
25        did he ever tell you that he saw someone with
```

285

```
1         a gun at 1128 West Mineral at around 3:00 --
2         3:30 in the morning when David Diaz got shot?
3    A.   Yes, he did.
4    Q.   Did he tell you that he saw that person point
5         the gun at David Diaz?
6    A.   Yes, he did.
7    Q.   And did he identify for you in some way who
8         that person was?
9    A.   Yes.  He identified through a photograph and
10        by name the person.
11   Q.   And who is that?
12   A.   Danny Wilber.
13   Q.   I'm going to show you what's been marked as
14        Exhibit 6.  Did you show that photo, what I
15        call a photo array or photo lineup, to Jeranek
16        Diaz?
17   A.   Yes, I did.
18   Q.   Did he circle the picture of Danny Wilber?
19   A.   Yes, he did.
20   Q.   And did Danny Wilber, whose picture he
21        circled, do you see that Danny Wilber in court
22        today?
23   A.   Yes sir, I do.
24   Q.   Can you point him out by where he's sitting
25        and what he's wearing?
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 286 of 325   Document 61-24

```
 1   A.   He's sitting at defense table wearing the
 2        purple striped shirt.
 3                 ATTORNEY GRIFFIN:  May the record
 4        reflect the witness has identified the
 5        defendant.
 6                 THE COURT:  It does.
 7   BY ATTORNEY GRIFFIN:
 8   Q.   Did Mr. Diaz seem unsure of whether or not he
 9        knew Mr. Wilber, or whether or not Mr. Wilber
10        had a gun, whether or not Mr. Wilber pointed
11        the gun at Mr. Diaz's head, anything like
12        that?
13   A.   No, he was -- he knew him, knew him from --
14        also from previous contacts.  I believe he
15        even told me that he had sold him a Cadillac
16        about a year earlier.
17   Q.   I'm going to show you an exhibit, Detective,
18        marked Exhibit 53.  Do you recognize that?
19   A.   Yes, I do.
20   Q.   Mr. Diaz, told you about going to different
21        bars that night with Vato and Claudia and
22        Heather and all that, is that what he told
23        you?
24   A.   Yes, he did.
25   Q.   Did he specifically mention a place by the
```

```
 1       name of Lenny's at 68th and National?

 2   A.  Yes.

 3   Q.  Did he also mention them going to the Macho

 4       Lounge down on the east side?

 5   A.  Yes.

 6   Q.  That after they went there they went to

 7       Bacardi's on 27th and Lincoln?

 8   A.  That is correct.

 9   Q.  The way he explained it to you, him and his

10       friends, did they all go in one car or two

11       cars?

12   A.  It would be two cars.

13   Q.  Did he indicate to you whether or not at some

14       point him and his car went to Bacardi's and

15       the other group, including Vato, did not go to

16       Bacardi's?

17   A.  That is correct.  He said at one point they

18       became separate, the two cars got separated.

19   Q.  Did he indicate to you about what time he got

20       back to the residence there at 1128 West

21       Mineral where David Diaz was shot and killed?

22   A.  It was early morning, I think about 2:30 --

23       3:00 in the morning.

24   Q.  And did he give you some information about how

25       after they got there and that party was going
```

288

```
 1        on something happened with some barbells?

 2   A.   Yes.

 3   Q.   What did he tell you?

 4   A.   He had mentioned that there was a lady that

 5        lived there with the victim, I believe it was

 6        his wife, and some of the guys were lifting

 7        barbells and they were clanking them and

 8        making noise.

 9   Q.   Did he indicate to you at one point that Cindy

10        was hit with a barbell and became upset?

11   A.   Yes.

12   Q.   Now that's in your report; right?

13   A.   Yes.

14   Q.   Did you make that up?

15   A.   No sir.

16   Q.   Did you at some point put words, so to speak,

17        into Mr. Diaz's mouth in this report and put

18        things in here that he never told you?

19   A.   No sir.

20   Q.   Were you aware from someone else about Cindy

21        Diaz getting hit with a barbell, so you just

22        threw it in this report and that way you could

23        pretend Mr. Diaz said it?

24   A.   No sir.

25   Q.   Did he tell you about David coming downstairs
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 289 of 325   Document 61-24

```
 1        and wanting people to leave his house?
 2   A.   Yes, he did.
 3   Q.   Did he indicate to you that Danny Wilber, the
 4        defendant in this case, did he indicate to you
 5        how Mr. Wilber was acting?
 6   A.   Yes, he did.  He had talked about that he was
 7        kind of wild, kind of crazy.
 8   Q.   Do you recall Mr. Diaz telling you that
 9        Slim -- that was the nickname he used for the
10        defendant; right?
11   A.   Yes.
12   Q.   That Slim was acting goofy, acting as if he
13        was quote, possessed, closed quote?
14   A.   Yes.
15   Q.   Now, in your report specifically, the word
16        goofy and the word possessed, those words were
17        all in quotes.  Why?
18   A.   That would have been a specific word that he
19        had said.  So I put quotes under that or
20        around that word.
21   Q.   To indicate those are specific words that
22        Mr. Diaz used; correct?  In other words, he
23        didn't say crazy and you translated that as
24        goofy and possessed?
25   A.   Correct.
```

```
1   Q.   Goofy and possessed were words Jeranek Diaz
2        said to you when you interviewed him last
3        February?
4   A.   Yes.
5   Q.   Do you recall him telling you about part of
6        the -- what went on there in that kitchen as
7        Slim snatching Jay's necklace and ripping out
8        part of it off of Jay's neck?
9   A.   Yes.
10  Q.   Did Mr. Diaz tell you that he heard about that
11       or that he saw that?
12  A.   He saw that.
13  Q.   And where was he in the house when he saw it
14       as he was explaining it to you?
15  A.   I believe it would have been the kitchen
16       area.
17  Q.   At any time did Mr. Jeranek Diaz tell you that
18       the defendant said to David Diaz, I don't give
19       a fuck about you and your family, I'll burn
20       this mother fucking crib down with or without
21       your family?
22  A.   Yes.
23  Q.   Is that in quotes in your report as well?
24  A.   Yes.
25  Q.   Is that because you wanted to make it up?
```

291

```
1    A.    No sir.

2    Q.    Where did those words come from?

3    A.    From him.

4    Q.    Mr. Diaz?

5    A.    Yes.

6    Q.    He told you at one point, did he not, that

7          David Diaz said to him something in Spanish

8          about getting rid of the defendant; right?

9    A.    Right.   That would have been after there was a

10         small confrontation and he wanted him to

11         leave.

12   Q.    And the defendant responded to Mr. Diaz by

13         saying, again, quote, I'll fuck you up, closed

14         quote?

15   A.    That is correct.

16   Q.    Another quote directly from Mr. Diaz to you?

17   A.    Yes.

18   Q.    How about the part about, let's box, let's box

19         outside, I'm tired of you Mexicans, closed

20         quote?

21   A.    Yes, those would have been words that he used.

22   Q.    And he said to the defendant, fuck that, let's

23         fight right here, closed quote; right?

24   A.    Yes.

25   Q.    Again, something Mr. Diaz told you?
```

```
1   A.   Yes.

2   Q.   Now, did he at some point tell you about a guy

3        named Isaiah?

4   A.   Yes.

5   Q.   Did he tell you that name or did you make it

6        up?

7   A.   He told me that name.

8   Q.   And did he refer to Richard Torres as Vato or

9        Richard Torres?

10  A.   Vato.  He also knew him as Richard Torres, but

11       he said that his nickname is Vato.

12  Q.   And he talked about the fight then; right?

13  A.   Yes.

14  Q.   Did he tell you that at some point after that

15       Isaiah also started to punch on Slim?

16  A.   Yes.

17  Q.   Or did you make that up?

18  A.   No sir, he told me that.

19  Q.   Did he tell you that Isaiah was a friend of

20       Slim's, but believed that Slim was out of

21       order and acting crazy, and that's why Isaiah

22       also started to punch on Slim?

23  A.   Yes.

24  Q.   Or did you make that up too?

25  A.   No sir.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 293 of 325   Document 61-24

```
 1   Q.   Did he tell you that after -- that Slim bent
 2        down slightly and reached into his jacket and
 3        pulled out a handgun?
 4   A.   Yes.
 5   Q.   You're sure about that, Detective?  I want to
 6        back up, you're not maybe confusing this
 7        interview with some other interview or some
 8        other case.  Jeranek Diaz told you this?
 9   A.   Yes, he did.
10   Q.   Did he tell you this gun was a silver handgun
11        with black grips and that he thought it was a
12        semiautomatic?
13   A.   Yes.
14   Q.   Did he tell you that Slim pulled this gun out
15        and now pointed it at David Diaz, who was
16        still standing close by in the kitchen?
17   A.   Yes.
18   Q.   Did he tell you that Diaz had just -- David
19        Diaz had just turned around and was about to
20        leave the kitchen, that Slim pointed the gun
21        at David Diaz?
22   A.   Yes, he did.
23   Q.   Did he tell you at that point he, Jeranek
24        Diaz, ducked down to avoid being shot himself,
25        he heard one gunshot being fired?
```

294

```
1    A.   Yes, he did.

2    Q.   You're sure?

3    A.   I'm positive.

4    Q.   You didn't just misunderstand him?

5    A.   No sir.

6    Q.   Did he tell you that he believed the gunshot

7         was fired from Slim's gun, because the sound

8         of it came from the location that Slim was

9         holding the gun?

10   A.   Yes.

11   Q.   At this point Jeranek states he now sees David

12        Diaz going to the ground and Slim is putting

13        the gun back under his coat?

14   A.   Yes.

15   Q.   Did he tell you that?  Did Jeranek Diaz say

16        those things to you?

17   A.   Yes sir, he did.

18   Q.   Did he tell you that he sees Slim hold the gun

19        under his coat and run out the front door?

20   A.   Yes, he did.

21   Q.   Did he tell you that Slim's sister, Tonia, who

22        was also in the kitchen, yelled out, oh my

23        God, you shot him, get out of here, you shot

24        him?

25   A.   Yes, he did.
```

295

```
1   Q.   And that particular part again is in quotes,
2        correct, oh my God, you shot him, get out of
3        here, you shot him, closed quote?
4   A.   That is correct.
5   Q.   And why did you put that part in quotes?
6   A.   Once again, that was because it was a specific
7        statement, verbatim that he said.
8   Q.   Jeranek -- did Mr. Diaz -- Jeranek Diaz tell
9        you that after Slim ran out the front door he
10       went to the front door and observed Slim
11       running around the corner?
12  A.   Yes, he did.
13  Q.   Or again, are you just making that up?
14  A.   No sir.
15  Q.   Did he indicate to you who else was in the
16       kitchen at the time of the shooting besides
17       him and Vato and David Diaz?
18  A.   Yes, he gave a list of people.  Some that he
19       knew by name, some that he knew by nicknames,
20       but he did give a group of people that were
21       there.
22  Q.   Did he indicate to you that Isaiah was in
23       there?
24  A.   Yes.
25  Q.   What about Jay?
```

```
 1   A.   Yes.

 2   Q.   What about some guy named Dumpy?

 3   A.   Yes.

 4   Q.   Did he refer to that guy as Slim's cousin?

 5   A.   Yes, he did.

 6   Q.   Or did you just decide to make that up, that

 7        there was a guy, a black Indian male, 28 years

 8        of age, five nine, 160 pounds, or something

 9        like that?

10   A.   No sir, that's what he gave me.

11   Q.   That Tonia was also there?

12   A.   Yes.

13   Q.   That he described her as the sister of Slim or

14        maybe a cousin?

15   A.   Yes.

16   Q.   Did you know whether or not Danny Wilber at

17        that point had a sister or a cousin with

18        anything close to a name like Tonia?

19   A.   No sir.

20   Q.   How about that Dumpy's girlfriend was there?

21   A.   No sir.

22   Q.   Did he also talk about a guy by the name of

23        Nando or Fernando, who was one of Vato's

24        friends?

25   A.   Yes, he also mentioned them.
```

297

```
1   Q.   You're sure?

2   A.   Yes sir.

3   Q.   He told you, did he not, that the September

4        before, which would have been September then

5        of '03, he sold a Cadillac to Slim and that he

6        remembered Slim signing the title Danny

7        Wilber; right?

8   A.   That is correct.

9   Q.   So this is a guy he had contact with before?

10  A.   Yes.

11  Q.   Did he talk to you what Slim had been drinking

12       at the party?

13  A.   Yes, he did.

14  Q.   Okay.  And did he -- do you remember what he

15       said?

16  A.   I'd have to refresh my recollection.

17  Q.   Go ahead.

18  A.   I know it was a bottle.  Corona or Budweiser.

19  Q.   I'll refer your attention to page 4 of that

20       document.

21  A.   Corona.

22  Q.   The one, two, third full paragraph there.

23  A.   I'm sorry, yeah.  Thought it to be a Smirnoff

24       or a Mike's Hard Lemonade.

25  Q.   Did he describe to you something about what
```

298

```
 1        happened when the defendant started drinking
 2        that?  In other words, did he tell you
 3        something about the defendant making an odd
 4        face?
 5   A.   Yes.  When he drank it, because it was not --
 6        it is like an awkward drink, I guess, kind of
 7        like a sour, he described it as a sour look
 8        when he drank this.
 9   Q.   Weren't you just kind of making all this stuff
10        up and decided to have a little fun with that
11        part, Detective?
12   A.   No sir.
13   Q.   When you talked to Mr. Diaz and you met with
14        him other times, right, at least twice?
15   A.   Yes sir.
16   Q.   One time you met with him out here in the
17        hallway outside this courtroom a few months
18        ago; correct?
19   A.   Yes.
20   Q.   And at that time you had a copy of what's been
21        here marked as Exhibit 49; right?  Take a
22        moment and look at it.
23   A.   Yes, I had copy of this.
24   Q.   And it basically is a -- a -- a statement from
25        a guy named Mr. Bill Kohl who you know; right?
```

299

```
 1   A.   Yes sir.

 2   Q.   Saying that Mr. Diaz had told him things about

 3        his statement to you not being true and all of

 4        that; correct?

 5   A.   That is correct.

 6   Q.   Basically taking it all back?

 7   A.   Yes.

 8   Q.   Did you talk to Mr. Diaz about that?

 9   A.   Yes, I did.

10   Q.   And what did he tell you?

11   A.   He said that his was bullshit.

12   Q.   Was that his word, bullshit?

13   A.   Yes.

14   Q.   He told you that what he told to Mr. Kohl was

15        not true?

16   A.   Correct.

17   Q.   That he -- not that Mr. Kohl was lying, in

18        other words, but just that he had told things

19        that weren't true to Mr. Kohl?

20   A.   That is correct.

21   Q.   Did -- at any time in any of the times that

22        you met with Mr. Diaz did he express fear?

23   A.   Oh yes.

24   Q.   And was his fear for himself or for his family

25        or what?
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 300 of 325   Document 61-24

```
 1   A.   His fear was for himself, his fear was for his
 2        family.  He had a a newborn baby girl, I
 3        think, and he was extremely fearful that
 4        somebody was going to come and harm his
 5        family, his daughter.
 6   Q.   When you were talking to Mr. Diaz about what
 7        happened there in -- when David Diaz got
 8        shot -- and you've established that Jeranek
 9        Diaz and David Diaz have the last -- same last
10        name but weren't family; correct?
11   A.   That is correct.
12   Q.   Was he unclear about the guy he referred to as
13        Slim having a gun?
14   A.   No sir.
15   Q.   Was he unclear at all about Slim, you know, I
16        thought maybe he pointed it up in the ceiling
17        so you just changed it to pointing it at David
18        Diaz's head?
19   A.   No sir.  When I talked to him he was very
20        articulate.  I mean, he gave a wealth of
21        information, information that I believed would
22        be truthful based on the fact that he was
23        giving me -- majority of what he gave me was
24        information that I did not know, did not
25        have.  And this would be a -- something that
```

301

```
 1        only a person that was actually at the scene
 2        would know.  I mean, he gave me names of other
 3        people that were there, descriptions of other
 4        people.  Even so much as to the shooting
 5        point, he specifically talks about that,
 6        when -- when the shot actually fired, that he
 7        was ducking down himself because he was
 8        afraid.
 9   Q.   He had no -- at least there was no particular
10        beef over him and the defendant that he had;
11        right?  I mean, he could have simply said, I
12        watched the whole thing, I saw a muzzle flash,
13        those kinds of things; right?
14   A.   Right.  He described his relationship with
15        Danny Wilber as -- not as friends, but not as
16        enemies, that they knew each other, that he
17        had sold a car to him and knew him from the
18        neighborhood.
19   Q.   Did Jeranek Diaz ever tell you anything about
20        seeing the smoke from the shot?
21   A.   Pardon me?
22   Q.   Do you know when a handgun gets fired there's
23        a little bit of smoke that comes out of the
24        barrel?
25   A.   Right.
```

302

```
1   Q.   Did Jeranek Diaz ever tell you anything about

2        the smoke when you talked to him in February?

3   A.   I believe he did.

4   Q.   Is it in your report anywhere?

5   A.   I'd have to refresh my recollection.

6   Q.   Go ahead.

7   A.   I don't see smoke.  He talks about the sound

8        and that's what he had mentioned, the sound of

9        the shot being fired came from the spot where

10       he had been standing.

11  Q.   Detective, did Jeranek Diaz tell you that he

12       saw the defendant in this case point a gun at

13       David Diaz's head moments before there was a

14       gunshot in that kitchen?

15  A.   Yes, he did.

16  Q.   Any doubt in your mind that that's what he

17       told you?

18  A.   There is no doubt in my mind at all.

19                 ATTORNEY GRIFFIN:  Nothing

20       further.

21                 THE COURT:  Cross.

22                 CROSS EXAMINATION:

23  BY ATTORNEY CHERNIN:

24  Q.   Detective Schuler -- you still are called

25       Detective Schuler, correct, even though you're
```

303

```
 1        now retired; is that correct?  Correct to
 2        address you as Detective still?
 3   A.   Whatever you would like.
 4   Q.   Okay.  Well, okay.  Detective Schuler, you
 5        have the name Dumpy in the report referring to
 6        Slim's cousin.  Is it possible that that was
 7        actually Don P or Donald Jennings?  It's on
 8        page 3 of your report at the bottom.
 9   A.   Correct.  No, the name that he gave me was
10        Dumpy.
11   Q.   Is it possible that you just didn't hear him
12        say Don P or Donald or Don or Donny?
13   A.   Well, it's a philosophical belief anything's
14        possible, but in this case he gave me Dumpy
15        and I knew it was Dumpy when I went through
16        the statement.  It was a very slow process, it
17        took a couple hours, and I tried to get as
18        much detail as possible, whatever he could
19        give me.  So I believe it was Dumpy, he told
20        me Dumpy.
21   Q.   And you had no reason to disbelieve that Dumpy
22        was the guy; right?
23   A.   Correct.
24   Q.   And when he talked about Jay, you had no
25        reason to disbelieve that Jay was the guy he
```

304

```
 1            was talking about; right?
 2      A.   At this point, no, he is telling me something
 3            and if he tells me Jay at this point then we
 4            would investigate it further.
 5      Q.   And he told you that it was a semiautomatic
 6            gun that he saw in Slim's hand; isn't that
 7            correct?
 8      A.   That is correct.
 9      Q.   And you have no reason -- and you were slow
10            and you went through it carefully, and he
11            described a silver handgun with black grips,
12            he stated that it was a semiautomatic type
13            handgun; correct?
14      A.   That is correct.
15      Q.   And you have no reason to say that it was not
16            a semiautomatic gun and that he truly believed
17            that it was a semiautomatic gun; correct?
18      A.   That is correct.
19      Q.   And you have no reason to disbelieve the truth
20            of that statement, that in fact he saw Slim
21            with a semiautomatic gun and Jeranek Diaz
22            knows exactly what a semiautomatic handgun
23            looks like; isn't that correct?
24      A.   He tells me that it was a semiautomatic
25            handgun, and once again, I would try to take
```

305

```
1        it a step further, why do you think it's a
2        semiautomatic, and he would describe it.
3   Q.   So you got a clear description from him that
4        this was a semiautomatic handgun; correct?
5   A.   Yes.  But I mean I also understood that he saw
6        this handgun for probably two or three seconds
7        at most.  So he gave a description of what he
8        described as -- what he thought was a
9        semiautomatic handgun.
10  Q.   And he also indicated that at the time of the
11       shooting David Diaz was to his left; is that
12       correct?
13  A.   I'd have to look in the report, and pardon me
14       for the glasses, I just got glasses.  They're
15       a retired thing kind of like --
16                THE COURT:  So did I, and I'm not
17       retired.
18  A.   Mr. Chernin?
19  BY ATTORNEY CHERNIN:
20  Q.   Yes.
21  A.   I don't know, are you looking at a specific
22       spot on here or a specific time?  I know he
23       talks about them being in the kitchen, and
24       that there's a slight hallway and they're all
25       in a very close proximity.
```

306

1   Q.   But in your report you never get to exactly
2        where everyone was standing when he observed
3        the shot fired; correct?  Or I guess he
4        doesn't say -- I -- I apologize, I'm not
5        trying to trip you up.
6                      When he talks about the time
7        period around the time that the gunshot
8        occurred, he never -- in this report, he never
9        really describes exactly where everyone was
10       standing, just that everyone was in close
11       proximity; isn't that fair to say?
12  A.   Right.  Basically pulled out the gun and
13       pointed at David Diaz who was still standing
14       close by in the kitchen.  Diaz had just turned
15       around and was about to leave the kitchen and
16       there -- it was like a kitchen and a hallway
17       which led into a living room.
18  Q.   So according to this report, Diaz is turning
19       and walking going toward -- is turned away
20       from Wilber, and if we used Exhibit 1, or
21       let's use photograph -- well, let's -- I guess
22       a diagram's good.  On Exhibit 1 -- the
23       pointer -- on Exhibit 1, living room was to
24       the south; correct?
25  A.   Yes.

```
 1   Q.   So Diaz had turned around and his head was
 2        facing toward the south, according to this
 3        report; correct?
 4   A.   That is correct.
 5   Q.   Now, in Exhibit 15, when -- in the photograph
 6        of Diaz as he appears after he was shot, his
 7        head is facing north; isn't it?
 8   A.   Yes, it would be.
 9   Q.   And are you -- do you know from your
10        involvement in the investigation in this case,
11        that Detective Casper found the bullet
12        fragments -- lead fragments to the north below
13        the stove?
14   A.   Yes, I do.
15   Q.   Now, if David Diaz was facing to the south,
16        looking out into the living room, wouldn't one
17        expect that the bullet fragments would have
18        been found to the south as opposed to the
19        north?
20             ATTORNEY GRIFFIN:  I'm going to
21        object, unless we know who 'one' is.
22             THE COURT:  Overruled.  I'll
23        allow the question.
24   A.   Well, now you'd have to start making
25        assumptions.  In -- in the victim as he's
```

308

```
 1        turning around -- well, the first -- where he

 2        falls, I mean it's not unusual when a person

 3        gets shot, that just doesn't mean they're

 4        going to get shot and fall over straight that

 5        way.  People could get shot and feel the pain

 6        and, oh my gosh, turn, his friends are in the

 7        kitchen, so does he turn, does he spin around,

 8        so I didn't think that was unusual, the body

 9        placement, just where he falls didn't really

10        have that much impact.

11                    I also know that whatever bullets

12        or casings -- I wasn't at the scene but I know

13        I was told that they were found in this area

14        here, that we had a kitchen full of people.

15        And you also had eventually other people

16        coming in, such as paramedics or -- or

17        responding officers.  Were they kicked, were

18        they bounced off something, was it a ricochet,

19        there's all sorts of reasons why bullets,

20        casings, end up where they do.

21   BY ATTORNEY CHERNIN:

22   Q.   Or where the body had been found?

23   A.   That is correct.

24   Q.   And/or if the body had been moved, or if the

25        body had been moved; right?
```

309

```
 1    A.   Sure.   Sure.

 2    Q.   So in this instance it doesn't -- in your

 3         report it doesn't talk about a body spinning

 4         or the like that you're just describing, it's

 5         not something that Mr. Diaz told you; is it?

 6    A.   No, and -- and Mr. Diaz's attention was pretty

 7         much now fixated on Danny Wilber.  After he

 8         sees him with a gun pointed at the victim,

 9         cowers down, hears the shot, looks up, sees

10         him tucking the coat in, he then sees him run

11         out the front and out on the street.  So he

12         would have been, by telling me that, he's now

13         pretty much concerned about him, Mr. Wilber,

14         and he's the person with the gun.  That's who

15         you want to be concerned about.

16    Q.   None of that's reflected in your report

17         though, that's just what you're adding now;

18         isn't that fair to say?  I mean, he doesn't

19         talk about just being concerned, that's

20         something that you're adding now to explain

21         your report; right?

22    A.   Oh no, I do mention in the report in detail

23         what he observed, that he paid attention all

24         the way.

25    Q.   Does it say he paid -- solely paid attention
```

310

```
1        to Mr. Wilber?
2   A.   No.  It says he paid attention -- or it says
3        that he described his actions, and by
4        describing his actions --
5   Q.   Whose, Slim's or his?
6   A.   I'm sorry, Mr. Wilber, described his actions
7        what he did specifically in terms of, you
8        know, putting the gun inside, as he's going
9        out the sister yells, you know, don't,
10       don't -- or not don't, don't, I'm sorry -- you
11       shot him, get out of here, something to that
12       effect, and then watching him go out the
13       front.  And then he says he even goes to the
14       front door and watches him go down the street.
15  Q.   Where does it say that?
16  A.   Would be on page --
17  Q.   3?
18  A.   -- 3.
19  Q.   Who says that he went to the front door?
20                 ATTORNEY GRIFFIN:  I'm going to
21       ask that he allow the witness to answer the
22       question.  Does he want to testify himself?
23                 THE COURT:  Sustained.  Go ahead.
24  A.   Jeranek stated that Slim ran out the front
25       door.  Jeranek stated that after Slim ran out
```

311

```
1        the front he went to the front door and
2        observed Slim running around the corner.  And
3        then in the line the -- the line or two prior
4        to that, Jeranek states that Slim's sister,
5        Tonia, who was also in the kitchen, yelled
6        out, oh my God, you shot him, get out of here,
7        you shot him.  And that's what he was talking
8        about.
9   BY ATTORNEY CHERNIN:
10  Q.   And do you know if that's the same or
11       different than other witnesses say that they
12       had observed with respect to Mr. Diaz's
13       position?
14                 ATTORNEY GRIFFIN:  Objection.
15       Foundation.
16                 ATTORNEY CHERNIN:  I asked him if
17       he knows.
18  BY ATTORNEY CHERNIN:
19  Q.   Do you know whether that description is the
20       same or different that other witnesses gave?
21                 ATTORNEY GRIFFIN:  Same
22       objection.  And relevancy.
23                 THE COURT:  Sustained.
24       Rephrase.  Well, not on relevancy, but you do
25       need to lay a better foundation.
```

312

```
 1   BY ATTORNEY CHERNIN:

 2   Q.   Detective Schuler, did you have the

 3        opportunity to review the statements of other

 4        witnesses to the shooting?

 5   A.   I have reviewed the file when I was employed

 6        with the police department and I -- but in

 7        terms of specific statements, I do not recall.

 8   Q.   Okay.  So that I just -- that's all I was

 9        asking.  That's -- so it wouldn't be fair to

10        ask you about that now, it's been some time

11        since you looked at the file?

12   A.   Correct.

13                    ATTORNEY CHERNIN:  I then have no

14        additional questions for Detective Schuler.

15                    THE COURT:  Redirect.

16                    ATTORNEY GRIFFIN:  I have none.

17                    THE COURT:  Detective, you may

18        step down.

19                    THE WITNESS:  Thank you.

20                    THE COURT:  Is the detective

21        released from his subpoena?  Mr. Chernin?

22                    ATTORNEY CHERNIN:  Yes.

23                    THE COURT:  Mr. Griffin?

24                    ATTORNEY GRIFFIN:  Yes.

25                    THE COURT:  You're released from
```

313

```
1        your subpoena.
2                      THE WITNESS:  Thank you.
3                      THE COURT:  I'm going to have you
4        tender those to my clerk as you walk past.
5                      (Witness excused.)
6                      THE COURT:  All right, ladies and
7        gentlemen of the jury, it's ten minutes after
8        the hour of five, and we're at that point in
9        the proceedings, and it's a Friday night,
10       where I'm going to -- you've all been working
11       real hard, and my staff has as well, and it's
12       time for you to go back to your lives for the
13       weekend, your families.  We're going to take a
14       break in the action.  You've asked me, you
15       know, what my sense is, and I told you
16       yesterday that I'd have a better feel for that
17       and I wanted to see where things were going.
18                      It's my expectation, based on the
19       number of witnesses that are left, including
20       the cross examination by the defense of
21       Mr. Torres, and the State has approximately
22       four to six witnesses left, although their
23       testimony -- and again, I don't want to
24       project what the State's going to be putting
25       in or not putting in with that, I think that
```

314

1   that piece of the case, that is the State's
2   case in chief, will be concluded at some point
3   either by noon or mid afternoon on -- on
4   Monday.  Thereafter, the defense has an
5   opportunity to put in witnesses, and they have
6   indicated to me who their witness list is.
7               And so based on those
8   conversations with the lawyers yesterday and
9   my rulings on several legal matters that we
10  took up yesterday after you folks left, my
11  expectation is that this case will go to the
12  jury for deliberations around noon on
13  Tuesday.  So that it looks like Monday and
14  Tuesday of next week you're still going to be
15  hard at work in your role as jurors in this
16  case.  I've noticed a couple of you
17  sniffling.  Miss Burzynski, you look like
18  you've got a bit of a cold.  Are you feeling
19  all right?
20              JUROR:  Not particularly.
21              THE COURT:  All the more reason
22  why we're going to break tonight so that you
23  folks have an opportunity to recoup, get a
24  rest over the weekend, take your cold
25  medicine, that stuff is going around, and come

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 315 of 325   Document 61-24

```
1        back ready to work Monday morning.  I'm going
2        to have you report to the jury room again,
3        Jury Management, no later than quarter to
4        nine.  I'll -- I'll let you sleep in a little
5        bit, I'll have you report about quarter to
6        nine.  That's 8:45.  My deputies will be down
7        there to greet you, so you can be up here and
8        working at 9:00 o'clock.
9                       That gives us -- you don't have
10       too much delays in terms of you sort of
11       hanging around while we're doing stuff out
12       here, and it gives my clerk an opportunity, an
13       extra half an hour, to really try and spin
14       some things.  This isn't too bad, we only have
15       a two-page calendar on Monday, but we're still
16       going to have to try to spin some of these
17       things to other courts, not to mention some
18       trials.  So we're going to be busy for about a
19       half an hour.  So I would normally have you
20       back here, so I just think that that gives you
21       folks a little bit more of a breather, less
22       lag time, where you're waiting around trying
23       to figure out what's going on.
24                       So if you're back to Jury
25       Management at 8:45 on Monday morning my
```

316

deputies will be down there to greet you with sunshiny faces and bring you up here to come right into the jury room or into the courtroom to again take your places in the jury box at 9:00 o'clock so we can conclude this trial. Anything's possible once the weekend goes through. Sometimes things would wrap up even earlier than what I'm projecting, but I'm using my best powers of estimation here to give you sort of a ballpark figure. Could be sooner than that.

And again, as I said, once you get the case, I don't put time frames on you, that's in the purview of the jury, however long it takes it takes. Some of you have your hands raised. Yes sir?

JUROR: Cell phones.

THE COURT: Cell phones, I assume that was yours.

JUROR: It's new.

THE COURT: All right. What we're going to do tonight, again, you'll be escorted out by my deputies, please do not discuss this case with each other, with anyone. You've got a longer lag time between

```
 1      today and the -- then coming back on Monday,

 2      same rules are in effect.  Don't discuss this

 3      with each other, with anyone until directed to

 4      do so by this court after all of the evidence

 5      has been presented.  We're not there yet.

 6      It's coming, but we're not there yet.

 7                      Do any of you have questions of

 8      me before I release you for the evening?  If

 9      any of you need additional information to

10      provide to your employers let my deputies know

11      that as well and we can certainly accommodate

12      you to let them know what's going on.  All

13      right.  Okay.  We'll see you here Monday

14      morning.

15                      DEPUTY:  All rise for the jury

16      please.

17                      (Jury excused for the evening.)

18                      DEPUTY:  You may be seated.

19                      THE COURT:  I want to take up one

20      of the side bars -- although there were many

21      of them, one of the side bar of the two that I

22      recall, were -- were the lawyers asked to see

23      the court in chambers.  One had to do with

24      the --

25                      ATTORNEY CHERNIN:  It's the
```

318

1      criminal record, Your Honor.

2                    THE COURT:  Well, there were

3      three.  One had to do with criminal records of

4      the witnesses for today's session.  And I

5      believe it had to do with Mr. Torres's.  I

6      think it was -- eight convictions I think is

7      what was indicated to the court.  That's at

8      least what my notes reflect.  And there was a

9      stipulation to that, that the defendant -- or

10     the witness rather, was aware of his

11     convictions and -- and the lawyers had gone

12     over it with him.

13                    Another one had to do with the

14     order of witnesses this afternoon, that and

15     the scheduling.  And that was specifically

16     with respect to interrupting Mr. Torres's

17     testimony, where we would normally have the

18     cross examination by the defense follow,

19     because of the scheduling of the -- or the

20     availability of -- of Mr. Greg Schuler, a

21     Detective Greg Schuler, the State indicating

22     that he was not available on Monday, that he

23     was actually driving in from out of town this

24     afternoon.  And so as to accommodate that,

25     would we be able to get him on and off the

                        319

```
1    witness stand yet today.  As I understood it,
2    the defense indicated that that was acceptable
3    to them, and that we would simply recall
4    Mr. Torres out of order again for the defense
5    to have an opportunity to cross examine
6    Mr. Torres.
7                    There was a third side bar and it
8    had to do with an objection based on the
9    defense's objection on hearsay, and the State
10   responding that this was a prior inconsistent
11   statement, and so it was an appropriate
12   hearsay exception.  The court agreed and
13   overruled the objection.
14                    I think those are the summaries
15   of those three side bars that we had during
16   the afternoon session, but if the lawyers have
17   recollections of additional ones or additional
18   information that we shared during those side
19   bars, I'll certainly let them make their
20   record.
21                    Mr. Griffin?
22                    ATTORNEY GRIFFIN:  I have
23   nothing.
24                    THE COURT:  Mr. Chernin?
25                    ATTORNEY CHERNIN:  Actually,
```

320

```
 1        there was -- there was, and it had to do with

 2        the criminal record of Mr. Diaz, as well we

 3        did -- we had one for Mr. Torres and one for

 4        Mr. Diaz.

 5                     THE COURT:  Mr. Jeranek Diaz.

 6                     ATTORNEY CHERNIN:  Yes.

 7                     THE COURT:  Was that this

 8        afternoon's session or was it the morning

 9        session?

10                     ATTORNEY CHERNIN:  I think that

11        was the last one we did before we broke in the

12        morning.

13                     THE COURT:  All right.  That's my

14        recollection, that the issue of the prior

15        record of Mr. Jeranek Diaz was taken right

16        before the lunch break.  And again, I allowed

17        the lawyers to review that to make sure that

18        Mr. Diaz understood what his prior record was

19        and how -- what he needed to respond to when

20        he was asked.  I don't know if I wrote down

21        his convictions, but I'll take a look.

22                     ATTORNEY CHERNIN:  It was ten,

23        Your Honor.

24                     THE COURT:  That's correct.

25        That's what my notes show as well, ten prior
```

321

```
1        convictions.

2                    Anything else, gentlemen?

3                    ATTORNEY GRIFFIN:  I would move

4        46 and 47 into evidence.  I'll do it again at

5        the -- in front of the jury, but those two

6        burned shoes.

7                    THE COURT:  So that the State --

8        or is that -- the court has custody of them

9        for the weekend?

10                   ATTORNEY GRIFFIN:  Yes.

11                   THE COURT:  46 Is what?

12                   ATTORNEY GRIFFIN:  The shoe.

13       They're both burned soles.

14                   THE COURT:  46 and 47 were the --

15                   ATTORNEY GRIFFIN:  They're tin

16.      cans with burned shoe soles in them.

17                   THE COURT:  Any objection to the

18       court receiving that, those exhibits, based on

19       my noting your running objection to my earlier

20       reading on whole this line of evidence?

21                   ATTORNEY CHERNIN:  That's --

22                   THE COURT:  Subject to that

23       objection?

24                   ATTORNEY CHERNIN:  Yes.  Subject

25       to that objection.
```

```
 1                    THE COURT:  The court notes the
 2       defense's continuing objection to the
 3       admissibility of Exhibits 46 and 47, the
 4       court's going to accept those into the trial
 5       record over the objection of defense counsel.
 6                    (Exhibits Number 46 and 47 were
 7       received into evidence.)
 8                    ATTORNEY CHERNIN:  Now, Your
 9       Honor, with respect to the shoes, based upon
10       the way the evidence came in through Detective
11       Erwin, I am going to request the following.  I
12       think in fairness and in completion that I
13       would ask the opportunity to be able to call a
14       very brief witness by telephone, and that
15       would be the witness that the State
16       interviewed by telephone contact through
17       Detective Carl Buschmann.  I would otherwise
18       ask -- and I don't think that this is a
19       reasonable request -- and that's why I'm
20       asking for the telephonic request, that
21       because of the way it came in and the way that
22       the State has the proponent of the evidence, I
23       would ask that the State be compelled to
24       pay -- to fly in Mr. -- I believe his name is
25       Beaucamp.  B-E-A-U-C-A-M-P.  And that may be
```

323

```
1     my -- just my recollection spelling of it, but
2     I would ask to be able to call him
3     telephonically for the purpose of establishing
4     the shoe size.
5                THE COURT:  I've already denied
6     that request, this is my fourth time, and it
7     is going to continue to be denied.  It's
8     coming in a little differently, now you're
9     asking to bring the witness in, but again, to
10    testify about the shoe size, I said it's not
11    coming into evidence, so that request is
12    denied.
13               All right.  That's it for the
14    evening, gentlemen.  It's 20 minutes after the
15    hour of 5:00, we'll see you on Monday morning
16    at 8:30.
17               (Proceedings adjourned for the
18    evening.)
19
20
21
22
23
24
25
```

```
 1    STATE OF WISCONSIN )

 2

 3    MILWAUKEE COUNTY    )

 4

 5                I, Lori J. Cunico, do hereby certify

 6         that I am a Registered Professional Reporter,

 7         that as such I recorded the foregoing

 8         proceedings, later transcribed by me, and that

 9         it is true and correct to the best of my

10         abilities.

11

12         Dated this ___ day of October, 2005, at

13         Milwaukee, Wisconsin.

14

15

16    _____

17    Lori J. Cunico - Court Reporter

18

19

20

21

22

23

24

25
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 325 of 325   Document 61-24