STATE OF WISCONSIN   CIRCUIT COURT   MILWAUKEE COUNTY
BRANCH 05

_____

STATE OF WISCONSIN,

             Plaintiff,     JURY TRIAL

    -vs-             Case No.04CF000609

DANNY L. WILBER,

          Defendant.

COPY

_____

CHARGE:  First Degree Intentional Homicide While
         Armed with a Dangerous Weapon

_____

February 21, 2005
Milwaukee, Wisconsin
Safety Building-Room 316

BEFORE:

      THE HONORABLE MARY M. KUHNMUENCH
      CIRCUIT JUDGE

APPEARANCES:

JAMES GRIFFIN, Assistant District Attorney,
    Appeared on behalf of the State of Wisconsin.

MICHAEL CHERNIN, Attorney-at-Law,
    Appeared on behalf of the defendant.

    Defendant appeared in person.

Lori J. Cunico
Official Court Reporter

# I N D E X

WITNESS                                              PAGE

RICHARD TORRES

Cross Examination by Attorney Chernin                 21
Redirect Examination by Attorney Griffin             33
Recross Examination by Attorney Chernin              42


TIMOTHY DUFFY

Direct Examination by Attorney Griffin               51
Cross Examination by Attorney Chernin                62


EXHIBITS                                  ID'd      REC'd

54 - Photos                                37          38

51 - Diagram                                           46

28 - Statement of Antonia West                         70

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 2 of 83   Document 61-25

<u>TRANSCRIPT OF PROCEEDINGS</u>:

2            THE COURT:  <u>State of Wisconsin v.</u>

3  <u>Danny Wilber</u>, 04CF000609, first degree

4  intentional homicide while armed with a

5  dangerous weapon.  Appearances please.

6            ATTORNEY GRIFFIN:  Assistant DA

7  Jim Griffin for the State.

8            ATTORNEY CHERNIN:  Michael

9  Chernin appearing on behalf of Danny Wilber.

10  Danny Wilber appears in person.

11            THE COURT:  All right.  It is

12  quarter to 11 and I do have a morning

13  calendar, gentlemen, that I'd like to be able

14  to get to, a couple of pleas and sentencings,

15  and I was apprised first thing this morning

16  with respect to this case that the State's

17  witness, Mr. Richard Torres, had failed to

18  return to court this morning.  The State had

19  indicated that they were in contact with

20  Mr. Torres's mother, and that they also had

21  received a voice message from Mr. Torres at

22  approximately 10:00 a.m. this morning.  I

23  think that's fairly accurate.

24            ATTORNEY GRIFFIN:  That's

25  correct.

```
 1                    THE COURT:  All right.  What
 2      would you like to apprise me of with respect
 3      to this situation?
 4                    ATTORNEY CHERNIN:  Isn't it also
 5      -- didn't somebody actually have -- didn't
 6      somebody from the police department actually
 7      have a conversation with him, with Mr. Torres
 8      earlier regarding meeting him at a gas station
 9      as well?
10                    ATTORNEY GRIFFIN:  That was on
11      Friday of last week.
12                    ATTORNEY CHERNIN:  Oh.  I thought
13      -- I'm sorry.
14                    ATTORNEY GRIFFIN:  Judge, I -- I
15      know that Detective Casper had agreed to have
16      transportation arranged for Mr. Torres this
17      morning.  He was not at the agreed upon pick
18      up spot.  He has, as you know, since left a
19      message on Lisa Maggiore's M-A-G-G-I-O-R-E,
20      phone, who's from Victim Witness in my office
21      who had contact with him several times last
22      week as well, that he could not -- could not
23      or would not be here this morning.  I think he
24      said could, but he would be here this
25      afternoon for sure.
```

4

```
 1                    Detective Casper informed me that
 2          some member of his family -- one second --
 3          that the mom apparently was under the
 4          impression apparently from him that he was
 5          going to be here or had to be here this
 6          afternoon.  I don't -- I don't know where the,
 7          I'll call it confusion, comes from, although
 8          apparently Mr. Torres has committed to being
 9          here this afternoon.
10                    At this point, other than through
11          his mother, I don't have any information as to
12          why he's not here.  In other words, Mr. Torres
13          himself has not explained that to Ms. Maggiore
14          or me or Detective Casper.  The mom gave us
15          some information about why she thought he
16          wasn't here based on things he told her, but
17          -- and I can tell you that they were fear-
18          related, as opposed to drug-and-alcohol-
19          related.  And -- and again, I can't vouch for
20          the truth of any of that.
21                    So with that said, I understand
22          that -- I understand, number one, these things
23          happen, which they shouldn't.  I understand
24          that it's already 10:45, which means we've
25          kept the jury back there already an hour and a
```

5

1   half waiting. The State's prepared to go

2   ahead with other witnesses and ask the court's

3   indulgence till later in the day to see where

4   Mr. Torres is. He obviously -- I know the

5   court saw his direct as an important witness

6   for the State.

7           I believe that it would be

8   difficult were he to, let's say, you know,

9   disappear forever, so to speak, or whatever

10  may happen, it would be difficult for this

11  court to simply instruct the jury to disregard

12  his testimony and proceed forward, although I

13  that would be, I guess, a bridge we would

14  cross at a later date. So I'm essentially

15  asking the court to either allow me to proceed

16  with other witnesses or to simply continue in

17  a waiting posture till 1:30 and see where

18  we're at.

19          I can't speak for Mr. Torres,

20  other than to tell you that last week he was

21  very cooperative with us in terms of

22  answering, you know, talking to Miss Maggiore,

23  understanding the delays, always checking in

24  with us, those kind of things. He does go to

25  class, he was going to class in the

6

afternoon. I think he talked about how he's

getting his HSED. But I'm a little surprised

by this. I do know that last week when we

were talking with him about where to pick him

up, he did express some concerns about his

safety. That was before the weekend, and that

was an issue for him, and why we were going to

pick him up some place else and those kinds of

things.

And while it's -- there's no --

so that's what I know at this point. I'll

stop there. I know that the family as well,

Mr. Torres's I believe brother and mom have

been helpful in trying to get us get in touch

with him. About 20 to 25 minutes ago I think

the mom indicated to Miss Maggiore that she

would go over there and see if he was over

there in his residence. As of right now I

haven't heard anything -- it's going on about

10:50 -- from Miss Maggiore who obviously

understands and will call me down here as soon

as she knows something. So I'm going to

assume she hasn't heard anything yet.

THE COURT: Mr. Chernin?

ATTORNEY CHERNIN: Well, clearly,

7

```
 1     under the rules of evidence the court has the
 2     right to direct the mode of presentation.  In
 3     this regard, I'd ask the court to exercise its
 4     discretion and continue to delay these matters
 5     pending Mr. Torres's appearance or non
 6     appearance.  I think that this is a very
 7     serious matter, that the court has already
 8     told the jury that Mr. Torres is going to be
 9     subject to cross examination or continued
10     examination, I don't know if Mr. Griffin was
11     through with him, and that we were going to
12     take a break for Detective Schuler.
13               We accommodated that because
14     Detective Schuler was coming in from out of
15     town.  He's retired and he was leaving the
16     country or leaving out of state at least,
17     today.  That made a degree of sense.  At this
18     juncture however I think it would be a result
19     of -- I think that the result would be that
20     the court would be placed in a position to
21     breaking faith with the jury if we have the
22     court back off of its prior statement to them,
23     that we were going to continue with the
24     examination of Mr. Torres, and it would seem
25     to me that this case -- this case really is
```

8

1    contingent upon Mr. Torres's availability.

2              And I don't -- and it really, at

3    this juncture would be inappropriate, in my

4    estimation, to put on other witnesses in front

5    of the jury.  And I don't think that it -- I

6    think it -- it could be understood in so many

7    different ways by the jury that I -- I'm

8    afraid that it will have a negative inference

9    to the jury if Mr. Torres is not brought back

10   to the stand.

11             THE COURT:  A negative inference

12   how?

13             ATTORNEY CHERNIN:  Well, that

14   they're going to blame somebody for his non

15   appearance.  And I don't want that to be held

16   against my client in any way.  And so that's

17   why.

18             THE COURT:  His non appearance

19   period or his delay in appearing?  If it's a

20   non appearance period that's a completely

21   different issue.

22             ATTORNEY CHERNIN:  Well, right.

23   Non appearance at this juncture.  So I guess

24   delay is the -- the -- what I'm looking at

25   right now.  I mean obviously.  So -- and, you

                        9

know, this jury's worked hard, they've been
with us an awfully long time, and it would
just simply be breaking faith with them if we
didn't resume with Mr. Torres.  I mean, you
can explain things in a -- other ways to them
as the court's busy calendar, and clearly this
court has a busy calendar, but I -- I think it
would be unduly prejudicial to commence with
-- with a witness other than Mr. Torres.

          (Discussion off the record.)

          THE COURT:  The court does have,
I think as the defense has correctly stated,
the ability to control the method and manner
by which witnesses are called, the order in
which they're called, subject to certain
limitations consistent with the defendant's
right to a fair trial, consistent with the
concept of a fair trial for the prosecution as
well, to be able to put in the case they want
to put in.

          When I balance all of those
things and I look at what the -- where we've
come in terms of the trial itself, we're here
in the sixth day of a trial through jury
selection, through the -- at least three

                    10

```
 1      quarters of the State's case in chief, a
 2      weekend, and now into the first day of the
 3      second week of trial with a jury that the
 4      parties worked very hard to -- to -- to
 5      obtain, in terms of their selection of these
 6      particular 12 individuals.
 7              The balancing test that I must
 8      make is whether or not allowing the State to
 9      continue with its case in chief around the
10      absence of Mr. Torres at this time is going to
11      create some sort of undue influence,
12      inference, pressure upon the jury, to -- to
13      question why other witnesses are being put in
14      and Mr. Torres --
15              ATTORNEY GRIFFIN:  Judge, hang on
16      one second.  If I may interrupt, Mr. Torres is
17      here.  Mr. Torres is here.
18              THE COURT:  All right.  The court
19      was going to be making a ruling about how the
20      State would need to proceed consistent with
21      the defense's request, whether it would be
22      appropriate to just have a continuance to 1:30
23      this afternoon or to fill the time in between
24      with other witnesses.  The State's -- or the
25      defense's request was to wait for just the
```

11

```
 1    continuance so as not to create some undue

 2    influence or inference in the minds of the

 3    jurors, and the court was inclined to, if it

 4    had come to that, grant that request.  That is

 5    that we would adjourn the proceedings or

 6    continue the proceedings until 1:30 this

 7    afternoon.

 8            It would have given me an

 9    opportunity to handle some of the calendar

10    that I have left this morning and then we'd

11    take up this trial again at 1:30.  That

12    doesn't seem to be necessary at this time, as

13    the State has just indicated that its witness,

14    Mr. Torres, has -- has appeared.

15            So one other matter that we need

16    to put on the record however, something I took

17    up in chambers with the lawyers, and that had

18    to do with the illness of one of our jurors,

19    Miss Burzynski, who was, she had indicated to

20    the parties and the court on Friday night,

21    very ill, not feeling very well, and we

22    actually adjourned early so that she'd be able

23    to use the weekend to hopefully recoup.  That

24    didn't appear to happen.  This morning she

25    appeared, she was timely, she came, but she
```

12

1   was extremely sick and asked the deputies if

2   she could be excused or at least let the court

3   know and the lawyers know of her illness, to

4   see if she might be able to be excused or used

5   as the 13th juror.

6           I did bring that to the attention

7   of Mr. Chernin and Mr. Griffin this morning

8   and they both indicated that I should use my

9   discretion and they would have no objection to

10  me using her as the 13th juror, that is as the

11  alternate in this case, which means we'd be

12  going just with a jury of 12.

13          I was pretty comfortable, as were

14  the lawyers, that we could proceed with the

15  trial and complete it with just a panel of 12,

16  because it seemed to me, as it did to the

17  lawyers, this was a pretty good panel and

18  they've all showed up, they've all come to

19  work every day when we've had long breaks like

20  this morning and they have not been deterred

21  in their duty.  So the court, consistent with

22  that, did in fact use Ms. Burzynski as our

23  13th juror, as our alternate, and returned her

24  back to Jury Management at 9:30 this morning.

25          We're going to continue with the

13

```
 1      State's case in chief at this time, where they

 2      will call Mr. Torres, we'll have him back up

 3      on the witness stand and we'll have my

 4      deputies bring the jury in momentarily.

 5                  ATTORNEY CHERNIN:  Judge, there's

 6      a couple -- a couple items.  One of the

 7      things, I filed a brief this morning.

 8                  THE COURT:  I did read it.

 9                  ATTORNEY CHERNIN:  Okay.

10                  THE COURT:  It's just a --

11      another motion in limine on the issue that I

12      believe I had already ruled on.  It does, more

13      particularly, raise some of the issues that I

14      think you raised sufficiently on the record

15      orally to the court on at least two occasions

16      last week.  But as it relates to that ruling,

17      I'm not going to get into that.  We've already

18      delayed the jury, so you and I and Mr. Griffin

19      will have to take that up, if need be, over

20      the lunch hour, but we're --

21                  ATTORNEY CHERNIN:  There is one

22      other issue with respect to the continuing

23      examination of Mr. Torres, and this was

24      something that we did discuss off the record

25      kind of rather informally.  One of the things
```

14

```
 1      that I suggest is Mr. Griffin had indicated
 2      that Richard Torres's mother had received
 3      statements from Mr. Torres regarding his non
 4      appearance.  To the extent that those
 5      statements may contain exculpatory matters,
 6      we're in the midst of a trial, a new issue has
 7      arisen, I don't have the resources to get to
 8      Mr. Torres's mother.  I don't even know her
 9      name.  Mr. Griffin has indicated that she has
10      a cell phone.
11              I would like to have the -- at
12      least the opportunity to have Mr. Kohl contact
13      her and find out what, if anything, she
14      learned about statements made by her son,
15      because they are potentially exculpatory under
16      Brady v. Maryland.  And if, for example, he
17      said that he wasn't coming back because he
18      couldn't stand the pressure of coming into
19      court and lying, or whatever, I mean that --
20      that would be a pretty good example.
21              So what I would like to do is
22      obtain the cell phone number from Mr. Kohl --
23      or from Mr. Griffin and have five minutes or
24      so so I can try and contact Mr. Kohl and give
25      him instructions as to what I'd like him to
```

15

```
 1      pursue.

 2                  THE COURT:  Mr. Griffin?

 3                  ATTORNEY GRIFFIN:  That's fine.

 4      Are we talking about delaying five minutes

 5      right now?

 6                  ATTORNEY CHERNIN:  Yeah.

 7                  ATTORNEY GRIFFIN:  Okay.  I have

 8      to get in touch with Ms. Maggiore, who may be

 9      out in the hallway.  She -- I'm not sure,

10      she's the one who has the number.

11                  THE COURT:  Get that and then,

12      Mr. Chernin, you can use that cell phone and

13      go in the back and call him with that

14      information.

15                  (Discussion off the record.)

16                  ATTORNEY GRIFFIN:  Ms. Maggiore

17      is on the phone, Judge, if I may.

18                  THE COURT:  You may.

19                  (Discussion off the record.)

20                  ATTORNEY GRIFFIN:  Judge, back on

21      the record?

22                  THE COURT:  Yes.

23                  ATTORNEY GRIFFIN:  I'm going to

24      give this number to Mr. Chernin.  I'm going to

25      ask that he be ordered not to share it with
```

16

```
 1     the defendant or anyone else other than

 2     Mr. Kohl, and that this piece of paper that

 3     I've written it on be destroyed after that.

 4                    THE COURT:  Mr. Chernin, that's

 5     the court's order.

 6                    ATTORNEY CHERNIN:  I appreciate

 7     that, but of course, you know, it's going to

 8     be in my cell phone.  I can erase it.

 9                    ATTORNEY GRIFFIN:  It's not going

10     to be in your cell phone, I don't think,

11     because I don't think you're going to call

12     her, and Mr. Kohl can call her from a land

13     line.

14                    ATTORNEY CHERNIN:  If he can do

15     it, I'll try.  I don't know --

16                    THE COURT:  You don't know what?

17                    ATTORNEY CHERNIN:  I don't know

18     what -- I don't know what --

19                    THE COURT:  Here's the order.

20     You're going to get a phone number that you

21     can share with Mr. Kohl.  Mr. Kohl is -- and

22     as soon as you share that number that piece of

23     paper comes back to my clerk, my clerk will

24     destroy it.

25                    ATTORNEY CHERNIN:  That's fine.
```

17

```
 1        Thank you.
 2                    (Discussion off the record.)
 3                    THE COURT:  Mr. Torres, I'm going
 4        to have you come on up to the witness stand,
 5        you may be seated.
 6                    ATTORNEY CHERNIN:  Judge, there's
 7        one thing before we bring the jury in.  I've
 8        asked that Mr. Torres's mother, because she's
 9        potentially a witness now, first be ordered to
10        remain and be available, and I'd ask that she
11        be subject to the sequestration order as well.
12                    THE COURT:  Is she here?
13                    ATTORNEY CHERNIN:  She's here
14        with Ms. Maggiore.
15                    ATTORNEY GRIFFIN:  She's here.
16        Can I have a minute, Judge, to explain to her
17        why, because I'm sure she's thinking, why do I
18        have to stay.
19                    THE COURT:  That's fine.
20                    (Discussion off the record.)
21                    DEPUTY:  All rise for the jury.
22                    (Jury in box.)
23                    THE COURT:  Good morning.  Please
24        be seated.  I want to thank you very much for
25        your patience this morning, ladies and
```

18

1     gentlemen.  You've been real troopers.  I
2     wanted to just make a record for purposes of
3     the trial, I've already informed you, and the
4     lawyers know this as well, that one of our
5     members of the panel was ill and we allowed
6     her to be released from further jury service.
7     She served as the alternate in this case.
8     That means we're down to 12.  Citizens who are
9     charged with the commission of a crime have a
10    right to a jury trial consisting of a panel of
11    12 of their peers.  You are the 12 individuals
12    that will decide this case ultimately at the
13    conclusion of the case.  We don't have an
14    alternate, so we're just sort of winging it
15    and hoping that nobody else gets sick.
16              And part of my thinking with
17    respect to that one juror was the longer she
18    stayed, the more she might have gotten you --
19    some of you sick, so then we'd really be in
20    trouble.  That was kind of the thought process
21    that went into it.  You folks have been with
22    this a whole week now and into a second week,
23    and as the lawyers and I discussed it, we have
24    every confidence that we won't lose any more
25    jurors and we'll be able to conclude the trial

19

```
 1    this week.
 2              We ended Friday's session in sort
 3    of an out-of-order process because of the
 4    detective who had retired who lives in Madison
 5    who came in, and so Mr. Torres's testimony was
 6    interrupted.  He had been examined by the
 7    State, I don't know if the State has any
 8    further direct, but I'll ask them that, and
 9    then he's also going to be subject to cross
10    examination at this time.  So that's where
11    we're at in the trial process.
12              I'm going to have you stand,
13    Mr. Torres, and I'm going to have you reraise
14    your right hand.
15              RICHARD TORRES, called as a
16    witness herein, having been first duly sworn,
17    was examined and testified as follows.
18              THE COURT:  Please be seated.
19    I'm going to ask you to begin once again, sir,
20    by stating your full name for the forward,
21    spelling your first and last name.
22              THE WITNESS:  Richard Torres.
23    R-I-C-H-A-R-D, T-O-R-R-E-S.
24              THE COURT:  Mr. Griffin, had you
25    concluded your direct examination?
```

20

```
 1                    ATTORNEY GRIFFIN:  Yes.

 2                    THE COURT:  Cross, Mr. Chernin.

 3                    ATTORNEY CHERNIN:  Thank you,

 4         Your Honor.

 5                    CROSS EXAMINATION:

 6    BY ATTORNEY CHERNIN:

 7    Q.   Mr. Torres, you recall during the course of

 8         your direct examination, Mr. Griffin had you

 9         engage in moving the people around; correct?

10    A.   Yes.

11    Q.   And when I say moving the people around, the

12         people that you were talking about in your

13         little exam wasn't obviously you and

14         Mr. Griffin and Detective Casper, but rather

15         you were trying to display the relative

16         positions of yourself, David Diaz, and the

17         person that you identified as Danny Wilber or

18         Slim; correct?

19    A.   Correct.

20    Q.   And in your examination -- or in your direct

21         examination, you said that -- if you could

22         hold Exhibit 15, have you seen Exhibit 15

23         before, it's the one that's in the front,

24         Exhibit 15?

25    A.   Yes.
```

21

```
1   Q.   Have you seen that one?  Okay.  In Exhibit 15,
2        does that display anything that you're
3        familiar with?
4   A.   Yes, my hat.  Also my best friend on the
5        floor.
6   Q.   It's your best friend?
7   A.   Yes.
8   Q.   And in that picture, does it show the position
9        that you saw Mr. Diaz in after he was shot?
10  A.   Yes.
11  Q.   Now, after Mr. Diaz was shot, did you do
12       anything or see -- first of all, did you move
13       his body in any way?
14  A.   No, I didn't.
15  Q.   Did you see anyone else move Mr. Diaz's body
16       in any way?
17  A.   No, I didn't.
18  Q.   Were you present when members of the fire
19       department came to the scene?  The emergency
20       medical technicians?
21  A.   No, I wasn't.
22  Q.   However, looking at Exhibit 15, is it fair to
23       say that that depicts the position that you
24       saw Mr. Diaz in immediately after he was shot?
25  A.   I wouldn't say immediately, no, 'cuz I don't
```

22

```
1           think he had a shirt on.
2    Q.     He didn't have a shirt on?
3    A.     Well, not this color, I don't think.  Earlier
4           he had a yellow sweater when we went out.  I'm
5           just now seeing this, you know.
6    Q.     You're saying that his body was -- was changed
7           in some way?
8    A.     I'm saying the last recall of his clothing
9           that I remember he was wearing a yellow and
10          tan sweater.
11   Q.     Other than the -- other than the tan sweater,
12          is there any other -- is there anything other
13          -- else in Exhibit -- is that 14 or 15, I'm
14          sorry?
15                    THE COURT:  Look at the yellow
16          sticker.  Is there a yellow sticker there,
17          Mr. Torres?
18                    ATTORNEY CHERNIN:  15.
19   A.     Yeah, 15.
20   BY ATTORNEY CHERNIN:
21   Q.     Other than the tan sweater that you don't see
22          in Exhibit 15, in every other respect you
23          would agree that that is how Mr. Torres was
24          positioned immediately after he was shot?
25   A.     Mr. Diaz.
```

23

```
 1    Q.   I'm sorry, Mr. Diaz, immediately after he was
 2         shot?
 3    A.   Yes.
 4    Q.   I'm going to show you what's been marked as
 5         Exhibit 25.  Have you seen this before?  The
 6         picture before?
 7    A.   Yes.
 8    Q.   In that photograph, Exhibit 25, does that also
 9         reflect the position in which Mr. Diaz's body
10         was after the time that he was shot?
11    A.   Yes.
12    Q.   And is it fair to say that the doorway
13         depicted in Exhibit 25 is the doorway that you
14         took to go out of the kitchen to the front
15         door as you testified earlier, you went to go
16         watch Danny Wilber run out the front door?
17    A.   Yes, this is the doorway.
18    Q.   That's the doorway to the kitchen; correct?
19    A.   Correct.
20    Q.   And the area between -- well, what I'm
21         pointing to just immediately above the sticker
22         that says Exhibit 25, that's the stairs;
23         correct?
24    A.   Correct.
25    Q.   So the -- and you can see one of those stairs
```

24

1      and I'm pointing to it; correct?

2   A.  Yes.

3   Q.  Now, in Exhibit 25 you can see where

4       Mr. Diaz's feet are positioned relative to the

5       doorjamb; correct?  And I'm pointing to the

6       doorjamb that leads to the side porch that one

7       sees in Exhibit 1, and I'm pointing to that

8       door; correct?

9   A.  Yes.

10  Q.  And here's that door; correct?  Am I correct?

11  A.  Which door are you referring to?

12  Q.  The white door.

13  A.  Yeah, side door.  Yes.

14  Q.  Side door?

15              ATTORNEY GRIFFIN:  Can the jury

16      see that, Judge, where he's pointing?

17              ATTORNEY CHERNIN:  Can the jury

18      see this?

19              THE COURT:  Jury is affirming

20      that they can see.

21  BY ATTORNEY CHERNIN:

22  Q.  His feet are located in the position -- in the

23      position that you see it, relative to this

24      doorjamb; correct?

25  A.  Right.

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 25 of 83   Document 61-25

```
 1   Q.   In Exhibit 14, one can see a different

 2        perspective, can you not, as to the position

 3        of Mr. Diaz's right foot; correct?  Would that

 4        be his right foot or his left foot?

 5   A.   His right foot.

 6   Q.   And his right foot appears in Exhibit 14, and

 7        from this perspective, you can actually see

 8        his shoe between the east wall and the

 9        counter top; is that correct?

10   A.   That's correct.

11   Q.   I'll show you what's been marked as Exhibit

12        51.  Are you familiar with that document?

13   A.   Yes.

14   Q.   Who drew the outline of the area depicted in

15        Exhibit 51?  Is that 51?  I'm sorry.

16   A.   Yes.

17   Q.   Yes, Exhibit 51.  Who drew that outline?

18   A.   I believe it was one of the detectives.

19   Q.   And was that detective doing that diagram

20        based upon your instruction as to the

21        positions of the rooms?

22   A.   I believe he was at the house, and he kind of

23        knew where everything was out and based on

24        what I was telling him where things were at I

25        was drawing it up where things should be
```

26

```
 1          placed.

 2     Q.   So what was on Exhibit 51 at the time that you

 3          first saw it?  Did it have just an outline?

 4          Did it have the cabinets in there?  Did it

 5          have the stove in there?  The table?  Were

 6          those items in there or were they placed in

 7          there at your instruction to the detective?

 8     A.   I believe that they were there, plus I told

 9          him where things were at.

10     Q.   Okay.  So Exhibit 51 reflects your perception

11          of what was in the kitchen at the time of the

12          shooting of your good friend, David Diaz; is

13          that fair to say?

14     A.   Yes, these are things that are in the

15          household that I know of because I live there.

16     Q.   You live there?

17     A.   Yes.

18     Q.   Okay.  Now, when I say something is drawn to

19          scale, do you understand what I mean by that?

20     A.   Yes.

21     Q.   What do you understand by drawn to scale?

22     A.   To scale, by measurements.

23     Q.   Okay.  Now, that diagram is not drawn to

24          scale; is it?

25     A.   No, it's not.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 27 of 83   Document 61-25

1    Q.   And despite it's not being drawn to scale, did

2          you do your best to place the individuals that

3          are depicted in Exhibit 51, by your

4          recollection, of their relative positioning?

5    A.   Yes.

6    Q.   In that diagram, is it fair to say that you

7          located Mr. Diaz in the position that is

8          reflected by the name David and X that you

9          placed on Exhibit 51?

10   A.   Yes.

11   Q.   And that Rock was closer to Mr. Diaz than you

12         or Slim; isn't that correct?

13   A.   Correct.

14   Q.   And Slim was facing forward looking at

15         Mr. Diaz; correct?  Or an angle to Mr. Diaz;

16         correct?

17   A.   Correct.

18   Q.   And isn't it fair so say that at the time that

19         the shot went off, you had been in a position

20         where you were blacked out and that's -- isn't

21         that fair to say?

22   A.   For a few seconds, yes.

23   Q.   And as a result of your being blacked out, you

24         did not actually see the shot being fired,

25         isn't that a fair assessment of what you've

```
 1      previously said?

 2   A. Yes.

 3   Q. Now, in your testimony, as you moved Detective

 4      Casper around to display the position of David

 5      Diaz as he was shot, you moved Detective

 6      Casper to the north side of this white door;

 7      isn't that correct?

 8   A. Correct.

 9   Q. And in these photographs, Mr. Diaz's feet are

10      located to the south of the white doorjamb as

11      depicted in Exhibit 25.  Would you agree with

12      that?

13   A. I would agree he was more by the table, which

14      would be right about here.

15   Q. And would you also agree that in Exhibit 14,

16      Mr. Diaz's feet are positioned to the south of

17      the doorjamb of the white door depicted in the

18      middle of that Exhibit 14?

19   A. Yes, but I believe when he did fall, his feet

20      did stretch out, 'cuz he was shaken.

21   Q. Well, that's a supposition on your part, isn't

22      that your guess because you didn't actually

23      see him being shot; correct?

24   A. Not being shot, yes.

25   Q. You did not.  Isn't that what you said, you
```

```
 1          did not see him being shot?

 2   A.     Right.   I didn't see nothing like smoke or

 3          fire being shot at his head, no.

 4   Q.     So you cannot say with any degree of certainty

 5          the exact position of Mr. Diaz when he was

 6          shot; isn't that fair to say?

 7   A.     His exact position when he was shot, no, but

 8          his position where I last seen him, yes.

 9   Q.     And you also said that it was possible,

10          because Mr. Griffin asked you this question,

11          you said it was possible that Mr. Diaz was

12          shot by somebody who was to the south of this

13          doorjamb?  Didn't you say that that was

14          possible?

15   A.     I don't recall what, I might have said it.

16   Q.     Mr. Torres, during the course of your

17          examination by Mr. Griffin, did you say that

18          there was an individual, a Hispanic male named

19          Ricky that you observed in the living room

20          area with either a 25 caliber or a 38 caliber

21          handgun?

22   A.     Well, when they were lifting weights I did

23          observe him with a handgun.

24   Q.     And as far as you know, after you went into

25          the kitchen area -- well, let's put it this
```

30

```
 1          way.  On Exhibit 51 you show Ricky on that
 2          diagram; do you not?
 3    A.    Yes, I do.
 4    Q.    Because Ricky was still in that living room
 5          area when you were engaged in the
 6          confrontation with Danny Wilber inside the
 7          kitchen area; isn't that true?
 8    A.    Well, I came down from the stairs, I seen him
 9          to my right before entering the kitchen.
10    Q.    So you know that he was still in the house at
11          least up to the point that you were in the
12          kitchen; correct?
13    A.    Up to that point, yes.
14    Q.    And you indicated that there were other people
15          that were watching as well in that living room
16          area; correct?
17    A.    Correct.
18    Q.    Do you know who those people are?
19    A.    No, I don't.
20    Q.    Now, are you familiar with something called an
21          under lug?
22    A.    No.
23    Q.    Are you familiar with the parts of a gun?
24    A.    Yes.
25    Q.    A gun consists at least in part of a barrel;
```

31

```
 1           correct?

 2    A.     Correct.

 3    Q.     And the barrel, you can put a counterweight

 4           below the barrel, and that's called an under

 5           lug.  Are you familiar with what I'm talking

 6           about now?

 7    A.     No, not really.

 8    Q.     Okay.  So the gun you said was a 25 caliber or

 9           a 38 caliber handgun though; correct?

10    A.     Correct.

11    Q.     Now, in your conversations with the police,

12           did you tell the police that David was shot

13           from behind by Danny Wilber?

14    A.     No.

15    Q.     You came to learn that he was shot from behind

16           at some later point after February 1st of

17           2004; correct?

18    A.     After my statement, yes.

19    Q.     After your statement you learned that he was

20           shot from behind; correct?  And as a result,

21           isn't it fair to say that you cannot say with

22           certainty that Danny Wilber was the person

23           that fired the shot at David Diaz?

24    A.     I can't say it like positively, no.

25                      ATTORNEY CHERNIN:  Thank you for
```

32

```
1        your honesty, Mr. Torres.

2                        THE COURT:  Redirect.

3                        REDIRECT EXAMINATION:

4   BY ATTORNEY GRIFFIN:

5   Q.   What's a 38?

6   A.   A 38 is a -- a 38 caliber.

7   Q.   Semiautomatic?

8   A.   Semiautomatic.

9   Q.   What's a 380?

10  A.   38's also called revolvers.

11  Q.   The gun that you saw Ricky with, what kind was

12       it?  What did you see?

13  A.   It was the kind that you have to load up from

14       the bottom of the handle, which would be a

15       semiautomatic.

16  Q.   I'm going to show you what's a plastic gun.

17       What part of it did you see on Ricky?

18  A.   The upper part.

19  Q.   Point to it for the jury.

20  A.   This part right here.

21  Q.   You're pointing to the part that your hand

22       goes around, what's often referred to as the

23       butt; correct?

24  A.   Correct.

25  Q.   And can you show the jury, for example, where
```

33

```
 1        it was on his body?

 2   A.   It was on his hip.  Right hip.

 3   Q.   On his right hip.  The way I'm putting it in

 4        my right hip like this?

 5   A.   No, the opposite direction.

 6   Q.   You mean with this part in?

 7   A.   No.

 8   Q.   You mean like this?

 9   A.   Yes.

10   Q.   Okay.  And the part of the gun you could see

11        was the part where the magazine goes?

12   A.   The magazine and the back of the handle.

13   Q.   And the back here?

14   A.   Yes.

15   Q.   Okay.  Could you see the magazine?

16   A.   Yes.

17   Q.   Was it in there?

18   A.   Yes.

19   Q.   So the magazine on the gun you saw Ricky with

20        which was either a 25 or a 38 was a

21        semiautomatic, the kind you put the magazine

22        in here so you have your bullets in the butt

23        so you can fire it?

24   A.   Yes.

25   Q.   You ever fired a semiautomatic?
```

34

```
1    A.   Yes.

2    Q.   You ever fired a revolver?

3    A.   Yes.

4    Q.   And you know that it's impossible in a

5         revolver to have this butt stock here where

6         the magazine goes in?

7    A.   Correct.

8    Q.   You know that a 25 caliber is a semiautomatic

9         handgun?

10   A.   Yes.

11   Q.   And what you told the police on February 1st

12        was that you saw Ricky with a 25?

13   A.   25 or 38.

14   Q.   And a 38 though, do you know if there's such a

15        thing as a 38 semiautomatic?

16   A.   It's not a 38, it's -- it's called a 380.

17   Q.   Right.  But in your mind is that the same

18        thing, point 38?

19                   ATTORNEY CHERNIN:  Objection.

20        Leading.

21                   THE COURT:  Overruled.  I'll

22        allow it.

23   A.   I say there's probably a slight difference on

24        size of the caliber.

25   BY ATTORNEY GRIFFIN:
```

1   Q.   Well, why do you say 25, for example?

2   A.   Because of the handle.  Sometimes if you can't

3        see the handle it could be a smaller barrel.

4   Q.   When we're talking about the handle do you

5        mean --

6   A.   I mean the barrel part, this part if you

7        cannot see this it could be smaller.  The exit

8        can be smaller.

9   Q.   On the gun Ricky had could you see anything

10       from the butt stock to the end of the barrel?

11  A.   No.

12  Q.   All you saw was the part the magazine?

13  A.   The magazine.

14  Q.   Now, when you saw the defendant immediately

15       after the shooting crouch down with something

16       in his hands, was it a gun?

17  A.   I believe so.

18  Q.   You believed it was a gun.  Which part of the

19       gun did you see?  Point to the jury, would

20       you.

21  A.   The top portion.

22  Q.   And you're going from about -- about all the

23       way back or partially back or where?

24  A.   About right here.

25  Q.   On this particular gun you're talking from a

36

```
 1        part just above the trigger, to the end?

 2   A.   Correct.

 3   Q.   Did you see the handle part?  In other words,

 4        the butt stock.

 5   A.   NO, I did not.

 6   Q.   As the defendant held this thing, did you

 7        believe it was a gun at that point?

 8   A.   Yes.

 9   Q.   Did you back away from him?

10   A.   Yes, I did.

11   Q.   Why?

12   A.   'Cuz I was afraid of getting shot too.

13   Q.   You thought the defendant was going to shoot

14        you?

15   A.   Yes.

16   Q.   I'm going to show you some photographs that

17        are going to be marked as Exhibit 54 --

18                  ATTORNEY CHERNIN:  Excuse me.

19        Could I see.  I -- yeah, we're good.  This is

20        going to be a group exhibit.  Just for the

21        record, how many pages is it?

22                  ATTORNEY GRIFFIN:  Nine I think.

23                  ATTORNEY CHERNIN:  Nine.

24                  (Exhibit Number 54 was marked for

25        identification.)
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 37 of 83   Document 61-25

```
 1   BY ATTORNEY GRIFFIN:

 2   Q.   Do you see Ricky in any of those photos?  Take

 3        your time and look at them just look at the

 4        pictures.

 5   A.   It would be the last one.

 6   Q.   The very last one?

 7   A.   Yes.

 8   Q.   For the record, the name on that photograph is

 9        Fidel Muniz or Muniz, M-U-N-I-Z; correct?

10   A.   Correct.

11             ATTORNEY CHERNIN:  Excuse me,

12        could we have a side bar please.

13             (Discussion off the record.)

14             ATTORNEY GRIFFIN:  Judge, I'm

15        going to move Exhibit 54 into evidence.

16             THE COURT:  Any objection?

17             ATTORNEY CHERNIN:  For

18        identification purposes no.  I may have a --

19        an objection --

20             THE COURT:  Court's going to

21        receive the 54 over the defense's objection.

22             (Exhibit Number 54 was received

23        into evidence.)

24   BY ATTORNEY GRIFFIN:

25   Q.   Mr. Torres, this packet of photos that I
```

38

```
 1      showed you, 54, had I ever shown you those
 2      before?
 3   A.  No.
 4   Q.  And the last guy in here is the guy, that's
 5      Ricky that you're talking about, that was in
 6      the house that night; right?
 7   A.  Yes.
 8   Q.  And when Mr. Chernin talked about Ricky on
 9      Exhibit --
10                   ATTORNEY CHERNIN:  51.
11                   ATTORNEY GRIFFIN:  Thank you.  I
12      appreciate it.
13   BY ATTORNEY GRIFFIN:
14   Q.  -- 51, that's the last place you saw Ricky
15      before you went into the kitchen, and all of
16      the -- the brouhaha started there in the
17      kitchen; right?
18   A.  Yes.
19   Q.  Do you know if Ricky stayed in the house at
20      the point?
21   A.  No, I don't.
22   Q.  Do you have any idea where Ricky was at the
23      time your friend David Diaz was shot in the
24      head?
25   A.  No, I don't.
```

39

1    Q.    We talked about -- before about the different
2          positions of the people.  And you would agree
3          with me that you never -- you're not saying
4          even today that your -- that David Diaz was
5          directly -- his back lined up directly with --
6          with the defendant's shoulders where the
7          defendant's directly behind him; correct?
8    A.    Correct.
9    Q.    In fact, if that were true and if the
10         defendant were right-handed and he raised up
11         his gun, he's more likely going to get him on
12         the right side?
13                   ATTORNEY CHERNIN:  Objection.
14         This calls for speculation.
15                   ATTORNEY GRIFFIN:  I'll withdraw
16         it.
17   BY ATTORNEY GRIFFIN:
18   Q.    The way you explained it to the jury was
19         you're over there, the defendant's here, and
20         David's just to the defendant's left at sort
21         of a angle; correct?
22   A.    Correct.
23   Q.    Okay.
24                   JUROR:  Microphone.
25                   THE COURT:  Thank you.

40

```
1    BY ATTORNEY GRIFFIN:

2    Q.   So you see Ricky with a semiautomatic, what

3         you believe is a semiautomatic; right?

4    A.   Yes.

5    Q.   And the last time -- and you correct me if I'm

6         wrong, Exhibit 14, when you testified last

7         week, did you put David on what would be the

8         left side of the white door, or the right side

9         of the white door, meaning which of those two

10        doorjambs?

11   A.   On the right side.

12   Q.   So in other words, Mr. Chernin said, well

13        didn't you say on Friday -- haven't you always

14        pointed to what would be sort of by the locks

15        and the -- and the -- the doorjamb on the

16        right side of that white door that we see in

17        Exhibit 14?

18   A.   Yes.

19   Q.   Do you recall after the shooting -- other than

20        you, do you recall anyone else moving away

21        from where the defendant was?

22   A.   Yes, I do.

23   Q.   Do you remember who that was?

24   A.   I think it was Jay, which was on the left side

25        corner of me.  And there was already people
```

41

```
 1        already in the bathroom.  And the person that
 2        was standing next to me too also as well.
 3   Q.   And was that person standing next to you to
 4        your right or to your left?
 5   A.   To my left.
 6   Q.   And these people as well were moving away from
 7        the defendant?
 8   A.   Yes.
 9   Q.   The guy that you identified in Exhibit 54 as
10        Ricky, do you know who his girlfriend is?
11   A.   I don't know her by her name.
12   Q.   Does the name Little Jamie mean anything to
13        you?
14   A.   No, just I know that she had a lot of tattoos
15        on her.
16   Q.   A lot of tattoos on her?
17   A.   Yes.
18                  ATTORNEY GRIFFIN:  Nothing
19        further.
20                  THE COURT:  Recross.
21                  RECROSS EXAMINATION:
22   BY ATTORNEY CHERNIN:
23   Q.   In October of 2004 do you recall meeting with
24        a fifty-something-year-old white guy, tall
25        with long hair, Bill Kohl, he's an
```

42

```
 1         investigator?

 2    A.   I believe so, yes.

 3    Q.   And do you recall telling Mr. Kohl that after

 4         David Diaz hit the floor you saw Slim slip,

 5         and then you said you told him that you --

 6         Mr. -- what Mr. Torres thought was a gun --

 7         I'm sorry, after David Diaz hit the floor, you

 8         saw Slim slip what you believed to be or

 9         thought was a gun underneath his shirt?

10    A.   His shirt, yes.

11    Q.   And you also told Mr. Kohl that you were not

12         100 percent sure that it was a gun, but you

13         thought it was?

14    A.   Yes.

15    Q.   So you're not absolutely certain -- isn't it

16         fair to say that you're not absolutely certain

17         that the object that you saw Slim place below

18         his shirt was a gun?

19    A.   I'm more into yes, I did.  I do believe.

20    Q.   But you're not 100 percent certain?

21    A.   Not 100 percent.

22                   ATTORNEY GRIFFIN:  Judge, could

23         the -- I'm sorry, could you repeat that

24         answer.

25                   THE COURT:  He's not a hundred
```

43

```
 1        percent certain, but he's leaning more towards
 2        yes, he's sure.
 3                      ATTORNEY GRIFFIN:  Thank you.
 4   BY ATTORNEY CHERNIN:
 5   Q.   Does the person now sitting in the back of the
 6        courtroom, does that look like Mr. Kohl?
 7   A.   Yes, it is.
 8                      ATTORNEY GRIFFIN:  I'll stipulate
 9        that it is Mr. Kohl and not a look alike.
10                      ATTORNEY CHERNIN:  Okay.  Okay.
11        But we need not have him marked?
12                      ATTORNEY GRIFFIN:  Correct.
13                      ATTORNEY CHERNIN:  Thank you.
14   BY ATTORNEY CHERNIN:
15   Q.   Mr. Torres, in the demonstration that you were
16        doing with Detective Casper and
17        Mr. Griffin, you were using this as the south
18        edge of the doorjamb, were you not, in the
19        demonstration?  And I'm pointing to the thing
20        on the wall that says name, marital status,
21        occupation?
22   A.   No, I was just reference on the -- where it
23        might have been the door.
24   Q.   Yeah.  It might have been the door.  And isn't
25        it in fact the case that you were saying that
```

44

```
1          David Diaz and Slim were positioned on the

2          stove side, the north side of the doorjamb, at

3          the time that you thought that the shot

4          occurred?

5     A.   I was saying that Jeranek Diaz was more by the

6          outlet and David Diaz was more by the door.

7     Q.   But that's a little bit different than what

8          you've portrayed in -- more than a little bit

9          different than what you portrayed in Exhibit

10         51; is it not?

11    A.   No, it's not.

12    Q.   Because you have --

13    A.   Because this would be where the outlet is at,

14         and this would be where the door is at and

15         this is exactly where the door is at.

16                   ATTORNEY CHERNIN:  Okay.  Your

17         Honor, I'd ask to be able to publish Exhibit

18         51 to the jury.

19                   THE COURT:  You may.

20                   ATTORNEY CHERNIN:  Thank you.

21                   THE COURT:  Mr. Chernin, the

22         proper way to do that is through the deputy.

23                   ATTORNEY CHERNIN:  Oh, sorry.

24                   ATTORNEY GRIFFIN:  I'm not sure

25         51 was received, but I'll move it into
```

45

1       evidence at this time. I'm sure Mr. Chernin

2       has no objection.

3                       THE COURT: One moment, let's

4       just make sure that it has been received.

5                       ATTORNEY CHERNIN: I'm sorry, if

6       it has not I would ask for the permission for

7       the admission of 51 and ask that it be

8       published.

9                       THE COURT: My record and my

10      clerk's records, it has not been received. Is

11      the defense moving it in?

12                      ATTORNEY CHERNIN: Yes.

13                      THE COURT: Any objection?

14                      ATTORNEY GRIFFIN: No.

15                      THE COURT: Court's going to

16      receive Exhibit 51, and any objection to it

17      being published to the jury? So published.

18                      ATTORNEY GRIFFIN: No.

19                      (Exhibit Number 51 was received

20      into evidence.)

21                      THE COURT: It's been published.

22      You may continue.

23      BY ATTORNEY CHERNIN:

24      Q.   I believe it was fairly early in your direct

25           examination by Mr. Griffin that you indicated

                                46

```
 1      that you had some concerns about drama on the
 2      night of January 31st, 2004.  Is that -- or --
 3      yeah, 2004.  Is that fair to say?
 4                      ATTORNEY GRIFFIN:  I'm going to
 5      object to the form of that question.  He's
 6      asking him to comment on whether it's fair to
 7      say Mr. Chernin believes that.
 8                      THE COURT:  I'm going to sustain
 9      the objection.  Rephrase.  Also side bar with
10      the lawyers.
11                      (Side bar.)
12                      THE COURT:  The objection's
13      sustained.
14   BY ATTORNEY CHERNIN:
15   Q.  It was during the course of your -- early in
16      your examination with Mr. Griffin you said you
17      had some concerns because Ricky was at the
18      party or the after set on January 31st of
19      2004; isn't that correct?
20                      ATTORNEY GRIFFIN:  Objection.
21      Scope.
22                      THE COURT:  Sustained.  That
23      means you don't have to answer the question.
24                      THE WITNESS:  Okay.
25   BY ATTORNEY CHERNIN:
```

47

```
 1   Q.   Isn't it fair to say that you had some

 2        concerns based upon the fact that Ricky was

 3        present at the after set with a gun that you

 4        just described for Mr. Griffin in his

 5        redirect?

 6   A.   I knew he had a gun with him, but I wasn't

 7        really worried about it.

 8   Q.   Well, now you say you weren't worried about

 9        it, but isn't it fair to say that you had had

10        previous problems with Ricky?

11   A.   I wouldn't say they were problems.  I would

12        say like bad vibes.

13   Q.   There were bad vibes just the week before with

14        Ricky; isn't that correct?

15   A.   In a different household.

16   Q.   Over some other issue that required Ricky to

17        carry a gun when he was around you?

18   A.   I didn't see him with a gun the last time I

19        seen him, no.

20   Q.   You did see him with a gun on January 31st of

21        2004, that you're clear about; aren't you?

22   A.   Yes.

23   Q.   And at a different household, you -- you had

24        had problems with him; right?

25   A.   Not problems, just being at some place where I
```

48

```
 1        wasn't really invited.  So I was basically
 2        just worried for myself being somewhere where
 3        I wasn't invited.
 4    Q.  On his turf?  Ricky's turf?
 5    A.  His parties, yes.
 6    Q.  But things had changed between the two of you
 7        so that you were comfortable that he was at
 8        your house on January 31st of 2004; right?
 9    A.  Yes.
10    Q.  And what were the bad vibes that you were
11        concerned with?
12    A.  Just to see that 'cuz he was there the
13        following week before and he did have a brush
14        with my roommate, you know, but I thought
15        nothing of it.
16    Q.  He had a brush with your roommate, David Diaz;
17        right?
18    A.  They passed through the hallway, and it was
19        just, you know, when you brush up, brush by
20        someone if you don't say excuse me or
21        something you get a dirty look.
22    Q.  So there was bad vibes between David Diaz --
23    A.  I wouldn't say it was a bad vibe, it was just
24        like something that I notice and I know when
25        you get a bad look from someone.
```

49

```
 1  Q.  And in this case it was a bad look from

 2      somebody that was carrying a gun; right?

 3  A.  There was no bad looks from him during the

 4      party, so I didn't have no bad vibes about

 5      him.

 6                  ATTORNEY CHERNIN:  Thank you,

 7      Mr. Torres.

 8                  THE COURT:  Redirect.

 9                  ATTORNEY GRIFFIN:  I don't have

10      anything.

11                  THE COURT:  You may step down,

12      Mr. Torres.

13                  (Witness excused.)

14                  ATTORNEY GRIFFIN:  Can we see you

15      on the side, Judge, for a minute?

16                  THE COURT:  You may.

17                  (Side bar.)

18                  ATTORNEY GRIFFIN:  Call Detective

19      Tim Duffy.

20                  ATTORNEY CHERNIN:  Judge, before

21      Detective Duffy comes on, can Mr. Griffin and

22      I have a matter to discuss -- if I can have a

23      moment, please.

24                  THE COURT:  Come on up, Detective

25      Duffy.  Detective, I'm going to have you step
```

50

```
 1        up into the box, raise your right hand, my
 2        clerk will swear you in.
 3                        TIMOTHY DUFFY, called as a
 4        witness herein, having been first duly sworn,
 5        was examined and testified as follows.
 6                        THE CLERK:  Please be seated.
 7                        THE COURT:  Detective, I'm going
 8        to ask you to begin by stating your full name
 9        for the record, spelling your first and last
10        name.
11                        THE WITNESS:  Timothy Duffy.
12        T-I-M-O-T-H-Y, D-U-F-F-Y.
13                        THE COURT:  You may begin.
14                        DIRECT EXAMINATION:
15   BY ATTORNEY GRIFFIN:
16   Q.   Sir, what do you do for a living?
17   A.   I'm a detective with the Milwaukee Police
18        Department.
19   Q.   How long have you been on the force, how long
20        have you been a detective?
21   A.   Been on the force a little over 22 years, I've
22        been a detective a little over 5 years.
23   Q.   On Monday, February 2nd of 2004, did you along
24        with your partner, Joe Erwin, interview a
25        woman by the name of Antonia West?
```

51

```
1   A.   I did.

2   Q.   And did she identify herself to you as the

3        sister of Danny Wilber?

4   A.   She did.

5   Q.   Did you review with her at that time, go back

6        over some of the events that had happened

7        there over on West Mineral Street that led to

8        the death of David Diaz?

9   A.   Yes.

10  Q.   And one of the primary things that you and

11       your partner did was to show her different

12       pictures to see who was there or who was at

13       the bar before, those kind of things?

14  A.   We did.

15  Q.   Did she at any point tell you where she was

16       and what she was seeing at the time the

17       gunshot went off?

18  A.   She was in the kitchen, she had turned her

19       back on Danny and some other individuals that

20       were there, she heard a gunshot and she

21       ducked.

22  Q.   She indicated to you specifically that three

23       Hispanic males walked from the living room to

24       the kitchen and told Danny to chill out;

25       correct?
```

52

```
 1    A.    She did.

 2    Q.    And she identified those as Richard Torres,

 3          David Diaz, and at one point thought maybe it

 4          was Fernando Ramirez Paniagua, although later

 5          she said no, that's wrong, and identified

 6          Jeranek Diaz?

 7    A.    That's correct.

 8    Q.    So the three people she puts talking to her

 9          brother the moment before she turns around and

10          hears the gunshot are David Diaz, the dead

11          gentleman, Richard Torres and Jeranek

12          Diaz?

13    A.    Yes.

14    Q.    And did she tell you what she specifically saw

15          her brother doing, Danny Wilber, at the time

16          of the gunshot?

17    A.    He was in the -- in the kitchen.

18                    ATTORNEY CHERNIN:  Well, I have

19          an objection to this based upon relevancy and

20          -- and hearsay.

21                    THE COURT:  Overruled on both

22          counts.  I'll allow it.

23    BY ATTORNEY GRIFFIN:

24    Q.    In other words, what did Ms. West tell you she

25          saw the defendant was doing the second before,
```

53

```
 1          the second of and the second after the

 2          gunshot?

 3    A.    He was talking to the victim.

 4    Q.    And what did she see when the gunshot went

 5          off?

 6    A.    She had her back turned.  She said she turned

 7          her back and heard a a gunshot.

 8    Q.    She turned away?

 9    A.    She had her back turned she said.

10    Q.    Did she tell you that she ducked and she was

11          scared?

12    A.    Yes.

13    Q.    Did she tell you she thought for a moment that

14          she may have been shot because she felt

15          something bump her arm?

16    A.    Yes.

17    Q.    Did she tell you that she turned and looked

18          back, she saw that Danny was gone?

19    A.    That is correct.

20    Q.    Didn't she tell you that she saw the defendant

21          throw his hands up in the air and then start

22          patting him down to see if he'd been shot?

23                    ATTORNEY CHERNIN:  Well,

24          objection, on the basis of Crawford case at

25          this point.
```

54

```
 1                      THE COURT:  Overruled.  I'll
 2           allow it.
 3   A.      I don't recall her saying that to me.
 4   BY ATTORNEY GRIFFIN:
 5   Q.      She never mentioned anything about the
 6           defendant throwing his hands up in the air.
 7           In fact, she said that from the time the
 8           gunshot went off till the time you interviewed
 9           her, she'd never seen her brother at all;
10           didn't she?
11   A.      That's correct.
12   Q.      In fact, she said she didn't see him the next
13           day or the day after that.  You're
14           interviewing her on February 2nd.  From the
15           moment she turned her back on the defendant at
16           that party till the moment you're sitting with
17           her in a room, she never saw Danny Wilber
18           again; isn't that what she told you?
19   A.      Yes.
20   Q.      Didn't she specifically tell you that she
21           couldn't tell you whether Danny did or did not
22           have a gun because her back was turned when
23           the shooting occurred?
24   A.      That is correct.
25   Q.      I'm going to show you what's been marked as
```

55

1      Exhibit 28.  Do you recognize that?

2  A.  That's a PA45-B.  It's a form that the

3      Milwaukee Police Department uses that we

4      hand write a person's statement on.  And this

5      one is one written by me on the 2nd of

6      February, and it is the interview of Antonia

7      West.

8  Q.  You knew, did you not, that's she'd been

9      interviewed by Detective Louis Johnson and

10     Detective Randy Olson from about 11:30 a.m.

11     till 4:00 p.m.?

12 A.  Yes.

13              ATTORNEY CHERNIN:  Objection.

14     Hearsay.

15              THE COURT:  Overruled.  I'll

16     allow it.

17              ATTORNEY CHERNIN:  And, Your

18     Honor --

19              THE COURT:  I'm going to note

20     that you have a running objection, but we had

21     a discussion of this in chambers earlier this

22     morning.

23              ATTORNEY CHERNIN:  Okay.  I

24     appreciate that, that's what I was going to

25     ask you.  As long as the record so reflects.

56

```
 1        Thank you, Your Honor.
 2   BY ATTORNEY GRIFFIN:
 3   Q.   You and detective Erwin started talking to her
 4        at about what time, 5:00 p.m.?
 5   A.   5:04.
 6   Q.   And it's fair to say that she was not under
 7        arrest?
 8   A.   She was not.
 9   Q.   If she had said to you, you know what, I'm
10        sick of this and I'm sick of you two, I want
11        to get out of here, what do you have to do?
12   A.   She would have been free to go.
13   Q.   Did you force her, promise her, threaten her,
14        beat her, burn her with cigarettes, do
15        anything to her to get her to talk to you?
16   A.   No.
17   Q.   On the bottom of the first page, there's both
18        initials and a signature.  Do you see where
19        I'm talking about?
20   A.   Yes.
21   Q.   What is that?
22   A.   AW is for Antonia West, and then she signed it
23        right after that.
24   Q.   Are those her initials too on about the eighth
25        line down on that page?  I'll count 'em.  I
```

57

1      think 11 lines down.

2  A.   Yes, it is.

3  Q.   Okay.  Is that where it talks about how she's

4       -- strike that.

5                      How is it that she puts her

6       initials and signature and all that on these

7       pages?  Explain that to the jury.

8  A.   When you write a statement down and you have a

9       person you're interviewing, any time you go

10      over it, and it's not unusual to be

11      interviewing someone, you interview 'em, then

12      you start writing it down and as you're

13      writing you're talking, so sometimes you make

14      a mistake, either spelling or in a choice of

15      word you use.  And when you're done with a

16      statement the person you're interviewing you

17      go over it with, as I read it, he or she will

18      read along, and if there's a mistake either,

19      if I notice a mistake or if the person who is

20      giving the interview notices a mistake we'll

21      correct  it and the initials AW will go down

22      there, indicating that the correction was made

23      in their presence, and that it wasn't made

24      after the interview was done.

25                      Some people at times don't want

                            58

```
 1          to sign, but they'll put their initials.

 2          Sometimes if people just decline to sign a

 3          form, we can't make anybody sign anything.   In

 4          this case, the AW down here, there's an AW --

 5    Q.    When you say 'down here' what part of that

 6          exhibit are you referring to?

 7    A.    The -- page 1, and it basically reads -- talks

 8          about West had voluntarily come down to the

 9          CIB to be interviewed regarding the homicide

10          of David Diaz Junior, his date of birth, it

11          says which occurred on 1-31-04 at 1128 West

12          Mineral Street.   And she acknowledged that by

13          putting her initials AW.

14    Q.    Did you go back over this document with her

15          after it was written?   In other words, the --

16          the -- the four pages of writing and the

17          diagram that's attached at the end, is there a

18          diagram on yours?

19    A.    No, there is not, sir.

20    Q.    Okay.   I'm going to show you what's been

21          marked as Exhibit 28-A, it got separated

22          from -- at one point from that document.   But

23          when you were with Ms. West that page was also

24          included; correct?

25    A.    That is correct.
```

59

1   Q.   So if you take all five of those pages, the

2        four written pages and that little map, that

3        would be everything you did with Ms. West?

4   A.   Yes.

5   Q.   Did she sign every page?

6   A.   Yes.

7   Q.   Did you go back through it with her,

8        Detective?

9   A.   Yes, we did.

10   Q.   Did you read it to her?

11   A.   Yes.

12   Q.   At any time in your dealing with Ms. West did

13        it seem to you that she was unclear about what

14        you were talking about?

15   A.   No, she was very clear.  In fact, part of the

16        reason we went back and reinterviewed her was

17        to clarify some things from the previous

18        statement that either were a little bit

19        confusing or she wasn't clear on.  And she

20        clarified those for us.

21   Q.   And even when you, for example, showed her a

22        picture of Mr. Ramirez Paniagua, at first she

23        said that's one of the three guys that

24        approached Danny, she then changed that and

25        said, no, it's Jeranek Diaz?

60

```
 1   A.   That's correct.

 2   Q.   At the very last -- page 4 of 5 there's an X

 3        again with her signature, why didn't you write

 4        in after that, after she signed it, why didn't

 5        you write in, Antonia added at the very end

 6        Danny shot that guy?

 7   A.   She didn't say it.

 8   Q.   Did she sign the map?

 9   A.   She had -- there is an X with her name and a

10        date of birth.

11   Q.   Did she sign that in your presence?

12   A.   Yes.

13   Q.   The markings on there for where people are,

14        Donald Jennings, Torres, Danny, victim, Jay

15        Diaz, Nevada Medrow, Jay, me, all of that, did

16        she put that in there?

17   A.   Yes.

18   Q.   Why didn't you put her closer to the shooting,

19        Detective?  Why didn't you put 'me' right next

20        to the shooter so that you could pin her in

21        and say, aha, you had to have seen it?

22   A.   Well, that's a point she told me, us, Joe and

23        I, where she was.

24                  ATTORNEY GRIFFIN:  Nothing

25        further.
```

61

```
 1                    THE COURT:  Cross.
 2                    CROSS EXAMINATION:
 3    BY ATTORNEY CHERNIN:
 4    Q.   Detective Duffy, you've read -- in fact you
 5         read the earlier interview of Antonia West
 6         that was prepared by Detective Louis Johnson;
 7         correct?
 8    A.   I read it some time ago, yes.
 9    Q.   And in fact, you read it in preparation to
10         reinterview Ms. West; correct?
11    A.   That's when -- the last time I read it, yes.
12    Q.   And so you knew what she had told Detective
13         Johnson; correct?
14    A.   Correct.
15    Q.   And would you agree that Detective Johnson
16         uses a -- incorporates a line on his
17         interviews, including this one, saying that
18         the individual had read the interview and what
19         they've said is true and correct?
20    A.   I don't specifically remember reading that
21         line, but it is a common line that that
22         detective would use at the end.
23    Q.   You don't use that one, do you though;
24         correct?
25    A.   That's correct.
```

62

1    Q.   And you're not -- you don't -- you do not
2         exclude that because what's on here isn't true
3         and correct, you just don't feel a need to do
4         so?
5    A.   It's individual detective's choice.  A lot of
6         detectives use that line when they close.
7    Q.   Now, with respect to Ms. West, where did she
8         come from?  When she voluntarily engaged in
9         this interview with you was she still in
10        police custody?
11   A.   She was never in police custody, to my
12        knowledge.
13   Q.   Well, was she still -- she was interviewed
14        from 11:30 a.m. until 4:01 a.m. by Louis
15        Johnson; isn't that correct?
16   A.   It was Detective Johnson, and I think it was
17        also Detective Olson that was with him.
18   Q.   So -- and 11:30 a.m., that's like morning --
19        that would be like this morning; right?
20   A.   Yes.
21   Q.   Until 4:01 p.m. -- I'm sorry, it's p.m, I
22        apologize, he writes a.m. in one place
23        and p.m. in another, is it fair to say that
24        you then saw her later that same day of
25        February 2nd?

63

1   A.   Yes.  Basically what happens is it's not

2        uncommon for someone to come down voluntarily,

3        be interviewed, we have a briefing between --

4        I start at 4:00 o'clock, they finish at 4:00

5        o'clock, we have a homicide briefing between

6        where the day's events are briefed on a

7        homicide we're working on.  And it's not

8        uncommon during that briefing, after they

9        have -- they'll come in and say what the

10       witness had said and someone from the early

11       shift may remember different aspects of the

12       investigation, especially if there were

13       detectives there that were at that scene.

14                     And it's not uncommon for

15       detectives to say, hey, we need to ask her

16       about this, and that doesn't sound quite

17       right, is she sure.  And we'll go back in

18       there, just go over things to make sure -- a

19       new set of detectives to make sure everything

20       is correct, and is there anything else she may

21       or may not remember.  It happens all the time.

22   Q.   And do you know where she was between

23        4:01 p.m. on February 2nd until 5:04 p.m. when

24        you commenced your interview?

25   A.   She was either in -- there's a witness waiting

64

```
 1          room that is on the fourth floor, and I can't
 2          remember if we got her from there or she chose
 3          to remain in the room she was being
 4          interviewed in.  I can't remember which one it
 5          was.  It was one of the two.
 6    Q.    So you don't know?
 7    A.    I'm not positive.  It's going to be one of
 8          those two.
 9    Q.    And you haven't recorded that anywhere; right?
10    A.    No.
11    Q.    And if she was still in the same little
12          interview room that she had been in with --
13          and I said little, could you describe what
14          those interview rooms are like?
15    A.    They're -- they're various sizes.  There's --
16          there's a couple at that time that had windows
17          in it.  There's one, it's about six by eight,
18          actually there's a couple that are about six
19          by eight, there's one that's like ten by
20          twelve.  They're lit.  It's just a basic room
21          with concrete walls.
22    Q.    With a table?
23    A.    Yeah, table and chairs.
24    Q.    A couple chairs.  And they're painted kind of
25          a gummy tan?
```

65

```
 1   A.   They're tan.  They're -- they're -- they're

 2        basic government building tan.

 3   Q.   And there is a hook and eye -- or an eye

 4        rather, on the wall, a big -- big eye so that

 5        if you wanted to chain somebody or handcuff

 6        somebody to the wall you could?

 7   A.   Well, that's -- yeah, there is an eye, it's a

 8        round steel loop that's bolted through the

 9        wall, and what that is for, those are the same

10        rooms that when we have to interview prisoners

11        they're also in there.  And when we leave we

12        have to place one cuff around the wrist and

13        one at the chain, which is actually at the

14        table level.  So they just have to sit there

15        with their hand on the table.

16   Q.   And with respect to Ms. West, if you're inside

17        those interview rooms, that's a locked area

18        where it's only accessible by members of the

19        police department; isn't that correct?

20   A.   It's accessible by citizens if they're with

21        us, but under the terms you're talking about,

22        yes, would be by police officers.

23   Q.   Okay.  A police officer would have to escort

24        somebody into the area; correct?

25   A.   That's correct.
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 66 of 83   Document 61-25

```
1   Q.   And no one could just like walk around in that
2        area unless they were a police officer; right?
3   A.   Correct.
4   Q.   There's no telephone in there; is there?
5   A.   In the rooms?
6   Q.   Yes.
7   A.   There's a -- there's no telephone in the
8        rooms, but there is a telephone in the
9        hallway.
10  Q.   And with respect to Ms. West, in the course of
11       your interview, you look at Exhibit 28-A, the
12       diagram that she did, you would agree, would
13       you not, that the last position that she saw
14       her brother in was to the north of the
15       location where David Diaz is depicted on
16       Exhibit 28-A; correct?
17  A.   Yes.  To the north and a little bit to the
18       side.
19  Q.   And if we were to compare her diagram with
20       Exhibit 15 and the doorways depicted in
21       Exhibit 28-A, correct, one would say that her
22       brother was -- and if the stove -- do you
23       agree that there's a stove depicted in Exhibit
24       15?
25  A.   Over there.  And the one on 15.  Okay.
```

67

```
 1   Q.   And 28-A.

 2   A.   Um-hmm.

 3   Q.   And that stove area is like -- is to the

 4        north; correct?

 5   A.   Yes.

 6   Q.   Okay.  And during the course of Antonia West's

 7        interview, both with you and Detective

 8        Johnson, she was very consistent in her

 9        statement as to the position of her brother

10        being to the north of David Diaz; correct?

11                  ATTORNEY GRIFFIN:  Well, I'm

12        going to ask that he not comment on Detective

13        Johnson's statements unless he's going to

14        review it.

15   BY ATTORNEY CHERNIN:

16   Q.   Well, at the time you didn't do anything in

17        your interview to clarify a change in the

18        position that Ms. West had provided; did you?

19                  THE COURT:  I'm going to sustain

20        the objection.  Rephrase.

21   BY ATTORNEY CHERNIN:

22   Q.   You were looking for clarifications in your

23        interview; correct?

24   A.   We went over the statement, and when she had

25        things that were different, or any -- anything
```

68

```
 1         that was a little bit clear as to the
 2         positions that was different it was
 3         documented.
 4    Q.   And in your documentation she never places her
 5         brother behind David Diaz; does she?
 6    A.   She places him -- well, depends what you mean
 7         behind.
 8    Q.   Okay.
 9    A.   Behind is -- is relative to where?
10    Q.   Okay.  If you're facing me, okay, and I'm --
11         let's say you're David Diaz and I'm Danny
12         Wilber, our positions -- I'm not behind you,
13         I'm to your front; correct?
14    A.   Okay.  I would have to say yeah, that would be
15         correct.
16    Q.   We're fronting one another, we're face to
17         face; correct?
18    A.   Yes.
19    Q.   And in -- in any manner, Ms. West, in any
20         manner, she never indicates that her brother
21         is behind David Diaz; isn't that correct?
22    A.   I would have to say that's correct.
23                   ATTORNEY CHERNIN:  Thank you,
24         Detective Duffy.
25                   THE COURT:  Redirect.
```

69

```
 1                    ATTORNEY GRIFFIN:  Nothing.  I
 2        move 28 into evidence.
 3                    THE COURT:  Any objection?  Not
 4        28-A at this time, it's just 28.
 5                    ATTORNEY GRIFFIN:  I believe --
 6                    THE COURT:  28-A has already been
 7        received.
 8                    ATTORNEY GRIFFIN:  Correct.
 9                    ATTORNEY CHERNIN:  Okay.  Subject
10        to a continuing objection?
11                    THE COURT:  Court will receive
12        Exhibit 28 over the objection, continuing
13        objection of defense counsel.
14                    ATTORNEY CHERNIN:  Thank you.
15                    (Exhibit Number 28 was received
16        into evidence.)
17                    THE COURT:  Detective, you may
18        step down.  I'm going to ask you to tender
19        those materials to my clerk as you pass by.
20                    Ladies and gentlemen, it's 12:25,
21        lunch has arrived.  We're going to have our
22        next witness as scheduled from the State's
23        case in chief at 1:30.  Is that correct,
24        Mr. Griffin?
25                    ATTORNEY GRIFFIN:  Yes.
```

70

```
 1                    THE COURT:  All right.  So it's
 2    going to be an abbreviated lunch hour today.
 3    Everything is back there.  Again, you're not
 4    to discuss any part of the testimony or
 5    anything about the case with each other or
 6    with anyone until directed to do so by this
 7    court.  Don't allow the parties to approach
 8    you, don't approach the parties.  We're also
 9    going to continue with the sequestration.
10    You'll continue to be back in the jury room at
11    all times.  If you're going to be leaving,
12    you'll leave in groups, and you'll be escorted
13    by one of my deputies.  Thank you.
14                    DEPUTY:  All rise.
15              (Jury out of box.)
16                    THE COURT:  You may be seated.
17    As I understand, the State is going to be
18    calling its next witnesses, Lea
19    Franceschetti --
20                    ATTORNEY GRIFFIN:  Yes.
21                    THE COURT:  -- back to the
22    witness stand.  And any other witnesses this
23    afternoon, Mr. Griffin?
24                    ATTORNEY GRIFFIN:  Yes.
25    Detective Burgos, Detective Caballero, Officer
```

```
 1    Collado, unless we work out a stipulation,

 2    Detective Olson possibly, and Detective

 3    Villarreal.  Did I say Gastrow?

 4              THE COURT:  No.

 5              ATTORNEY GRIFFIN:  Gastrow.  I'll

 6    finish this afternoon, Judge, I'm reasonably

 7    certain.

 8              ATTORNEY CHERNIN:  I was going to

 9    ask for some direction in that regard.  I

10    anticipated calling Mr. Kohl.

11              THE COURT:  I don't believe the

12    State -- if we start at 1:30 and we will have

13    to abbreviate it today, I've got a meeting

14    with the chief judge at 5:00 p.m, which means

15    that you're looking at three and half hours

16    for seven witnesses.

17              ATTORNEY GRIFFIN:  Well, but a

18    lot of them are sort of like Detective Duffy,

19    just going through a statement, and I don't

20    think they will take more than half an hour.

21    Also, I'm asking the court to take judicial

22    notice of 02CM006647, that on February 4th of

23    2004, which was when Mr. Oscar Niles was --

24    came downtown, there was an outstanding

25    commitment for him, which would of course --
```

72

1  in that case, that it was ordered that any law
2  enforcement officer arrest and detain him in
3  custody for two days until the $147 is paid.
4  It was then paid on February 6th, which was
5  after Milwaukee was done with him.  But he did
6  come down voluntarily.
7           I believe Detective Gastrow will
8  say that he had a warrant and in fact there
9  was a warrant outstanding for his arrest.  It
10 was not any kind of illegal detention or
11 illegal arrest on Mr. Niles and explained why
12 he was in the jail.
13          ATTORNEY CHERNIN:  I respectfully
14 disagree.  I think that that requires -- I
15 won't stipulate to that, I think it requires a
16 witness.  And I also think that it requires
17 Mr. Niles' recollection of whether that
18 warrant was served upon him.
19          ATTORNEY GRIFFIN:  I'm not asking
20 for a stipulation, I'm asking this court to
21 take judicial notice of that fact, which is in
22 the court file.  I asked your clerk to order
23 that file up, it was brought up this morning,
24 and the court can review that in C-CAP.  C-CAP
25 also shows -- I printed it out but didn't

```
 1     bring it down, I could bring it down this
 2     afternoon -- that it was on February 6th that
 3     that commitment -- February 6th of '04 the
 4     commitment was deemed served or paid, which is
 5     shown in there, but on February 4th, when he
 6     was in MPD custody there was a warrant for his
 7     arrest.
 8              THE COURT:  On what date?
 9              ATTORNEY GRIFFIN:  That was on
10     February 4th.  Let me double check.  Correct.
11     February 4th of 2004.
12              ATTORNEY CHERNIN:  Okay.  Here's
13     the problem.  I don't think the court can take
14     judicial notice of the warrant, in that we
15     don't have any paperwork, showing that that
16     warrant was served on February 4th.  It
17     doesn't say it was served -- the warrant was
18     served on February 4th.  Every time you see a
19     warrant, a bench warrant or the like, it
20     always shows when the warrant was served by
21     the party who served it.  There's no
22     indication that the Milwaukee -- the City of
23     Milwaukee Police Department served that
24     warrant on February 4th.
25              It does -- what it does show is
```

74

```
 1      that he paid the citation on February 6th,
 2      according to the stand, but I don't think the
 3      court's in a position to take judicial notice
 4      that -- either that the Milwaukee Police
 5      Department had knowledge of the warrant at the
 6      time or that the warrant was served upon
 7      Mr. Niles at that time.
 8                ATTORNEY GRIFFIN:  Neither of
 9      which am I asking this court to take judicial
10      notice of.  Let me be more specific and I'll
11      repeat myself.  This court can take judicial
12      notice of the fact that on February 4th of
13      2004 there was a commitment/order to arrest
14      for Oscar Niles.  That's all.  What MPD may
15      have done with that this court cannot take
16      judicial notice of, I'm not asking them to.
17      When there's a bench warrant out for someone
18      the police arrest them out on the street, they
19      don't serve him with a warrant, but they have
20      a right to arrest him, and et cetera, et
21      cetera, et cetera.  That's all I'm asking the
22      court to take judicial notice of, is what's in
23      that court file.
24                THE COURT:  What I have is a -- a
25      commitment order for nonpayment of fine,
```

75

```
1    original, and it appears that the commitment
2    order, the warrant, was paid or satisfied on
3    February 6th of '04.  That's the date on it,
4    with the attached notation by the Sheriff's
5    Department, I hereby certify and return that I
6    did on the 6th of February, 2004, in the City
7    of Milwaukee, take the within named Oscar R.
8    Niles as required by the -- with -- by the
9    within commitment and committed him to
10   Milwaukee County Jail, dated 2-6-04.  You keep
11   referencing an '04 date, it says '06 -- or it
12   says February 6th on this warrant.
13             ATTORNEY GRIFFIN:  Right,
14   February 6th of 2004.
15             THE COURT:  Correct.  And it does
16   in fact verify that the Sheriff's
17   Department -- and it's stamped Sheriff's
18   Department did do that, did take the
19   commitment or exercise its commitment
20   authority under -- on this warrant on February
21   6th, 2004.  What is it that you're exactly
22   asking me to take judicial notice of?
23             ATTORNEY GRIFFIN:  That on
24   February 4th of 2004 that commitment was
25   outstanding for Mr. Niles, and there was an
```

76

```
 1        order to arrest.

 2                    THE COURT:  Well, there

 3        clearly -- the commitment was outstanding and

 4        not satisfied until February 6th of 2004.

 5                    ATTORNEY GRIFFIN:  That's my

 6        point.  And I don't remember the exact date it

 7        was issued.  It was sometime I believe in '03,

 8        though I could be wrong about that, because I

 9        don't recall, I think it was like July of '03

10        or something that the commitment was issued.

11                    THE COURT:  July 16th, 2003.

12                    ATTORNEY GRIFFIN:  In other

13        words, it's the State's perspective, Judge,

14        that Mr. Niles is somewhat of a truth fudger,

15        and that his, whoa is me, I'm locked up in

16        this jail, which of course makes the police

17        look like they're holding this guy illegally,

18        he's actually in a cell, they had every right

19        to hold him, they had a right to arrest him

20        and put him in a cell.  There's a commitment

21        out for him.  He can be arrested.  He could

22        have been taken out of his car or bedroom or

23        store or anywhere else the police found him

24        and brought downtown.

25                    THE COURT:  And what is it that
```

77

1     my taking judicial notice of, what are -- what

2     are you expecting to see or hear Detective

3     Gastrow say to that point?

4               ATTORNEY GRIFFIN:  That Mr. Niles

5     came down voluntarily and then they discovered

6     that he had a warrant out for his arrest,

7     which, you know, the police term warrant means

8     that they can arrest him.  There's some -- I

9     mean, it turns out it's a commitment, but

10    that's what he recalled, and sure enough there

11    is one.

12              THE COURT:  I believe that's

13    appropriate rehabilitation or at least

14    impeachment of a witness that was called on

15    this matter and did testify in that regard.

16    Otherwise there's an inference out there,

17    Mr. Chernin, that as the State has correctly

18    pointed out, that the jury is going to be left

19    with the inference that he was held because

20    you spent quite of a bit of your cross

21    examination on that point that he was held

22    against his will for some significant period

23    of time.

24              ATTORNEY CHERNIN:  Well, which is

25    in fact the case, because they -- when they

78

```
 1        discovered this warrant, is when they -- when

 2        he's turned over and the sheriff serves him at

 3        the jail.  It doesn't -- that doesn't -- this

 4        after the fact we've got warrant for him, it's

 5        just -- there's no ADR on that showing that

 6        there was a warrant for him at the time.

 7        There's no --

 8                    THE COURT:  Sure there is.  We

 9        don't need an ADR, the warrant itself

10        indicates that it was issued on such and such

11        a date and it remained open until February the

12        6th.

13                    ATTORNEY CHERNIN:  When the MPD

14        officer takes somebody into custody on a

15        warrant --

16                    THE COURT:  I'm very familiar

17        with MPD practices.

18                    ATTORNEY CHERNIN:  There is no

19        such -- there is no such ADR in this case

20        relating to Oscar Niles.  If you can show me

21        that there is one, then maybe it would be an

22        appropriate stipulation, but there isn't.

23                    ATTORNEY GRIFFIN:  I --

24                    ATTORNEY CHERNIN:  If this man is

25        being held against his will and on the basis
```

79

```
 1          of a commitment, he could have paid a fine --
 2                    THE COURT:  Court's going to
 3          overrule your objection.  I am going to -- I
 4          think it's legitimate use of impeachment, you
 5          have to put it in through Detective Gastrow or
 6          whoever it is that you intend to do it
 7          through, and at that point you can ask me to
 8          take judicial notice of this warrant.  You can
 9          do it on the record in the presence of the
10          jury.
11                    ATTORNEY GRIFFIN:  Thank you.
12                    THE COURT:  We're going to be on
13          our lunch break until 1:30.
14                    ATTORNEY CHERNIN:  Your Honor,
15          this is real -- real quick.  There's a
16          stipulation that Mr. Griffin has asked me for
17          with respect to Officer Collado taking this
18          Mr. Wilber into custody and doing an ADR, and
19          on the ADR it indicates that Mr. Wilber's
20          address on February 20th of 2004 was 25 --
21          that he told the officer that it was 2548 West
22          Forest Home, and that was the address that the
23          officer had.  And that's what the State's
24          asking me to stipulate to.
25                    ATTORNEY GRIFFIN:  Right.  I
```

80

1    spoke with Officer Collado, he does not know

2    if the defendant gave him that information or

3    if it was the last known address on file.

4              THE COURT:  So what are you going

5    to do, put him on the stand to say what?

6              ATTORNEY GRIFFIN:  No, I'm going

7    to ask Bill Kohl when he testifies.

8              THE COURT:  What address he went

9    to to interview the defendant?

10             ATTORNEY GRIFFIN:  I believe that

11   Bill Kohl has an address for this defendant.

12   I believe the defense is going to call him to

13   the stand and I believe that I can ask him

14   that.

15             THE COURT:  What was your

16   concern, Mr. Griffin?  I'm not sure what

17   Mr. Chernin -- wait, let me just back up.

18             Mr. Chernin, you started to talk

19   about a stipulation.  I'm not quite sure where

20   you were going with it.

21             ATTORNEY CHERNIN:  Well, because

22   I had been asked -- sorry to stutter -- I've

23   been asked for such a stipulation.

24             ATTORNEY GRIFFIN:  I didn't know

25   Mr. Chernin was going to bring this up.  We

81

```
 1    haven't had a chance to talk yet about this.

 2    Officer Collado is in the hallway, and that

 3    came up this morning.  He showed up again.  So

 4    if -- however Mr. Chernin -- if Mr. -- if

 5    Mr. Chernin wants to stipulate that Mr.

 6    Wilber gave that address as his that's fine,

 7    we can do that, but I'm not ready to stipulate

 8    to that at this point because I'm not sure

 9    it's accurate.  So we can take lunch.

10              ATTORNEY CHERNIN:  Let's just do

11    that and we'll talk.  I'm sorry.  Thank you,

12    Your Honor.

13              (Lunch break taken. )

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:10-cv-00179-WCG   Filed 08/29/19   Page 82 of 83   Document 61-25

1    STATE OF WISCONSIN )

2

3    MILWAUKEE COUNTY    )

4

5              I, Lori J. Cunico, do hereby certify

6         that I am a Registered Professional Reporter,

7         that as such I recorded the foregoing

8         proceedings, later transcribed by me, and that

9         it is true and correct to the best of my

10        abilities.

11

12        Dated this _____ day of October, 2005, at

13        Milwaukee, Wisconsin.

14

15

16        _____

17        Lori J. Cunico - Court Reporter

18

19

20

21

22

23

24

25

83