## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANNY WILBER,

        Petitioner,

    v.                               Case No. 10-C-179

MICHAEL THURMER,

        Respondent.

## DECISION AND ORDER GRANTING PETITION FOR RELIEF UNDER § 2254

Having fully exhausted his state court remedies, Petitioner Danny Wilber seeks federal relief under 28 U.S.C. § 2254 from his state court conviction for first degree intentional homicide by use of a dangerous weapon. Wilber filed his original petition more than ten years ago on March 3, 2010, but immediately moved for a stay so that he could exhaust his state court remedies as to additional claims. After significant delays attributed to ongoing investigations by retained counsel, Wilber filed a pro se motion for postconviction relief in the state trial court on March 17, 2014. Wilber thereafter amended his pro se motion for postconviction relief and retained new counsel. After the Wisconsin Supreme Court denied his petition for review on April 9, 2019, he moved to lift the stay and proceed on an amended petition. Wilber alleges in his amended petition that his constitutional rights were violated because there was insufficient evidence presented at trial to support his conviction, his trial and post-conviction counsel provided ineffective assistance, and the trial court violated his due process right to a fair trial by ordering him shackled to a wheelchair in a way that was visible to the jury during closing arguments. Because the court concludes that

visibly shackling him to a wheelchair during closing arguments violated Wilber's due process right to a fair trial, his petition will be granted.

## BACKGROUND

In the early morning hours of January 31, 2004, Milwaukee police were dispatched to a residence at 1128 W. Mineral Street to investigate a fatal shooting at a house party. Upon arrival, the police discovered the body of David Diaz, who lived at that address, lying on the floor with a gunshot wound to the head. Most of those in attendance at the party had fled before police arrived. In the days that followed, two witnesses, Richard Torres and Jeranek Diaz (no relation to the victim and hereinafter referred to as Jeranek), allegedly identified Wilber as the shooter. According to statements taken by police both witnesses said that Wilber had been acting belligerently during the house party, and at some point, Wilber pulled out a handgun and shot Diaz. Shortly thereafter, Torres and Jeranek heard Antonia West, Wilber's sister, urge Wilber to leave, saying "Oh my God. You shot him. Get out of here. You shot him." Several days later, Wilber was charged with Diaz's murder.

At trial, the prosecutor called a number of individuals who had been present at the party at the time of the shooting, but they all testified that they did not see who shot Diaz. Contrary to their earlier statements, Jeranek and Torres denied actually seeing Wilber shoot Diaz, and Antonia West denied making the statement attributed to her. Jeranek denied even seeing a gun, and though Torres testified that he did not see Wilber shoot Diaz, he saw him immediately afterwards holding a gun in a crouched position and assumed he was the shooter. West testified she did not see the shooting and was not looking at her brother when Diaz was shot. The State offered the prior inconsistent statements of the witnesses to impeach them and as substantive evidence.

2

Perhaps even more problematic for the prosecution than the testimony of its witnesses was the physical evidence. The medical examiner testified that the bullet that killed Diaz was fired at close range (two to three inches), entered the back of his head on the upper left, traveled in a downward trajectory, and exited to the right of his nose. Diaz had fallen face-forward in a northerly direction from where he was standing in the doorway to the kitchen on the south side of the room, consistent with being shot from behind. Three bullet fragments were found under the stove on the north wall of the kitchen directly across from where Diaz was standing when he was shot, also consistent with having been shot from behind. Yet, all of those present at the time of the shooting testified that Wilber was in the kitchen in front of where Diaz was standing, and at least one of the witnesses testified that Ricky Munoz, who had also been at the party, also had a gun. According to the diagram of the layout drawn by Torres, Munoz was in the living room behind where Diaz was standing at the time the shot rang out. Dkt. No. 69-61. Another difficulty with the State's theory was that the witnesses who claimed to have seen Wilber with a gun said it was a semiautomatic, which would have expelled a casing when fired. Yet, no casing was found at the scene, and the firearms examiner who examined the bullet jacket testified that it was fired from a revolver. Despite these difficulties, the jury found Wilber guilty of first-degree intentional homicide in the death of David Diaz.

The trial did not proceed smoothly. At various times throughout the seven-day trial, the trial judge commented on what she viewed as Wilber's disrespectful behavior. Beginning the first day of trial before jury selection had even begun, the trial judge cautioned Wilber that he would not be allowed to make "facial gestures," "sounds," "act imprudently," or be disrespectful to the court. Dkt. No. 61-17 at 4:18–21. The judge stated that she had noticed during the morning session that Wilber was reacting inappropriately to the arguments of the prosecutor: "Every time Mr.

Griffin would make some comment that -- in terms of how he was going to couch this -- this evidence, and why he thought it was admissible, your head was straining at the bit at times looking back at him and -- and maybe it was just a reflex on your part." *Id.* at 5:8–14. When "we're in front of the jury," the court warned, this would not be allowed:

> You can't do that. You have to face frontwards at all times. You're not allowed to look back into the gallery. You're not allowed to turn back and make faces or gestures at the State table. You're supposed to be sitting straight in front in your chair, eyes forward, confer with your lawyer, but always facing this direction.

*Id.* at 5:15–25. The court offered two reasons why such behavior would not be allowed:

> One, because it's disrespectful, and I'm going to have to take some steps to stop you if you don't do it, if you don't stop, and I don't want to have to do that. And the second thing is it's -- it's bad for you and it looks bad in front of a jury. So I'm going to ask you to be careful about how you act and how you react to the different things that happen during a trial here.

*Id.* at 6:07–15. Wilber's attorney explained to the judge that his client meant no disrespect but had worked closely with counsel on preparing his defense, was familiar with the legal arguments, and strongly disagreed with the court's rulings. *Id.* at 6:20–7:01. Disagreement was fine, the judge noted, but "what I'm trying to tell you is it's a disrespect to the court to show you disagree." *Id.* at 7:06–08. "You have to keep a poker face," she continued, noting that it was in his interest to do so because it "looks bad in front of the jury." *Id.* at 7:08–11.

On the second day of trial, the court also noted that it had taken all the necessary steps to make sure this is "a safe proceeding." Dkt. No. 61-18 at 75:22–24. The court noted that Wilber was to remain shackled throughout the trial. Leg irons were placed on Wilber's ankles and anchored to the floor beneath defense counsel's table. The court also noted that steps had been taken to prevent jurors from becoming aware that Wilber was shackled and maintain the presumption of innocence to which he was entitled. Both the prosecution and the defense tables were skirted to prevent the shackles from being visible to the jury. *Id.* at 75:21–76:02. In addition,

4

the court noted that the defendant was allowed a change in the civilian clothes he was wearing "so that all steps -- all reasonable steps are being made to continue to have the presumption of innocence for the defendant protected." *Id.* at 76:08–11.

At the same time, however, the court expressed its view "that even if jurors do see an individual defendant secured in some fashion that that sight or that observation in and of itself is not enough for a default of that particular juror or that they are somehow exempted." *Id.* at 76:13–18. "There has to be something about those observation[s]," the court continued, "that have affected them one way or the other that they articulate to the parties and to the court -- that would cause them to be an unsuitable juror." *Id.* at 76:18–22.

After two days of jury selection and several lengthy discussions of legal issues, the attorneys gave their opening statements on the third day and began the presentation of evidence. When the jury was released for lunch, the court granted the prosecution's request over the objection of the defense that two of the State's witnesses be instructed to read their statements over the break so that their direct examinations could proceed more efficiently. In response to the court's ruling, Wilber stated, "It's not new." Dkt. No. 61-20 at 116:14. The court instructed Wilber to "Stop it," to which Wilber responded, "You are granting everything the D.A. is throwing at you." *Id.* at 116:18–20. As the court ordered the courtroom deputies to remove Wilber from the courtroom, the discussion continued:

> THE DEFENDANT: What haven't you denied, that's nothing new. Put that on the record. I'm speaking up on my behalf. This is my life.
>
> THE COURT: Mr. Chernin, please talk to your client.
>
> MR. CHERNIN: I will, Your Honor.
>
> THE COURT: Thank you.
>
> THE DEFENDANT: You don't intimidate me with that shit, man.

5

THE COURT: Mr. -- Mr. Wilber.

THE DEFENDANT: You gonna hold me in contempt? What, you gonna hold me in contempt. It's my life right here.

THE COURT: Mr. Wilber, I'm going to if you don't --

THE DEFENDANT: Do it.

THE COURT: Settle down and behave.

MR. CHERNIN: Danny, please relax.

THE COURT: If you don't behave --

THE DEFENDANT: It ain't doing me no good her overruling -- sustaining everything he throw out whether it is bogus or not.

THE COURT: Mr. Wilber, you are doing yourself no good.

*Id.* at 116:22–17:20.

After lunch, before the trial resumed, the trial court again cautioned Wilber that he had to stay in control when he was in front of the jury. Dkt. No. 61-21 at 3:19–20. Wilber stated he understood and was "all right." *Id.* at 4:07–08. The court then stated that it wanted to make a record of the fact that it had added additional security in the courtroom. It added two additional deputies in the courtroom, bringing the total to four, and had also added a stun belt to Wilber's arm that one of the deputies would control as "a way of keeping you safe, everybody around you safe, the staff safe and the jury safe so that the trial can continue without hopefully any additional incidences." *Id.* at 4:25–5:04. These steps were necessitated, the court explained, "because of some of the statements that you made to the court and to the deputies in -- I'm hoping was a moment of anger, but when you make those kinds of statements and you indicate that you don't really have any respect for my authority or for the authority of the deputies, it becomes a -- a real

6

safety concern, an issue for everyone involved in the trial, and it doesn't do anybody any good." *Id.* at 5:05–14.

On the fourth day of the trial, as the morning session was ending, the trial court advised the jury that they would be sequestered during the day over their breaks and when coming to and leaving the courtroom.  Dkt. No. 61-22 at 104:08–07:05.  The sequestration was "to avoid even the appearance of somebody suggesting that the jury was somehow tainted, talking or overhearing conversations in the hallway, talking to people."  *Id.* at 106:08–11. After the jury left the courtroom, the court set forth the reasons for the sequestration order and additional measures that were being implemented on the record.

The court noted that specific issues had arisen over the course of the trial requiring that additional security measures be taken and that the jury be sequestered.  *Id.* at 107:21–25.  Referring back to Wilber's outburst at the court's ruling the previous day, the judge stated that Wilber had been highly agitated, not only with the court, but according to the deputies, also with anyone who was in the bullpen area and even with his own attorney.  The judge noted that the deputies had advised her that Wilber made certain statements to them, such as "[I am] not going down for this, you might as well use your gun and kill me now."  *Id.* at 110:15–11:01.  Wilber also asked detailed questions about the paths he would walk to the courtroom each morning, what floors they would be on, and who would have access to that same path.  These questions alarmed the deputies and suggested that Wilber might attempt to flee, potentially with the help of others.  *Id.* at 111:02–22.

The court also expressed concern that three men had approached the trial court's clerk and made comments that were ill-advised at best, and a possible threat at worse.  The three men had also watched the trial and were seen near witnesses who were under a sequestration order.  Although Wilber denied any connection with the men, the court noted their presence as an

additional reason for its sequestration order and concern for security. *Id.* at 114:21–16:14; 120:12–19.

As a result, in consultation with the deputies, the court had decided that certain security measures would be added. First, two additional deputies would be added inside the courtroom and at least one outside. In addition, the court had agreed with the recommendation that a stun belt be placed on Wilber's arm under his shirt which would allow one of the deputies to administer a shock to him if he became disruptive. *Id.* at 110:03–16. The court explained that it wanted Wilber to continue to have the use of his hands, but the court also warned that, if any further disruptions occurred, Wilber may either have his hands secured below the table, or he may be removed from the courtroom for the duration of the trial. At the same time, the court acknowledged that there had been no problems with Wilber since his outburst the previous day. *Id.* at 112:05–13:25.

At the beginning of the fifth day of trial, the court returned to a discussion of an issue that the prosecutor had raised earlier—whether Wilber could be directed to participate in a courtroom demonstration intended to show the State's theory of how Wilber, given his height (over six feet, six inches), could have fired a gun at an angle at which the bullet would have caused the entrance and exit wounds to Diaz's head. Dkt. No. 61-24 at 4:13–13:01. Wilber's attorney strenuously objected to forcing his client to, in effect, reenact the crime he was accused of committing before the jury. *Id.* at 32:14–33:02; 42:04–17. The question arose as to whether doing so would expose the stun belt around his arm. *Id.* at 44:22–45:18. Wilber stated that when he raised his hand as the prosecutor was requesting, he would pull his shirt a certain way to prevent such exposure. The court, apparently under the impression that Wilber was again being disrespectful, directed his attorney to warn him:

> Mr. Chernin, please advise him about his conduct in this court, because as I said the other day, I'm not going to have you folks mistake my kindness for weakness. I have

been doing this as restrained as I can outside the presence of the jury, and given his outburst the other day, he's lucky he hasn't been charged with threatening a judge, that he hasn't been charged with disorderly conduct, that he hasn't been charged with contempt. And you know whereof I speak.

*Id.* at 46:13–23. As counsel attempted to explain that his client meant no disrespect, the court continued:

And I am not going to continue to run my court with this gentleman, you know, being disrespectful to me from the minute he comes in the court till the minute he leaves. I'm not going to tolerate it and I don't have to, quite honestly. I don't have to. Tell me if I have to. I don't think I do. I don't think there's anything in the rules of judicial conduct that require a judge to be disrespected and do nothing about it. Tell me if I'm wrong. I'm not going to. Today's the end. You do it again, we are going to add additional restraints to you in front of the jury.

*Id.* at 46:25–47:13. The court directed Wilber's counsel to explain to Wilber the proper conduct in court and took a ten-minute break to decide the issue before it and to allow counsel to converse with his client. *Id.* at 48–49.

The trial proceeded to its conclusion with no further comments on the record about Wilber's behavior. After the evidence was closed, however, and just before closing arguments were to begin, defense counsel moved to reopen the case and allow him to investigate a report by Wilber's sisters that there was an eyewitness who saw someone else shoot David Diaz. In the course of an offer of proof outside the presence of the jury and a lengthy cross-examination by the State, one of Wilber's sisters testified that her boyfriend Roberto Gonzalez told her that he was at the party at Diaz's house and saw one of Wilber's friends shoot Diaz. Dkt. No. 61-28 at 11:10–68:06. Based upon the offer of proof, Wilber's attorney asked for an opportunity to interview Gonzalez before closing. The trial court found the testimony of Wilber's sisters inconsistent and incredible and denied the defendant's motion for an offer of proof and for a mistrial. *Id.* at 89:09–99:18.

9

At that point, before the jury was brought back into the courtroom for closing arguments, the court noted that Wilber was "in a secured wheelchair with -- not only secured at his ankles but at his wrists." *Id.* at 100:04–06.  His feet remained in shackles anchored to the floor, but now his hands were chained together at the wrists and two-inch wide black straps held both his wrists and at least one of his arms fast to the wheelchair.  *Id.* at 197:04–09; Dkt. No. 69-73.  The court stated that "Wilber is responsible for his own predicament and for his own position, that is to be restrained and to have that obvious restraint being shown to the jury."  Dkt. No. 61-28 at 100:08–12.  His behavior throughout the trial, the court stated, "has been contemptible."  *Id.* at 100:15–17.

The trial court went on to summarize Wilber's previous behavior and the measures taken to insure the trial would proceed in an orderly and safe manner.  Describing Wilber's previous behavior, the court stated:

> This defendant, through his gestures, through his facial gestures at the court, through his facial expressions, through his body language, through his tone, and most particularly through his language, including the tirade that he had at the end of the second day or the end of the second morning of this trial, directed at this court, and challenging this court, quite honestly, to find him in contempt, thereby setting the stage for his defiance throughout the proceedings.

*Id.* at 101:01–12.  The court then noted that in response to this behavior, additional deputies had been stationed in the courtroom and a stun belt had been placed on Wilber's right arm.  This was in addition to the shackles around his ankles that were anchored to the floor under the counsel table where Wilber was seated.

The judge stated that she had thought these measures, along with her words of advice, would be enough "to get him to understand that such disrespect to the court to these proceedings was not going to be tolerated."  *Id.* at 103:08–10.  "Apparently," the judge concluded, "it was not a sufficient amount of restraint."  *Id.* at 103:13–14.  She then explained why:

because on today's date the defendant used absolutely inappropriate, vulgar, profane language to the deputies who were in charge of security of this courtroom, and will not be tolerated or accepted. He also physically fought with the deputies, such that they had to decentralize him in the back hallway leading back to the bullpen. That conduct will not be rewarded, it will not be tolerated, and I will not be manipulated into allowing a defendant, by his actions, to dictate how I run this court.

*Id.* at 103:14–04:02.

The court noted that "we're at the stage where we charge the jury, we have closing arguments, where quite honestly the State is going to be making their closing argument that I'm sure is going to have parts of it that the defendant is going to simply find annoying, wrong, incorrect, lying, disrespectful of him, and if he was already demonstrating to me at the very beginning of these proceedings that he didn't agree with my rulings and was going to act out, God only knows how he's going to react when the State starts making its closing argument and summing up what it believes the evidence is showing or not showing in this case." *Id.* at 104:07–21. Not wanting to risk any "further physical outburst of any kind by this defendant in the presence of the jury," *id.* at 105:07–09, the judge stated, I will not be dissuaded from having him in any less secure form than he is right now." *Id.* at 105:01–03.

Wilber's attorney objected, noting that Wilber's appearance in the wheelchair was "disturbing" and that there were constitutional problems with the restraints. *Id.* at 105:14–24. The trial court reminded counsel that Wilber had been admonished for his behavior and that the restraints had been progressive. *Id.* at 106:13–20. It explained that there is a precedent for taking these extra measures and described an incident that a defendant, who did not have any security measures on him at all, was shot and killed by law enforcement at the reading of a verdict in that courtroom. *Id.* at 107:20–23. The court determined that it was "taking the appropriate measures" in this case, "given this gentleman's behavior and his tone and tenor with the court." *Id.* at 108:05–09. Counsel again requested that the court proceed without the visible restraints and limit Wilber

11

to the restraints he wore prior to that day, noting that it was in his interest to avoid misconduct in front of the jury and reminding the court that Wilber had not engaged in any misconduct in front of the jury up to that point. *Id.* at 112:14–20. The court denied the request, noting that Wilber was someone who "by his own language and conduct" toward the court and court staff posed a security threat. *Id.* at 111:05–09. Shortly thereafter, the trial court instructed deputies to bring the jury into the courtroom. As they moved to do so, the prosecutor offered to see if his office had a sport coat or blazer that Wilber could wear, presumably to cover the visible restraints. *Id.* at 113:08–11. The trial court, without explanation, responded, "That's not necessary." *Id.* at 113:12. The jury thereupon entered the courtroom, and the closing arguments proceeded without incident. The court then directed the jury to begin deliberations. *Id.* at 197.

After closing arguments, Wilber moved for a mistrial based on the jury viewing him in restraints. Counsel argued that allowing the jury to view him in restraints violated his rights under the United States and Wisconsin constitutions. *Id.* at 199:06–15. The trial court denied the motion. The jury ultimately found Wilber guilty, and Wilber was sentenced to life in prison with the possibility of extended supervision after forty years.

Wilber filed a post-conviction motion, seeking a new trial on the grounds that the trial court erroneously allowed the admission of certain evidence not relevant to this petition and improperly ordered that Wilber be visibly restrained in a wheelchair during closing arguments. The postconviction court denied the motion, the Wisconsin Court of Appeals affirmed, and the Wisconsin Supreme Court denied Wilber's petition for review on December 9, 2008.

Following this court's stay of his § 2254 petition, Wilber filed a Wis. Stat. § 974.06 motion for postconviction relief, seeking physical and digital copies of the crime scene photographs the State used at trial, and asserting claims of newly discovered evidence and ineffective assistance of

12

defense and postconviction counsel. Wilber then amended the postconviction motion alleging that: (1) the evidence was insufficient to support his conviction; (2) trial counsel and postconviction counsel were ineffective; (3) newly discovered evidence proved that Fidel Muniz, a/k/a Ricky, admitted to the murder of Diaz; and (4) he was entitled to a new trial in the interest of justice. The postconviction court denied the motion without a hearing, the Wisconsin Court of Appeals affirmed, and the Wisconsin Supreme Court denied Wilber's petition for review.

## ANALYSIS

Wilber's petition for federal relief is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, a federal court may grant habeas relief only when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" decisions from the United States Supreme Court, or was "based on an unreasonable application of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite result as the Supreme Court on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an "unreasonable application of . . . clearly established federal law" when the court applied Supreme Court precedent in "an objectively unreasonable manner." *Id.*

A state court decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" when it is so clearly incorrect that it would not be debatable among reasonable jurists. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) ("If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." (internal quotations

13

and brackets omitted)).  The determination of a factual matter made by a state court is presumed to be correct, and that presumption can be overcome only by clear and convincing evidence. § 2254(e)(1); *Janusiak v. Cooper*, 937 F.3d 880, 888 (7th Cir. 2019) ("The petitioner must show by clear and convincing evidence that the findings were unreasonable.").  Although habeas courts cannot "second-guess the reasonable decisions of state courts," *Renico v. Lett*, 559 U.S. 766, 779 (2010), "deference does not imply abandonment of or abdication of judicial review . . . ." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) ("[A] decision involves an unreasonable determination of facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.").

This is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

### A. Sufficiency of the Evidence

Wilber claims that the evidence presented at trial was insufficient to constitutionally support his conviction.  If true, then unlike his other claims of constitutional error, he would be entitled to full and final relief.  This is because an "appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal." *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988). *Burks v. United States* held that when a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict,

the Double Jeopardy Clause bars a retrial on the same charge. 437 U.S. 1, 18 (1978). The same is true for collateral review under § 2254. "Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010). The court therefore turns first to Wilber's claim that the evidence was insufficient to support his conviction.

As a preliminary matter, Wilber argues that the Wisconsin Court of Appeals did not directly address his argument regarding sufficiency of the evidence, and as such, this claim is not subject to deference under AEDPA. The court of appeals undoubtedly adjudicated Wilber's sufficiency claim on the merits. The court explicitly noted that it rejected Wilber's sufficiency claim when discussing Wilber's postconviction discovery argument. Dkt. No. 61-11, ¶ 43 ("Because we have concluded that the evidence was sufficient . . ."). The court of appeals examined the evidence in the record, including testimony from multiple witnesses and the testimony of the investigator assigned to the case, and determined that the evidence was sufficient for conviction. *Id.*, ¶ 37. This is plainly an adjudication on the merits, and thus, the decision of the court of appeals is entitled to AEDPA deference.

### 1. Clearly established federal law governing sufficiency of evidence

In *Jackson v. Virginia*, the United States Supreme Court held that the relevant inquiry into a sufficiency of the evidence claim is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original). And while the court looks to Wisconsin law for the substantive elements of the crime, federal law governs the minimum amount of evidence required by the Due Process Clause. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam). With these standards in mind, the court may only

15

overturn the state court's finding of sufficient evidence if it was "objectively unreasonable." *Maier v. Smith*, 912 F.3d 1064, 1074 (7th Cir. 2019). This is not an easy standard to satisfy, and indeed, review under § 2254 "involves a double dose of deference: Federal courts defer to the state courts, which in turn defer to the jury." *London v. Clements*, 600 F. App'x 462, 466 (7th Cir. 2015). The Seventh Circuit has consistently characterized the *Jackson* standard as a "nearly insurmountable hurdle." *Winfield v. Dorethy*, 956 F.3d 442, 455 (7th Cir. 2020).

### 2. The Wisconsin Court of Appeals reasonably applied *Jackson*

Wilber argues that the court of appeals either unreasonably applied *Jackson* or relied upon objectively unreasonable findings of fact because it failed to consider evidence that Wilber believes "directly conflicts" with the court of appeals' decision. Namely, Wilber argues that the conviction is "so in conflict with the laws of nature" that no reasonable jurist could conclude that the conviction is consistent with the due process requirements of *Jackson*. Wilber draws from a variety of items in the record, primarily asserting that, based on where the victim was shot, where the bullet fragments were found, and where the victim fell, Wilber could not possibly have been the shooter. Dkt. No. 70, at 15–16.

The Wisconsin Court of Appeals' decision was not contrary to, or an unreasonable application of, the clearly established federal law set forth in *Jackson*, or an unreasonable determination of the facts. Although the court of appeals did not cite to the relevant cases such as *Jackson* and its Wisconsin analogue, *State v. Poellinger*, 451 N.W.2d 752 (Wis. 1990), the court of appeals engaged in the proper analysis. *See Adams v. Bertrand*, 453 F.3d 428, 432 (7th Cir. 2006) (noting that Wisconsin "effectively duplicates" the standard created by *Jackson*). So long as "neither the reasoning nor the result of the state-court decisions contradicts [United States

Case 1:10-cv-00179-WCG   Filed 08/04/20   Page 16 of 28   Document 82

Supreme Court precedent]," the state court need not cite the controlling federal case. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Here, the court of appeals described in detail the evidence supporting Wilber's conviction. This included not only the witnesses' testimony at trial, but also the inconsistent statements several had given to police during the investigation naming Wilber as the shooter. Dkt. No. 61-11 at ¶¶ 2, 5, 8, 9, 11. Under Wisconsin law, prior inconsistent statements, even when not under oath, constitute substantive evidence. *See* Wis. Stat. § 908.01(4)(a)1; *Vogel v. State*, 96 Wis. 2d 372, 386, 291 N.W.2d 838 (1980). The court also discussed the multiple witnesses who testified that Wilber was acting aggressively and violently prior to the shooting, testimony that indicated Wilber had a gun in his hand immediately after the shooting, testimony that supported the theory that the gunshot came from the direction in which Wilber was standing, and the investigator's testimony regarding various details about the house and where the victim's body was found in relation to those details. *Id.* at ¶ 37.

The court applied the standard announced in *Poellinger* that the court must affirm unless "the evidence, viewed most favorably to the state . . . is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt," 451 N.W.2d at 757–58, and therefore adhered to the standard in *Jackson*. The jury was entitled to credit and discredit certain testimony as it felt appropriate, and the court of appeals was required to give deference to the jury's decisions on such matters. While the court of appeals may not have explicitly reviewed every detail of the record in its opinion, the court of appeals undoubtedly reviewed the record and specifically described the evidence it thought was sufficient to sustain the conviction.

17

Notwithstanding the eye-witness evidence, Wilber argues that the physical evidence renders the State's theory of the case impossible. He contends, as his attorney did in his closing argument to the jury, that the location of Diaz's body at the entrance on the south side of the kitchen with his head to the north, the bullet fragments under the stove on the north wall of the kitchen, the medical examiner's testimony concerning the entrance and exit wounds, and the undisputed testimony placing Wilber inside the kitchen in front of Diaz at the time he was shot make it physically impossible for Wilber to have been the shooter. To be sure, this is not an unreasonable argument, but it is not dispositive. In response, the prosecutor cited testimony that Diaz was turning away at the time he was shot and noted the height discrepancies between Wilber and Diaz. With respect to the location of the bullets, the detective who examined the crime scene testified that bullets often do strange things when they hit something like bone or ricochet off floors, walls, or appliances. Based on his experience, he testified that forensic evidence often ends up in unexpected places. In this case, he found the bullet jacket on the kitchen table. Dkt. No. 61-20 at 52:19–53:03.

In sum, the court of appeals plainly followed the mandate of both *Jackson* and *Poellinger* and found, albeit implicitly, that a reasonable trier of fact could have found guilt beyond a reasonable doubt based on the evidence produced at trial. Wilber has not put forth "clear and convincing evidence that the findings were unreasonable." *Janusiak*, 937 F.3d at 888. While Wilber's evidence, on its own, may paint one picture, the court of appeals reviewed the record in its entirety and came to the reasonable conclusion that the evidence was sufficient to sustain the conviction. That is all that is required of it, and thus, Wilber is not entitled to relief on this claim.

18

**B. Use of Restraints**

Wilber argues that his visible shackling to a wheelchair at trial denied him his due process right to a fair trial. As an initial matter, Wilber argues that he is entitled to a *de novo* review of this claim because the state court did not adequately adjudicate the claim on the merits. Wilber asserts, in particular, that the Wisconsin Court of Appeals only addressed whether *additional* restraints were justified, not whether *visible* restraints were justified. Thus, Wilber contends AEDPA deference would be inappropriate here. The court of appeals, throughout its nine-page decision, indicated that it was addressing the visible restraint issue raised by Wilber and ultimately rejected Wilber's claim that the use of visible restraints denied him a fair trial. Dkt. No. 61-5, ¶ 40. In short, the court finds that the Wisconsin Court of Appeals decided the issue on the merits and will apply AEDPA deference to this claim. That means this court cannot grant relief under § 2254 unless the decision of the Wisconsin Court of Appeals affirming Wilber's conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**1. Clearly established federal law governing use of shackles**

Clearly established federal law prohibits forcing a defendant in a criminal trial to appear before a jury in shackles absent extraordinary reasons. In *Deck v. Missouri*, the United States Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. 622, 629 (2005). The reason for the rule is obvious: "visible shackling undermines the presumption of innocence and the related fairness of the factfinding process" and it suggests to the jury that the justice system itself sees a need to "separate a defendant from the community at large." *Id.* at 630 (citations

19

omitted).  The Court further noted in *Deck* that, historically, physical restraints were also forbidden because they could potentially interfere with the accused's ability to communicate with his attorney and their use was considered an affront to the dignity and decorum of judicial proceedings. *Id.* at 631.  As one court has observed, "[a] presumptively innocent defendant has the right to be treated with respect and dignity in a public courtroom, not like a bear on a chain."  *United States v. Sanchez-Gomez*, 859 F.3d 649, 661 (9th Cir. 2017) (en banc), *vacated as moot*, --- U.S. ---, 138 S. Ct. 1532 (2018).

*Deck* involved the shackling of a defendant during the punishment phase of a capital murder trial after the jury had already determined the defendant's guilt and the presumption of innocence no longer applied.  Notwithstanding this fact, the Court held that the same rule applied during the punishment phase: "The considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases."  *Id.* at 632.

Of course, the rule prohibiting visibly shackling a defendant during trial is not absolute.  In *Deck*, the Court acknowledged that there are cases where the perils of shackling are unavoidable:

> We do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations. We are mindful of the tragedy that can result if judges are not able to protect themselves and their courtrooms. But given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case.

*Id.*  The question presented in this case is whether the Wisconsin Court of Appeals reasonably applied this clearly established federal law in upholding the trial court's decision to visibly shackle Wilber during closing arguments.

20

### 2. The Wisconsin Court of Appeals unreasonably applied federal law

The Wisconsin Court of Appeals concluded the trial court did not erroneously exercise its discretion when it ordered Wilber to appear before the jury visibly restrained and bound to a wheelchair. It explained that the trial court "took great pains to explain its concerns and each level of security it imposed," and further concluded that the "record provid[ed] ample support for the trial court's conclusion that restraints were necessary to maintain order and ensure the safety of the participants." Dkt. No. 61-5, at ¶¶ 38, 40. It ultimately rejected Wilber's claim that the use of visible restraints denied him a fair trial. *Id.*, ¶ 40. While the court of appeals is entitled to AEDPA deference on this issue because it undeniably adjudicated the claim on the merits, its discussion as to why *visible* restraints were required was not only inadequate, but also an unreasonable application of federal law to the undisputed facts of the case.

The court of appeals noted that "the trial court discussed Wilber's behavior and the need for security at least eight times throughout the trial," and that "its comments on this matter were extensive, composing nearly fifty pages of the transcript." Dkt. No. 61-5 at ¶ 20. A careful review of the record, however, reveals no misconduct on the part of Wilber that justified the kind of visible restraints placed on him during closing arguments.

It is true that Wilber verbally protested the court's ruling just before the noon break on the third day of trial, complaining that all of the court's rulings were in favor of the State. Dkt. No. 61-20 at 116:14–24. He also used vulgarity, stating "You don't intimidate me with that shit, man" when the court ordered the deputies to remove him. *Id.* at 117:04–06. But the jury had already left for lunch, and his outburst in the courtroom, as inappropriate as it was, was entirely verbal. When court resumed after the noon break, the court asked him if he would be able to control himself going forward. Wilber replied: "Yeah, I'm all right. I'm all right." Dkt. No. 61-21 at

21

4:04–08.  The record reflects no further instances of courtroom misconduct by Wilber for the duration of the trial.

The only other instances of improper courtroom behavior reflected in the record over the seven-day trial were his nonverbal reactions to the court's rulings and the prosecutor's arguments for which the court admonished Wilber on the first day of trial.  Dkt. No. 61-17 at 4:18–21.  In other words, over the entire trial, the record reflects only two instances, one verbal and the other nonverbal, and both outside the jury's presence and early in the trial, when Wilber acted inappropriately.  This is not the kind of record that justifies visibly shackling a defendant before the jury.

In *Illinois v. Allen*, some thirty-five years before *Deck*, the Court recognized that shackling and gagging a defendant at trial was so offensive and prejudicial that it could be done only as a last resort.  397 U.S. 337, 344 (1970).  The contrast between the facts in *Allen* and those in this case demonstrate the degree to which the court of appeals' decision in this case deviates from clearly established federal law.

In *Allen*, the defendant, on trial for armed robbery, continued to talk, proclaiming that the appointed attorney was not going to act as his lawyer.  He told the judge, "When I go out for lunchtime, you're going to be a corpse here."  He then tore up his attorney's file and threw the papers on the floor.  The trial judge warned him, "One more outbreak of that sort and I'll remove you from the courtroom."  The warning had no effect.  The defendant continued to talk back to the judge, saying, "There's not going to be no trial, either. I'm going to sit here and you're going to talk and you can bring your shackles out and straight jacket and put them on me and tape my mouth, but it will do no good because there's not going to be no trial."  *Id.* at 340.  At that point, the judge ordered the defendant removed from the courtroom but told him he could return if he

22

behaved. The defendant agreed to behave, but when he returned, he became upset when his sister and friends were ordered out of the courtroom under a witness sequestration order. The defendant then announced, "There is going to be no proceeding. I'm going to start talking and I'm going to keep on talking all through the trial. There's not going to be no trial like this. I want my sister and my friends here in court to testify for me." *Id.* at 341. The trial judge again had the defendant removed. After this second removal, the defendant remained out of the courtroom during the presentation of the State's case-in-chief, except that he was brought in on several occasions for purposes of identification. During one of these latter appearances, the defendant responded to one of the judge's questions with vile and abusive language. After the prosecution's case had been presented, the trial judge reiterated his promise to the defendant that he could return to the courtroom whenever he agreed to conduct himself properly. The defendant gave some assurances of proper conduct and was permitted to be present through the remainder of the trial, principally his defense. His defense was of no avail, however, and the jury returned a verdict of guilty. On appeal, he claimed that the trial court had violated his Sixth Amendment rights by removing him from the courtroom. When his State appeal failed, he sought habeas relief in federal court.

In rejecting his challenge to his conviction, the Court concluded that the defendant's behavior "was clearly of such an extreme and aggravated nature as to justify either his removal from the courtroom or his total physical restraint." *Id.* at 346. The Court declined to adopt one approach over the other, explaining:

> Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself

something of an affront to the very dignity and decorum of judicial proceedings that
the judge is seeking to uphold.

*Id.* at 344. Here, of course, the trial court did not order Wilber gagged, but the use of shackles,

visible to the jury, conveyed the unmistakable message to the jury that Wilber was too dangerous

to be permitted even the use of his hands. Yet, the record in this case reflects none of the extreme,

persistent, and ongoing obstruction and abuse the court confronted in *Allen*.

Also missing in this case is any reasonable explanation as to why the visible restraints on

Wilber's hands and arms were suddenly needed just as the trial was coming to a close. It is clear

from the trial judge's comments that the added security was in reaction to the report from the

deputies that Wilber had "used absolutely inappropriate, vulgar, profane language" toward them

and engaged in a physical altercation with them in the back hallway leading to the lock-up earlier

that day. Dkt. No. 61-28 at 103:14–22. Up until that time there had been no record of inappropriate

behavior by Wilber since the brief verbal outburst just before the noon break on the third day of

trial. More importantly, the recent behavior reported by the deputies was not only outside the

presence of the jury, it was outside of the courtroom. At the time the court ordered the additional

restraint, there was no indication that once seated at counsel table with his feet shackled and

anchored to the floor, the stun belt around his arm, and virtually surrounded by deputies, Wilber

posed any threat to the safety of the judge, her staff or the public. And based on his behavior up

to that point and his continued hope for an acquittal, there was no reason to believe he would do

anything to cause the jury to fear or disdain him.

Also troubling is the fact that from some of the judge's comments it appears that the court

was to a large extent deferring to the Sheriff's deputies in ordering additional restraints. At the

end of the afternoon session on the third day of trial, for example, the court recounted its earlier

in-chambers comments regarding the additional security measures it had just implemented, stating

"I had indicated to the parties that I felt that that was necessary and appropriate, and I was going to abide by what the Sheriff's Department, particularly my two deputies who are assigned to this court and are charged with the safety of everyone in it, I would acquiesce to their -- to their judgment." Dkt. No. 61-21 at 149:14–21. Likewise, in response to the defense suggestion that the level of restraint be left as it was throughout the trial, the court stated, "Mr. Chernin, I'm going to deny that request. I -- I simply can't do that. I can't go against the advice of law enforcement or my own instincts and beliefs as to how -- why we're here and why it's warranted." Dkt. No. 61-28 at 110:19–14.

A trial judge cannot delegate the decision of whether and how a defendant is to be restrained to law enforcement or other correctional or security staff. "Of course, there is no constitutional prohibition on the trial court's giving significant weight to the view of law enforcement authorities as to the necessity of certain security measures." *Lopez v. Thurmer*, 573 F.3d 484, 493 n.4 (7th Cir. 2009). "[S]uch respect for the advice of those charged with protecting public safety is prudent." *Id.* But "the actual due process determination must be made by the judicial officer. Law enforcement officials hardly can be said to be neutral in balancing the rights of the defendant against their own view of necessary security measures." *Id.*; *see also Woods v. Theiret*, 5 F.3d 244, 248 (7th Cir. 1993) ("While the trial court may rely 'heavily' on the marshals in evaluating the appropriate security measures to take with a given prisoner, the court bears the ultimate responsibility for that determination and may not delegate the decision to shackle an inmate to the marshals."). To the extent the trial court delegated its responsibility for deciding the courtroom security issues here, it was error.

Other comments suggest that the trial judge viewed visibly shackling the defendant as punishment for what she perceived as disrespect. On the fifth day of the trial, for example, when

she again cautioned Wilber about his reaction to her rulings, the trial judge warned him, "You do it again, we are going to add additional restraints to you in front of the jury." Dkt. No. 61-24 at 47:11-13. And in announcing the additional restraints that were imposed just before the closing arguments, the court explained, "Wilber is responsible for his own predicament and for his own position, that is to be restrained and to have that obvious restraint being shown to the jury." Dkt. No. 61-28 at 100:08–12. Also weighing on the judge's mind was the tragic event that had occurred in the same courtroom one or two years earlier when a defendant had grabbed a court officer's gun during a trial, and shot and wounded him before the defendant himself was fatally shot by another deputy, though as counsel pointed out, the defendant in that case was not anchored to the floor. Dkt. No. 61-28 at 108:15–09:13. Neither of these considerations justified the additional restraints added just before closing argument.

Even if the record supported additional restraints on Wilber's wrists and arms, however, no explanation was offered as to why the restraints had to be visible to the jury. After all, the chief danger that the rule against shackling the accused is intended to guard against is the risk of prejudice that displaying a defendant in shackles to the jury creates. As the Seventh Circuit explained in *Stephenson v. Wilson*, "[e]ven when a visible restraint is warranted by the defendant's history of escape attempts or disruption of previous court proceedings, it must be the least visible secure restraint, such as, it is often suggested, leg shackles made invisible to the jury by a curtain at the defense table. (There should of course be a curtain at the prosecution table as well, lest the jury quickly tumble to the purpose of the curtain at the defense table.)" 619 F.3d 664, 668–69 (7th Cir. 2010); *see also Deck*, 544 U.S. at 634–45 ("Nor did [the trial judge] explain why, if shackles were necessary, he chose not to provide for shackles that the jury could not see—apparently the arrangement used at trial.").

26

Apparently realizing the need to hide the shackles, the prosecutor offered to find a sport coat that Wilber could wear presumably to cover the restraints before the jury was brought into the courtroom. Dkt. No. 61-28 at 113:08–11. Without explanation, the trial court responded, "That's not necessary." *Id.* at 113:12. The court of appeals, in affirming Wilber's conviction, likewise offered no reason why the restraints needed to be visible to the jury. Absent any explanation for displaying Wilber to the jury in such a manner, the state court's decision must be seen as contrary to, or an unreasonable application of, clearly established federal law.

Finally, Respondent asserts that even if the visible use of shackles during closing argument violated Wilber's constitutional rights, he is not entitled to relief because he has failed to show any prejudice. Respondent contends that it is Wilber's burden to show prejudice and, given the strength of the State's case against him, he is unable to do so. Respondent is wrong on both points. The burden of showing prejudice is not on Wilber, and the State's case was not overwhelming.

*Deck* held that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" 544 U.S. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Thus, the burden of proving prejudice is not Wilber's. Instead, the State must prove that visibly shackling Wilber during closing argument did not contribute to his conviction. And as the discussion of Wilber's claim concerning the sufficiency of the evidence shows, Respondent cannot meet his burden. Given the inconsistent testimony of the eyewitnesses and the physical evidence suggesting Wilber could not have fired the fatal shot, the error may well have contributed to Wilber's conviction. His petition for relief under § 2254 must therefore be granted.

27

**CONCLUSION**

For the reasons set forth above, the court concludes that Wilber is entitled to relief under § 2254.  Wilber's petition for relief under 28 U.S.C. § 2254 is therefore **GRANTED**, and he is ordered released from custody unless, within 90 days of the date of this decision, the State initiates proceedings to retry him.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 4th day of August, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge